IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

GUIDANCE ENDODONTICS, LLC,
a New Mexico Limited Liability Company,

       Plaintiff,

vs.                              No. CIV 08-1101 JB/RLP

DENTSPLY INTERNATIONAL, INC.
a Delaware Business Corporation, and
TULSA DENTAL PRODUCTS, LLC,
a Delaware Limited Liability Company,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Application for Temporary Restraining Order, filed November 21, 2008 (Doc. 2)("TRO Application"). The Court held evidentiary hearings on November 25 and 26, and on December 1, 5 and 8, 2008. The primary issue is whether the Court should enter a temporary restraining order ("TRO") requiring Defendants Dentsply International, Inc. and Tulsa Dental Products, LLC, to immediately commence manufacture, and thereafter ship without delay, two outstanding purchase orders that the Defendants received. Because Plaintiff Guidance Endodontics, LLC has carried its burden with respect to one aspect of the requested TRO, which the Court concludes is not a disfavored form of relief, the Court will grant the TRO Application in part. Because, however, part of the requested relief is mandatory and alters the status quo, and because Guidance has not carried its burden on this disfavored relief, the Court will also deny the TRO Application in part.

## FACTUAL BACKGROUND

This case concerns an action that Guidance has brought against the Defendants for breach

of contract and unfair trade practices.  Guidance, like the Defendants, sells endodontic equipment.  Following a lawsuit and settlement, however, the Defendants became the exclusive manufacturer of Guidance products, and Guidance also received access to certain endodontic supplies it had never before been able to sell.  This arrangement worked well for a short time, but soon ran into trouble.  The Defendants ceased providing certain supplies to Guidance, asserting that Guidance had been informing potential and existing customers that the Defendants were manufacturing Guidance's product, in breach of the confidentiality provisions in their contract.  Guidance denies any wrongdoing, and asserts that the Defendants are the ones in breach of the contract because of their failure to provide supplies and because of what Guidance alleges are unreasonable and unprecedented demands for engineering drawings for the development of a new product.  Guidance believes that the Defendants, whose endodontic supplies empire is vastly larger than Guidance's slim slice of the market, are attempting to drive Guidance out of business.  Guidance, fearing that it is on the verge of financial ruin, filed this lawsuit and seeks a TRO to prevent the Defendants from continuing to breach their agreement with Guidance.

### 1.     Guidance, Dentsply, and the Market for Endodontic Instruments.

Endodonists specialize in root canal therapy and root canal surgery, and use their special training and experience to treat difficult cases that general dentists refer to them.  See Verified Complaint and Demand for Jury Trial ¶ 9, at 3, filed November 21, 2008 (Doc. 1)("Complaint").  This specialized practice requires specialized tools, including three basic tools: (i) obturators; (ii) files, and (iii) ovens.  See id.  During a root canal, after the nerve is removed from the tooth, files are used to shape the tooth canal.  The obturator is used to fill the tooth canal, and the oven heats the obturator to prepare for this operation.  See id. ¶ 109, at 22.  All three instruments thus work together and are key to any endodontist's practice.

Most dentists maintain a limited inventory of endodontic instruments.  They expect their endodontic supplier to ship promptly.  See Declaration of Charles J. Goodis in Support of Plaintiff's Application for Temporary Restraining Order ¶ 34, at 8, filed November 21, 2008 (Doc. 5)("Goodis Decl.").  Dr. Charles J. Goodis, Guidance's founder and chief executive officer, estimates that approximately 50,000 dentists use endodontic products in their practices.  See id. ¶ 18, at 4.  Dr. Goodis estimates that 5,000 of these users are large-volume users, such as HMOs or corporate practices with multiple offices.  See id. at 4-5.  The market for obturators alone is worth approximately fifty million dollars.  The total domestic endodontics market is approximately $300 million per year.  See id. ¶ 15, at 4.

Guidance is a company that Dr. Goodis founded in September 2004.  See id. ¶ 4, at 2.  Dr. Goodis invested seven million dollars of his money in Guidance.  See id. ¶ 5, at 5.  Guidance currently has three full-time employees in addition to Dr. Goodis.  See id.  Guidance currently has about 5,400 customers.  See id. ¶ 15, at 4.   Using his training and experience as an endodontist and as a mechanical engineer, Dr. Goodis developed several innovative endodontic products for Guidance, including: (i) the V-Taper NiTi Rotary File ("V-Taper"); (ii) the EndoTaper 06 NiTi Rotary Files ("EndoTaper"); (iii) the OneFill Obturation System ("OneFill Obturator"); and (iv) the Guidance Obturator Oven.  See Goodis Decl. ¶¶ 5-7, at 2; Complaint ¶¶ 10, 16-18, at 3-4.  Most recently, Dr. Goodis has begun developing the V2 04 Taper File ("V2").  See id. ¶ 8, at 2.

Dentsply is a public company that has been in existence for over one-hundred years and has thousands of employees.  It supplies approximately eighty percent of the endodontic products sold annually in the United States and Canada, and holds itself out as the largest manufacturer of products for the dental market, with annual sales over $2.3 billion.  See id. ¶ 13, at 4.

**2.    Dentsply Becomes Guidance's Manufacturer.**

Guidance's initial manufacturer was a French company known as Micro-Mega.  See Complaint ¶ 12, at 4.  In July 2007, Dentsply initiated an investigation against both Guidance and Micro-Mega before the United States International Trade Commission (the "ITC case").  Dentsply dropped the ITC case in February 25, 2008, apparently after Micro-Mega and Dentsply reached an agreement.  See id. ¶ 38, at 8.  On January 24, 2008, Dentsply commenced a patent infringement lawsuit against Guidance in the United States District Court for the Middle District of Pennsylvania. See id. ¶ 39, at 9.  Guidance and Dentsply settled that case on July 29, 2008.  See id.  As consideration for the settlement, Guidance and Dentsply entered into the Manufacturing and Supply Agreement ("Supply Agreement").  See id. ¶ 41, at 9.  Guidance has already spent more on legal fees defending itself in the ITC case and the patent case than it has made in net profit since opening its doors four years ago.  See id. ¶ 120, at 24.  In addition to being a competitor of Guidance, the Defendants are also Guidance's sole and exclusive manufacturer under the Supply Agreement.

**3.    Guidance's Purchase Orders.**

After the parties executed the Supply Agreement on July 29, 2008, Guidance submitted its initial orders for endodontic products, which the Defendants promptly filled.  Specifically, the Defendants filled a July 30, 2008 purchase order for OneFill Obturators, which Guidance received less than thirty days later on August 26, 2008.  See Exhibit 4 to Complaint, Guidance Endodontics Purchase Order (Doc. 1-3).

Likewise, on July 29, 2008, Guidance submitted a purchase order for EndoTapers, and Guidance received a partial shipment of EndoTapers on September 30, 2008 -- thirty days later -- and additional shipments fully satisfying the order on October 17 and October 21, 2008.  This TRO

involves two purchase orders made more than two months ago.[1]  See Complaint ¶ 135, at 26. Guidance gave the Defendants two subsequent orders: (i) a second purchase order sent to and received by the Defendants on July 30, 2008 for OneFill Obturators (order # DENT 100108 – the "Obturator Order") for eventual shipment to Guidance during the fourth calendar quarter; and (ii) an order sent to and received by the Defendants on September 2, 2008 for V2 endodontic files (order # DENT 100308 – the "V2 Order"), also for shipment to Guidance during the fourth quarter.  See Complaint ¶¶ 58, 92, at 13, 19.

One of the Defendants' customer-service representatives subsequently confirmed to Guidance that the Obturator Order would be shipped on November 13, 2008.  See id. ¶ 60, at 13. In two letters dated September 25, 2008, however, the Defendants stated that they did not intend to fill the Obturator Order.  See id. ¶¶ 60-68, at 13-15.  One letter stated that Guidance's marketing was in violation of the Supply Agreement because, among other things, Guidance was disclosing that the Defendants made Guidance files and obturators, and that their products were the same.  See Complaint ¶ 62, at 13-14.

On or about September 2, 2008, Guidance submitted "product specifications" for the V2, and a prototype acceptable to Guidance was developed at the plant.  Id. ¶¶ 92, 102, at 19, 21. Subsequently, senior management advised Guidance that, to fill the V2 Order, Guidance must provide detailed "engineering drawings."  Because Guidance had not done so, the Defendants, in

---

[1] Guidance also includes in its request for relief a demand that the Defendants commence processing additional purchase orders that the Defendants received after Guidance filed its suit, but before the end of November.  While Guidance may need those products for the next quarter, it does not need them within the next ten days.  Accordingly, Guidance has not made an adequate showing of its entitlement to a temporary restraining order, and the Court will deny Guidance's application on these new orders.  Guidance may seek relief for these new orders as part of the relief it seeks in a motion for preliminary injunction.  The Court will not, however, consider these two new orders on this application.

two separate communications, refused to acknowledged receipt of the V2 Order, and refused to manufacture or ship it to Guidance.  See id. ¶¶ 91-98, at 19-21.

    **4.**    **The Dispute Over the Development of the V2.**

To develop the V2, which is a new product, Guidance provided product specifications to the Defendants' employees at their Johnson City, Tennessee plant.  In connection with the first two prototypes of the V2, Guidance submitted "product specifications" by  communicating written, technical parameters for the products to the Defendants, and speaking with project managers at the plant to develop the prototypes.  Complaint ¶ 102, at 21.  The Defendants, in turn, made prototypes of the V2 for Guidance.  The prototypes of endodontic instruments are usually produced through a combination of written product specifications that the instrument's designer provided, and through collaborative discussions and electronic correspondence between the designer and manufacturer -- in this case, between Guidance and the plant.  See id. ¶ 106, at 22.  In September 2008, Dr. Goodis froze the V2 design, but later decided to continue with more modifications.  On September 24, 2008, William Newell, vice president and general manager of Tulsa Dental, on behalf of the Defendants, informed Guidance that detailed engineering drawings were needed before the V2 would be ready for manufacturing.  See id. ¶ 96, at 20.

Dr. Goodis testified that the Defendants never required him to submit any drawings during the development of the EndoTaper, the first instrument on which Guidance and the Defendants had worked together.  Instead, Dr. Goodis supplied specifications, and the process went through several rounds of prototypes, with each round producing hundreds of prototypes in several different sizes, often a thousand or more prototypes per round.  See Transcript of TRO Hearing at 83:13-21 (taken November 26, 2008)(Doc. 26)(Goodis)("II Tr.").  These prototypes were fully functional files that could be used.  See id. at 84:17-85:8 (Kelly & Goodis).  They were prototypes, because it was not

certain whether a specific prototype design would be the final one.  See id. at 85:9-13.

Newell explained that freezing a design meant that the frozen design would be the design used for manufacturing.  See II Tr. at 160:5-24 (Gulley & Newell).  Newell testified that Tulsa Dental would manufacture only products whose design was frozen, to ensure quality and that all details were considered.  See id. at 160:21-161:5.  The prototype phase was a stage along the road to freezing a design.  Before the design would be frozen, detailed engineering drawings and tolerances were required.  See id. at 161:10-162:6.  Newell stated that manufacturing from a prototype was possible, but was against Tulsa Dental's policies and quality control.  See id. at 161:10-14.

