IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

GUIDANCE ENDODONTICS, LLC,
a New Mexico Limited Liability Company,

      Plaintiffs,

vs.                                                                          No. CIV 08-1101 JB/RLP

DENTSPLY INTERNATIONAL, INC.
a Delaware Business Corporation, and
TULSA DENTAL PRODUCTS, LLC,
a Delaware Limited Liability Company,

      Defendants.

and

DENTSPLY INTERNATIONAL, INC.
and TULSA DENTAL PRODUCTS, LLC,

      Counter Plaintiffs,

vs.

GUIDANCE ENDODONTICS, LLC
and DR. CHARLES GOODIS,

      Counter Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Dentsply/TDP Motion for Summary Judgment

Against Guidance on Count VI (Lanham Act), Count IV (Delaware Unfair Practices Act) and Count

V (New Mexico Unfair Practices Act), filed July 7, 2009 (Doc. 182).  The Court held hearings on

August 21, 2009 and September 2, 2009.  The primary issues are: (i) whether evidence of alleged

false statements by Dentsply International, Inc. ("Dentsply") and Tulsa Dental Products, LLC's

("TDP") (collectively "the Defendants") sales representatives is inadmissible hearsay; (ii) whether

that evidence, if admissible, is sufficient to create a factual issue whether the Defendants violated the Lanham Act; (iii) whether either New Mexico's Unfair Practices Act ("New Mexico UPA") or Delaware's Deceptive Trade Practices Act ("DPA") can apply to the Defendants's conduct without having unlawful extraterritorial effect; and (iv) whether the evidence is sufficient to create a genuine factual issue whether either state statute was violated.  Because the Court finds that Plaintiff Guidance Endodontics, LLC ("Guidance") has presented sufficient evidence to sustain the claims, it will deny the motion with respect to Counts V and VI. Because, however, there is no evidence that any conduct or harm occurred in Delaware, it will grant the motion for summary judgment as to Count IV.

## FACTUAL BACKGROUND

This case concerns a suit that Guidance, a small endodontic-equipment company, has brought against the much larger Defendants, who are both Guidance's rivals and its suppliers.  More background on the lawsuit general is set forth in the Court's earlier opinion.  See Guidance Endodontics, LLC v. Dentsply Intern., Inc., 2008 WL 6013069, at *1-5 (D.N.M.) (Browning, J.). In this motion, the Defendants largely challenge the admissibility and adequacy of Guidance's evidence of unfair business practices, but do not present a significant number of alleged facts of their own.  Thus, the Court lays out the evidence that Guidance contends is admissible and sufficient to defeat summary judgment.

According to Guidance, the Defendants, who dominate the endodontics instrument market, waged an organized campaign to drive it out of business.  As relevant here, Guidance accuses the Defendants of running a marketing campaign which involved falsely representing to actual and potential Guidance customers that Guidance was no longer able to supply files.  Guidance has provided several declarations to support these allegations.

Around September 2008, Debra Ruggles, Guidance's office manager, who normally answers calls to Guidance's main number, began receiving calls from customers asking if the Defendants were suing Guidance and if Guidance was going out of business.  See Declaration of Debra S. Ruggles in Opposition to Defendants' Motion for Summary Judgment ¶ 5, at 2 (executed July 28, 2009, filed July 29, 2009) (Doc. 212) ("Ruggles Decl.").  One unidentified man called and said he had heard that Guidance was no longer making V-Taper Files and wanted to know why.  See id. ¶ 7, at 2.  Suspecting that the Defendants' sales representatives were making negative comments about Guidance, Ruggles talked with John Ferone, Guidance's sales manager, who had also been receiving similar calls, and Sharon Bettes-Grove, its operations manager.  See id. ¶¶ 8-9, at 2-3.  They decided to began documenting the calls on "Negative Call Sheets."  Id. ¶ 9, at 3.  Before October 2, 2008, when she began documenting calls, Ruggles received five or six calls indicating generally that the callers had heard that Guidance was being sued and could no longer sell products.  See id. ¶ 10, at 3.  From October 2, 2008 to November 14, 2008, Ruggles documented five calls that were variations on the same theme: that a sale representative of one of the Defendants had told the caller that Guidance was being sued and could no longer sell or manufacture its products.  See id. ¶¶ 11-16, at 3-4; Exhibits A to E, Negative Calls/Comments Received Sheets (Doc. 212-2).  Ruggles also states that she received one or two similar calls after October 2, 2008, which she did not document. See Ruggles Decl. ¶ 17, at 5.

Ferone's declaration largely corroborates Ruggles' statements.  He asserts that, before October 2, 2008, he received between three and five negative calls of a similar nature to those Ruggles received.  See Declaration of John P. Ferone in Opposition to Defendants' Motion for Summary Judgment ¶ 6, at 2 (executed July 28, 2009, filed July 29, 2009)(Doc. 213)("Ferone Decl.").  Throughout October and November of 2008, Ferone received another five similar calls,

some of which he documented.  See id. ¶¶ 8-12, at 2-4; Exhibits F, G, Negative Calls/Comments Received Sheets (Doc. 213-2).  Bettes-Grove's declaration largely corroborates the other two; it states that she received one negative call, which she documented, in which a dentist from Las Vegas, Nevada said that she had heard from a sales representative from a large company that Defendant Tulsa Dental Products, LLC was buying out Guidance and Guidance could no longer sell files. See Declaration of Sharon Bettes-Groves in Opposition to Defendants' Motion for Summary Judgment ¶ 6, at 2 (executed July 28, 2009, filed July 29, 2009) (Doc. 214) ("Bettes-Grove Decl."); Exhibit H, Negative Calls/Comments Received Sheet (Doc. 214-2).

In addition to the declarations of its employees, Guidance offers the declaration of David Stramback, a dentist and Guidance customer from New Jersey.  Stramback says that Jason Halsey, a Tulsa Dental sale representative, came to visit him and asked what endodontics products he used. See David Stramback's Declaration ¶¶ 5-6, at 2 (executed December 1, 2008, filed July 29, 2009) (Doc. 216) ("Stramback Decl.").  When he found out that Stramback used Guidance products, Haley told Stramback that Guidance had just lost a major lawsuit and that Stramback would no longer be able to order Guidance files.  See id. ¶ 6, at 2.  Guidance also offers the declarations of Samuel Kratchman and Theresa Casada.  Each testified that a representative of Defendants contacted them, informed them that Guidance files were no longer available, and offered to provide them with files from Dentsply/TDP.  See Theresa Casada Declaration ¶¶ 6-10 (executed December 2, 2008, filed July 29, 2009) (Doc. 216) ("Casada Decl."); Samuel I. Kratchman Declaration ¶¶ 5-9 (executed November 26, 2008, filed July 29, 2009) (Doc. 216) ("Kratchman Decl.").

