# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

GUIDANCE ENDODONTICS, LLC,
a New Mexico Limited Liability Company,

      Plaintiffs,

vs.                                                              No. CIV 08-1101 JB/RLP

DENTSPLY INTERNATIONAL, INC.
a Delaware Business Corporation, and
TULSA DENTAL PRODUCTS, LLC,
a Delaware Limited Liability Company,

      Defendants.

and

DENTSPLY INTERNATIONAL, INC.
and TULSA DENTAL PRODUCTS, LLC,

      Counter Plaintiffs,

vs.

GUIDANCE ENDODONTICS, LLC
and DR. CHARLES GOODIS,

      Counter Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Dentsply/TDP Motion for Summary Judgment on Guidance's Count VII – Tortious Interference with Existing and Prospective Contractual Relations, filed July 31, 2009 (Doc. 220). The Court held a hearing on August 21, 2009. The primary issues are whether Guidance Endodontics, LLC ("Guidance") has shown a genuine issue of fact: (i) whether it had any existing contractual relations with which Defendants DENTSPLY International, Inc. and Tulsa Dental Products, LLC could tortiously interfere; (ii) whether any

conduct of the Defendants constituted "improper means" and could therefore support a claim for tortious interference; (iii) whether the "improper means" in which the Defendants engaged, if any, caused damages to Guidance; and (iv) whether Guidance has suffered any damages as a result. Because the Court finds no evidence that Guidance had any contractual relationships with which the Defendants could interfere, it will grant the Defendants' motion for summary judgment on the claim for tortious interference with existing contractual relations. And because there is insufficient evidence that customers would have bought the V2 file if the Defendants had supplied it, the Court will grant the Defendants' motion for summary judgment regarding the tortious interference with prospective contractual relations claim.

## FACTUAL BACKGROUND

This case concerns a suit that Guidance, a small endodontic-equipment company, has brought against the much larger Defendants, who are both Guidance's rivals and its suppliers. More background on the lawsuit generally is set forth in the Court's earlier opinion. See Guidance Endodontics, LLC v. Dentsply Intern., Inc., 2008 WL 6013069, at *1-5 (D.N.M. Dec. 15, 2008)(Browning, J.). In this motion, the Defendants challenge the admissibility and adequacy of Guidance's evidence of tortious interference, but present few alleged facts of their own. Thus, the Court's factual background is drawn largely from the facts alleged by Guidance and supported by admissible evidence. Those facts are portrayed in the light most favorable to Guidance, the non-movant, as they must be when the Court analyzes a motion for summary judgment. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).

### A.    "UNDISPUTED" FACTS.

Perhaps in an effort to make the Court's job easier, each side has presented lists of "undisputed facts," about which there is much dispute. The parties agree that Guidance sells

products directly to licensed dentists, endodontists, accredited dental schools and dental or endodontic practice groups in the United States. <u>See</u> Verified Complaint and Demand for Jury Trial ¶ 23, at 5, filed November 21, 2008 (Doc. 1)("Complaint"); Motion at 4; Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment on Count VII - Tortious Interference with Existing and Prospective Contractual Relations at 2, filed August 17, 2009 (Doc. 256)("Response"). Guidance also sells directly to these customers without the use of distributors, and it maintains direct marketing, sales, and contractual relationships with its customers in the United States. <u>See</u> Complaint ¶ 24, at 6; Motion at 4; Response at 2. Guidance uses targeted mailings and Counterdefendant Charles Goodis, the sole owner of Guidance, presents and lectures to dentists and endodontists at trade shows and conventions. <u>See</u> Complaint ¶¶ 19-20, at 4; Motion at 4; Response at 2. Guidance sells its products through an internet site and by telephone. <u>See</u> Motion at 4; Response at 2. Guidance has sold endodontic equipment to more than 5,000 dentists and endodontists in the United States. <u>See</u> Complaint ¶¶ 19, 26 , at 4, 6; Response at 5.

For the purposes of this motion only, the Defendants also concedes the following: Guidance is a supplier of endodontic files, obturators, and ovens, all of which products are used to perform root canal therapy. <u>See</u> Complaint ¶¶ 9-18, at 3-4; Response at 2; Reply at 1. The Defendants are manufacturers and suppliers of a variety of dental/endodontic products that compete with Guidance's products, including endodontic obturators, files, and ovens. <u>See</u> Complaint ¶ 32, at 7; Response at 2-3; Reply at 1. Dentsply holds itself out as "the world's largest designer, developer, manufacturer and marketer of a broad range of products for the dental market," and has over $2.3 billion in sales annually. Complaint ¶¶ 30, 34, at 7; Response at 3; Reply at 1.

On or about July 29, 2008, Guidance and Dentsply entered into a Manufacturing and Supply Agreement (the "Supply Agreement"), pursuant to which the Defendants agreed to manufacture all

of Guidance's proprietary endodontic products, and Guidance agreed to purchase all of its requirements for such products from TDP on an exclusive basis.  See Declaration of Kyle C. Bisceglie in Opposition to Defendants' Motion for Summary Judgment, ¶ 7, at 2, (executed July 29, 2009) at Exhibit 5, filed July 31, 2009 (Doc. 228)("Bisceglie Dec.").  Section 4.5 of the Supply Agreement requires TDP to manufacture and provide endodontic files or obturators that are improvements or successor products to the Guidance Files or Guidance Obturators, as those terms are defined in the Supply Agreement, if Guidance supplies product specifications to TDP.  See Bisceglie Dec. at 6.  Because the Supply Agreement prohibited Guidance from obtaining a particular file -- the V-Taper file -- from its prior supplier, Guidance was in the process of developing a new file, called the V2 file, which is designed to replace the V-Taper file.  See Complaint ¶¶ 124-25, at 25; Response at 3; Reply at 1.  Guidance intended to begin offering the V2 file for sale on November 1, 2008.  See Complaint ¶ 127, at 25; Response at 3; Reply at 1.

> **B.    DISPUTED FACTS.**

Contrary to the section headings in the parties' briefs, the remaining facts are in dispute. Guidance makes factual assertions, arguing that its verified complaint and other documents provide the necessary evidentiary support.  The Defendants take issue with various aspects of those assertions.