Newell testified that he was aware of the e-mail exchange he had with Dr. Goodis, that Dr. Goodis promised to provide drawings, but that, to Newell's knowledge, Dr. Goodis never provided them.  See id. at 162:17-25.     On cross-examination, Newell testified that he was not aware whether it was Guidance or Dentsply that provided the mechanical drawings annexed to the Supply Agreement.  See id. at 180:22-181:3 (Bisceglie & Newell).  Newell testified that he had not checked to see if Tulsa Dental had sent Guidance prototypes of the V2 before he sent an e-mail requesting that Guidance supply detailed mechanical drawings.  See id. at 183:3-184:19.  Newell was not aware whether Tulsa Dental would manufacture prototypes without detailed mechanical drawings.  See id. at 185:1-9.  While Newell testified that Guidance was the only wholesale customer from which he had requested drawings during his tenure with the Defendants, he also stated that Guidance was the only customer with which Tulsa Dental had worked with in developing new instruments.  See id. at 187:5-22.  Newell also admitted that he did not know whether Guidance had provided drawings before or whether Guidance would be able to provide drawings.  See id. at 188:3-12.  Newell testified that, based on information from Tulsa Dental employees, the V2 was not complete

and ready for manufacture.  See id. at 190:14-22.

### 5.    **Guidance's Alleged Breach.**

The Defendants decided to discontinue supplying Guidance with obturators based on what they considered objectionable statements made by Guidance's sales representatives and in Guidance's brochures and marketing materials.  See Complaint ¶¶ 61-72, at 13-16.  Guidance's only sales representative, John Ferone, has denied making any of the objectionable statements that the Defendants alleged.  See Declaration of John P. Ferone in Support of Application for Temporary Restraining Order, filed November 21, 2008 ¶¶ 2, 7-21, at 1-5 (executed November 20, 2008)(Doc. 6)("Ferone Decl.").  As soon as Guidance received the Defendants' September 25, 2008 letter, Guidance took action to resolve the Defendants' concern by removing the offensive language from its promotional material.  Guidance ceased distributing the objectionable materials, removed them from its website, made revisions to both the website and brochures, and instructed its only sales representative to avoid making statements that could be construed as inconsistent with the Supply Agreement.  See Complaint ¶ 79, at 17; Ferone Decl. ¶¶ 21, 25-26, 29-30, 34-35, at 5-7. Guidance's revised marketing materials have been on Guidance's website for nearly a month, and the Defendants' have expressed no objection to them in their current form.  See Complaint ¶ 90, at 19.

In a letter dated October 1, 2008, Guidance informed the Defendants of its intention to cure. See id. ¶ 80, at 17.  Notwithstanding Guidance's efforts, the Defendants again by letter refused to "confirm or acknowledge receipt" of the Obturator Order "for the reasons already communicated." Id. ¶ 83, at 18.  On October 7, 2008, Guidance, through its patent attorneys, once again informed the Defendants of Guidance's curative measures, including that Guidance would revise its promotional materials to accommodate the Defendants' concerns.  See id. ¶ 84, at 18.  On October 14, 2008, the Defendants informed Guidance that its "conduct is such that there is no way to cure the impacts of

it in the market" and that "the only appropriate action at this point in time is to discontinue supplying Guidance with the obturator product." Id. ¶¶ 86-88, at 18-19.

Newell testified that the Defendants believed Guidance's marketing tactics were in breach of the Supply Agreement.  Newell outlined two major concerns: (i) that Guidance was telling customers that Dentsply was manufacturing product for Guidance; and (ii) that Guidance was telling customers and clinicians that Guidance instruments were identical to Dentsply and Tulsa Dental instruments.  See II Tr. at 166:1-22 (Gulley & Newell).  Newell stated that he interpreted section 9.1 of the Supply Agreement, the confidentiality clause, to allow Guidance to disclose that it had a license for Dentsply patents, but that this provision did not apply to potential customers.  See 168:3-15.

### 6.   <u>Consequences for Guidance</u>.

Guidance's customers are waiting for the launch of the V2 and shipment of OneFill Obturators.  Guidance's customers anticipate receiving their next shipment from Guidance in December 2008.  See Complaint ¶ 113, at 23; Goodis Decl. ¶¶ 32-34, at 8.  If Guidance is unable to ship because of the Defendants' refusal to manufacture, Guidance's customers will run out of inventory.  See Goodis Decl. ¶ 34, at 8.

Guidance's inventory of OneFill Obturators will run out by December 1, 2008.  See id. ¶ 32, at 8.  Guidance believes the Supply Agreement prohibits it from using a manufacturer other than the Defendants and, in any event, the lead times to do so would make the option untenable given the harm that will occur absent shipment over the next few weeks.  See id. ¶ 28, at 7.

If Guidance is unable to fill customers' current outstanding orders during December, the customers will run out of product, and will have no choice but to switch to other suppliers, including to the Defendants.  Given that the Defendants are the only other supplier of endodontic products in

Guidance's price and quality range, customers whose orders cannot be filled by Guidance will likely turn to the Defendants for the purchase of their obturators, files, and ovens.  See id. ¶ 36, at 8.

Guidance believes that it risks losing customers, goodwill, and unique business opportunities. If Guidance is unable to meet its customers' needs, it will lose their goodwill and trust, and they are likely to switch permanently to other suppliers because of the importance of dependability in the endodontic world.  See id. ¶¶ 37-38, at 8-9.  The next two years are an important time period for the endodontic instrument business generally.  Certain of the Defendants' key obturator patents will expire over the next several years.  As a consequence, there will likely be additional entrants into the endodontic instrument marketplace, and Guidance will need a stable customer base to survive. See id. ¶ 40, at 9.  Moreover, Guidance believes that, without more supplies, it will not only have to abandon plans to expand over the coming years, but will be forced out of business.  See id. ¶ 42, at 9-10.

## PROCEDURAL BACKGROUND

Guidance filed its Complaint on November 21, 2008, and filed its TRO Application the same day.  Before filing, Guidance's counsel contacted the office of Dentsply's General Counsel in York, Pennsylvania, and informed the General Counsel's assistant that Guidance was bringing a lawsuit and applying for a TRO.  See TRO Application ¶ 13, at 4.  At the time of filing, Dentsply had not responded.  Guidance anticipated -- correctly -- that the Defendants would oppose its application. Thomas P. Gulley appeared at the initial scheduled TRO hearing on behalf of the Defendants, and the Court conducted all evidentiary hearings with both parties represented.

Guidance requests, pursuant to rule 65 of the Federal Rules of Civil Procedure, that the Court enter a TRO "requiring Defendants . . . to immediately commence manufacture, and thereafter ship without delay, two outstanding Guidance purchase orders that Defendants received more than two

months ago, and to commence processing two additional purchase orders that Defendants will receive before the end of November." TRO Application at 1. Guidance contends that its customers keep "only a 1-3 week reserve of endodontic products . . . . [and if] the customers run out of product, [they] will have no choice but to switch to other suppliers, including Defendants." Id. ¶ 7, at 2. "Absent new product from Defendants, delivered in December," Guidance maintains, it "will likely lose its customers, its reputation, its goodwill, and the unique opportunity it currently has to significantly grow its business." Id. ¶ 8, at 2.

According to Guidance, if the Court orders the Defendants to commence manufacturing immediately, Guidance will be able to meet customer orders before their supplies are exhausted, thereby avoiding irreparable injury. See id. ¶ 10, at 3. Guidance states that it will soon move for a preliminary injunction, but "that the passage of even one week without a mandatory order directing Defendants to commence manufacturing will result in irreparable injury." Id. ¶ 12, at 3. Guidance thus requests that the Court enter an order "requiring Defendants to immediately commence filling all outstanding Guidance orders that have been or will be placed, and to do so without unnecessary delays (including novel "engineering drawing" requirements)." Id. at 4. Guidance also requests that the Court not require security because the "Supply Agreement provides for compensation to the Defendants in return for manufacturing product." Id. ¶ 14, at 4.

At the first hearing, Mr. Gulley argued that Guidance had failed to abide by the Supply Agreement's mediation clause. See Transcript of TRO Hearing at 5:6-13 (taken November 25, 2008)("Gulley")(Doc. 25)("I Tr."). Mr. Gulley contended that Guidance "knew by late September that the [D]efendants were not going to supply the products at issue" here, but "took no steps toward mediation." Id. at 5:23-6:1. Mr. Gulley also maintained that Guidance was obligated to provide engineering drawings and specifications for the V2, but had failed to do so, and that Guidance was

aware of this problem at least as early as September 24, 2008, two months before the filing of the Complaint and TRO Application.  See I Tr. at 6:10-7:17 (Gulley).  Mr. Gulley stated that safety concerns also motivated the Defendants' actions.  According to Mr. Gulley, without the engineering drawings, a safe V2 cannot be produced.  See id. at 11:3-12:24 (Gulley & Court).  Mr. Gulley also stated that the Defendants took the position that Guidance was in breach of the Supply Agreement because Guidance was informing people that Guidance was getting obturators from the Defendants. See id. at 13:16-16:22.

John J. Kelly, Guidance's attorney, argued that the Court could issue a TRO, and later an injunction, despite the mediation clause because the injunction would make mediation a viable remedy.  Mr. Kelly also argued that the mediation clause was not binding and that Guidance was willing to mediate, but needed a TRO and an injunction to be able to proceed with mediation without going out of business.  See I Tr. at 43:21-47:25.

The Court heard testimony from Dr. Goodis on the first and second day of the evidentiary hearing.  The Court also heard testimony from Newell on the second day of the hearing.  At the end of the second day of hearings, the Court expressed its concerns about issuing a TRO without the parties making some good faith efforts to begin mediation.  The Court heard continued testimony from Newell on December 1, 2008, the third day of the hearing.  The Court then heard continued testimony from Dr. Goodis on December 5, 2008, the fourth day of the hearing.  At the end of the fourth day, the Court heard testimony from Gary Higley, a Dentsply sales employee, and Marcie Littleton, an employee of the Defendants who worked in their Johnson City plant on the V2 process. On the fifth and final day of the evidentiary hearing, December 8, 2008, the Court heard testimony from Dr. William T. Henson, an endodontist from Dallas, Texas, and a consultant with Dentsply. The Court then heard testimony from Nathan Roy, a Dentsply employee based in Brunswick,

Canada.   Finally, the Court heard rebuttal testimony from Sharon Bettes-Grove, Guidance's operations manager.  The Court heard additional argument from counsel and took the matter under advisement.