Guidance also points to a series of internal emails of employees of the Defendants which indicate an underlying scheme to put Guidance out of business.  For example, Brandon Miller, a sales employee of Tulsa Dental, wrote that recent litigation had forced Guidance files off the market,

and encouraged his team to "get in every Guidance account that you know of this week and convert them using Godfather!!!!"[1]  Exhibit 7, Email dated September 10, 2008 (Doc. 215-2).  And an email from Bill Newell, vice president and general manager at Tulsa Dental, discusses plans to attract Guidance customers and suggests that a "Guidance Target List" is needed to "AGGRESSIVELY target [Guidance] accounts with Max fire power."  Exhibit 8, Email dated September 5, 2008 (Doc. 215-2).  Another employee wrote about the need to "[u]nleash a massive and overwhelming force" against Guidance, Exhibit 12, Email dated March 5, 2009 (Doc. 215-12), and also urged: "Stay on the attack!!!!  The competition is losing....We are winning!  Keep firing!!!!" Exhibit 13, Email dated March 5, 2009 (Doc. 215-12).   Other emails reiterate the message of aggressive targeting of Guidance customers.

    This evidence is the crux of the issues here.  Beyond arguing that Guidance lacks admissible evidence of wrongful statements, however, the Defendants also make a few other contentions about the facts.  First, they contend that, based on the Complaint, Guidance has 5,400 customers.  See Motion ¶ 1, at 2.  Guidance says that the number is a fair approximation, but that as of September 1, 2008, Guidance had just over four-thousand customers who had purchased products.  See Exhibit 5, Customer List (Doc. 215-2).  Second, the Defendants contend that Guidance mailed marketing brochures to approximately five-thousand dentists.  See Dentsply/TDP's Memorandum in Support of this Motion for Summary Judgment on Counts VI (Lanham Act), Count IV (Delaware Unfair Practices Act), and Count V (New Mexico Unfair Practices Act) of Guidance's Complaint at 2, filed July 7, 2009 (Doc. 183) ("Memo").  Guidance says that this number is an approximation and deals only with obturators and not with all Guidance products. See Plaintiff's Memorandum of Law in

---

[1] Apparently, the Godfather is a promotional plan of the Defendants, which Guidance contends was aimed at improperly luring away Guidance customers.

Opposition to Defendants' Motion for Summary Judgment on Counts IV, V and VI of Plaintiff's Complaint at 7, filed July 29, 2009 (Doc. 211) ("Response").  Third, the Defendants contend that, according to Guidance, there are fifty-thousand dentists using endodontic products in the United States, of which five-thousand are "'high-end' users."  See Memo at 3.  According to Guidance, this statement misreads the Complaint, which Guidance notes alleges that there are five-thousand high-end users, which includes endodontists, corporate practices, HMO's and similar buyers.  See Complaint ¶ 21, at 5.  Finally, the Defendants contend that Guidance advertises its products on its website, which Guidance does not dispute.  See Memo at 3.

## PROCEDURAL BACKGROUND

Among the seven counts Guidance has brought against the Defendants, three allege unlawful business practices under state and federal law.  Count IV alleges that the Defendants violated the DPA by misrepresenting Guidance's ability to sell its products, disparaging Guidance's goods and services, and engaging in other unfair or deceptive conduct that created a likelihood of confusion or misunderstanding.  See Complaint ¶¶ 190-92, at 34.  Count V alleges that the same conduct violated the New Mexico UPA.  See Complaint ¶¶ 200-02, at 35.  Count VI alleges that the Defendants violated § 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), by making several false and misleading statements to Guidance's actual or potential customers regarding Guidance's goods, services, and commercial activities, in the course of advertising and promoting their business, with the intent to harm Guidance.  See Complaint ¶¶ 209-10, at 35-36.

The Defendants move for summary judgment on Counts IV, V and IV.  First, the Defendants contend that the only evidence Guidance has of alleged wrongful representations is inadmissible hearsay.  See Memo at 3-4.  Next, the Defendants maintain that, even if the evidence is admissible, it demonstrates only isolated incidents and at most a modest amount of activity that is insufficient

to rise to the level of commercial advertising or promotion as the Lanham Act requires.  See id. at 4-7.  With respect to the unfair practices claims, Guidance largely rests on its argument that there is no admissible evidence to support the claims, but also briefly contends that the representations on their face do not support any claims.  See id. at 7.

Guidance counters that the Lanham Act covers more than just classic, large-scale advertising campaigns and that Guidance has the sworn statements of several witnesses attesting to false statements that the Defendants' sales representatives made.  See Response at 9-12.  Guidance asserts that the evidence in the record shows at least twenty examples of misrepresentations and that they demonstrate that the Defendants were engaged in an organized campaign that satisfies the requirements of the Lanham Act.  See Response at 12-18.  Finally, Guidance contends that the same evidence supporting a Lanham Act violation supports a claim under New Mexico and Delaware's unfair practices statutes.  See Response at 18-20.

In reply, the Defendants first argue that neither New Mexico nor Delaware intended their unfair trade practices act to have extraterritorial effect, nor could they legally be allowed such scope, and that Guidance has not shown that any of the statements alleged by Guidance could have violated either state's law.  See Dentsply/TDP's Reply to Plaintiff's Memorandum of Law in Opposition to Defendants' (Dentsply/TDP's) Motion for Summary Judgment on Counts IV, V and VI of Plaintiff's Complaint (Doc. 211) at 1-4, filed August 4, 2009 (Doc. 230) ("Reply").  Turning to the Lanham Act, the Defendants discuss the various affidavits Guidance has supplied in support of its Response and argue that they are all inadmissible hearsay.  See Reply at 5-6.  Next, the Defendants argue that Guidance's arguments twist the case law on what constitutes commercial advertising or promotion, and that, even if the affidavits are admissible, they do not demonstrate such activity under the correct standard.  See id. at 6-9.  Lastly, the Defendants offer their views on the various affidavits

-7-

Guidance has filed, and contend that they do not add up to evidence of a Lanham Act violation. See Reply at 9-10.  After the Defendants filed their Reply, Guidance moved the Court to allow it to file a surreply.  See Plaintiff's Motion for Leave to File and Serve Surreply as to Defendants' Motion for Summary Judgment and Supporting Memorandum, filed August 7, 2009 (Doc. 239). The Court granted the motion.

At the first hearing on the motion, Defendants' counsel, Thomas Gulley and Rebecca Avitia, renewed their arguments that the contents of the declarations provided by Guidance were inadmissible hearsay and that therefore there is no evidence to support the Lanham Act claim. Transcript of Hearing at 3:4-6:5 (taken August 21, 2009).[2]  Gulley further argued that the statements made by the Defendants' employees were not disparaging because they were arguably true, and the declarants were simply confused about the facts.  See id. at 7:2-13:11.  Mr. Gully also attacked the claim on the basis that there was only admissible evidence of three instances of allegedly disparaging statements to a market of over 4,000 customers, and that such a ratio failed to constitute "commercial advertising and promotion" under the Lanham Act.  See id. at 13:14-20:1.  With respect to the UPA and DPA claims, Mr. Gulley again argued that a state cannot hold a person liable for conduct that occurred in another state.  See id. at 20:17-26:10.