> **1.    Most of Guidance's Attached Evidence Is Inadmissible Because It Is Unauthenticated Hearsay and Will Not Be Considered by the Court.**

Of the facts that Guidance alleges to be supported by the verified Complaint, the Defendants attack most on the grounds that they are conclusory or made without evidence of personal knowledge.  See Reply at 2-5.  The verification on the Complaint, although ensuring that Mr. Goodis has read the contents and verifies that "it is true and correct to the best of his knowledge and belief,"

does not state that it is based on Goodis's personal knowledge.  See Complaint at 39.  As the Defendants implicitly concede, a verified complaint can be used as an affidavit to oppose summary judgment under rule 56(e) of the Federal Rule of Civil Procedure, but only if the portion being asserted as evidence satisfies the other requirements of an affidavit.  See Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1019 (10th Cir. 2002). In other words, the assertions must "be made on personal knowledge, . . . set forth such facts as would be admissible in evidence, and . . . show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).  They assert that many of Guidance's alleged "undisputed facts" fail to satisfy this standard in some way.

The Defendants' position is compelling, and it would make the Court's job easier, but an affidavit need not state that it is based on personal knowledge if personal knowledge can be inferred from the context of the affidavit.  See Roberts v. Cessna Aircraft Co., No. 07-3133, 289 Fed. Appx. 321, 324 (10th Cir. Aug. 14, 2008)(citing Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir.1990)).  The same should hold true for a verified complaint.  Thus, where Guidance's asserted facts rely on portions of the Complaint, and it appears that Goodis would have personal knowledge of what the Complaint states, the Court will consider the fact supported by evidence.

To other alleged facts, the Defendants object that the assertions in the response, and in the Complaint upon which the response relies, are based on documents that are not properly authenticated pursuant to rule 901 of the Federal Rules of Evidence or include inadmissible hearsay as defined by rule 801.  Fed. R. Evid. 901, 801.  Guidance made no response to this argument, nor has it endeavored to authenticate any of the documents.  Evidence attached to a response must be admissible to properly oppose a motion for summary judgment.  See Sports Unlimited, Inc. v. Lankford Enters., Inc., 275 F.3d 996, 999 (10th Cir. 2002); Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1122 (10th Cir. 2005); Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).  The

Defendants are also correct that a document must be properly authenticated to constitute evidence in opposition to a motion for summary judgment.  See Law Co., Inc. v. Mohawk Const. & Supply Co., Inc., No. 08-3076, 2009 WL 2488140, at *4-5 (10th Cir. Aug. 17, 2009); Denison v. Swaco Geolograph Co., 941 F.2d 1416, 1423-24 (10th Cir. 1991).  Thus, of the evidence attached to Guidance's response, the Court may consider only those alleged facts that are supported by authenticated, admissible evidence.

The authentication requirement is satisfied by "evidence sufficient to support a finding that the evidence is what its proponent claims."  Fed. R. Evid. 901(a).  One way to authenticate these documents might be by affidavit of a person with actual knowledge, reporting that the document is what the party claims it is.  See Law Co., Inc. v. Mohawk Const. & Supply Co., Inc., No. 08-3076, 2009 WL 2488140, at *4-5 (10th Cir. Aug. 17, 2009).  It can also be proved in other means, one of which is by being produced in response to a discovery request.  See Anderson v. Cramlet, 789 F.2d 840, 845 (10th Cir. 1986).  Even those documents, however, must still be authenticated by an affidavit that identifies where the documents came from and that they have not been altered.  See Taylor v. Principi, No. 04-3147, 141 Fed. Appx. 705, 708 (10th Cir. June 28, 2005)("[O]n appeal [Plaintiff] argues that the documents were admissible under the business-records exception to the hearsay rule. While this may be true, it would not excuse her duty to identify the source of the documents and their absence of alteration to the district court when submitted in response to a motion for summary judgment.").  Furthermore, many documents provided by Guidance are its own documents which must be authenticated in some other manner.  Because no such authentication was provided, most of Guidance's documents will not be factored into the Court's conclusions in this opinion.  In the course of this opinion, however, the Court will specify when such evidence is at issue and whether it would affect the resolution of this motion.

### 2.      Some of the Disputed Facts Still Have Evidentiary Support.

The Supply Agreement requires that TDP will supply Guidance with "such quantities of Guidance products as Guidance may wish to purchase from TDP from time to time."  Complaint ¶ 55, at 12; Response at 4.  In September 2008, pursuant to a dispute regarding whether Guidance's advertising materials violated the Supply Agreement and the Lanham Act, the Defendants informed Guidance that it would no longer supply it with obturators.  See Complaint ¶ 65-71, at 14-15. Further, the Defendants refused to provide the new V2 file to Guidance unless Guidance provided them with detailed engineering drawings, which Guidance alleges the Supply Agreement does not require.  See Complaint ¶ 96, at 20; Response at 4.  As a result of these refusals, Guidance was unable to market the V2 file to potential customers.  See Complaint ¶ 127, at 25; Response at 4.

Goodis testified that he has told multiple potential purchasers that he does not know when the V2 file will be available because the Defendants have not met their contractual obligations, implying that such customers would have purchased the file.  See Response at 4; Transcript of Hearing at 116:3-18 (taken November 26, 2008)(Goodis).[1]  At approximately the same time that the Defendants informed Guidance they would not supply the new V2 file, they also were engaged in an aggressive sales and marketing campaign called the "Godfather" or the "Smack down campaign," designed to convert Guidance customers to Dentsply/TDP. Response at 5-6; Bisceglie Dec. at

---

[1]Guidance argues that it has at least 60 current or former Guidance customers to whom Guidance has promised the V2 file.  See Response at 4.  To support this assertion, they attach what appear to be unauthenticated records that they label "V2 Sample Requests."  See Response Exhibit A. This evidence would strengthen Guidance's claim that it has been unable to fulfill some requests, but the testimony of Goodis, who testified to having personal knowledge of some such requests, fulfills the same function.

Exhibits 7-17.[2]  The electronic documents evidencing this were admitted to be authentic in a hearing, see Transcript of Hearing at 73:20-74:4 (taken September 1, 2009)("Tr. of Sept. 1, 2009")(Gulley), and avoid hearsay problems because they are admissions of a party opponent under rule 801. During the course of this campaign, the Defendants' representatives have contacted some Guidance customers, telling them that Guidance would no longer be able to provide endodontic files.  See Declaration of Samuel J. Kratchman, DMD, ¶ 8, at 3-5 (executed November 26, 2008), filed July 29, 2009(Doc. 216) ("Kratchman Dec."); Declaration of Theresa Casada, ¶¶ 6-9, at 6-8 (executed December 2, 2008), filed July 29, 2009 (Doc. 216)("Casada Dec."); Declaration of David M. Stramback, DDS, ¶¶ 5-6, at 1-2 (executed December 1, 2008), filed July 29, 2009 (Doc. 216)("Stramback Dec.").