Over the course of the hearings, in addition to the exhibits submitted during the hearing, the parties have also filed several other documents with the Court.  Guidance filed several brochures for its products.  See Guidance Brochures, filed December 1, 2008 (Docs. 12-14).  Guidance also submitted a memorandum of law in support of its TRO Application, see Plaintiff's Memorandum in Support of Application for Temporary Restraining Order, filed November 21, 2008 (Doc. 4)("Memo. in Support"), and another addressing the standards governing preliminary relief in the Tenth Circuit, see Plaintiff's Bench Memorandum Concerning Temporary Restraining Order and Preliminary Injunction Standards, filed December 5, 2008 (Doc. 21).  Finally, the Defendants' submitted their written opposition to the TRO.  See Defendants' Summary of Salient Points in Opposition to Issuance of a Temporary Restraining Order, filed December 5, 2008 (Doc. 22)("TRO Opposition").

## LAW REGARDING PRELIMINARY RELIEF

The requirements for the issuance of a TRO are similar to those for the issuance of a preliminary injunction.  See 13 J. Moore, Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004).  The primary difference between a TRO and a preliminary injunction is that a TRO may issue without notice to the opposing party and that a TRO is of limited duration:

> **(1) Issuing Without Notice.** The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
> > **(A)** specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

> **(B)** the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.
>
> **(2) Contents; Expiration.** Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry — not to exceed 10 days — that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.

Fed. R. Civ. P. 65(b)(bolded in original).

Injunctive relief is an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted.   Leviton Mfg. Co., Inc. v. Nicor, Inc., No. CIV 04-0424 JB/RHS, CIV 04-1295 JB/ACT, 2007 WL 505796 (D.N.M.)(Browning, J.)(citing Greater Yellowstone Coalition v. Flowers, 321 F .3d 1250, 1256 (10th Cir. 2003)). The Supreme Court and the United States Court of Appeals for the Tenth Circuit have explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can beheld."  Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981). See Keirnan v. Utah Transit Auth.,339 F.3d 1217, 1220 (10th Cir. 2003)("'In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.'")(quoting Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986)).

To establish its right to preliminary relief, a moving party must demonstrate: "(1) the movant will suffer irreparable harm unless the injunction issues; (2) there is a substantial likelihood the movant ultimately will prevail on the merits; (3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and (4) the injunction would not be contrary to the public interest."  Wyandette Nat'l v. Sebelius, 443 F.3d at 1254-55 (quoting Kiowa

-14-

Indian Tribe of Okla. v. Hoover, 150 F.3d 1163,1171 (10th Cir. 1998)).  If the moving party

demonstrates that the first, third, and fourth factors "tip strongly in his favor, the test is modified,"

and the moving party "may meet the requirement for showing success on the merits by showing that

questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue

for litigation and deserving of more deliberate investigation."  Okla. ex rel. Okla. Tax Comm'n v.

Int'l Registration Plan, Inc., 455 F.3d 1107, 1113 (10th Cir. 2006)(quotation marks omitted).

There are, however,

> three types of specifically disfavored preliminary injunctions [for which] a movant
> must "satisfy an even heavier burden of showing that the four [preliminary
> injunction] factors . . . weigh heavily and compellingly in movant's favor before such
> an injunction may be issued": (1) preliminary injunctions that alter the status quo;
> (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford
> the movant all the relief that it could recover at the conclusion of a full trial on the
> merits.

O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004)

(en banc)("O Centro Espirita"), aff'd 546 U.S. 418 (2006).  Courts in the Tenth Circuit "must

recognize that any preliminary injunction fitting within one of the disfavored categories must be

more closely scrutinized to assure that the exigencies of the case support the granting of a remedy

that is extraordinary even in the normal course."  Id.  "[M]ovants seeking such an injunction are not

entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard. Instead, a

party seeking such an injunction must make a strong showing both with regard to the likelihood of

success on the merits and with regard to the balance of harms . . . ."  Id. at 976.

**1.      Disfavored Injunctions.**

Two categories of disfavored relief are relevant here: (i) injunctive relief that would alter the

status quo; and (ii) mandatory injunctive relief.

-15-

a.      **Injunctions Altering the Status Quo.**

Preliminary injunctions that alter the status quo between parties are disfavored and subject to a heightened standard of review.  The "historic purpose" of a preliminary injunction is "the preservation of the status quo pending a trial on the merits."  O Centro Espirita, 389 F.3d at 977 (Murphy, J.).  "[T]he status quo is the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing."  Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1155 (10th Cir. 2001)(internal quotation marks omitted).  "In determining the status quo for preliminary injunctions, [a] court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights."  Id.  In Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., EchoStar had been activating Dominion satellite customers even when they did not meet the criteria -- known as the QRS criteria -- that would obligate EchoStar to perform the activation.  The Tenth Circuit therefore held that

> the last uncontested status of the parties was the four years in which EchoStar activated Dominion subscribers regardless of whether the subscriber had met the QRS criteria. Even if EchoStar had the *legal* right under the contract to refuse activating new, non-QRS Dominion subscribers, the *reality* was that EchoStar activated Dominion subscribers whether or not they qualified for QRS status.

Id. (emphasis in original).  The Tenth Circuit has declined to adopt the standard that the status immediately preceding the application for a preliminary injunction is the status quo because such an approach

> would imply that any party opposing a preliminary injunction could create a new status quo immediately preceding the litigation merely by changing its conduct toward the adverse party.  To treat such a new status quo as the relationship which an injunction should not disturb would unilaterally empower the party opposing the injunction to impose a heightened burden on the party seeking the injunction.

Id.

### b. __Mandatory Injunctions__.

"There is no doubt that determining whether an injunction is mandatory as opposed to prohibitory can be vexing." O Centro Espirita, 389 F.3d at 1006. Despite overlap between the categories of what is mandatory and what disturbs the status quo, the Tenth Circuit has recognized the two forms of disfavored injunctions as being distinct. See id. ("[T]he distinction between mandatory and prohibitory injunctions, however, cannot be drawn simply by reference to whether or not the *status quo* is to be maintained or upset.")(quoting Abdul Wali v. Coughlin, 754 F.2d 1015, 1025-26 (2d Cir. 1985), overruled on other grounds by O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 n. 2 (1987)). Mandatory injunctions are those injunctions that "affirmatively require the nonmovant to act in a particular way, and as a result they place the issuing court in a position where it may have to provide ongoing supervision to assure that the nonmovant is abiding by the injunction." SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1099 (10th Cir. 1991). In SCFC ILC, Inc. v. Visa USA, Inc., the Tenth Circuit noted in a footnote that the injunction at issue was mandatory because "it required Visa to take the affirmative step of approving issuance of the new cards, even though in this particular case that would not have required a substantial amount of court involvement in assuring that Visa complied with its terms." Id. n. 6.

In contrast, the Tenth Circuit held the injunction in Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., which required EchoStar to continue activating Dominion subscribers, was non-mandatory. The Tenth Circuit noted that "the injunction . . . prohibits EchoStar from refusing to activate new Dominion customers on the same terms and conditions previously applicable. It does not compel EchoStar to do something it was not already doing during the last uncontested period preceding the injunction." 269 F.3d at 1055.

The Tenth Circuit held the injunction in O Centro Espirita to be non-mandatory, despite the

government's protests that the injunction contained "36 separate provisions requiring specific affirmative action by the government to facilitate the UDV's use of hoasca." 389 F.3d at 1005 (internal quotation marks omitted).[2]  In finding the injunction prohibitory, the Tenth Circuit noted that "the additional provisions were added to the injunction by the district court in response to the government's insistence that the UDV be subject to some form of governmental oversight in its importation and use of *hoasca*." Id. (italics in original).  The Tenth Circuit noted that the original injunction:

> temporarily prohibits the government from treating the UDV's sacramental use of hoasca as unlawful under the CSA or the treaty. It also orders the government not to intercept or cause to be intercepted shipments of hoasca imported by the UDV for religious use, prosecute or threaten to prosecute the UDV, its members, or bona fide participants in UDV ceremonies for religious use of hoasca, or otherwise interfere with the religious use of hoasca by the UDV, its members, or bona fide participants in UDV ceremonies. . . .

Id. (quotation omitted).

### 2.    **Irreparable Harm.**

The Tenth Circuit has acknowledged several different economic losses under the irreparable harm standard.  The Tenth Circuit has acknowledged that loss of customer goodwill is a factor that supports an irreparable harm determination.  See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 356 F.3d at 1263.  Many other cases have found that loss of goodwill is an irreparable harm.  For example, in Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546 (4th Cir. 1994), the United States Court of Appeals for the Fourth

---

[2] Hoasca is a liquid tea-like mixture that Uniao do Vegetal ("UDV"), a religious movement that originated in Brazil, uses as a sacramental drink.  Hoasca is made from two plants indigenous to Brazil, psychotria viridis and banisteriposis caapi.   Psychotria viridis contains dimethyltryptamine, a hallucinogenic controlled substance.  See O Centro Espirita, 389 F.3d at 975 n.1.  UDV had sought a preliminary injunction prohibiting the United States government from enforcing controlled-substance laws against UDV.

Circuit held that, "when the failure to grant preliminary injunction creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." Id. at 552. Similarly, the United States Court of Appeals for the Sixth Circuit in Basicomputer Corp. v. Scott, 973 F.2d 507 (6th Cir. 1992), held that "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." Id. at 511-12 (citations omitted). See Ferrora v. Associated Materials, Inc., 923 F.2d 1441, 1449 (11th Cir. 1991).

In Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12 (1st Cir. 1996), the United States Court of Appeals for the First Circuit considered a case similar to the one before the Court. In Ross-Simons of Warwick, Inc. v. Baccarat, Inc., a manufacturer refused to supply goods to a vendor, even though customers had already ordered the goods from the vendor and were expecting them. The First Circuit held that "[t]he harm to [the vendor's] general goodwill stemming from its inability to fill such orders . . . would be incalculable, and, thus, irreparable." Id. at 19 n.7 (citing cases).

The Tenth Circuit has also acknowledged that the loss of an opportunity to distribute a unique product, diminished competitive position, and loss of customers all support an irreparable harm determination. See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 356 F.3d at 1263. In a comparable case, CPM Indus., Inc. v. Fayda Chemicals & Minerals, Inc., No. 15966, 1997 WL 762650, 1997 Del. Ch. LEXIS 175 (Del. Ch. 1997), the Delaware Chancery Court acknowledged that a company's inability to supply a product, even if it were temporary, could result in a permanent competitive disadvantage. In CPM Indus., Inc. v. Fayda Chemicals & Minerals, Inc., the plaintiff sought a preliminary injunction against a competitor to ensure its continued supplies of $Ti0_2$ (Titanium Dioxide). The competitor had arranged to cut off the plaintiff's supply of $Ti0_2$,

which was the plaintiff's sole product and source of income.  The Delaware Chancery Court explained that the plaintiff was likely to suffer irreparable harm if the preliminary injunction was not issued, because the "[plaintiff] cannot compete effectively if [its] customers come to doubt [its] ability to assure a steady supply of high quality futile Ti02."  Id. at *6.  Further, "even if [the plaintiff] could eventually obtain Ti02 of the appropriate quality from a new supplier, by the time [it] did so [it] would be at a severe competitive disadvantage vis-a-vis [the defendant] . . . because [the plaintiff's] customers may well by then have turned to [the defendant]."  Id.