Kyle Bisceglie responded for Guidance, first on the UPA and DPA claims.  He seemed to argue that one can sue a defendant under the uniform consumer protection law of the state of incorporation and of the state where the injury occurred.  See id. at 35:25-37:24.  He also defended the falsity of many of the statements in the declarations and exhibits attached to Guidance's response to the motion.  See id. at 38:12 - 40:14.  With respect to the Lanham Act claim and the admissibility

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

of evidence supporting it, Bisceglie argued that Guidance has at least three declarations with admissible evidence of false statements, and evidence of an internal policy of aggressive marketing intended to put Guidance out of business, thus satisfying the relatively light burden to survive a motion for summary judgment on the UPA, DPA, and Lanham Act claims. See id. at 44:6-48:25.

In their surreplies, the parties debated the extraterritoriality issue, citing further authorities. See Plaintiff's Surreply in Opposition to Defendants' Motion for Summary Judgment on Counts IV, V, and VI of Plaintiff's Complaint, filed August 28, 2009 (Doc. 278) ("Surreply"); Dentsply/TDP's Sur-Surreply to Plaintiff's Surreply in Opposition to Defendants' (Dentsply/TDP's) Motion for Summary Judgment on Counts IV, V, and VI of Plaintiff's Complaint, filed August 31, 2009 (Doc. 281) ("Sur-Surreply").  Guidance asserted that applying state consumer-protection laws to conduct that occurs in other states, but causes harm in New Mexico, does not raise any constitutional issues. It further argued that the proper substantive law to apply is that of New Mexico, because New Mexico conflicts-of-law principles select the law of the state where the harm occurred and not of where the conduct occurred.  The Defendants clarified that their argument against application of the consumer-protection statutes is primarily centered on the Commerce Clause of the United States Constitution.  They also argued that, if the Court finds this issue to be a choice-of-law question, that it should analogize these statutory consumer-protection claims to claims for defamation, not simple torts, and thus apply the law of the place where the statements were made.

At the hearing on the surreplies, Guidance argued that Defendants' response was deceptively focused on the small number of disparaging statements of which Guidance had direct evidence.  It urged the Court to consider the circumstantial evidence that the disparaging statements were more widely disseminated.  Guidance also emphasized the distinction between statutes that govern commerce, such as those in the cases that the Defendants cited, and statutes regulating tortious

conduct, such as the UPA and DPA.  Furthermore, the consumer-protection statutes at issue do not impose an undue burden on interstate commerce.  In response, the Defendants reiterated their argument that there was no admissible evidence supporting Guidance's claims.[3]  They then reiterated the arguments in their brief, that the applying the UPA to conduct occurring outside the state of New Mexico violates the Constitution.  They finally assert that allowing a state's unfair practices law to apply to conduct in other states would result in a treacherous net of regulations as some states prohibit conduct that other states permit.  On the choice-of-law issue, the Defendants assert that New Mexico's choice-of-law rules apply, but that New Mexico's choice-of-law rules relating to defamation, rather than that of basic torts, should apply.  And under those rules, they argue, the Court would apply the substantive law of the state of publication.

## ANALYSIS

While there are hearsay problems with some of Guidance's evidence, Guidance has introduced some admissible evidence to support its three claims against the Defendants. After a careful review of that evidence, the Court concludes that Guidance has sufficient evidence to support its Lanham Act claim. Moreover, Guidance's New Mexico UPA claim is a valid cause of action and can be asserted without having impermissible extraterritorial effect.

## I.   GUIDANCE HAS INTRODUCED SOME ADMISSIBLE EVIDENCE TO SUPPORT ITS THREE CLAIMS AGAINST THE DEFENDANTS.

"Summary judgment is appropriate only if the admissible evidence shows 'there is no

---

[3] Mr. Gulley, on the Defendants' behalf, also emphasized that the Court should disregard some of the arguments in Guidance's surreply because it made reference to sections 57-12-2D(15) and 57-12-2D(17) of the UPA, which have never before been asserted.  As it has been shown no authority to the contrary, the Court finds that those subsections merely describe examples of conduct that would violate the UPA -- different theories -- and not independent claims.  Because Guidance has provided sufficient evidence to avoid summary judgment on its UPA claim, the Court will not dismiss the claim.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Sports Unlimited, Inc. v. Lankford Enters., Inc., 275 F.3d 996, 999 (10th Cir. 2002) (citing Fed. R. Civ. P. 56(c)). See also Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1122 (10th Cir. 2005).[4] Contending that the evidence Guidance offers is hearsay, the Defendants maintain that Guidance has no admissible evidence to support Counts VI, V, or VI. The Court agrees that some of the statements in the materials Guidance has submitted are inadmissible hearsay. Nonetheless, some of the evidence could support Guidance's claims.

When reviewing a motion for summary judgment, the Court should keep in mind three principles that the Supreme Court of the United States has set forth. First, it is not the Court's role to weigh evidence; the Court's role is to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1980). The second principle is that the Court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999). Third, the Court cannot decide any issues of credibility in a summary-judgment motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

The Defendants primarily argue that the declarations of Guidance employees stating that customers had spoken about the Defendants' sale representative making comments to the customers

---

[4] Bryant v. Farmers Ins. Exchange could arguably be interpreted to permit all of the evidence attached to Guidance's Response to be admitted as summary judgment evidence. See 432 F.3d at 1122 ("At the summary judgment stage, the parties need not submit evidence in a form admissible at trial; however, the content or the substance of the evidence must be admissible."). But see Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004) ("an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."). The Court takes the more conservative view both because it finds sufficient evidence to maintain Guidance's claims using the conservative approach and because it can think of no way Guidance could present the double-hearsay statements that would make them admissible.

is inadmissible hearsay.  The Court largely agrees.  There are two layers of potential hearsay in the employees' declarations, but exceptions are available to bypass only one of the layers.  This fact is best explained in a concrete fashion.

For example, Ruggles states that she received calls in which the caller told her that one of the Defendants' sales representatives had told the caller that Guidance was being sued and could no longer sell its products.  Ruggles' statement itself is not hearsay.  She can testify that a customer said something to her, so long as it is not being offered to prove the truth of what was said.  The problem, however, is that the Court cannot accept that a sales representative was making a negative statement about Guidance without taking the customer's statement for the truth of the matters asserted.