Guidance offers, as examples of its lost business, data concerning three former Guidance customers that have been allegedly converted to be the Defendants' customers.  See Response at 5-6. The documents provided to prove this allegation, however, are problematic.  The first document is what Guidance asserts is a "conversion list," which was likely turned over to Guidance during the course of discovery.  Response Exhibit C (Doc. 256-4).  There are, however, no identifying markings on the document, nor any affidavit establishing exactly what it is or how Guidance acquired it.  Guidance also relies on three Guidance "Customer Data" sheets that appear to show the amounts of Guidance products which those three customers purchased.  Response Exhibits D, E, F

---

[2]The Defendants argued at the hearing that these marketing campaigns were not specifically targeting Guidance and that aggressive marketing toward all potential customers in the target market is just business.  See Transcript of Hearing at 72:25-73:5 (taken September 1, 2009)(Gulley).  Given the documentary evidence provided to the Court, however, a reasonable fact-finder could draw an inference that Guidance was the primary target.

(Docs. 256-5, 6, 7). All four documents are, at present, unauthenticated hearsay.[3] Thus, the Court will not weigh them in deciding this motion. Nevertheless, the Court does not believe they would create a factual issue whether there are existing or prospective contractual relations with which Guidance could interfere. If Guidance could clear the hurdles of authentication and hearsay, these documents still only purport to show that certain purchasers of products from Guidance later purchased products from the Defendants. From this evidence alone, many inferences are equally likely: the customers preferred the Defendants' customer service, the customers preferred Defendants' products, the customers were persuaded by the Defendants' marketing, or -- as Guidance alleges -- the customers were converted as part of a tortious campaign to put Guidance out of business. Without more evidence, a reasonable fact finder could not chose one explanation over another. In any case, as the Court will discuss more below, the Court's decision in this case is based on a lack of evidence of existing contractual relations and a lack of evidence that the Defendants' conduct caused potential Guidance customers not to form contractual relations with Guidance. Admitting these documents would not remedy either problem with Guidance's evidence.

## PROCEDURAL BACKGROUND

Guidance's Seventh Cause of Action in its Verified Complaint and Demand for Jury Trial alleges a claim for Tortious Interference with Existing and Prospective Contractual Relations against

_____

[3]The documents -- though not any hearsay statements contained within them -- might be admissible under the business -records exception to the hearsay prohibition. See Fed. R. Evid. 803(6). "To fall within this exception, a document must (1) have been prepared in the normal course of business; (2) have been made at or near the time of the events it records; and (3) be based on the personal knowledge of the entrant or of an informant who had a business duty to transmit the information to the entrant." Hertz v. Luzenac America, Inc., 370 F.3d 1014, 1017 (10th Cir. 2004) (internal quotes and alterations omitted). Guidance has provided no evidence attempting to meet this standard. Any evidence that would satisfy the above standard would almost certainly clear the hurdle of authenticating the documents as well. See Fed. R. Evid. 901(a), (b)(1).

the Defendants.  Guidance alleges in Count VII that the Defendants "have used dishonest, unfair and/or means to advance [the Defendants'] commercial interests by, among other things, deliberately refusing to supply product to Guidance under the Supply Agreement, so that Guidance could not fulfill its contractual obligations to third parties, and disparaging Guidance's business, productivity and services . . . ."  Complaint ¶ 220, at 36-37.  Guidance also alleges that the Defendants interfered with Guidance's prospective contractual relations by "using dishonest, unfair and/or improper means to induce third parties not to enter into or continue prospective contractual relations with Guidance." Complaint ¶ 221, at 37.

## ANALYSIS

New Mexico law governs Guidance's tortious interference claim.  Guidance has not provided sufficient evidence to show a genuine issue of material fact on all elements of its claims. Accordingly, Guidance's claims in Count VII do not survive this motion for summary judgment.

## I.   NEW MEXICO LAW APPLIES TO GUIDANCE'S TORTIOUS INTERFERENCE CLAIM.

Guidance has invoked the district court's diversity jurisdiction, so the court looks to the forum state's choice-of-law rules to determine which state's substantive law to apply.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Pepsi-Cola Bottling Co. v. PepsiCo, Inc., 431 F.3d 1241, 1255 (10th Cir. 2005).  In New Mexico, choice-of-law is a two-step process. First, the Court must characterize the claim by "area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue. "  Terrazas v. Garland & Loman, Inc., 140 N.M. 293, 296, 142 P.3d 374, 377 (Ct. App. 2006).  It seems clear that tortious interference, whether with a prospective or existing contract, is a tort.  That New Mexico cases refer to the liability arising under such a claim as "tort liability" further supports that

-10-

conclusion.  Guest v. Berardinelli, 145 N.M. 186, 196, 195 P.3d 353, 363 (Ct. App. 2008); Ettenson v. Burke, 130 N.M. 67, 73, 17 P.3d 440, 446 (Ct. App. 2000).  Thus, the Court will apply New Mexico's choice-of-law rules regarding torts to this claim.

The second step is to apply New Mexico's choice-of-law rule.  See Terrazas v. Garland & Loman, Inc., 140 N.M. at 296, 142 P.3d at 377.  New Mexico applies "the doctrine of *lex loci delicti commissi*," or the law of the place where the wrong occurred.  Torres v. State, 119 N.M. 609, 613, 894 P.2d 386, 390 (1995); Terrazas v. Garland & Loman, Inc., 140 N.M. at 296, 142 P.3d at 377.  New Mexico's *lex loci* rule, rooted in the First Restatement, defines the place of the wrong as "the state where the last event necessary to make an actor liable . . . takes place."  Zamora v. Smalley, 68 N.M. 45, 47, 358 P.2d 362, 363 (1961); Restatement (First) of Conflicts of Law § 377 (1934).  Where the elements of the underlying claim include harm, the place of the wrong is the place where the harm occurred.  See First Nat'l Bank in Albuquerque v. Benson, 89 N.M. 481, 482, 553 P.2d 1288, 1289 (Ct. App. 1976) (referring to the rule as requiring application of "the law of the State of injury").  Thus, the Court is to apply the law of the state where the alleged injury occurred -- New Mexico.  The parties seem to agree with this determination.  See Motion at 5 (citing New Mexico case law and New Mexico's UCC); Tr. of Sept. 1, 2009 at 61:21-25 ("THE COURT: . . . we're all in agreement . . . that New Mexico [law] governs this count, correct?  MR. DECANDIA [for Guidance]: I agree, Your Honor.").