Numerous cases have acknowledged that losing current and future customers is an irreparable harm.  For example, in Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., the Fourth Circuit held that, "when the failure to grant preliminary injunction creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied."  Id. at 552. Similarly, in Spiegel v. City of Houston, 636 F.2d 997 (5th Cir. 1981), the United States Court of Appeals for the Fifth Circuit explained:

> [P]laintiffs need to establish that at the time of the injunction it was under a substantial threat of harm which cannot be undone through monetary remedies.  Such a threat is the possibility of customers being permanently discouraged from patronizing one's business.  The District Court found more potential injury to plaintiff-appellees than merely the downturn of business.  It found that appellants' actions tended to discourage patrons from patronizing appellees' businesses.

Id. at 1001 (quotation and citation omitted).

The Tenth Circuit has acknowledged that irreparable harm exists where losses are difficult to calculate with certainty.  See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 356 F.3d at 1263.   In General Leaseways, Inc. v. National Truck Leasing Ass'n, 744 F.2d 588 (7th Cir. 1984), a suit by a trucking franchise to block an attempted expulsion by a franchisor, the United States Court of Appeals for the Seventh Circuit upheld a preliminary injunction against expulsion,

holding that the franchisee would suffer irreparable harm because "the difficulties of proving lost profits make it chancy to rely on a damage award to provide full compensation even where as in this case a preliminary injunction is not necessary to keep the plaintiff afloat while the suit is proceeding toward final judgement." Id. at 591. See McClendon v. City of Albuquerque, 272 F.Supp. 2d 1250, 1259 (D.N.M. 2003)(holding that irreparable harm is suffered "when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain").

In a suit by a cable company that had installed cable delivery systems in several apartment complexes, which had them switched to another cable supplier, the Fourth Circuit held:

> [T]he historical average of Adelphia's revenue does not provide an adequate basis for measuring the potential loss of revenue because Adelphia only began providing a la carte service in the summer of 1993. The relative novelty of such service clearly makes any calculation of Adelphia's damages "difficult to ascertain" and, therefore, supports a finding that Adelphia would suffer irreparable harm.

Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d at 552.

The Supreme Court has held that where a party "would suffer a substantial loss of business and perhaps even bankruptcy . . . the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless." Doran v. Salem Inn, Inc., 422 U.S. 922, 932 (1975). See Commodity Futures Trading Comm'n v. British American Commodity Options Corp., 434 U.S. 1316, 1322 (1977)(upholding stay of regulation on the grounds that the regulation would cause irreparable harm because it would have "potentially fatal consequences for a number of the firms").

## RELEVANT DELAWARE LAW

Under Delaware law, the elements of a breach of contract claim are: (i) a contractual obligation; (ii) a breach of that obligation; and (iii) resulting damages. See VLIW Technology, LLC

v. Hewlett-Packard Co., 840 A.2d 606, 612 (2003); Interim Healthcare, Inc. v. Spherion Corp. 884

A.2d 513, 548 (Del. Super. 2005).  Delaware law recognizes an implied covenant of good faith and

fair dealing in every contract.  See Dunlap v. State Farm Fire and Cas. Co., 878 A.2d 434, 442 (Del.

2005).  As the Supreme Court of Delaware explained:

> [T]he implied covenant requires a party in a contractual relationship to refrain from
> arbitrary or unreasonable conduct which has the effect of preventing the other party
> to the contract from receiving the fruits of the bargain. . . . [I]t requires that the
> [contracting parties] act in a way that honors the [parties'] reasonable expectations.

Id.  (internal citations and quotations omitted).  Moreover, the Supreme Court of Delaware has held

that terminating a contract for pretextual reasons violates the covenant of good faith and fair dealing.

See E.I. DuPont de Nemours and Co. v. Pressman, 679 A.2d 436, 444 (1996).

## ANALYSIS

The TRO that Guidance requests covers different orders, and the circumstances of those

orders are different and warrant different treatment.  The Court will grant the TRO and order the

Defendants to cease breaching the Supply Agreement with respect to the Obturator Order, but the

Court will deny the TRO as to the V2 Order.  The threshold issue is whether Guidance's request is

disfavored under Tenth Circuit case law.  The Court concludes that the TRO with respect to the

Obturator Order would not be disfavored, but the TRO with respect to the V2 Order would be

disfavored.  As to the first order, the Court finds that a TRO should be granted.  The Court concludes

that the evidence clearly and unequivocally demonstrates that Guidance will suffer irreparable harm

without a TRO, that the balance of harms favors Guidance, and that a TRO would not offend public

policy.  Because these three elements have been shown, Guidance is entitled to the Tenth Circuit's

modified-success-on-the-merits standard for part of its TRO.  Accordingly, Guidance has met its

burden as to its first requested order.  The second half of the requested TRO, however, is disfavored,

so Guidance must show a substantial likelihood of success on the merits.  Guidance is not able to

make that showing, specifically as to the alleged breach underlying this particular order.  Both sides

of this dispute have meritorious arguments and the issues are complex, both legally and factually.

I.      **WHETHER THE REQUESTED TRO IS DISFAVORED.**

As in any case seeking a TRO or preliminary injunctive relief, the threshold issue here is

whether the relief that is sought falls within a disfavored category.  Of the three classes of disfavored

injunctions in the Tenth Circuit, two are relevant here: (i) status-quo altering injunctions and (ii)

mandatory injunctions.  The TRO that Guidance seeks with respect to the V2 Order would both

change the status quo and would be a mandatory injunction.  The TRO with respect to the Obturator

Order, in contrast, would preserve the status quo and would be a prohibitory injunction.

Accordingly, the Court will analyze Guidance's request for a TRO regarding the V2 Order as a

disfavored form of relief, but will consider the request for a TRO regarding the Obturator Order

under the usual standard or the modified success-on-the-merits standard.

A.      **THE REQUESTED TRO IS DISFAVORED WITH RESPECT TO THE V2 ORDER.**

Ordering the Defendants to begin production, and later shipment, of the V2 would upset the

status quo.  "[T]he status quo is the last uncontested status between the parties which preceded the

controversy until the outcome of the final hearing."  Dominion Video Satellite, Inc. v. EchoStar

Satellite Corp., 269 F.3d at 1155.  "In determining the status quo for preliminary injunctions, [a]

court looks to the reality of the existing status and relationship between the parties and not solely

to the parties' legal rights."  Id.  The reality of the situation between the parties on the V2 is that it

remains at a pre-production stage and that, at best for Guidance, there is a dispute whether

manufacturing can immediately commence.

The evidence indicates that the V2 remains in a developmental phase.  Unlike the OneFill Obturators, no V2 order has ever been shipped or filled.  Guidance has received prototypes, but not finished models.  While Dr. Goodis has testified that the prototypes are functional, that falls short of being finished and ready for mass production and use.  The Defendants provided credible evidence that they do not consider the V2 ready to manufacture.  The Defendants indicate that they require detailed mechanical drawings and that further work is necessary before the design can be frozen and the V2 can be manufactured in a manner consistent with the Defendants' quality and safety policies.

Guidance challenges the Defendants' position and contends that the Defendants' demand for drawings is nothing more than a ruse invented for purposes of delay.  The Court is not convinced that the evidence before it would allow it to ascribe such impure motives to the Defendants.  Moreover, this dispute regarding whether the V2 is ready for production is part of the underlying series of disagreements that have given rise to the case.  This dispute indicates that the Court should look further back in time to find "the last uncontested status between the parties."  Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d at 1155.  Turning back the clock even further, however, only makes it more certain that the status quo between the parties is one in which the V2 is an instrument that the parties are jointly designing, but that it is not a product that can be immediately manufactured and placed on the market.

In addition to disturbing the status quo, a TRO aimed at the V2 Order would also be a mandatory injunction.  The Tenth Circuit has recognized "that determining whether an injunction is mandatory as opposed to prohibitory can be vexing."  O Centro Espirita, 389 F.3d at 1006.  Mandatory injunctions "affirmatively require the nonmovant to act in a particular way, and as a result they place the issuing court in a position where it may have to provide ongoing supervision

to assure that the nonmovant is abiding by the injunction." <u>SCFC ILC, Inc. v. Visa USA, Inc.</u>, 936 F.2d at 1099.  The degree and number of affirmative actions that would be required of the Defendants, and the concomitant possibility that the Court would need to engage in substantial oversight to ensure compliance with the TRO, lead the Court to conclude that the TRO would be mandatory with respect to the V2 Order.[3]

The fundamental disagreement between the parties regarding the status of the V2 and the amount of additional work necessary to bring the V2 to the point where it can be manufactured poses a significant possibility of entangling the Court in a number of different disputes.  The Court might well, should a TRO issue, be required to resolve what the final design of the V2 is, whether more work is needed, who should be responsible for different tasks, whether safety concerns have been met, how long production will take, and a host of other issues large and small.  This situation is not one where the TRO would obligate a party to continue a series of discrete, simple tasks that the defendant has long performed.  <u>See</u> <u>Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.</u>, 269 F.3d at 1055 (holding that injunction prohibiting EchoStar from refusing to activate new Dominion customers on the same terms and conditions as EchoStar had been using was not mandatory).  Instead, Guidance is asking the Court to embark into what is new territory for the parties and is requesting that the Court lead the way.  The number of different individual tasks that the Defendants are likely to have to perform to make the V2 ready to manufacture, and to then manufacture and to ship the V2 to Guidance, together with the degree of supervision that Court would need to exercise over this process given the differences between the parties regarding how

---

[3] The Court notes that, even if it were to interpret Guidance's request to require the Defendants only to continue with the back and forth of development, which would maintain the status quo, the request would nonetheless be disfavored because of its mandatory nature and would perhaps require the Court to supervise the good faith of the communications.

far along the process is, show that a TRO for the V2 Order would be mandatory.

A TRO that applied to the V2 Order would thus be disfavored on two separate grounds. Because the TRO, in this respect, has landed in the disfavored category, that portion of the TRO "must be more closely scrutinized to assure that the exigencies of the case support" granting the TRO. O Centro Espirita, 389 F.3d at 975. Guidance will also be barred from the benefit of the Tenth Circuit's modified-likelihood-of-success-on-the-merits standard. Instead, Guidance "must make a strong showing . . . with regard to the likelihood of success on the merits." Id. at 976.

### B. THE REQUESTED TRO IS NOT DISFAVORED WITH RESPECT TO THE OBTURATOR ORDER.

The requested TRO presents a different story regarding the Obturator Order. Granting the TRO with respect to the Obturator Order would not upend the status quo the way granting it with respect to the V2 Order would. The Defendants have supplied Guidance with this product. No further design work must be finished; no new modifications are necessary. Newell testified that the Defendants have obturators in stock. See III Tr. at 271:17-21 (Bisceglie & Newell). All that the Defendants must do is manufacture and ship an existing product, pursuant to the terms of the Supply Agreement, just as the Defendants have done so in the past. The TRO would prohibit them from breaching an existing contract and only require them to continue to perform their duties as they have done before. The situation is similar to that in Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., where EchoStar had long been activating Dominion's subscribers and the injunction required that EchoStar not depart from that course, but continue activating subscribers. See 26 F.3d at 1155. Although the practice is not as longstanding here as it was in Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., the Court does not consider the length of the prior relationship to be a material difference. What is important here is that the Defendants have been providing obturators

and that the Defendants were doing so before the present disputes and subsequent litigation broke out.