Guidance contends that two exceptions apply: that the statements are not for the truth of the matter asserted and that they are vicarious admissions.  But those exceptions both address the same hearsay problem.  Statements from the sales representative to the customer are not hearsay for both those reasons. The hearsay issue is not whether the representative was being truthful -- indeed, Guidance asserts that the statements were false -- but whether the statement was made.  And the representative's statement qualifies as an admission under rule 801(d)(2)(D) of the Federal Rules of Evidence.  Thus, if the <u>customer</u> were testifying, the representative's statements to the customer would be admissible.  No exception, however, allows the Guidance employees to pass along the customers' statements about the representatives' statements.  The customers are not the Defendants' agents.  And to reach the representatives' statements, the Court would have to consider the customers' statements for their truthfulness -- that the representative said what the customer claims he said.  In other words, the issue is not whether the customer said something to Guidance employees, but whether the Court can admit what the customer said for the truth of the matters asserted.

On the other hand, some evidence presented by Guidance avoids this double-hearsay problem.  Most notably, Guidance presents declarations by dental-health professionals that the Defendants' sales representatives told them that Guidance had lost a lawsuit to the Defendants and thus could no longer supply endodontic files.  In two conversations, the sales representative allegedly urged the professional to purchase files from Defendants instead.  See Kratchman Dec. ¶ 8; Casada Dec. ¶¶ 6-9.  The statements of the Defendants' sales representatives are admissions under rule 801(d)(2) and thus non-hearsay.

Further, the questions asked during telephone calls from Guidance customers, inquiring whether Guidance was still able to supply files, are non-hearsay, so long as reference to what the Defendants' representatives said are ignored.  The questions asked by the customers would only be hearsay if intended by the customers to function as an assertion -- the customers' intent controls. See Fed. R. Evid. 801(c); United States v. Summers, 414 F.3d 1287, 1300 (10th Cir.2005) ("[A] declaration in the form of a question may . . . constitute an assertion within the meaning of Rule 801(a) and (c), [but one should] focus the inquiry on the declarant's intent."); Fed. R. Evid. 801(a) note to subdivision (a) ("[N]onassertive verbal conduct and verbal conduct which is assertive but offered as a basis for inferring something other than the matter asserted [are] excluded from the definition of hearsay by the language of subdivision (c).").  "[T]he burden is on the opponent to show that the speaker had the intent to assert the implication in the statement," and the Defendants have shown the Court no reason to believe these customers questions were intended to be anything other than sincere inquiries.  S. Saltzburg, M. Martin & D. Capra, Federal Rules of Evidence Manual § 801.02[1][i], at 801-23 (9th ed. 2006) (citing United States v. Summers, 414 F.3d at 1300).  The assertion of what the customer had heard from the Defendants' representatives was likely nothing more than a preface to provide context.  The customers did not know the situation.  This analysis

-13-

avoids the "Ruggles problem," discussed above, because the fact-finder is no longer required to believe what the customer asserts she was told; the fact-finder must only believe that the customer asked the question.  Combined with the testimony of its three dental-health professionals, the sudden and frequent calls with questions are circumstantial evidence of a rumor that Guidance is in trouble.

Finally, Guidance has provided internal documents attached to the declaration of its attorney, Mr. Bisceglie.  See Bisceglie Dec. Exhibits 1-18.  Most of those are the Defendants' internal emails, sent between the Defendants' employees.  They are out-of-court statements, but the vast majority would be considered admissions of a party opponent under rule 801(d)(2) and thus non-hearsay. Some are not offered for the truth of the matter asserted, but are offered as evidence of motive or intent to engage in the anti-competitive, unfair, and deceptive practices alleged.  Some could arguably never be offered their truth. For instance, one email sent to many of Defendants' employees states: "As a result of recent litigation, Guidance files are off the market!!!!"  Exhibit 7, Email dated September 10, 2008 (Doc. 215-2).  Guidance asserts that this statement was false, and Guidance would therefore not offer it for its truth.  Others are orders or directives that cannot be said to have any clear truth or falsity.  Thus, Guidance has provided these internal documents, the declarations of Stramback, Kratchman, and Casada, and the non-hearsay portion of the declarations by Ruggles, Ferone, and Bettes-Groves as admissible evidence tending to prove its Lanham Act, DPA, and New Mexico UPA claims.

## II.   GUIDANCE HAS SUFFICIENT EVIDENCE TO SUPPORT ITS LANHAM ACT CLAIM.

Guidance's claim under § 43(a)(1)(B) of the Lanham Act requires it to prove some "false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another

person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(B).  The Defendants

argue that the claim fails on two fronts: (i) Guidance has no admissible evidence of false and/or

misleading representations by the Defendants; and (ii) even if Guidance produces some admissible

evidence of false and/or misleading representations from the ten dental offices Guidance identifies

in its interrogatory answers, these representations as a matter of law do no constitute "commercial

advertising or promotion" as required to sustain a claim under § 43(a)(1)(B).

As discussed above, Guidance has provided some admissible evidence of false and/or

misleading representations by the Defendants' representatives.  If believed, the testimony of

Stramback, Kratchman, and Casada creates a genuine issue of fact whether the Defendants'

representatives made the false statements described in the declarations.  Less obvious is whether the

evidence raises a fact issue whether the Defendants' conduct constitutes "commercial advertising

or promotion."

For representations to be "commercial advertising or promotion" under the Lanham Act, §

43(a)(1)(B), they must be:

> (1) commercial speech; (2) by a defendant who is in commercial
> competition with plaintiff; (3) for the purpose of influencing
> consumers to buy defendant's goods or services. While the
> representations need not be made in a "classic advertising campaign,"
> but may consist instead of more informal types of "promotion," the
> representations (4) must be disseminated sufficiently to the relevant
> purchasing public to constitute "advertising" or "promotion" within
> that industry.

Proctor & Gamble v. Haugen, 222 F.3d 1262, 1273-74 (10th Cir. 2000).  In their motion, the

Defendants attack only the fourth element of this test, arguing that a small number of instances of

disparaging statements for which Guidance has direct evidence is insufficient, as a matter of law,

to be sufficient dissemination.  Were the Court to consider only the three statements described in

the Stramback, Kratchman and Casada declarations, they might be correct.

The Court is not convinced, however, that this fourth element of "commercial advertising or promotion" is controlled purely by the instances of disparaging statements of which there is direct evidence. One must consider both direct and circumstantial evidence in determining whether there has been sufficient dissemination.

Guidance has presented evidence of the following: (i) three specific instances of a representative of Dentsply or TDP contacting a customers of Guidance, making a false statement that Guidance can no longer provide certain products, and, in two cases, attempting to persuade the customer to buy the Defendants' products instead; (ii) dissemination of the same false information amongst the Defendants' sales representatives and other employees; (iii) a rash of mysterious telephone calls inquiring whether it could still supply those products; and (iv) an internal policy of extremely competitive marketing on the Defendants' part. Based on this evidence, viewed in the light most favorable to Guidance, and on the fact that Guidance and the Defendants share target markets, the Court finds that Guidance has created a genuine issue of material fact with respect to both challenged elements of its Lanham Act claim.