## II.  NEW MEXICO LAW ON TORTIOUS INTERFERENCE

Now that the Court has determined that New Mexico law applies to Guidance's claims, it must investigate what that law requires Guidance to prove.  As the New Mexico Court of Appeals recently recognized: "Under New Mexico law, these are separate claims, although there is considerable evidentiary overlap between the two causes of action."  Guest v. Berardinelli, 145 N.M.

at 196, 195 P.3d at 363.  Thus, the Court will treat them separately.

### A.   TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS

To sustain a claim of tortious interference with existing contractual relations under New Mexico law, Guidance must prove that: (i) the Defendants had knowledge of existing contracts between Guidance and its customers; (ii) Guidance's customers breached their existing contracts with Guidance; (iii) the Defendants played an active and substantial part in causing Guidance to lose the benefits of the existing contracts with its customers; (iv) damages flowed from the breached existing contracts; and (v) Dentsply/TDP induced the breach without justification or privilege.  See Deflon v. Sawyers, 139 N.M. 637, 643, 137 P.3d 577, 583 (2006); Guest v. Berardelli, 145 N.M. at 196, 195 P.3d at 363.  As part of inducing a breach "without justification or privilege," the defendants must act either with an improper motive to harm the plaintiff or interfere by some improper means.  See id.  What constitutes "improper means" depends "to some degree on the context and can include, but is not limited to, predatory behavior, violence, threats or intimidation, deceit or misrepresentation, bribery, economic pressure, unfounded litigation, defamation, unlawful conduct, and perhaps violation of business ethics and customs."  Zarr v. Washington Tru Solutions, LLC, 146 N.M. 274, 208 P.3d 919, 922 (Ct. App. 2009).

### B.   TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

Courts in New Mexico are less willing to protect one's interest in a prospective contract than in an existing one.  See Anderson v. Dairyland Ins. Co., 97 N.M. 155, 158, 637 P.2d 837, 840 (1981).  Nevertheless, New Mexico has adopted the tort of interference with prospective contractual relations, as found in the Restatement (Second) of Torts:

One who intentionally and improperly interferes with another's prospective

contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of:

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation, or

(b) preventing the other from acquiring or continuing the prospective relation.

M & M Rental Tools, Inc. v. Milchem, Inc., 94 N.M. 449, 453, 612 P.2d 241, 245 (Ct. App. 1980)(quoting Restatement (Second) of Torts § 766B (1977)).  Evidence of either improper motive solely to harm the plaintiff or improper means will support liability.  See Zarr v. Washington Tru Solutions, LLC, 146 N.M. at 208 P.3d at 921.  Recently, the New Mexico Court of Appeals held that, although sole motive to harm was required if a plaintiff sought to proceed under an improper-motive theory, see id. at 922-23, such a showing is not necessary under an improper-means theory, see id. at 921-22.

In short, the statute requires a plaintiff to prove two things: (i) either the requirement of Restatement (Second) of Torts § 766B(a) or § 766B(b), and (ii) either improper motive or improper means.  Additionally, a plaintiff "must prove that there was an actual prospective contractual relation which, but for the [Defendant's] interference, would have been consummated." Anderson v. Dairyland Ins. Co., 97 N.M. 155, 159, 637 P.2d 837, 841 (1981).

## III.   GUIDANCE HAS NOT PROVIDED SUFFICIENT EVIDENCE TO SHOW A GENUINE ISSUE OF MATERIAL FACT ON ITS CLAIMS.

The Defendants challenge numerous elements of Guidance's claims for tortious interference with prospective and existing contractual relations.  See Motion at 3 (Doc. 220).  In each case, they argue that Guidance has the burden of proof at trial and yet has failed to produce sufficient admissible evidence to create a genuine issue of fact.  See id.  The Court agrees and therefore will grant the Defendants' motion for summary judgment on Guidance's tortious interference claims.

## A.    STANDARDS FOR SUMMARY JUDGMENT

"Summary judgment is appropriate only if the admissible evidence shows 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Sports Unlimited, Inc. v. Lankford Enters., Inc., 275 F.3d 996, 999 (10th Cir. 2002)(citing Fed. R. Civ. P. 56(c)).  A party can satisfy this standard as to claims or elements for which the non-movant bears the burden of proof at trial by pointing out that the non-movant has no admissible evidence as to those claims or defenses.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). Once the movant meets this burden, the non-movant must designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).

When reviewing a motion for summary judgment, the Court should keep in mind three principles.  First, the Court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the Court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Third, the Court cannot decide any issues of credibility in a summary judgment motion.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

**B.    GUIDANCE HAS NOT PROVIDED SUFFICIENT EVIDENCE TO SURVIVE SUMMARY JUDGMENT ON ITS TORTIOUS-INTERFERENCE-WITH-EXISTING-CONTRACT CLAIM.**

In their motion, the Defendants challenge the second (Guidance customers breached an existing contract with Guidance), third (the Defendants played an active and substantial part in causing Guidance to lose the benefits of those contracts), and fourth (that damages were caused by such breach) elements of Guidance's claim of tortious interference with existing contractual relations.  Because of the Court's resolution of the first challenged element, the Court will grant Defendants' motion with respect to Guidance's tortious interference with existing contractual relations claim.

**1.    Guidance has Provided Insufficient Evidence of Existing Contractual Relations to Survive Summary Judgment.**

The Defendants primarily argue that Guidance has no contractual relations; Guidance's "existing contracts" are merely repeat purchasers with no contractual obligation to purchase again in the future.  Motion at 4-5.  Thus, with no contract, there is no contractual relation with which the Defendants can interfere.  See id.  They assert that Guidance's advertisements are invitations to offer and that customers' individual orders are the offers.  See id.  Thus, they could not possibly interfere with any contractual relations unless they snuck in between the time in which a contract was formed -- either by Guidance sending some sort of confirmation memorandum or by Guidance performing under the offered contract -- and the time of delivery.  See id. at 6.  In response, Guidance does not assert that it had existing contracts.  Instead, it argues that ongoing business relationships are equivalent to existing contractual relations.  See Response at 10.

The Court is persuaded by the Defendants' argument on this point.  Guidance has not shown that it had existing contracts with its customers.  Nor has Guidance provided the Court with any

authority for its assertion that an ongoing business relationship is the equivalent of an existing contractual relation.  Without such authority, the Court is unwilling to make the leap that a claim for interference with existing contractual relations can be sustained in the absence of any existing contractual relations.