Although the TRO escapes being disfavored as altering the status quo, it must also not be mandatory in nature. That point is more complicated, but ultimately the TRO with respect to the Obturator Order is also not mandatory. The Tenth Circuit has upheld both the grant and the denial of injunction in circumstances similar to this case.[4]  Compare SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d at 1099 n. 9 (noting that the injunction at issue was mandatory because "it required Visa to take the affirmative step of approving issuance of the new cards"), with Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d at 1055 (holding that injunction was not mandatory because, although EchoStar had to activate new subscribers, it prohibited "EchoStar from refusing to activate new Dominion customers on the same terms and conditions previously applicable"). The lesson to be drawn from these opposing results is that a TRO or injunction that prohibits the breach of an existing contract -- or stated differently, one that enforces a contract -- is not automatically within or outside of the disfavored classification. That the Defendants would be required to perform some specific acts is thus not, as the Defendants suggest, dispositive of the issue. The Defendants rely in particular on Schrier v. University of Colorado, 427 F.3d 1253 (10th Cir. 2005), for the proposition that requiring performance of a contract is mandatory in nature. The Tenth Circuit does not specifically discuss the issue of enforcing a contract in coming to the conclusion that the relief sought in Schrier v. University Of Colorado was mandatory, and in light of cases such as Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., the Court cannot reasonably conclude that the

---

[4] The superficial discrepancy is likely the result of a certain degree of flexibility in the law, but also a result of the abuse-of-discretion standard of review and some different facts between the two cases.

requested remedy resembling specific performance is enough, standing alone, to make it mandatory. The Court must instead undertake a more nuanced inquiry.

That the TRO would not alter the status quo supports a finding that the TRO is not mandatory. The issues of mandatory quality and of the affect on the status quo are distinct -- the one feature of not altering the status quo alone is not sufficient to find that the TRO would be prohibitory rather than mandatory. The Tenth Circuit has expressly decided to retain the distinction between the two forms of disfavored injunction. See O Centro Espirita, 389 F.3d at 1006. It would thus be impermissible to equate the two forms of disfavored injunction, but the Court believes it is appropriate to consider the status quo issue as a factor in its analysis whether the TRO is mandatory.

The Defendants' preexisting contractual duties to Guidance also supports a finding that the TRO is not mandatory. While the disparate results of SCFC ILC, Inc. v. Visa USA, Inc. and Dominion Video Satellite, Inc. v. EchoStar Satellite Corp. indicate that this fact alone will not suffice to decide the issue, the Court again believes it is an appropriate factor to place on the scales. As the Tenth Circuit has noted, whether something is mandatory or prohibitive is often semantic. See O Centro Espirita, 389 F.3d at 1006 ("In many instances, this distinction is more semantical than substantive. For to order a party to refrain from performing a given act is to limit his ability to perform any alternative act; similarly, an order to perform in a particular manner may be tantamount to a proscription against performing in any other.")(quoting Abdul Wali v. Coughlin, 754 F.2d at 1025-26). In Schrier v. University Of Colorado, the Tenth Circuit found reinstatement of the plaintiff as the Chair of the University of Colorado's Department of Medicine to be mandatory relief. This case provides a good example of how restoring the status quo or ensuring compliance with a contract can be mandatory. Before the dispute and the removal of the plaintiff from his position, the defendant's obligation would have been to refrain from wrongly removing the plaintiff.

-28-

After removal, however, ordering the defendant to continue existing duties under the contract would not preserve the contract or status quo.  Instead, a new obligation, reinstatement, was necessary.  In other words, enforcing a contract tends to be mandatory when the nature of the breach can only be remedied by the performance of actions different than those provided in the contract.   Here, by contrast, no new duties must be imposed on the Defendants to ensure compliance with the contract.  Only the exact same contractual obligations they were previously performing is required.  There is something more essentially prohibitory about directing compliance with existing duties than with imposing new duties.

The most important factor in this situation, however, is the negligible chance that the Court will find itself having to constantly supervise the TRO.  The importance of this factor is great.  As the Tenth Circuit indicated in SCFC ILC, Inc. v. Visa USA, Inc., this concern is largely what motivates the rule.  See 936 F.2d at 1099 (noting that mandatory injunctions "affirmatively require the nonmovant to act in a particular way, and as a result they place the issuing court in a position where it may have to provide ongoing supervision to assure that the nonmovant is abiding by the injunction.")(emphasis added).  Although the Defendants suggest that the aspect of the TRO applicable to the Obturator Order may also require court supervision, the likelihood of that possibility seems small.  Any TRO, of course, might end up placing the Court in such a role.  Simply filling and shipping an order for an existing product, however, is a routine business activity.  Whether the Defendants are complying with the terms of a TRO preventing them from not complying with that particular provision of the contract will be readily ascertainable.  A TRO on the Obturator Order is unlikely to drag the Court into a position where it has to oversee compliance.

When all these factors are added up, the Obturator Order of the requested TRO is prohibitory with respect to the Obturator Order.  The Court does not see any significant feature that would make

this part of the TRO mandatory, and the Court will thus follow the approach taken in Dominion Video Satellite, Inc. v. EchoStar Satellite Corp. Because this portion of the TRO is neither mandatory nor disruptive of the status quo, the Court will evaluate it under the normal standard of review, and Guidance will be able to rely on the modified-likelihood-of-success-on-the-merits standard for the request related to the Obturator Order.

## II.   GUIDANCE HAS DEMONSTRATED THAT IT FACES IRREPARABLE HARM IF THE COURT DOES NOT ACT.

The first element of the test for injunctive relief is whether Guidance is in danger of irreparable harm if the Court does not grant a TRO or preliminary injunction. See Oklahoma, ex rel., Okla. Tax Comm'n v. International Registration Plan, Inc., 455 F.3d at 1113. Economic damage to a business can be a basis for preliminary relief. The evidence reveals that Guidance is in a precarious financial situation and that it is unlikely to obtain needed supply from any source other than the Defendants. This evidence sufficiently demonstrates that Guidance is threatened with irreparable injury.

Guidance paints a dire picture about its situation and raises a number of reasons why it will suffer irreparable harm absent injunctive relief: (i) loss of goodwill; (ii) loss of unique economic opportunities; (iii) loss of customers; (iv) loss of future profits; (v) diminishment of competitive advantage in the marketplace; and (vi) impending bankruptcy. Guidance contends that the Defendants are the only reasonable source of supply and that, unless Guidance receives more product soon, it will begin to suffer the six consequences laid out. The evidence strongly favors Guidance's position.

The Tenth Circuit and many other federal courts of appeals recognize that loss of customer goodwill is a factor that supports an irreparable harm determination. See, e.g., Dominion Video

Satellite, Inc. v. EchoStar Satellite Corp., 356 F.3d at 1261; Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d at 19 n. 7; Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d at 552.   Guidance has offered evidence that, without product from the Defendants, Guidance will not be able to meet the needs of its customers, which will severely damage Guidance's reputation for reliability and significantly reduce its goodwill.   See e.g., Goodis Decl. ¶¶ 36-38, at 8-9; II Tr. at 113:13-115:7 (Kelly & Goodis).

The Tenth Circuit has acknowledged that the loss of an opportunity to distribute a unique product can support an irreparable harm determination.   See Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d at 1263.   If Guidance is unable to bring the V2 to market, it will lose out on the opportunity to distribute this unique product.   The Defendants' manufacturing is of a unique quality, and a replacement manufacturer would take months to find and prepare for production.   See Goodis Decl. ¶ 28, at 7.   The obturators, however, do not appear to be a unique product, so their loss does not support this particular factor.

The Tenth Circuit has also acknowledge how a loss of competitive position or a loss of customers can support an irreparable harm determination.   See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 356 F.3d at 1263.   Although loss of competitive position and loss of customers are distinct concepts, the two are closely intertwined in this case.   Guidance's customers cannot wait for more products once their current stock runs out.   See Goodis Decl. ¶¶ 33-34, at 8. Dr. Goodis states that they will be forced to switch to other manufacturers, such as the Defendants, to obtain products in the short term and may never return to Guidance in the long term.   See id. ¶¶ 36-37, at 8.   Further, Guidance depends on its reputation for reliability to keep current customers and to attract new customers.   Endodonists would prefer a more expensive product that can be supplied reliably to a cheaper product that cannot.   See Goodis Decl. ¶ 38, at 9; II Tr. at 114:15-21

(Kelly & Goodis).  Given Dr. Goodis' familiarity with his business and customers, and also given his experience as a practicing endodontist, the Court views this as a  credible explanation of what is likely to happen.  The Delaware Chancery Court has recognized how even temporary disruptions in the ability to provide a product can translate to permanent competitive disadvantage.  See CPM Indus., Inc. v. Fayda Chemicals & Minerals, Inc., 1997 WL 762650 at *6.  Common sense also suggests that customers for whom dependability is important will drift away from unreliable suppliers, even if an interruption proves temporary.  Guidance is therefore likely to have its image tarnished and be less able to compete effectively in the market on a characteristic that is important to its current and potential customers.  Supply delays are likely to lead both to a reduction of Guidance's ability to compete, and to a loss in current and future customers.

Loss of goodwill, unique opportunities, competitive position, and customers are all damaging losses for a business.  They all also essentially mean that Guidance is threatened with lost profits. As the Tenth Circuit has acknowledged, however, what makes such harms irreparable is not a loss of, for instance, goodwill specifically, or profits more generally.  Most economic harms can be remedied with money.  What makes these harms irreparable is that they are difficult to calculate with much certainty.  See Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d at 1263.  Losses such as those of which Guidance has presented evidence are generally difficult to quantify.  Moreover, Guidance's status as a fledgling company on the verge of expansion, with a minimal track record, makes it more difficult to estimate with a reasonable degree of accuracy the extent of the harm in areas such as lost goodwill and lost profits.

Guidance has presented evidence that, not only does it risk significant, hard to quantify losses of various future opportunities and profits, it faces the possibility of bankruptcy.  As the Supreme Court has noted, where a business "would suffer a substantial loss of business and perhaps

even bankruptcy . . . the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless." Doran v. Salem Inn, Inc., 422 U.S. at 932.  Guidance sells a limited range of products, all of which the Defendants manufacture.  While the Defendants are apparently still supplying EndoTapers, they are not providing obturators.  Given the importance Guidance has placed on being able to supply the basic package of endodontic tools, it is doubtful that EndoTapers will keep the company afloat during litigation.  Dr. Goodis has stated and testified that Guidance lacks the wherewithal to withstand any more prolonged litigation, especially given the amount of money Guidance has already spent on prior litigation with the Defendants, which has placed the company in debt and unable to procure additional debt or equity funding.  See Goodis Decl. ¶ 41-42, at 9-10.