Sports Unlimited v. Lankford Enterprises, 275 F.3d 996 (10th Cir. 2002), which the Defendants cite, is easily distinguished. In Sports Unlimited v. Lankford Enterprises, Tenth Circuit Court of Appeals affirmed the district court, which granted summary judgment against the plaintiff on his § 43(a)(1)(B) claim because the evidence did not show that the defendant had engaged in "commercial advertising or promotion." 275 F.3d at 998, 1005. The parties were both providers of gymnasium floors. See id. at 999. The defendant had acquired a "reference list" containing allegedly defamatory information about the plaintiff, which defendant distributed to a number of plaintiff's customers. See id. The plaintiff, however, alleged that the defendant sent the list to, at

-16-

most, seven customers out of an estimated market of 150.  See id.  There was no evidence in Sports Unlimited v. Lankford Enterprises of a wider range of dissemination, perhaps reaching a substantial segment of the market.  On the other hand, a jury might infer a larger dissemination of this false information based on the evidence Guidance has proffered.

The Defendants also cite Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48 (2d Cir. 2002).  Although not binding, it is also distinguishable.  There, Fashion Boutique and Fendi were both businesses selling "Fendi" brand merchandise in New York.  See id. at 53.  Shortly after Fendi set up shop, Fashion Boutique suffered a sharp decline in sales.  See id.  Fashion Boutique sued Fendi under § 43(a)(1)(B) and New York law.  See id.  When Fendi moved for summary judgment, Fashion Boutique presented evidence of numerous negative statements about Fashion Boutique made to Fendi consumers by Fendi employees.  See id. at 54.  Each statement, however, was made after the customer approached the Fendi employee and asked a question or otherwise made reference to Fashion Boutique.  See id.  The district court granted the motion, and the Second Circuit affirmed.  See id. at 62.

The Second Circuit in Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc. found that the key to determining whether actions are "commercial advertising or promotion" is whether the representations made are part of an organized campaign to penetrate the relevant market.  See id. at 57.   It also found instructive the lower court's distinction between "proactive and reactive" conduct.  See id. at 57-58.  In the end, it held that Fashion Boutique had simply failed to provide any evidence of such an organized campaign.  See id. at 58.  The Second Circuit said: "twenty-seven oral statements regarding plaintiff's products in a marketplace of thousands of customers . . . is insufficient to satisfy the requirement that representations be disseminated widely in order to constitute 'commercial advertising or promotion' under the Lanham Act."  Id. at 58.  Taken in

-17-

context, however, it appears clear that the Second Circuit did not find the number of admissible oral statements alone to be dispositive. Neither does this Court.

In short, the Court finds that Guidance has presented sufficient evidence to create a genuine issue of material fact whether the Defendants engaged in "commercial advertising or promotion." The evidence, taken together, would allow a rational fact finder to conclude that the Defendants were encouraging their employees to contact all of Guidance's customers. Combined with evidence of false information being distributed internally by the Defendants and to Guidance customers, the Court believes that there is a genuine issue of material fact whether the Defendants engaged in commercial advertising and promotion.

III.   **GUIDANCE'S NEW MEXICO UPA CLAIM IS A VALID CLAIM AND CAN BE ASSERTED WITHOUT HAVING IMPERMISSIBLE EXTRATERRITORIAL EFFECT.**

The Defendants submit that Guidance's Delaware Act and New Mexico UPA claims fail on the basis that Guidance has no admissible evidence of misrepresentation, disparagement, or other unfair or deceptive conduct by Dentsply/TDP to sustain claims under those acts. The Defendants are correct with regard to the DPA. The New Mexico UPA, on the other hand, does apply, and Guidance has provided sufficient evidence to sustain that claim.

A.   **NEW MEXICO'S CHOICE-OF-LAW RULES DICTATE THAT NEW MEXICO LAW APPLIES TO THIS CASE.**

Where, as in this case, the plaintiff has invoked the district court's jurisdiction on the basis of diversity of citizenship, the court looks to the forum state's choice-of-law rules to determine which state's substantive law to apply. See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496-97 (1941); Pepsi-Cola Bottling Co. v. PepsiCo, Inc., 431 F.3d 1241, 1255 (10th Cir. 2005). The first step in a New Mexico choice-of-law analysis is to characterize the claim by "area of substantive

-18-

law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular

claim or issue." Terrazas v. Garland & Loman, Inc., 140 N.M. 293, 296, 142 P.3d 374, 377 (N.M.

App. 2006).  There are only a few categories within which claims might fall -- "[t]ort cases, i.e. all

'civil wrongs,' are one class; contracts, i.e., every kind of enforceable promise, is another single

class." James Audley McLaughlin, Conflict of Laws: the Choice of Law Lex Loci Doctrine, the

Beguiling Appeal of a Dead Tradition, Part One, 93 W. Va. L. Rev. 957, 989 (1991) (describing the

categories as "tort, contract, or some other")[5].

The Court will categorize these claims as torts.  Other courts that have had to classify a

violation of a consumer-protection statute in its choice-of-law analysis usually do so by asking to

what common-law cause of action the wrongful conduct is most similar.  See In re

Bridgestone/Firestone, Inc. Tires Products Liability Litigation, 155 F. Supp. 2d 1069, 1078, 1079

n.6 (S.D. Ind. 2001)(finding the consumer-protection law violation most like fraudulent

misrepresentation); Heller v. Manufacturers Product Research Group of North America, Inc., 59

F.3d 1514, 1537-38 (5th Cir. 1995) (weighing the source of the duty allegedly violated and the harm

alleged in finding the Texas DTPA claim to sound in tort); Crellin Technologies, Inc. v.

Equipmentlease Corp., 18 F.3d 1, 11 (1st Cir. 1994) ("[W]hen a chapter 93A claim and the requested

remedy are highly analogous to a tort claim and remedy, the chapter 93A claim should be considered

as a tort for choice-of-law purposes."); Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 213-14 (E.D. Pa.

2000) (finding that a claim was "no more than a dressed-up breach of contract or breach of warranty

claim," and applying contract choice-of-law principles).  Guidance complains of harm from lost

---

[5]Professor McLaughlin criticizes this characterize-and-apply approach as being easily manipulated and inconsistent for claims, like a consumer-protection claim, that are not obviously torts or contracts.  See id. at 989 & n.109.  Nevertheless, as a federal district court sitting in diversity, the Court must apply the rule applied by the courts of New Mexico.

sales based on misrepresentations made to its potential customers, which resembles damages under a claim for tortious interference with prospective contractual relations -- a tort.  Further, these claims are grounded in breach of a duty created by law -- the consumer-protection statutes -- not by any agreement between the parties.  Finally, both parties agree that the consumer-protection claims should be treated as tort claims for choice-of-law purposes.  As the Court will address below, they disagree regarding only what tort.  The Court, therefore, will apply tort choice-of-law principles.