An ongoing business relationship probably cannot constitute an "existing contract" under the Uniform Commercial Code ("UCC").  New Mexico's UCC permits a contract for the sale of goods to be formed "in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  NMSA 1978, § 55-2-204(1) (1961).  See Elephant Butte Resort Marina, Inc. v. Wooldridge, 102 N.M. 286, 289, 694 P.2d 1351, 1354 (1985) ("Contract formation can be by conduct.").  But, as § 55-2-204(1) implies, there must be some showing of agreement.  Further, "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."  NMSA 1978, § 55-2-204(3) (1961). The Court, however, is not sure how it would provide a remedy if either Guidance or its prospective purchasers attempted to enforce their "relationship."  In light of this problem, the Court believes that the Supreme Court of New Mexico would hold that the alleged ongoing business relationship between Guidance and its customers does not, without more, constitute an existing contractual relation. Regarding the time between Guidance's acceptance of an offer to purchase goods and delivery of those goods, in which a contract might have existed, Guidance has presented no evidence that it "accepted" customers' orders -- thereby creating a contract -- before delivery.  If acceptance was by delivery, there is no time between formation and completion of a contract in which the Defendants could have interfered.  The Court therefore finds that Guidance has provided insufficient evidence of existing contractual relations.

    2.      **<u>Guidance Has Failed to Show a Factual Issue Whether Discussions with Prior Customers Created Contracts to Provide the V2 when It Became Available</u>.**

At the hearing on this motion, Donald DeCandia argued for Guidance that there are existing contractual relations between Guidance and its customers because customers requested the V2 file and Guidance has promised that it will provide the file when the Defendants deliver it to Guidance. <u>See</u> Tr. of Sept. 1, 2009 at 62:2-9 (DeCandia). Guidance seems to allege that such an exchange of promises creates an existing contractual relation and it is this relationship with which the Defendants tortiously interfered. <u>See id.</u> In response, the Defendants assert that there is no admissible evidence of any prior Guidance customer requesting the V2 file. <u>See</u> Tr. of Sept. 1, 2009 at 71:19-72:4 (Gulley). The Defendants also argue that there is no evidence that any prior customer would request the V2 file, given that there is no evidence that any customer knew what the V2 file would be like. <u>See</u> id.

If the transaction alleged by Guidance forms a contract, it appears that contract would be for the eventual sale of goods and therefore be governed by New Mexico's Uniform Commercial Code. <u>See</u> NMSA 1978, § 55-2-102 (1961) ("[T]his article applies to transactions in goods."). The parties seem to agree with this conclusion. <u>See</u> Motion at 5 (citing NMSA § 55-2-206 in its section regarding Guidance's tortious interference with existing contractual relations claim); Tr. of Sept. 1, 2009 at 62:2 (DeCandia)(likewise citing the New Mexico UCC in his argument to the Court). Thus, to the extent possible, the Court will analyze this issue using New Mexico's UCC jurisprudence.

The evidence to which Mr. DeCandia alluded, which he contends creates a factual issue as to the existence of contracts, is a snippet of hearing testimony by Goodis where he says: "[W]hen I talk at trade shows, when I talk at dental conventions, and when I talk to our own customers, the

ones that are begging -- I'm getting phone calls going, 'Chuck, you're out of V-Tapers. What's your new file?'"  Response Exhibit B.  Guidance argues that this statement evidences existing contracts with current Guidance customers, promising that Guidance will send the V2 files when they become available.

Guidance also provides a series of documents that allegedly demonstrate contracts to provide the V2 file.  See Response at 4 & Exhibit A.  The documents, collectively referred to as "V2 Sample Requests," appear to be reports of customer orders, though that is not entirely clear because of the lack of identifying markings or description in the filing to which they are attached.  The customer orders themselves are not for the V2 file, so far as the Court can discern.  Rather, the relevant material is found in the "Comments/Notes" section near the bottom marked "Internal Use Only," which is presumably filled out by Guidance employees.  Response Exhibit A.  The notes generally express a directive that the customer in question should receive a sample of the V2 file when it becomes available.  See id.  With one exception, none of them reflect that the customer requested the sample.  See id.

In its reply brief, the Defendants argue that these documents contain hearsay and have not been authenticated.  See Reply at 3.  The Court agrees, but that does not affect the outcome of this motion.[4]  At the hearing, Mr. Gulley argued for the Defendants that the documents that Guidance provided do not prove that its customers would buy the V2 file if it were available.  See Tr. of August 21 at 69:15-70:10 (Gulley).  The Court agrees.  The documents, even assuming they can be authenticated and circumvent the hearsay prohibition, seem to demonstrate that a Guidance

---

[4]These documents, like those discussed at the end of the Factual Background section, might be able to satisfy the business-records exception to the hearsay prohibition.  As discussed in footnote 3, however, there has been no effort by Guidance to meet the requirements of the business-records exception.

employee -- a person who would edit an "Internal Use Only" field -- believed that someone should send a sample of the V2 file to that customer.  The most promising document is the third in that series, wherein the Guidance employee reports that a customer "is interested in samples of the ET & V2 when we get it in."  Response Exhibit A.  Being interested in samples of a product, however, is not entering a contract to purchase the product.  That is the reason for a sample.  See Oxford English Dictionary Online, "sample, n," (2d ed. 1989, Oxford University Press), *available at* http://dictionary.oed.com/cgi/entry/50212695 (last accessed Sept. 09, 2009)("[A] small quantity of some commodity, presented or shown to customers as a *specimen* of the goods *offered* for sale." (emphasis added)).  As Mr. Gulley pointed out at the hearing, "there is no evidence these customers even know what the V2 file is going to be like."  Tr. of August 21 at 70:8-10 (Gulley).  The Court finds that these documents do not create a genuine issue of fact whether contracts existed between Guidance and its potential customers.  Thus, they would not change the outcome of this motion, even if the barriers of authentication and hearsay were removed.

The Court finds that, even if it were to consider all evidence that Guidance proffered, the terms of these alleged contracts are too uncertain to be given any legal effect.  See Padilla v. RRA, Inc., 124 N.M. 111, 114, 946 P.2d 1122, 1125 (Ct. App. 1997) (noting that, in the context of a contract for services,"indefiniteness can indicate that the parties failed to reach an agreement.") (citing  Restatement (Second) of Contracts § 33 (1981)).  The UCC is liberal with its offer and acceptance requirements.  For instance, "an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances."  NMSA 1978, § 55-2-206 (1961).  See also NMSA 1978, § 55-2-204(3) (1961) ("Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.").  Even by such

-19-

liberal standards, however, Guidance has provided no evidence of an offer to purchase goods.