The Defendants make a two-pronged attack on Guidance's irreparable harm arguments.  First, the Defendants argue that Guidance gained access to obturators only through the Supply Agreement and thus characterizing a refusal "to supply obturators now as causing irreparable harm is ignoring [Guidance's] business before its contract with Defendants."  TRO Opposition at 5-6. Second, the Defendants contend that no credible evidence supports Guidance's contentions of imminent financial disaster.  The Defendants maintain that Guidance has offered no financial statements or similar evidence, and is relying solely on Dr. Goodis' word.  See id. at 6.

Guidance's situation before the Supply Agreement does not lend much weight to the Defendants' position.  While Guidance was in existence before the Supply Agreement, Guidance is a young company.  Dr. Goodis has testified how the company has yet to turn a profit, not uncommon in start-ups.  Guidance's past performance is an imprecise mirror at best of its future potential.  If Guidance were a company with a significant business history, the Defendants' argument would have more bite.  Moreover, the Defendants' argument does not adequately account

for the fact that Guidance, before the Supply Agreement, had deals with Micro-Mega and with Patterson Dental, for manufacturing and distribution respectively.   As Dr. Goodis testified, the obturators deal that Guidance got from the Defendants was what made the Supply Agreement worthwhile.   Without the Supply Agreement, Guidance will not be in the same situation it was in the beginning of its existence when it had other arrangements.

Additionally, the evidence that Guidance offers is credible and sufficient to support a finding of irreparable harm.   While Guidance relies upon Dr. Goodis for its evidence, there is nothing inherently wrong with such evidence.   In fact, Dr. Goodis, as the founder, owner, and CEO of Guidance, is probably the person in the best position to describe Guidance's prospects.   There is no requirement that specific financial statements be submitted.   A movant can rely on any relevant and credible evidence.   The evidence that Guidance has presented, indicating that it risks losing significant and hard-to-calculate future business and also risks going bankrupt, is sufficient to demonstrate irreparable harm.

## III.   THE BALANCE OF HARMS FAVORS GUIDANCE.

The next prong of the test is whether "the threatened injury to" Guidance "outweighs whatever damage" the TRO may inflict on the Defendants.   SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d at 1098.   Guidance has already demonstrated that it faces irreparable harm and stands on the brink of bankruptcy and going out of business.   The scales thus already tip in Guidance's favor.   Any harm flowing to the Defendants, however, is minimal.   The damage that requiring the Defendants to fill the orders, and even to continue design work on the V2, will cause is likely to be small, given that the TRO would only require the Defendants to continue observing a contract that they had negotiated and freely entered into.   Additionally, the Defendants are successful and dominant players in the endodontic market specifically and in the dental supply market more generally.   When

-34-

the slight damage that the Defendants might incur is compared with the significant and irreparable harm confronting Guidance, it becomes clear that the balance of harms tilts in Guidance's favor.

The Court has already discussed in detail the significant harms that Guidance might endure without a TRO. The Court will therefore focus here on the potential harms that a TRO might cause the Defendants. Such harms are difficult to identify. The Defendants freely entered into the Supply Agreement with Guidance. Presumably, resuming compliance with that contract would not be very onerous. Guidance will not be getting free supplies under the TRO -- the TRO will only prevent the Defendants from not abiding by the terms of the Supply Agreement, so Guidance will still have to pay normal rates for the instruments ordered. Arguably, the Supply Agreement might be a bad deal for the Defendants because of the low cost of obturators under the agreement. Additionally, the Defendants might lose some market share if Guidance remains a viable company. If these possibilities are even appropriate to consider, they nonetheless do not add up to much harm for the Defendants. The relative size of the Defendants and Guidance makes it unlikely that the Defendants will suffer much of an economic disadvantage from either possibility, particularly relative to Guidance. Rarely do Davids slay Goliaths in the world of business.

The only real injury that the Defendants have advanced so far is the harm they assert resulted from Guidance's alleged breach of the confidentiality provision of the Supply Agreement. Even if the Court credits this contention as correct, it does not alter the balance of hardships. Much of the harm from any disclosure has already occurred. As the Defendants themselves argue, the breach is incurable. See TRO Opposition at 5. Moreover, the TRO itself would not inflict any additional harm of this variety. The focus here is on the harm that would flow from obeying the TRO. Simply producing endodontic supplies for Guidance will not involve the harm that the Defendants argue resulted from Guidance's marketing efforts. Accordingly, Guidance has shown that the balance of

harms favors Guidance.

IV.    **A TRO WOULD NOT BE ADVERSE TO THE PUBLIC INTEREST.**

Guidance must also show that the TRO it is seeking would not be adverse to the public interest.  See Wyandotte Nation v. Sebelius, 443 F.3d at 1255.  A TRO in this case would not be adverse to the public interest.  Guidance is seeking a TRO to enforce the terms of a contract.  The strong public policy favoring the enforcement of contracts and upholding the right of freedom of contract is widely recognized.  See, e.g., Sander v. Alexander Richardson Invs., 334 F.3d at  721 ("Public policy demands enforcing contracts as written and recognizing the parties' freedom to contract."); Trenwick America Litigation Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 176 (Del. Ch. 2006)("Delaware public policy is strongly supportive of freedom of contract."); State ex rel Udall v. Colonial Penn Ins. Co., 112 N.M. at 126, 812 P.2d at 780 ("New Mexico has a strong public policy of freedom to contract that requires enforcement of contracts unless they clearly contravene some law or rule of public morals.").  The temporary restraining order will also serve the "overriding public policy in favor of competition."  Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, 473 U.S. 614, 654 n. 21 (1985).

The Defendants have not argued that the relief that Guidance is pursuing would be contrary to the public interest.  The Court is also not aware of any public policy that granting the requested relief would offend.  In light of the lack of a public policy that the TRO would offend, and given the public policy that favors competition and the enforcement and freedom of contracts, the Court concludes that a TRO would not be adverse to the public interest.

Moreover, Guidance has shown that its requested TRO would not be adverse to the public interest clearly and compellingly.  Guidance has thus shown that the irreparable harm, balance of hardships, and not adverse to the public interest prongs of the test all favor Guidance.  The Court

also concludes that these three factors "tip strongly in" its favor and thus Guidance, with respect to

that part of the TRO covering the Obturator Order, "may meet the requirement for showing success

on the merits by showing that questions going to the merits are so serious, substantial, difficult, and

doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."

Oklahoma, ex rel., Okla. Tax Comm'n v. International Registration Plan, Inc., 455 F.3d at 1113

(internal quotation marks omitted).  Because the TRO with respect to the V2 Order is disfavored,

however, Guidance must still show a substantial likelihood of success on the merits before the Court

will grant that part of the TRO.  See O Centro Espirita, 289 F.3d at 975-76 (en banc).

## V.   GUIDANCE HAS SHOWN THAT THE ISSUES ON THE MERITS ARE COMPLICATED WITH RESPECT TO THE OBTURATORS, BUT HAS NOT SHOWN THAT THE DEFENDANTS HAVE BREACHED THE SUPPLY AGREEMENT WITH RESPECT TO THE V2s.

Guidance asserts a number of causes of action against the Defendants in its Complaint: (i)

two claims for breach of contract; (ii) a claim for breach of the covenant of good faith and fair

dealing; (iii) claims for violations of the Delaware Deceptive Trade Practices Act and the New

Mexico Unfair Practices Act; (iv) a claim for violations of the Lanham Act; and (v) a claim for

tortious interference with existing and prospective contractual relations.  Guidance, in its application

for the TRO, however, attempts only to prove three claims: (i) the two breach of contract claims;

and (ii) and the claim for breach of the covenant of good faith and fair dealing.  See Memo. in

Support at 9 & n. 1.  Guidance need not prove that it is likely to succeed on all of its claims  See

ACLU v. Johnson, 194 F.3d 1149, 1160 (10th Cir. 1999).

The merits of this case are complicated, both legally and factually.  With respect to the TRO

for the Obturator Order, the Court has no trouble concluding that Guidance has met its burden under

the modified standard.  With respect to the V2, however, Guidance is unable to make a clear enough

showing that the Defendants are in breach.  Because Guidance has not made that showing and is, for the V2 Order, seeking disfavored relief, Guidance has not met its burden on the TRO with respect to the V2 Order.[5]

### A.   RESOLUTION OF THE MERITS IS SUFFICIENTLY COMPLEX THAT A TRO WITH RESPECT TO THE OBTURATOR ORDER SHOULD ISSUE.

Guidance can avail itself of the relaxed standard for the purposes of the TRO on the Obturator Order.  Guidance carries its burden under this easier standard.  Whether the Defendants breached the contract and whether Guidance breached the contract are both involved issues, as the length of these TRO proceedings indicates.  Both sides have plausible arguments, supported with credible evidence.  The matter is one that should thus be left for later resolution.  The issues going to the merits are sufficiently "serious, substantial, difficult, and doubtful" for Guidance to satisfy the final prong under the modified-success-on-the-merits test.  Oklahoma, ex rel., Okla. Tax

---

[5] As ACLU v. Johnson indicates, a movant need not show that all claims would be successful to obtain relief.  As the Court discusses infra, the Court does not believe that the Defendants have met their burden on the affirmative defense of unclean hands because it is not clear that Guidance is in breach of the confidentiality provision of the Supply Agreement.  It is undisputed that the Defendants are not providing obturators.  Given that, for the moment, the Defendants' justification for withholding obturators is not clear, it would seem that Guidance could make a strong showing of succeeding on its breach-of-contract claim with respect to the obturators.  Arguably, under ACLU v. Johnson, the whole TRO should issue.  The Tenth Circuit, however, only briefly mentioned in ACLU v. Johnson the point for which Guidance cites it.  See 194 F.3d at 1160 (noting "we need not reach this [Commerce Clause] issue, since we have already held plaintiffs have demonstrated a likelihood of success on their First Amendment argument").  In ACLU v. Johnson, only one item of relief -- an injunction prohibiting enforcement of a criminal statute -- was sought, and the ACLU advanced several alternative theories supporting the one position that the statute should not be enforced.  It seems more likely that the ACLU v. Johnson stands for the proposition that, where any of several theories would ultimately allow a plaintiff to succeed on the merits, the plaintiff, when moving for a preliminary injunction or TRO, need show only a likelihood of success on a single theory.  Here, the relief sought is divisible, and the different product orders are in distinct postures.  The Court thus concludes that, for Guidance to receive a TRO directing production of the V2s, it must show that the Defendants breached that portion of the Supply Agreement.  It would be an odd result to grant a party relief for an unrelated breach that would not independently support a permanent injunction or specific performance.

Comm'n v. International Registration Plan, Inc., 455 F.3d at 1113.  Accordingly, the Court will issue a TRO regarding the Obturator Order.