Step two of is to determine what substantive law New Mexico would apply to these tort-like claims.  See Terrazas v. Garland & Loman, Inc., 140 N.M. at 296, 142 P.3d at 377.  New Mexico applies "the doctrine of *lex loci delicti commissi*," or the law of the place where the wrong occurred.  Torres v. State, 119 N.M. 609, 613, 894 P.2d 386, 390 (N.M. 1995); Terrazas v. Garland & Loman, Inc., 140 N.M. at 296, 142 P.3d at 377.  While Guidance might have provided some evidence of conduct that would violate the Delaware DPA or the New Mexico UPA, it has provided no evidence that any wrongful conduct occurred in this state.  The declaration by Ruggles recounted suspicious telephone calls received in New Mexico, but, even if fully admissible, it merely relays allegedly wrongful conduct occurring at an undisclosed location.  See Ruggles Dec. ¶¶ 5, 10-17, at 2-7.  The recount of Bettes-Groves was the same, describing only phone calls that imply that wrongful conduct occurred.  See Bettes-Groves Dec. ¶¶ 4, 6, at 2.  Ferone gave a declaration to the same effect.  See Ferone Dec. ¶¶ 6, 8-12, at 2-4.  None of these declarations demonstrate that wrongful conduct occurred in New Mexico.

As discussed above, Guidance also provided declarations of three dental-health professionals.  They are more direct, and recount things that the Defendants' representatives actually said.  See Stramback Dec. ¶¶ 5-6, at 2; Casada Dec. ¶¶ 6-9, at 7; Kratchman Dec. ¶ 8, at 4.  According to the declarations, however, Stramback's encounter with Jason Halsey occurred in

Stramback's office in Matawan, New Jersey, and Theresa Casada's encounter with Shawn Dehart occurred in Sterling Heights, Michigan.  See Stramback Dec. ¶¶ 1, 5, at 1-2; Casada Dec. ¶¶ 1, 6, at 6-7. Kratchman talked to a Dentsply/TDP representative by phone, and there is no indication where the telephone call originated.  Neither do any of the documents attached to the Bisceglie declaration prove that any wrongful conduct occurred in New Mexico or Delaware. See Bisceglie Dec. Exs. 1-18.

This failure is not fatal to the UPA claim, however.  New Mexico's *lex loci delicti* doctrine has its roots in the First Restatement, which defines the place of the wrong as "the state where the last event necessary to make an actor liable for an alleged tort takes place." Zamora v. Smalley, 68 N.M. 45, 47, 358 P.2d 362, 363 (1961); Restatement (First) Conflicts of Law § 377 (1934).  This location includes both the place where the acts occurred and where the legal consequences occur. See Restatement (First) Conflicts of Law § 377, cmt. a (1934); First Nat'l Bank in Albuquerque v. Benson, 89 N.M. 481, 482, 553 P.2d 1288, 1289 (N.M. App. 1976) (referring to the rule as requiring application of "the law of the State of injury").  The injury allegedly caused by the Defendants is damages from lost sales that occurred in tandem with the telephone calls discussed above.

The Defendants argue that the Court should analogize these claims, based on false or misleading representations, to claims for defamation, rather than traditional torts.  See Sur-Surreply at 5-6.[6] They contend that, with respect to defamation claims, the place of the harm has traditionally been considered to be the place where the defamatory statement was published -- the place where it was seen or heard by non-parties.  See id. at 6.  For this rule, they cite to the Restatement (First)

---

[6] Because defamation is a tort caused of action, the Defendants appear to concede that, for its choice-of-law analysis, the Court should characterize and treat this UPA claim as some category of tort rather than as a contract claim.

-21-

of Conflict of Laws, still followed in New Mexico, which says: "Where harm is done to the reputation of a person, the place of wrong is where the defamatory statement is communicated." Restatement (First) of Torts § 377, note 5 (1934).  In defamation actions, where the harm alleged is to a person's reputation, this apparent "exception" to the usual tort choice-of-law rule makes sense because the harm occurs at the moment the third-party hears or reads the defamatory statement. Thus, it is not an exception to the general rule, but an application of it.  The place where the defamatory statement is seen or heard <u>is</u> the place where the harm occurred.

Guidance, however, does not assert damages from harm to its reputation.  It complains of economic harm caused by the Defendants duping its customers into believing that Guidance can no longer supply the kind of goods they want, causing the customers to shop elsewhere.  <u>See</u> Complaint ¶¶ 201, 206, at 35 (complaining of damages caused by the "likelihood of confusion or misunderstanding among potential or actual customers").  Courts in Virginia and North Carolina have had occasion to apply the *lex loci* rule in the context of a consumer protection statute and have come to the same conclusion.  <u>See</u> <u>Corinthian Mortg. Corp. v. Choicepoint Precision Marketing, LLC</u>, 543 F. Supp. 2d 497, 502-03 (E.D. Va. 2008) ("Plaintiff's unfair trade practices claim is a tort claim, with injuries suffered in Virginia, and therefore is governed by Virginia substantive law."); <u>United Virginia Bank v. Air-Lift Associates, Inc.</u>, 79 N.C. App. 315, 321, 339 S.E.2d 90, 93 (N.C. App. 1986).  Because this case does not fit into the special case described in the Note 5 of §377, the Court will apply the usual choice-of-law rules applicable to general torts, and apply the substantive law of New Mexico to Guidance's UPA and DPA claims.

**B.     APPLICATION OF THE NEW MEXICO UNFAIR PRACTICES ACT TO DEFENDANTS DOES NOT VIOLATE THE COMMERCE CLAUSE OF THE UNITED STATES CONSTITUTION.**

The Court finds unpersuasive the Defendants' assertion that the New Mexico UPA cannot

apply.  They argue that, since Guidance produced no evidence of conduct occurring in New Mexico or in Delaware, these state-law claims fail automatically because they cannot create liability for conduct occurring in other states without having an impermissible "extraterritorial" effect.  See Reply at 2.

Though the Defendants make sweeping statements about prohibiting the application of New Mexico law to conduct outside its borders, they cite primarily to cases invalidating state legislation on Dormant Commerce Clause grounds.  See Reply at 2.  The cases they cite are distinguishable, however, and application of the principles drawn from those cases lead the Court to conclude that allowing Guidance to proceed on its New Mexico UPA claim will not violate the Commerce Clause.