That an offer may be accepted in any reasonable manner implies that an offer -- or, by an even more liberal standard, some expression of intent to enter an agreement to purchase -- is necessary.  None of Guidance's documents refer to a customer proposing to buy a V2 file; all documents make reference to delivery of samples.  See Response Exhibits A & B.  And with one exception, there is not evidence that the customer requested that Guidance provide the sample.  See id.  The encounter described by Dr. Goodis is similarly unhelpful.  The question, "What's your new file?" is not certain enough to constitute an offer to purchase which Guidance could then accept. See Response Exhibit B.  In contracts under the UCC, many missing terms will be filled by the off-the-shelf default provisions of Part 3, see NMSA 1978, §§ 55-2-301 to 55-2-328 (1961), but the lack of evidence of a valid offer and acceptance leaves the Court constructing contracts out of whole cloth.  While generally "the determination of whether a contract existed [is a] question[] of fact," see Grubb v. Kempthorne, No. CIV 06-1260 JB/DJS, 2008 U.S. Dist. LEXIS 108724, at *64 n.2 (D.N.M. Aug. 25, 2008)(Browning, J.)(citing Stites v. Yelverton, 60 N.M. 190, 193, 289 P.2d 628, 630 (1955)), the Court finds no genuine issue of fact whether Guidance had formed contractual relations with its prospective customers regarding the V2 file.

### 3.     One Party's Breach of Contract Can Probably Constitute Tortious Interference with Different Contract, But that Is Not Necessary to the Court's Decision.

The Defendants also argue that its alleged breach of contract is not tortious interference, even if it resulted in Guidance being unable to fulfill obligations to third parties, because only conduct directed toward third parties can be tortious interference.  See Motion at 6.  As a matter of law, they say, one cannot tortiously interfere with his or her own contract.  See id. In response, Guidance refers to the Restatement (Second) of Torts § 766A, which, they argue, describes a claim for

-20-

"intentional interference with another's performance of his *own* contract."  <u>See</u> Response at 10 (emphasis in original); <u>Restatement (Second) of Torts</u> § 766A (1977).  Guidance provides no case law adopting this variant of the tort in New Mexico, and the Court has likewise found none.  The only cases citing to § 766A are referring to the notes following that section describing "improper means" and the historical development of the tort of tortious interference generally.  <u>Diversey Corp.</u> <u>v. Chem-Source Corp.</u>, 125 N.M. 748, 755, 965 P.2d 332, 339 (Ct. App. 1998)(citing the notes to §§ 766, 766A, and 766B as "providing a broad overview of the historical development of the tort"); <u>Kelly v. St. Vincent Hosp.</u>, 102 N.M. 201, 207, 692 P.2d 1350, 1357 (Ct. App. 1984)(citing comment e of § 766A for a description of "improper means").

Even if the Court were to conclude that New Mexico has adopted § 766A, it would not help Guidance.  Section "[766A] and § 766 both involve interference with an existing contract." <u>Restatement (Second) of Torts</u> § 766A, cmt. c (1977).  By the Court's reading of § 766A, if X and Y have a contract, and X breaches that contract, it does not automatically create liability.  Rather, there must be two contracts -- one between X and Y, and one between Y and a third party, T. Section 766A creates tort liability on the part of X if X "intentionally and improperly" breaches the X-Y contract, and that breach makes Y unable to perform the Y-T contract or "caus[es] his performance to be more expensive or burdensome."  <u>Restatement (Second) of Torts</u> § 766, cmt. h (1977) ("This is [] the case when performance by [Guidance] of [its] contract with [its customers] necessarily depends upon the prior performance by [the Defendants] of [their] contract with [Guidance] and [the Defendants] fail[] to perform in order to disable [Guidance] from performing for [its customers]."); <u>id.</u> § 766A, cmt. g (referring reader to comments relating to § 766 for examples of means of interference applicable to § 766A).  Because the Court has finds no evidence of existing contracts between Guidance and its customers, i.e., between Y and T, whether the

Defendants can tortiously interfere with such contracts by making Guidance unable to perform under them is irrelevant.

Overall, the Court finds the Defendants' arguments persuasive.  Guidance has failed to show a genuine factual issue whether Guidance had existing contracts with its customers.  As a necessary concomitant of that holding, it has provided no evidence that any of its customers breached any such contracts, nor that the Defendants "played an active and substantial part" in causing Guidance to lose the benefit of those contracts.  The Court will therefore grant Defendants motion for summary judgment on Guidance's claim for tortious interference with existing contractual relations.

### C.    GUIDANCE HAS FAILED TO PROVIDED SUFFICIENT EVIDENCE TO SURVIVE SUMMARY JUDGMENT ON ITS TORTIOUS-INTERFERENCE-WITH-PROSPECTIVE-CONTRACT CLAIM.

With respect to its claim of tortious interference with prospective contractual relations, the Defendants challenge the sufficiency of Guidance's evidence to create a factual issue regarding: (i) whether Guidance was damaged because the Defendants caused Guidance's customers not to enter into contractual relations with Guidance, and (ii) whether Guidance was damaged because the Defendants prevented Guidance from acquiring contractual relations with customers.  See Motion at 3.  At the hearing on this motion, Mr. Gulley also impliedly argued that Guidance has no evidence of conduct that constitutes "improper means" which can be said to have caused any of Guidance's alleged damages.  See Transcript of Hearing at 63:19-66:5 (taken August 21, 2009)(Gulley)("Tr. of August 21").

The Court reads the Defendants' first two arguments as being aimed at causation and damages. The Defendants appear to concede that Guidance's customers and potential customers had prospective contractual relations with Guidance.  See Motion at 9.  They argue, however, that Guidance has "no admissible evidence that customers refused to place orders with Guidance due to

[the Defendants'] conduct or that [the Defendants] prevented Guidance from contracting with prospective customers." Id. They contend that, if Guidance relies on the alleged disparagement as the interference with prospective relations, the claim fails because Guidance has not provided evidence that such disparagement caused any of Guidance's prospective customers not to enter into contracts with Guidance. See id. Further, they assert that, "[b]ecause there was no interference, there can be no resulting damages [and w]ithout any resulting damages, Guidance cannot succeed on its claim . . . ." Id.

To this argument, Guidance responds that it does not rely solely on disparaging statements as the basis for its tortious-interference claim, but that it also relies on the Defendants' refusal to manufacture the V2 file as an act that constitutes "improper means," which interfered with Guidance's prospective contractual relations. See Response at 7. Guidance also responds that it has evidence of damages of approximately $1.2 million in the form of testimony from an expert witness. See Response at 12-13; Exhibit C to Dentsply/TDP's Motion in Limine to Exclude Certain Evidence Related to Guidance's Damages Claim, filed July 31, 2009 (Doc. 219-4) ("Guidance's Expert Report").

### 1.    Guidance Has Not Shown a Factual Issue Whether the Statements Made by the Defendants' Representatives Interfered with Guidance's Prospective Contractual Relations.