## B.   GUIDANCE HAS NOT SHOWN A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS ON THE V2.

Although Guidance has narrowed the specific claims it is attempting to prove for this TRO application, its choice still amounts to several different claims.  Only some of them, however, are relevant to the V2 Order and the development of the V2 more generally.  The Court will focus only on those relevant claims here.  Those relevant claims are: (i) breach of the Supply Agreement with respect to the V2s; and (ii) breach of the covenant of good faith on the grounds of the Defendants' refusal "to manufacture or supply" V2s "without 'engineering drawings' that are not required by the Supply Agreement and are contrary to Guidance's prior course of dealing."  Memo. in Support at 14.  The other claims that Guidance presses relate primarily to obturators, a point on which Guidance need not succeed at this juncture and which, as discussed above, are not relevant to whether a TRO for the V2 Order should issue.

Both of the relevant V2 claims turn on the same set of facts -- the circumstances surrounding the development of the V2 and the Defendants' demand for engineering drawings as part of the development process.  Guidance and Tulsa Dental employees were working on the V2 for some time, but the relationship broke down when Tulsa Dental requested engineering drawings.  Guidance contends that the Defendants have not requested such drawings before.

Under the Supply Agreement, Guidance is allowed to have Tulsa Dental "manufacture endodontic files or obturators, which are improvements or successor products (of similar design) to" existing Guidance products, but must "present product specifications to [Tulsa Dental] for such products."  Supply Agreement § 4.5, at 6.  Additionally, the exhibit to the Supply Agreement states:

"All requests for prototypes under this agreement must be submitted with engineering drawing(s) complete with product specs and tolerances."  Exhibit 1 to Supply Agreement, at 25.

Before the development of the V2, the Defendants did not require drawings from Guidance. Dr. Goodis testified that the Defendants never required him to submit any drawings during the development of the EndoTaper.  Instead, Dr. Goodis supplied specifications and the process went through several rounds of prototypes, with modifications done through e-mail, without Guidance providing drawings.  See I Tr. at 67:9-15; II Tr. at 83:13-21 (Goodis). Although Dr. Goodis asked the Defendants if they wanted drawings for the EndoTaper, he was informed that if he "could just send specifications by e-mail just describing it in words and numbers, that would be good enough." I Tr. at 66:10-11.

The V2 also began in a similar fashion.  Guidance never provided drawings.  Dr. Goodis testified that he also asked whether drawings for the V2 were needed, but was told that specifications through e-mail would be sufficient. See id. at 71:7-15 (Kelly & Goodis).  Dr. Goodis initially froze the V2 designs on September 2, 2008, but then decided to follow up with more modifications.  See id. at 72:10-15 (Goodis).  About two weeks later, he was informed that he would need to provide engineering drawings. See id. at 72:18-21.  Dr. Goodis decided to return to the originally frozen designs, but was told that the drawings were still necessary. See id. at 73:2-9 (Kelly & Goodis).

Newell sent e-mail to Dr. Goodis, informing him that Guidance would be required to provide "complete detailed engineering drawings" for the V2.  Exhibit 11 to Complaint, Electronic Mail from Bill Newell to drcjgoodis@aol.com (dated September 26, 2008)(Doc. 1-3). See Exhibit 19 to Complaint, Electronic Mail from BNewell@Dentsply.com to drcjgoodis@aol.com (dated September 24, 2008).  According to Newell's testimony, he was not aware whether Tulsa Dental had sent

Guidance prototypes of the V2 before writing his e-mails to Dr. Goodis, see II Tr. at 183:3-184:19 (Bisceglie & Newell), or whether Guidance would be able to comply with his request, see id. at 188:3-12.  Newell was relying on information from Tulsa Dental employees that the V2 was not complete and ready for manufacture.  See id. at 190:14-22.

Littleton, who worked on the V2 process, testified that a final version of the prototypes for the V2 were never made and that Dr. Goodis had not frozen the V2 design because he wanted to make additional modifications, see Transcript of Hearing at 386:14-23 (taken December 5, 2008)(Gulley & Littleton)(Doc. 28)("IV Tr."), although she later testified that Dr. Goodis actually froze and unfroze the design the same day, see Transcript of Hearing at 422:6-17 (taken December 8, 2008)(Doc. 29)("V Tr.").  According to Littleton, drawings were needed to complete the process.  See IV Tr. at 386:24-387:14.

Littleton testified that the process of developing the EndoTapers went differently than with the V2 because she had a drawing for the EndoTaper, which she did not believe the Defendants made, but which may have come from Micro-Mega.  See id. at 389:18-392:13 (Bisceglie & Littleton).  During the process of designing the V2, Littleton became concerned that Tulsa Dental was effectively designing the V2, something that she had never done for a retail customer, but only for Dentsply.  See V Tr. at 426:7-427:8.  Her concerns and Tulsa Dental's internal decision to request drawings made their way to Newell, and after a conversation with Littleton, Newell told her that he would inform Guidance.  See id. at 29:16-30:16.

In light of such evidence, the Court cannot say that Guidance has met its burden.  Guidance has provided evidence that the Defendants' request for engineering drawings was something new and that the Defendants had not required Guidance to produce them before.  On the other hand, the exhibit to the Supply Agreement specifically states that Guidance was required to provide

"engineering drawing(s) complete with product specs and tolerances."  Exhibit 1 to Supply Agreement, at 25.  Furthermore, Littleton's testimony is credible and provides an explanation for the Defendants' request.  According to Littleton, the development of the V2 and the development of the EndoTaper proceeded along different paths.  Littleton's concerns whether the Defendants should be doing the amount of work and doing the engineering drawings are reasonable.  Given the short relationship between the Defendants and Guidance, and the apparent divergence in the production of the EndoTaper and the V2, it is difficult for the Court to say that there was some longstanding course of dealing that did not require Guidance to produce drawings.  With the language of the Supply Agreement, and the evidence before the Court, the Court cannot say Guidance had shown a substantial likelihood that it would prevail on a breach of contract claim.  Given Littleton's explanations and the relative lack of evidence to the contrary, the Court also cannot say that the drawings request was a pretextual ploy upon which the Defendants seized for ulterior purposes.  Accordingly, the Court cannot conclude on the record before it that Guidance has shown a substantial likelihood of success on its claim for breach of the covenant of good faith and fair dealing.

## VI.    THE DEFENDANTS HAVE NOT SHOWN THAT THE DOCTRINE OF UNCLEAN HANDS SHOULD PREVENT THE TRO FROM ISSUING.

A TRO is a form of equitable relief, and an application for equitable relief is subject to equitable defenses.  The Defendants invoke the doctrine of unclean hands, arguing that it prevents the Court from issuing a TRO, based on two reasons: (i) Guidance's failure to pursue mediation; and (ii) Guidance's alleged breach of the confidentiality provisions of the Supply Agreement.  Based on the evidence before the Court, however, the Court cannot completely agree with the Defendants' position and will therefore not apply the doctrine of unclean hands to preclude a TRO.  The Court

will, however, use the presence of the mediation clause to delay the effective date of the TRO.

The Court does not believe that the first basis the Defendants advance completely bars relief because Guidance is now seeking mediation.  Guidance has said that it is not adverse to mediation, but feels that preliminary relief is necessary, because of time constraints.  The Court believes that Guidance knew that the Defendants were not going to ship the obturators as early as September 25, 2008 and had time to seek mediation earlier, before it filed this lawsuit in late November.  In making a deliberate, strategic litigation decision to seek judicial relief without seeking mediation, Guidance breached the Supply Agreement.  On the other hand, the Defendants have vigorously opposed Guidance's case, indicating that informal discussions were unlikely to be successful.  The Court has, however, high regards for JAMS, and does not think that its considerable talents should be skipped over lightly.  While the Court is not happy that Guidance came to court before seeking mediation, especially when it had time to do so, the Court and the parties are where they are.  Moreover, seeking preliminary relief is often an appropriate way of helping to ensure the status quo and setting the stage for mediation.  The parties are now in fact entering mediation on December 16, 2008, in Dallas, Texas.  In these circumstances, unclean hands should not completely preclude relief.  The Court will grant Guidance injunctive relief on the Obturator Order, but will not make it effective until 4:00 p.m. MST (5:00 p.m. CST), on December 16, 2008.  This delay in the effective time of the TRO will allow the Defendants to engage in mediation for one full day with JAMS to resolve their differences.  If they work out their differences on the Obturator Order, the TRO does not go into effect.  If they do not resolve their differences on the Obturator Order, this TRO is effective at 4:00 p.m. New Mexico time.

The Defendants' second grounds for application of the doctrine is also unavailing.  The Supply Agreement contains two provisions related to confidentiality that the Defendants assert

Guidance has breached.  The first reads:

> Guidance agrees that in marketing materials (including brochures, mailers, DVDs, website pages and journal advertisements), the Guidance Obturator and Guidance Ovens will not be promoted for use with any system offered for sale by [Tulsa Dental] or any Affiliate of [Tulsa Dental] and Guidance shall instruct its sales representatives to not promote the Guidance Obturator and Guidance Ovens for use with any system offered for sale by [Tulsa Dental] or any Affiliate of [Tulsa Dental].

Supply Agreement § 2.4, at 3.  The second confidentiality provision states:

> Confidentiality.  Each side shall use reasonable commercial efforts not to disclose the terms of the Agreement and the Confidential Information of the other side to any third party.  Without limiting the foregoing, each of the sides shall use at least the same degree of care which it uses to prevent the disclosure of its own confidential information of like importance to prevent the disclosure of Confidential Information disclosed to it by the other side under this Agreement.  Each side shall promptly notify the other side of any actual or suspected misuse or unauthorized disclosure of the other side's Confidential Information.  Notwithstanding the foregoing, if necessary to assure customers of Guidance, Guidance may disclose the fact that it has a license under the Dentsply Patents to sell and offer for sale the Products in accordance with Section 4.2.

Supply Agreement § 9.1, at 10-11.  The provision has numerous exceptions, including: (i) for information that "was in the public domain at the time it was disclosed or has entered into the public domain through no fault of the receiving side;" and (ii) for information that "is disclosed generally to third parties by the disclosing party without restrictions similar to those contained in this Agreement."  Id. § 9.2 (i) & (vi), at 11.  "Confidential Information" is defined as including:

(a)   The terms of this [Supply] Agreement (including, without limitation, the financial terms);

(b)   Any information disclosed by one side to the other, which the recipient knows or has a reason to know is deemed confidential or proprietary by the disclosing side, (whether before, on or after the Effective Date)(including, without limitation, current and/or future business, sales, marketing and product (including, without limitation, the Products [meaning any products Guidance purchases under the Supply Agreement]) plans); and

(c)   Any technical information (including, without limitation, schematics, designs, source code, application programmer interfaces and algorithms)

relating to the Products.

Id. § 1.2.9, at 2.