"Not every exercise of state power with some impact on interstate commerce is invalid." Edgar v. Mite Corp., 457 U.S. 624, 640 (1982).  In Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573, 578-79 (1986), one case the Defendants cite, the Supreme Court of the United States explained its "two-tiered approach to analyzing state economic regulation under the Commerce Clause."  476 U.S. at 578-79.  Step one asks whether the state statute directly regulates or discriminates against interstate commerce; if so, the statute is generally struck down. See id. at 579.  Otherwise, "a statute [that] has only indirect effects on interstate commerce and regulates evenhandedly" is invalid only where "the burden on interstate commerce clearly exceeds the local benefits."  Id.  See Edgar v. Mite Corp., 457 U.S. at 640.  The ultimate consideration is "the overall effect of the statute on both local and interstate activity."  Id.  Thus, if the statute has only an indirect impact on interstate commerce, it will survive this Commerce Clause analysis as long as the local benefits exceed the burden imposed on interstate commerce.

Ideally, if nobody engaged in unfair or deceptive trade practices, the application of the New Mexico UPA to any company over which New Mexico has jurisdiction would have no effect on

interstate commerce.  Realizing that this is not an ideal world and accepting the fact that different

states may have different impressions of what constitutes unfair conduct, the New Mexico UPA's

impact on interstate commerce is indirect.  It does not directly regulate legitimate commercial

conduct, but it creates restrictions on certain unfair acts in the course of commercial conduct.

Specifically, the statute applies to:

> an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or
> misleading oral or written statement, visual description or other representation of any
> kind knowingly made in connection with the sale, lease, rental or loan of goods or
> services or in the extension of credit or in the collection of debts by a person in the
> regular course of the person's trade or commerce, that may, tends to or does deceive
> or mislead any person . . . .

NMSA 1978, § 57-12-2D. It also applies to:

> an act or practice in connection with the sale, lease, rental or loan, or in connection
> with the offering for sale, lease, rental or loan, of any goods or services, including
> services provided by licensed professionals, or in the extension of credit or in the
> collection of debts that to a person's detriment (1) takes advantage of the lack of
> knowledge, ability, experience or capacity of a person to a grossly unfair degree; or
> (2) results in a gross disparity between the value received by a person and the price
> paid.

NMSA 1978, § 57-12-2E.

Brown-Forman Distillers Corp. v. New York State Liquor Authority, on the other hand, dealt

with a New York law directly controlling the price that a liquor producer could charge for alcohol

in the state based on the price the producer charged in any other state.  See Brown-Forman Distillers

Corp. v. New York State Liquor Authority  476 U.S. at 575-76.  See also Healy v. Beer Institute,

Inc., 491 U.S. 324 (1989) (dealing with a very similar statute and arriving at the same result).  In

Edgar v. MITE Corp., 457 U.S. 624 (1982), also cited by the Defendants, the Supreme Court struck

down an Illinois statute that restricted interstate tender offers.  See 457 U.S. at 634-35, 641.  The

Supreme Court concluded that the statute directly restrained interstate commerce and had

"sweeping" extraterritorial effects.  Id. at 642.

　　The Defendants cite Bissel Carpet Sweeper v. Masters Mail Order, 240 F.2d 684 (4th Cir. 1957), as the case "closest to the case before this Court."  Reply at 2.  It is the most factually similar of the authorities that the Defendants cite.  In the case, Bissell had entered into agreements with distributors in Maryland and other States which have fair trade laws, under which they agreed not to advertise or resell certain items for less than certain minimum prices.  See 240 F.2d at 686. Maryland's fair trade law stated that "wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in a fair trade contract is unfair competition, whether or not the advertiser or seller is a party to the contract." 240 F.2d at 687.  Masters Mail Order was a competitor that was incorporated in Maryland, but its place of business and all sales and advertising had occurred in Washington, DC.  See id. at 685.  The parties conceded that the Maryland law could not properly govern the price at which goods could be sold in Washington DC. See 240 F.2d at 687.  The United States Court of Appeals for the Fourth Circuit then found the Maryland statute could apply only to advertising that occurred within the state of Maryland.  See 240 F.2d at 687.

　　This Fourth Circuit case does not impact the resolution of this case for three reasons.  First, this 1957 Fourth Circuit decision is not binding on this Court.  Second, the Fourth Circuit reached its decision on the advertising issue based on statutory construction and existing Maryland case law that restricted the scope of Maryland's fair trade law to advertising that occurred in Maryland.  See 240 F.2d at 688.  The Fourth Circuit mentioned the potential unconstitutionality of a statute that attempts to regulate advertising in other states as dicta, but did not hold that a contrary interpretation would violate the Constitution.  See 240 F.2d at 688.  Finally, this case deals with an economic regulation -- dictating maximum advertised prices and resale prices -- being asserted over out-of-

state conduct. The Court finds that, even if a state statute that controls the price for which a product can be advertised has a "direct" impact on interstate commerce, a statute that prohibits only particular predatory conduct has an indirect impact.

Rather than strike down the UPA and DPA, or restrict their application, they should be put to the balancing test discussed above, weighing the burden on interstate commerce against the local benefit. The most relevant policy underlying the two statutes is the protection of New Mexico and Delaware consumers. The states' interest in that policy is strong, and the countervailing burden on interstate commerce caused by restricting unfair and deceptive practices in situations in which the state can exercise personal jurisdiction over the defendant is relatively weak. The traditional conflict-of-laws rules and the due process limits on personal jurisdiction are sufficient to protect out-of-state defendants from unfair application of a state's laws, and there is no need to create new constitutional limits on the reach of a state's law. The Court is unconvinced that entertaining the UPA or DPA claims violate the Commerce Clause.

## C.   BASED ON THE APPLICATION OF NEW MEXICO LAW AND PERSONAL JURISDICTION OVER THE DEFENDANTS, GUIDANCE MAY ASSERT A CLAIM UNDER THE NEW MEXICO UPA.

Rather than creating a new body of law to prevent a state from unfairly reaching out with its laws, the Court finds the relevant questions to be ones of choice-of-law and personal jurisdiction over the Defendants. Neither Dentsply nor TDP has objected to the Court's exercise of personal jurisdiction and, at this point, any such objection is waived. The choice of law was discussed above, and New Mexico law -- the law where the injury occurred -- applies to these consumer-protection claims. Because New Mexico law applies, based on an injury occurring within the state, a New Mexico Unfair Practices Act claim is appropriate. Conversely, with no basis for applying the law of Delaware -- no evidence of wrongful conduct or injury occurring in Delaware -- a claim under

the Delaware DPA is not available.