The Defendants' primary argument against Guidance's claim of tortious interference with prospective contractual relation is aimed at allegedly disparaging statements by the Defendants' representatives. See Motion at 9; Stramback Dec. ¶¶ 5-6, at 2; Casada Dec. ¶¶ 6-10, at 7; Kratchman Dec. ¶¶ 5-9, at 4. The Defendants argue that none of the declarations that Guidance provided constitute evidence that the allegedly disparaging statements caused any potential Guidance customer not to enter into future contracts with Guidance. See Motion at 9. Guidance does not

appear to contest this argument in its Response.  Instead, Guidance argues that the Court should deny summary judgment because there exists a genuine issue of fact whether Defendants' failure to manufacture the V2 file -- and resulting inability of Guidance to market it -- constitutes tortious interference with prospective contractual relations.  The Court finds no evidence that any allegedly disparaging statements made by the Defendants' employees caused any potential Guidance customers not to place orders with Guidance.   As a result, Guidance's tortious interference with prospective contractual relations claim will rise and fall on the Court's analysis of the Defendants' failure to supply the V2 file.

> **2.      While the Defendants' Failure to Provide the V2 File Might Have Been an "Improper Means," There Is No Evidence that It Interfered With Prospective Contractual Relations.**

The other underlying act upon which Guidance bases its tortious interference with prospective contractual relations claim is the Defendants' refusal to supply the V2 file.  <u>See</u> Response at 7.  Guidance alleges that the Defendants refusal makes it impossible for Guidance to sell the V2 file to customers who would care to buy it.  <u>See</u> Response at 9.  Neither party has been able to provide the Court with authority whether one party's breach of contract can be the basis of a claim for tortious interference with the other party's prospective contractual relations.  The Court is convinced that, in the right situation, it can.  In other words, if A and B have a contract whereby A is to supply B with parts necessary to produce a widget, and A breaches that supply contract, B can no longer produce the widget.  In that scenario, A might be liable to B for tortious interference with prospective contractual relation between B and the customers of its widgets, provided the other elements of tortious interference are present.

The Defendants argue that this position, that they can be liable for tortious interference with prospective contractual relations because they breached a separate supply agreement with Guidance,

"would turn many breach of contract cases into intentional interference with prospective contractual relations cases."  Reply at 8.  The Court sees no problem with that result, as a claim for intentional interference with prospective contractual relations requires proof of improper means or improper motive, and the requisite prospective contractual relations, which will not often be present in a garden-variety breach-of-supply-contract case.  In other words, as long as the defendant's breach of the prior contract fits the definition of "improper means" -- or was done with the requisite improper motive -- and caused the plaintiff to be unable to realize prospective contracts, the defendant would be liable for tortious interference with prospective contractual relations.  At least one other court has come to a similar conclusion.  See American Business Interiors, Inc. v. Haworth, Inc., 798 F.2d 1135, 1145 (8th Cir. 1986)(allowing breach of contract to support a claim for tortious interference with prospective contractual relations under Restatement (Second) of Torts § 766B where there was proof of improper motive).  In any case, the Court believes that the Supreme Court of New Mexico, if confronted with this situation, would recognize the availability of this tort.

### 3.     A Rational Fact-Finder Could Find that Failure to Deliver the V2 Files was Improper Means, Supporting a Claim for Tortious Interference with Prospective Contractual Relations

This is the stage of the analysis where the Defendants' argument about improper means crops up.  Mr. Gulley argued that the Defendants' failure to supply the V2 file, even if it constituted a breach of the underlying contract, which they do not concede, is not an improper means that can support a claim for tortious interference with prospective contractual relations.  See Tr. of August 21 at 65:12-66:16 (Gulley).  They point to the analysis of the Honorable Bruce Black, United States District Judge, in Nanodetex Corp. v. Sandia Corp., No. 05-1041, 2007 WL 4356154, at *3-9 (D.N.M. Aug. 1, 2007).  There, Judge Black had to determine if one corporation's accusation that the other breached a contract could be the kind of "tortious [or] predatory" behavior that would

constitute improper means.  Nanodetex Corp. v. Sandia Corp., No. 05-1041, 2007 WL 4356154, at *8.  Judge Black determined that, "to constitute predatory behavior, an accusation of breach must be so completely unfounded as to, in effect, shock the conscience of a court." Id. at *8-9.  Perhaps by analogy, Mr. Gulley argued that this Court must hold the Defendants' conduct would not constitute improper means unless it, likewise, would "shock the conscious of the Court." Tr. of August 21at 66:3-66:16 (Gulley).

The Court sees a distinction between a company accusing another of breaching a contract and a company breaching a contract, if that is, indeed, what the Defendants have done.  Just because an accusation of breach must be particularly egregious to constitute improper means does not mean that a failure to perform under a contract must likewise.  As mentioned earlier, what constitutes "improper means" depends "to some degree on the context and can include, but is not limited to, predatory behavior, violence, threats or intimidation, deceit or misrepresentation, bribery, economic pressure, unfounded litigation, defamation, unlawful conduct, and perhaps violation of business ethics and customs." Zarr v. Washington Tru Solutions, LLC, 208 P.3d at 921.  New Mexico courts will find other means to be improper only where they are "innately wrongful or predatory in character." Knight v. Snap-On Tools Corp., 3 F.3d 1398, 1402 (10th Cir. 1993)(citing Kelly v. St. Vincent Hosp., 102 N.M. 201, 207, 692 P.2d 1350, 1356 (Ct. App.1984)).  Taking the evidence in the light most favorable to Guidance, as it must, the Court believes Guidance has provided some evidence of improper means.

The breach of contract, standing alone, will probably not constitute improper means under New Mexico law.  See id.; Quintana v. First Interstate Bank of Albuquerque, 105 N.M. 784, 787, 737 P.2d 896, 899 (Ct. App. 1987)("[A] breach of a contract with a third party is not the sort of improper means that has been held sufficient to support a claim of tortious interference with

contractual relations."). The Court finds, however, that the Defendants' alleged breach, combined with other facts and circumstantial evidence, creates a factual issue whether this particular breach, if it was a breach of contract, was an improper means.  First, the Defendants are Guidance's suppliers of certain dental products, but also one of Guidance's competitors.  Second, Guidance has provided evidence that the Defendants' representatives have made allegedly false and misleading statements to Guidance's customers, often as part of a sales pitch for the Defendants' products.  See Stramback Dec. ¶¶ 5-6, at 2; Casada Dec. ¶¶ 6-10; Kratchman Dec. ¶¶ 5-9.[5]  Next, Guidance has provided evidence of an aggressive marketing campaign targeted at former Guidance customers. See Bisceglie Dec. at Exhibits 7-17.  When combined with these other pieces of evidence, the Court is convinced that a reasonable fact-finder could conclude that the Defendants were engaged in "predatory" conduct when they decided that they would not supply the V2 file to Guidance.