On September 25, 2008, Newell informed Guidance that the Defendants considered Guidance in breach of the Supply Agreement's confidentiality provisions based on a review of Guidance's "advertising materials" and "reports from the field regarding recent activities of Guidance."  Exhibit 8 to Complaint, Facsimile Letter from Bill Newell to Dr. Charles Goodis (dated September 25, 2008)(Doc. 1-3).  Newell's letter focused on the Defendants' assertions that Guidance was representing Guidance products as interchangeable with or identical to the Defendants' products, and that Guidance was making it known that the Defendants manufactured the Defendants' product.  Newell's letter stated that the Defendants were discontinuing supplying obturators until they received written notice that Guidance had halted the activities the Defendants considered to be in breach of the Supply Agreement.  See id.  The Defendants ultimately decided that Guidance's behavior was, in their view, an incurable breach.  See Exhibit 15 to Complaint, Facsimile Letter from Bill Newell to Dr. Charles Goodis (dated October 14, 2008)(Doc. 1-3).  During the hearing, Newell stated that he interpreted section 9.1 of the Supply Agreement to allow Guidance to disclose that it had a license for Dentsply patents, but that this provision did not apply to potential customers. See II Tr. at 168:3-15 (Gulley & Newell).

Newell also testified that he became aware that Guidance revised its marketing materials and website, although he was not sure whether it was in response to concerns that the Defendants raised. See id. at 191:24-192:5 (Bisceglie & Newell).  Newell stated, however, that he had no current complaints about Guidance's marketing materials.  See id. at 192:6-12.  Newell also testified that he heard that Guidance was representing Guidance obturators as identical to the Defendants' Thermafil obturators from the Defendants' salespeople and from dentists.  See Transcript of TRO

Hearing at 220:17-221:13, 239:20-242:5 (taken December 1, 2008)(Doc. 27)("III Tr.").  Newell explained that, once the market knew that the Defendants manufactured Guidance product and that Guidance obturators were identical to the Defendants' obturators, the "cat was out of the bag" and the breach could not be cured.  Id. at 263:7-264:7.

Higley, a Dentsply sales employee, testified about how he was at a trade show in California and visited the Guidance booth.  Higley thought that the files Guidance had at its booth were identical to Dentsply's files.  See IV Tr. at 369:18-370:3 (Gulley & Higley).  Higley chatted with Ferone and two women working the Guidance booth, and was told that the files were the same and that Dentsply was manufacturing the files for Guidance.  See id. at 370:7-371:16.  When Higley visited the booth, he had on a pair of badges saying he worked for Dentsply.  See id. at 374:21-22 (Bisceglie & Higley).  Higley was also familiar with Ferone, though not closely.  See id. at 376:8-20.  Higley remembered that the brochures at the booth compared Guidance files to files from several companies and not just to Dentsply.  See id. at 378:21-380:19.

Dr. Henson, who knows Ferone, was also present at the California trade show with Higley.  Dr. Henson was struck by the similarities between the Guidance files and the Defendants' product, and was shocked to learn -- apparently in response to Higley's question -- that the Defendants were manufacturing them for Guidance.  See V Tr. at 437:7-438:2 (Gulley & Henson).  Ferone had recognized Henson when he came to the Guidance booth.  See id. at 442:4-6 (Bisceglie & Henson).

Roy testified that he called Guidance's telephone number and spoke to a woman, who did not give her name.  Roy did not identify himself as an employee of the Defendants and mentioned that Guidance's EndoTaper seemed very similar to the ProTaper.  See id. at 54:8-25 (Gulley & Roy).  The woman told him the two were identical and that Tulsa Dental was making the EndoTapers for Guidance.  See id. at 55:1-4.  Roy had called to investigate whether the EndoTapers would be

available in Canada, because he was worried they might cut into his business.  See id. at 64:3-8
(Bisceglie & Roy).

Based upon these facts, the Court cannot say that the Defendants have met their burden of
showing that Guidance is in breach of the Supply Agreement such that the doctrine of unclean hands
would bar relief.  One aspect of the Defendants' concerns, Guidance's marketing materials, has
already been corrected apparently.  See, e.g., V Tr. at 487:5-489:4 (Kelly & Bettes-
Grove)(discussing how Guidance stopped referring to the Defendants as their manufacturer in the
wake of Newell's letters).  Curing a potential or actual breach may fall within the scope of the
Supply Agreement's clause on default. See Supply Agreement § 8.4, at 10 (giving parties sixty days
after written notice to correct a failure to perform).  Although the Defendants argue that Guidance's
alleged breaches are incurable, it is not clear that the Supply Agreement makes such distinctions.
Moreover, the Court is not convinced that non-trademarked and apparently apt descriptive phrases
like "thermal filling," or Guidance brochures comparing Guidance products to Dentsply and other's
products, would run afoul of the  provisions of the Supply Agreement restricting promotions and
requiring confidentiality.

The Defendants have presented some evidence that Guidance employees were making it
known that certain Guidance products were identical to certain Dentsply products and that the
Defendants were manufacturing products for Guidance.  Much of Newell's information was second-
or third-hand, and Higley and Henson were known Dentsply employees when they heard the
remarks they testified about.  The only strong evidence that the Defendants have put forward is
Roy's testimony, which indicates that, on at least one occasion, a Guidance employee was loose with
information about from where Guidance got its product.  Roy's testimony is in conflict with
Ferone's affidavit, explaining that he never said Guidance products were identical to the Defendants'

products, and Bettes-Groves' testimony, also explaining that she never said the products were identical and would try to point out minor differences.  See V Tr. at 484:20-485:20, 487:18-24 (Kelly & Bettes-Grove).  The evidence before the Court reveals, at best for the Defendants, that occasionally a Guidance employee would admit to their product being identical the Defendants, but the Court does not on the record see evidence of the widespread disclosure that the Defendants allege.

The Court does not see, in either the testimony or in the marketing materials, anything that the Court could at this point identify as being clearly in breach of the marketing restrictions.  Section 2.4 of the Supply Agreement forbids only promoting Guidance products for use with products the Defendants make.  While the older advertising materials that have been introduced into evidence draw comparisons with the Defendants' obturators and files, or indicate that Guidance's products can be used in a similar way, the Court does not see anything that can be easily described as promoting Guidance products for use with the Defendants' products.  Rather, the tenor of the materials is that Guidance products are just as good and could replace the Defendants' products in an endodontists' practice.

The Court also does not believe that it is clear, on the record presently before the Court, that revealing that the Defendants are acting as manufacturers for Guidance, or that some Guidance products are the same as the Defendants' products, would necessarily be in violation of the Supply Agreement.  Confidential information is a defined term in the contract, much of which covers technical information, and proprietary information such as marketing plans.  The only provision that might cover the information that has the Defendants concerned is section 1.2.9(a), which extends confidentiality to the terms of the Supply Agreement.  The language does not explicitly cover the existence of the Supply Agreement, but more importantly, the Supply Agreement exempts from

information in the public domain from the confidentiality provision.  See Supply Agreement § 9.2(i), at 11.  The consent judgment that resulted from settlement between Guidance and Dentsply is a matter of public record, and specifically mentions that Guidance and Dentsply will "enter into a manufacturing and supply agreement."  Consent Judgment and Order at 2, Dentsply Int'l, Inc. v. Guidance Endodontics, LLC, CV No. 08-0155 (M.D. Pa. 2008)(Jones, J.).  Given this language, the Court cannot say that revelation that the Defendants manufactured Guidance product would clearly be a violation of the confidentiality provision of the Supply Agreement.[6]

Nor is the Court able to conclude at this point that disclosing that Guidance products and the Defendants' products are similar or identical would necessarily be in breach of the confidentiality provision.  That the products are identical seems to be obvious to the endodontic community, given how the Defendants' sales representatives, unaware of the Supply Agreement, were struck by the similarities on viewing Guidance's files and obturators.  Moreover, Bettes-Grove testified about how endodontists would press her for information about the products and how she would not say that the products were exactly the same as the Defendants', but would describe certain differences.  Again, the relevant definition of confidential information here seems to be "the terms of the agreement."  The Court is not convinced, at this stage of proceedings, that acknowledging the strong and obvious similarities between the various tools would necessarily fit under this label, particularly given that the governing standard for the provision is "reasonable commercial efforts."  Supply Agreement § 9.1, at 10.  The scope of the clause may be ambiguous; a reasonable and perhaps likely definition

---

[6] The Defendants also seem to make the argument that disclosing them as the manufacturers of Guidance products violates the marketing restriction provision.  While such a disclosure may violate section 9.1, the Court does not see how such a disclosure would amount to promoting Guidance products for use with the Defendants' products in violation of section 2.4.  Revealing that the products share a common manufacturer does not mean that the products are meant or able to be used together, or that they are being promoted as such.

of the terms of the agreement is that it refers to, for instance, the financial details of the arrangement between Guidance and the Defendants, but not to the readily apparent physical similarities in their products.  The sentence at the end of section 9.1, allowing disclosure of Guidance's patent license, does not change this reading.  Guidance's having a license under Dentsply's patents, as opposed to the apparent product similarities, could be understood as being a term of the agreement, requiring an exception for disclosure.  In sum, given what are, at best, ambiguities in the marketing and confidentiality clauses in the Supply Agreement, and the conflicting evidence whether Guidance was disclosing that its products were identical to the Defendants' products, the Court cannot conclude on the record before it that Guidance is in breach of the Supply Agreement.  Accordingly, the doctrine of unclean hands will not prevent a TRO from issuing.

## VII.   **THE COURT WILL REQUIRE SECURITY.**

Guidance contends that the Court should not require security under rule 65, because the TRO would require payment to the Defendants and would preserve the Defendants' rights.  Rule 65(c) provides: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The language of the rule appears mandatory, but the Tenth Circuit has held that "a trial court has 'wide discretion; under Rule 65(c) in determining whether to require security."  Winnebago Tribe of Nebraska v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)(quoting Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 782 (10th Cir. 1964)).  Guidance must promptly pay for any product, so no security is needed for the obturators to be shipped.  The Court is concerned, however, that the Defendants may be able to prove at some point damages for disclosing that Guidance's obturators and the Defendants' obturators are the same.  The Court is also concerned about Guidance's financial viability.  On the

other hand, the Defendants did not argue for a bond or specify an amount.  The Court will secure a $10,000.00 bond payable to the Defendants, which will remain in place for the remainder of the case.

## VIII.   TERMS OF THE TRO.

Beginning at 5:00 PM Central Standard Time on Tuesday, December 16, 2008, the following TRO shall become effective as follows:

i) The Defendants shall cease their refusal to respect their Supply Agreement with Guidance with regard to the Obturator Order, # DENT 100108.  Specifically, the Defendants will, without delay, begin filling that order, including manufacturing OneFill Obturators if necessary, and shall ship the order without delay to Guidance.

ii) If the parties reach an agreement during mediation or otherwise, they may, by joint agreement, consider the TRO no longer in effect.  Upon reaching such an agreement, they shall promptly notify the Court and jointly move for the formal dissolution of the TRO.

iii) The TRO shall end at 5:00 PM Central Standard Time on Friday, December 26, 2008, unless the Court extends its duration.

**IT IS ORDERED** that the Application for Temporary Restraining Order is granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE

-51-

*Counsel*:

Kyle C. Bisceglie
Olshan, Grundam, Frome, Rosenweiz
  & Woldosky, LLP
New York, New York

-- and --

John J. Kelly
Ryan Flynn
Adam Greenwood
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Thomas P. Gulley
Lewis and Roca
Albuquerque, New Mexico

   *Attorneys for the Defendants*