The other Supreme Court case cited by the Defendants is <u>Miller Bros. v. Maryland</u>, 347 U.S. 340 (1954).  In <u>Miller Bros. v. Maryland</u>, the State of Maryland seized a delivery truck belonging to Miller Bros., a Delaware Corporation. <u>See</u> <u>id.</u> at 341.  The State sought to hold Miller Bros. liable for collection and remittance of a Maryland use tax that it was allegedly supposed to collect from its Maryland customers.  <u>See</u> <u>id.</u>.  The only contact that Miller Bros. had with Maryland was incidental advertising -- not directed at Maryland -- and the occasional delivery of goods to its Maryland customers' residences via company truck. <u>See id.</u> at 342. The Supreme Court thought that imposition of the tax threatened the Commerce Clause, but the aspect of the tax that concerned the Court was that it was imposed "[w]here there is jurisdiction neither as to person nor property."  <u>Id.</u> at 342, 344 (citing <u>City of St. Louis v. Wiggins Ferry Co.</u>, 11 Wall. 423, 430 (1870)).

<u>Miller Bros. v. Maryland</u> explained that, to satisfy due process, there need only be "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax."  347 U.S. at 345.  If the imposition of a tax is analogous to imposing restrictions on certain deceptive trade practices, as the Defendants appear to concede by citing this authority, the Court sees no problem in holding the Defendants to the conduct standards set down by New Mexico law when the Defendants' dealings with a New Mexico resident might subject the Defendants to personal jurisdiction in a New Mexico court. The Defendants do not contend that the Court lacks jurisdiction over it.  And their relationship to the New Mexico plaintiff creates the necessary nexus between the state and the conduct, such that New Mexico is justified in imposing its controls on the Defendants' conduct with respect to its consumers.  <u>Miller Bros. v. Maryland</u> does not require more. As a result, summary judgment will be granted in favor of the Defendants with respect to the DPA claim, but the UPA claim requires further analysis.

IV.    **GUIDANCE HAS SUFFICIENT EVIDENCE OF MISREPRESENTATION AND
       DISPARAGEMENT TO SUPPORT ITS NEW MEXICO UPA CLAIM.**

The Defendants argue that Guidance has "no admissible evidence of conduct which could

possibly be a violation of the . . . New Mexico Act." Defendants' Memorandum at 7. They do not

specify a particular element or elements as to which there is no evidence.  To survive a motion for

summary judgment on a claim arising under the New Mexico UPA, a plaintiff must present specific

facts tending to show four elements:

> (1) Defendant[ ] made an oral or written statement that was false or
> misleading; (2) the false or misleading statement was knowingly
> made in connection with the collection of a debt; (3) the
> representation occurred in the regular course of the representor's trade
> or commerce; and (4) the representation may, tends to, or does,
> deceive or mislead any person.

Billsie v. Brooksbank, 525 F. Supp. 2d 1290, 1295 (D.N.M. 2007) (quoting Russey v. Rankin, 911

F. Supp. 1449, 1459-60 (D.N.M.1995)). See NMSA 1978, § 57-12-2D.

As mentioned previously, the Court must take the evidence in the light most favorable to the

non-movant, Guidance.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Taken in that light,

the declarations of Stramback, Kratchman and Casada show a genuine fact issue whether the

Defendants' representatives made false or misleading statements, that those statements were made

in connection with the sale or attempted sale of goods, and that those statements were made in the

regular course of the representatives trade.  Stramback's deposition, for example, states that a TDP

representative came to him and told him "that Guidance had just lost a major lawsuit and that, as a

result, [Stramback] could no longer obtain Guidance Files."  Stramback Dec. ¶ 6 at 2 (Doc. 216).

Similar information was conveyed to Casada -- that Guidance had lost a lawsuit to Dentsply.  See

Casada Dec. ¶ 6-7, at 7 (Doc. 216).  Mr. Gulley conceded at the hearing on this motion that the

statement was not fully accurate -- the case was settled, and Guidance was still able to sell some

-28-

files.  See August 21, 2009 Transcript of Hearing at 54:19-55:14. The representative was a salesperson and allegedly made his or her false statements as a preface to a sales pitch -- the ordinary course of trade or commerce.

The Defendants make much of the fact that none of these witnesses seemed to believe that the statements were true.  Under the New Mexico UPA, however, successful deception is not necessary; it is enough that the statement "tends to" deceive.  Smoot v. Physicians Life Ins. Co., 135 N.M. 265, 270, 87 P.3d 545, 551 (2003).  Further, it is those customers who did not believe the statements, or who would be skeptical about them, who would be most likely to bring them to Guidance's attention.  Those who were deceived might carry on with life none the wiser.  The statements that Guidance can no longer sell particular files, if false, tend to deceive.

Finally, it is arguable that there exists no evidence that the misrepresentations were "knowingly" made.  The "knowing" requirement, under New Mexico law, has a relatively low threshold. "The 'knowingly made' requirement is met if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading."  Stevenson v. Louis Dreyfus Corp., 112 N.M. 97, 100-01, 811 P.2d 1308, 1311-12 (1991).  At least one of the admissible statements alleged that Guidance lost a lawsuit to Dentsply.  First, Dentsply is considered to be on notice of facts known to its agents.  See Berlangieri v. Running Elk Corp., 132 N.M. 92, 99, 44 P.3d 538, 545 (Ct. App. 2002) ("[B]ecause Bundy clearly acted as Running Elk's agent . . . I would impute Bundy's knowledge . . . to his principal, Running Elk."); Tom Growney Equipment Co. v. Jouett, 137 N.M. 497, 509,113 P.3d 320, 332 (2005) ("[I]f Big Dog or an agent in charge of the work had actual knowledge . . . Jouett is not required to give written notice." (emphasis added)).  A rational fact-finder could presume that someone employed by Dentsply knew the actual disposition of the prior

-29-

Dentsply-Guidance lawsuit.  Thus, through imputation of knowledge, Dentsply knew, or at least should have known, that the broad statements of which Guidance presents evidence were false.

The Court finds that Guidance has provided evidence sufficient to establish a genuine issue of fact with respect to the elements of its New Mexico UPA claim.

**IT IS ORDERED** that the Dentsply/TDP Motion for Summary Judgment Against Guidance on Count VI (Lanham Act), Count IV (Delaware Unfair Practices Act) and Count V (New Mexico Unfair Practices Act) is granted in part and denied in part. The motion is granted with respect to Count IV (Delaware Unfair Practices Act). The motion is otherwise denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kyle C. Bisceglie
Renee M. Zaystev
Olshan, Grundam, Frome, Rosenweiz
 & Woldosky, LLP
New York, New York

-- and --

John J. Kelly
Donald A. DeCandia
Ryan Flynn
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Albuquerque, New Mexico

*Attorneys for the Plaintiff and Counterdefendants*

Brian M. Addison
 Vice President, Secretary, and General Counsel
Dentsply International, Inc.
York, Pennsylvania

-- and –

Thomas P. Gulley
Rebecca L. Avitia
Lewis and Roca, LLP
Albuquerque, New Mexico

*Attorneys for the Defendants and Counter-Plaintiffs*