**4.      Guidance has Provided Less than a Scintilla of Evidence that the Defendants' Failure to Provide the V2 File has Caused it Damages.**

Once a plaintiff shows a factual issue regarding improper means, it must still show a genuine issue of fact on the issues of causation and damages.  As the Supreme Court of New Mexico has held, a plaintiff "must prove that there was an actual prospective contractual relation which, but for the [Defendant's] interference, would have been consummated."  Anderson v. Dairyland Ins. Co., 97 N.M. 155, 159, 637 P.2d 837, 841 (1981).  It takes no evidence to see that the Defendants' failure to provide the V2 file to Guidance would impede a prospective purchaser from buying it if such a purchaser existed.  The debate, then, is whether Guidance has provided sufficient evidence to create

---

[5]Defendants objected to these declarations on hearsay grounds in their reply to Guidance's response to their first motion for summary judgment.  The Court disposed of those hearsay objections in the prior opinion.  See Memorandum Opinion and Order, at *10-14, filed September 8, 2009 (Doc. 303).

a factual issue whether anyone would have bought the V2 file if it were brought to the market.

Guidance asserts that "[t]here are at least sixty current or former Guidance customers [who] have been waiting . . . to place firm orders for the V2 file product."  Response at 4.  Guidance provides one piece of admissible evidence that might tend to establish a demand for the V2 file and thus that the Defendants' refusal to provide it is preventing Guidance from entering into contractual relations with prospective purchasers.  That is a snippet of a hearing transcript wherein Goodis says:

> when I talk at trade shows, when I talk at dental conventions, and when I talk to our own customers, the ones that are begging -- I'm getting phone calls going, "Chuck, you're out of V-Tapers. What's your new file?" Half of them that try the EndoTaper go, "You know, I like it, but I don't like the shape.  I like that more conservative taper that the V-Taper gives."

Response Exhibit B.  The Defendants disregard this statement, arguing that this testimony is no evidence that anyone would have bought the V2 file, even if they had supplied it.  Tr. of Sept. 1, 2009 at 71:15-23 (Gulley).  The Court agrees.  Even if the Court takes Goodis' statement, and the second-hand statements recounted within it, for the truth of the matters asserted, they do not provide more than a scintilla of evidence that any customer would actually have purchased the V2 file.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").  The statements of the anonymous customer, some of which are hearsay, at best express an interest in purchasing the now-unavailable V-Taper file and curiosity regarding what product will replace it.  The V-Taper file and the V2 file are different products.  The Court agrees that this evidence shows some interest in the V-Taper, but it cannot be assumed that the purchasers of the V-Taper would purchase the V2 without evidence that the latter will be a reasonable replacement for the former.  The Court does not believe that, based on the evidence presented to the Court, a reasonable jury could find by a preponderance of the evidence that any

particular Guidance customer would buy the V2 file if Guidance were able to sell it.

As discussed in Section III.B.2 of this opinion, Guidance has provided a stack of other documents that they claim demonstrate a demand for the V2 file.  For the reasons expressed in that Section of the opinion, the documents are no more helpful to establish future demand than they are to establish existing contractual relations.  First, the documents are unauthenticated and hearsay.  And second, there is no indication precisely who wrote the "Comments/Notes" section or what it is meant to express.  The customer might have expressed some desire for the V2 file, he might have asked for a sample thereof -- as in the third document, mention in the discussion above, indicates -- or the salesperson might have wanted to remind himself to give the customer an unsolicited sample of the product.  In short, these documents do not create a fact issue whether there were "actual prospective contractual relation which, but for the [Defendant's] interference, would have been consummated."  Anderson v. Dairyland Ins. Co., 97 N.M. at 159, 637 P.2d at 841.

Guidance also seems to contend that an additional document provides some evidence of prospective contracts.  In its response, it refers to the expert report of Dr. Brian McDonald, an economic consultant for Guidance.  See Response at 12.  Guidance alleges that his report establishes its damages and,  implicitly, that they were caused by the Defendants' alleged tortious interference.  See id.  The Defendants argue that McDonald's report is not based on facts in evidence and does not provide evidence that past Guidance customers would have purchased the V2 file in place of the V-Taper file.  See Tr. of August 21 at 69:6-14 (Gulley).

The Court is not convinced that Guidance's expert report provides evidence of causation.  The shortcoming of the report is that it expressly makes the assumption, not relying on any evidence (admissible or otherwise), that the V2 file would be a suitable replacement for the V-Taper file.  See Guidance's Expert Report at 3, 6 (stating that the report "assumes that, had Dentsply fulfilled its

agreement and provided the V2 file . . . Guidance would have been able to achieve sales of the V2

file . . . equal to its actual historical direct sales of the V file.").  It assumes that Guidance customers

who purchased the V-Taper file would have purchased the V2 file, and in equal or greater quantities.

Guidance has not referred the Court to any document, admissible or inadmissible, authenticated or

unauthenticated, that would tend to prove that the V2 file would be a suitable replacement for the

V-Taper file or that Guidance customers who purchased the V-Taper would buy the V2 file once

shown a sample of it.  Without such evidence, McDonald's report does not bridge the gap between

the Defendants' conduct and the damages that McDonald describes.

As a result of the foregoing, Guidance has failed to raise a genuine issue of fact whether the

Defendants' failure to supply the V2 file deprived Guidance of prospective contracts.  The Court

will therefore grant the Defendants' motion for summary judgment as to Guidance's tortious

interference with prospective contractual relations claim.

**IT IS ORDERED** that Dentsply/TDP Motion for Summary Judgment on Guidance's Count

VII – Tortious Interference with Existing and Prospective Contractual Relations is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kyle C. Bisceglie
Renee M. Zaystev
Olshan, Grundman, Frome, Rosenzweig
  & Wolosky, LLP
New York, New York

-- and --

John J. Kelly
Donald A. DeCandia

-30-

Ryan Flynn
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Albuquerque, New Mexico

    *Attorneys for the Plaintiff and Counterdefendants*

Brian M. Addison
  Vice President, Secretary, and General Counsel
Dentsply International, Inc.
York, Pennsylvania

-- and --

Thomas P. Gulley
Rebecca L. Avitia
Lewis and Roca, LLP
Albuquerque, New Mexico

    *Attorneys for the Defendants and Counter-Plaintiffs*