IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

GUIDANCE ENDODONTICS, LLC,
a New Mexico Limited Liability Company,

      Plaintiffs,

vs.                                                                                No. CIV 08-1101 JB/RLP

DENTSPLY INTERNATIONAL, INC.
a Delaware Business Corporation, and
TULSA DENTAL PRODUCTS, LLC,
a Delaware Limited Liability Company,

      Defendants.

and

DENTSPLY INTERNATIONAL, INC.
and TULSA DENTAL PRODUCTS, LLC,

      Counter Plaintiffs,

vs.

GUIDANCE ENDODONTICS, LLC
and DR. CHARLES GOODIS,

      Counter Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Motion for Leave to Supplement

Expert Report of Brian McDonald, filed August 31, 2009 (Doc. 287).  The Court held a hearing on

September 11, 2009.  The primary issue is whether the Court should grant Plaintiff Guidance

Endodontics, LLC leave to supplement the expert report of Dr. M. Brian McDonald on damages,

increasing his opinion of damages from $1.2 million to $75.2 million, because the information

needed to support these opinions was allegedly in the possession of the Defendants and had not yet

been produced.  Because the Court concludes that all the information necessary to make a rough calculation of the higher damages was available to Guidance and to Dr. McDonald before the date of disclosing his expert report, and because Guidance and Dr. McDonald consciously and intentionally chose not to make any calculation of those damages before the deadline for doing so, the Court will not allow Guidance to drastically change the calculation of its damages fourteen days before trial is scheduled to begin.  The Court will therefore deny the motion.

## FACTUAL BACKGROUND

This case concerns a suit that Guidance, a small endodontic-equipment company, has brought against Defendants Dentsply International, Inc. and Tulsa Dental Products, LLC (collectively "the Defendants"), who are both Guidance's rivals and its suppliers.  More background on the lawsuit is set forth in the Court's earlier opinion.  See Guidance Endodontics, LLC v. Dentsply Intern., Inc., 2008 WL 6013069, at *1-5 (D.N.M. Dec. 15, 2008)(Browning, J.).  Based on a dispute, the Defendants failed to supply a particular endodontic file -- the V2 file -- to Guidance.  Guidance now seeks lost-profits damages based on its inability to sell the V2 file to its customers.

## PROCEDURAL BACKGROUND

On December 17, 2008, the Court entered an Initial Scheduling Order.  See Initial Scheduling Order, filed December 17, 2008 (Doc. 34).  In it, the Court ordered the parties to make their initial disclosures by January 22, 2009.  See id. at 1-2. The Court also ordered the parties to develop a Joint Status Report and Provisional Discovery Plan by January 15, 2009.  See id. at 1.

### 1.   Guidance's Initial Disclosures on Damages.

On January 23, 2009, Guidance made its initial disclosures.  See Certificate of Service of Rule 26 Initial Disclosures, filed January 23, 2009 (Doc. 47).  Under rule 26(a)(1)(A)(iii) of the

Federal Rules of Civil Procedure, a party is required to disclose as part of its initial disclosures the

following information about damages:

> [A] computation of each category of damages claimed by the disclosing party -- who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered

Fed. R. Civ. P. 26(a)(1)(A)(iii).  Guidance made the following initial disclosures about its damages

pursuant to this rule:

1. Damages caused by Defendants' breach of the Supply Agreement and violation of the covenant of good faith and fair dealing, as alleged in Counts I, II, and III, but not yet quantified.

2. Damages caused by Defendants' violation of the Delaware Deceptive Trade Practices Act and the New Mexico Unfair Practices Act, as alleged in Counts IV and V, but not yet quantified.

3. Damages caused by Defendants' violation of the Lanham Act, as alleged in Count VI, but not yet quantified.

4. Damages caused by Defendants' tortious conduct, as alleged in Count VII, but not yet quantified.

5. Damages caused by Defendants' anticompetitive behavior, to be alleged in Plaintiff's Amended Complaint, but not yet quantified.

> Plaintiff reserves the right to modify or supplement its disclosure as necessary and appropriate to include additional materials, documents and damages relevant to support its defenses.

Motion Exhibit B at 3-4.  Notably, the disclosure gave no indication of how Guidance might seek

to calculate the damages listed, nor a rough sense of the magnitude of the damages sought.

### 2.    <u>The Court and Parties Set the Schedule for Disclosing Experts.</u>

On January 16, 2009, the parties submitted a Joint Status Report and Provisional Discovery

Plan.  In that document, the parties proposed deadlines of May 24 and April 23, 2009 to identify

experts.  See Joint Status Report and Provisional Discovery Plan at 13, filed January 16, 2009 (Doc.

46).  On January 23, 2009, the Court held an initial scheduling conference.  At that hearing, the

Court expressed its agreement with how the parties proposed to handle the majority of pretrial

matters.  The Court orally ordered that Guidance must identify its expert witnesses and provide their

expert reports no later than April 23, 2009.  The Court also stated that, while Guidance's experts did

not have to be deposed on that date, they should be ready to go to depositions at that time.  The

Court also ordered that the parties had to identify rebuttal witnesses soon thereafter, on May 19,

2009.  After the conference, the Court issued a written order, stating:

> Plaintiff shall identify to all parties in writing any expert witness to be used
> by Plaintiff at trial and to provide expert reports pursuant to Fed. R. Civ. P.
> 26(a)(2)(B) no later than **April 23, 2009**.  All other parties shall identify in writing
> any expert witness to be used by such parties at trial and to provide expert reports
> pursuant to Fed. R. Civ. P. 26(a)(2)(B) no later than **April 23, 2009**.
> **The parties shall identify rebuttal experts no later than May 19, 2009.**
> **The parties shall have their experts ready to be deposed at the time they
> identify them and produce their reports.**

Scheduling Order at 2, filed March 4, 2009 (Doc. 62)(emphasis in original).

Since the initial scheduling order, the Court has repeatedly extended the deadline to identify

experts and provide their reports.  First, the parties were to identify experts by April 23, 2009 -- May

19, 2009 for rebuttal experts.  See Scheduling Order at 2.  The deadline was then extended to May

22, 2009.  See Order Granting Joint Motion for Extension of Time to File Expert Reports at 1, filed

May 1, 2009 (Doc. 101).  On May 19, 2009 the parties filed a motion seeking to extend the Court's

initial scheduling deadlines.  See Joint Motion to Amend the March 4th and May 1st Scheduling

Orders, filed May 19, 2009 (Doc. 115).  The parties agreed to the following schedule for the

disclosure of experts:

> The parties shall identify in writing any expert witness to be used at trial and
> provide expert reports pursuant to Rule 26(a)(2)(B) no later than June 5, 2009.

The Parties shall identify rebuttal experts and provide expert reports pursuant
to Rule 26(a)(2)(B) no later than June 30, 2009.

Id. Exhibit A, p. 2.  The Court, pursuant to this request, extended the deadline to June 5, 2009 -- June

30 for rebuttal experts.  See Order to Amend Scheduling Order (Dkt. No. 62) and (Dkt. No. 101) at

2, filed June 3, 2009 (Doc. 133).  Both parties met this final deadline, serving the required expert

reports on one another on June 5, 2009.

### 3. Guidance's Response to Defendants' Interrogatory Regarding Damages.

On January 26, 2009, the Defendants served Guidance with its first set of interrogatories.

See Dentsply/TDP's Motion to Compel Guidance/Goodis' Production of Documents and Answers

to Interrogatories ¶ 1, at 2, filed March 23, 2009 (Doc. 75).  One of those interrogatories sought

more information about Guidance's damages.  It requested that Guidance "[i]dentify all damages

you claim in this case, and identify all documents which support your damages claims."  Id. Exhibit

A, at 17.  Guidance objected to this interrogatory and responded only that "Guidance seeks damages

to the full extent permitted by law, including but not limited to treble damages and attorneys fees."

Id.

### 4. The Court Compelled the Defendants to Disclose Certain Data.

Because it is relevant to Guidance's argument, the Court will recount the history of an

underlying discovery dispute.  In Guidance's Requests for Production of Documents, First Set,

served February 9, 2009, and Second Set, served March 13, 2009, Guidance requested the

Defendants' sales data in connection with obturators and files, the Defendants' financial statements,

and secondary and primary research on the endodontic industry in the Defendants' possession.  The

Defendants refused to produce any of these materials, objecting on grounds of relevance,

burdensomeness, and over breadth.  Guidance filed a motion to compel with respect to each of these

three categories of documents on May 4, 2009.  See Plaintiffs' Motion to Compel Production of

Documents and Answers to Interrogatories, and for an Extension of Time Under LR-CV 26.6, filed

May 4, 2009 (Doc. 105).

In his first report, McDonald opined about lost sales to existing V-Taper file customers, but

noted that he could not yet provide opinion testimony in support of other damages claims.

McDonald stated that, although "there are several different components to the economic damages

suffered by Guidance due to [the Defendants'] alleged breach of contract," his report was "limited

to one component only -- the inability of Guidance to sell Guidance-designed, fixed taper (0.04)

rotary endodontic files to existing customers of its variable taper file (V-Taper file) in the five-

quarter time period from October 1, 2008 to December 31, 2009."  Expert Report of M. Brian

McDonald, Ph.D. at 1, filed July 31, 2009 (Doc. 219-4)("McDonald's Report").  McDonald stated

that there were other components of damages, but that their quantification would require information

that was not presently available.  See id.  He suggested that he might "supplement this report to

include quantification of other components of economic damages" if he later received that

information.  Id.

In relevant part, McDonald's report, dated June 5, 2009, stated:

Conceptually, there are several different components to the economic damages
suffered by Guidance due to this alleged breach of contract.  In this report the
quantification of economic damages has been limited to one component only -- the
inability of Guidance to sell the Guidance-designed, fixed-taper (0.04) rotary
endodontic file to *existing* customers of its variable taper file (V Taper file) in the
fix-quarter time period from October 1, 2008 to December 31, 2009.  Other
components of economic damages are acknowledged at the conclusion of this report.
Any quantification of these other components of damages will require additional
information and analysis, not presently available.  If this additional information does
become available, I may supplement this report to include quantification of other
components of economic damages.

. . .

-6-

There are other components to the economic damages suffered by Guidance as a result of the alleged breach of contract by Dentsply.  Guidance's business model was to sell endodontic products directly to customers are a lower price than its competitors, while using a low cost marketing strategy that relied upon direct mail, the internet, and presentations at professional meetings.  Guidance expected to capture an increasing market share of the endodontic market with this business model, resulting in future sales and profits well beyond what was expected from their existing V file customer base. . . .

McDonald's Report at 1, 8-9 (emphasis in original).

The additional component of economic damages, according to McDonald, is that resulting from the Defendants' impeding Guidance's opportunity to "capture an increasing market share of the endodontic market" with its low-cost supplier model.  See McDonald's Report at 8-9.  McDonald stated that Guidance's business model will "result[] in future sales and profits well beyond what was expected from their existing V file customer base." Id.  He stated, however, that he could not currently quantify those damages:

Quantification of this component of economic damages will require additional information about the prices charged by its competitors such as Dentsply, the price elasticity of demand for endodontic products, the importance of brand name loyalty among dentists and endodontists, and access to other market research on the endodontic devices market.  It would also be useful to have access to information concerning specific Dentsply customers in the 2005-2007 time period and compare the Dentsply's customer list to Guidance's customer list in order to see how many Dentsply customers became customers of Guidance.

McDonald's Report at 8-9.  McDonald thus indicated that he needed five pieces of additional information that were allegedly unavailable to him to complete his calculation.[1]  Guidance's May

_____

[1] McDonald's initial report indicated that he needed five pieces of unavailable information to do the damages calculation he decided to do, but the reply brief lists four things McDonald needed. McDonald asserts in his declaration that he was missing two pieces of information. Nevertheless, McDonald used only one piece of information that the Defendants disclosed in July to form the opinions in his supplemental report.  Weber and McDonald used that information, the Defendants' sales data, in developing their "weighted price differential" used to execute the market survey.

4, 2009 motion implied that Guidance believed the Defendants possessed those documents.

The Court heard argument on Guidance's motion to compel on June 11, 2009. With respect to these three categories of documents, the Court ordered production, in part, within thirty days. See Sealed Memorandum Opinion and Order at 14-16, filed July 14, 2009 (Doc. 194).

### 5.    The Defendants Turn Over Certain Information to Guidance.

The Defendants responded to the Court's order to produce by providing sales data in response to RFP No. 17 on July 27, 2009. In particular, the Defendants produced a fifty-five megabyte CD Excel spreadsheet containing over one-million sales transactions between 2005 and the present. The Defendants also produced income statements on July 22, 2009. On July 27, 2009, the Defendants advised that they had no primary or secondary market research responsive to RFP, Second Set, No. 3. See Letter from Thomas P. Gulley to John J. Kelly at 1 (dated July 27, 2009), filed August 31, 2009 (Doc. 287-2).

On May 21, 2009, James Mosch, Executive Vice President for Dentsply and the officer in charge of the company's endodontics division, refused in his deposition to disclose Dentsply's United States market share for files and obturators. On July 21, 2009, Guidance and Goodis filed their First Omnibus Discovery Motion, requesting, in part, that the Court compel Mosch to answer Guidance's questions about market share. See Plaintiffs' First Omnibus Discovery Motion ¶¶ 21-26, at 9-11, filed July 21, 2009 (Doc. 204). The Court held a hearing on this issue on September 1, 2009, and indicated that it would compel Mosch to answer the questions. The Defendants had already disclosed the pertinent information in July, 2009, by an affidavit of Mr. Mosch. See Clerk's Minutes Before the Honorable James O. Browning for September 1, 2009 at 7, filed September 1, 2009 (Doc. 290). Guidance then had two new pieces of information and was informed that another piece was not in the Defendants' possession.

**6.      After the Defendants' Disclosure, Guidance Springs into Action.**

At that juncture, Guidance did three things.  First, it commenced its review of the data produced.  Second, it commissioned a survey of dentists and endodontists through Dr. Lynne Weber of Duff & Phelps to determine whether and to what extent practitioners in the marketplace would move from Dentsply files and obturators to Guidance files and obturators, given the price difference. See Declaration of Lynne Weber, Ph.D. ¶ 8, at 2 (executed August 31, 2009), filed August 31, 2009 (Doc. 287-3)("Weber Dec.").  In connection with the supplemental damage analysis, Weber discussed the importance of the Defendants' files and sales data: "The Retail Sales Data File provided information that was critical to estimating the price differential between Guidance and Tulsa Dental products."  Id. ¶ 9, at 3.  In other words, Guidance undertook its own original market research to obtain data that Guidance believed should have been discoverable from the files of the Defendants -- the market leader in the endodontic file and obturator industry.  See id. ¶¶ 6-8, at 2-3. Third, Guidance also filed a second motion to compel with regard to market research, which Guidance continued to argue was in the Defendants' possession.  See Plaintiffs' Second Omnibus Discovery Motion, filed August 6, 2009 (Doc. 233-2).

**7.      Guidance Files This Motion to Supplement its Expert Report.**

On August 31, 2009, Guidance filed this motion, requesting leave of the Court to supplement McDonald's expert report, served on the Defendants on June 5.  The Defendants oppose the motion. See Dentsply/TDP's Response as to Timeliness of Plaintiff's Motion to Supplement Expert Report of M. Brian McDonald (Doc. 287), filed September 9, 2009 (Doc. 308).  In the new report, McDonald asserts that Guidance's damages might be as high as $75.2 million -- a significant increase from the $1.2 million in his first report.  Guidance asserts that the Court should permit it to supplement McDonald's report because it is based in part on information in the Defendants'

possession, which should have been turned over in discovery.

### 8. **McDonald's Second Report.**

The trial of this case began on September 18, 2009.  On August 31, 2009, Guidance sought to fill the gap left in McDonald's expert report.  It requested the Court's leave to supplement McDonald's opinion with an opinion regarding Guidance's future damages based on increased market share ("lost-market-share" damages).  Guidance delivered the report to the Defendants on September 8, 2009 -- over three months after the expert report deadline and ten days before the case was schedule for trial.  See Response at 1 & Exhibit A.

In the supplement, McDonald opined that "Guidance has suffered additional economic damages which total $73,983,711 in present value over the seven-year life of the [Supply] Agreement." Expert Report of M. Brian McDonald, Ph.D. at 2 (dated September 8, 2009)(Doc. 308-2)("McDonald's Supplement").  McDonald asserts that he relied on, among other things, the retail sales data that the Defendants provided on July 27, 2009, the affidavit of James Mosch dated July 30, 2009, and a declaration executed and survey conducted by Weber, which purports to rely on the sales data and affidavit.  See McDonald's Supplement at 2.

### **ANALYSIS**

The Court's Order required the parties to have their expert reports served on one another by June 5, 2009.  See Order to Amend Scheduling Order (Dkt. No. 62) and (Dkt. No. 101) at 2, filed June 3, 2009 (Doc. 133).  Rule 26(e) further directs that "any additions or changes" to an expert report "must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e).  Under the scheduling order, pretrial disclosures in this case were due August 31, 2009.  See id. at 2.  Guidance did not supply the Defendants with McDonald's supplement until September 8, very near the start of the trial and a week past the deadline for supplementing expert

reports.

Guidance argues that the Court should excuse its missing this deadline for two reasons. First, it argues that its supplement should be found timely under rule 26(e).  It asserts that McDonald's initial opinion was timely under the Court's scheduling order and this supplement is being made "in a timely manner" based on the recent receipt of new information, as rule 26(e) contemplates.  Motion at 5.  Guidance argues it diligently sought that information from the Defendants and only recently, by way of an order compelling disclosure, acquired it.  See id.  In other words, if the Defendants had turned over the necessary documents when they were requested, Guidance argues, it would not need to supplement McDonald's report at the last minute.  Second, Guidance argues that its failure to timely supplement McDonald's report "was substantially justified or harmless" under rule 37, thus the Court should allow McDonald to testify to the opinions in the supplement even if it was untimely.  See Motion at 6-7.

In response, the Defendants argue that these damages resulting from Guidance's inability to capture market share are based on a new theory of damages, never before disclosed.  See Response at 2.  Guidance did not include these damages in its initial disclosure, in response to the Defendants' interrogatory requesting "all damages [Guidance] claim[s] in this case," or in any supplement to the initial disclosure or interrogatory response.  See Response at 2.  They further claim that McDonald's reference to this other category of damages in his initial report was insufficient to constitute proper disclosure.  See Response at 2.  They also argue that all data necessary for McDonald to do the calculations included in his supplemental report was available to Guidance at or before the initiation of this lawsuit, so it has no valid excuse for waiting until the last minute to add these damages to McDonald's opinion.  See Response at 5.  Finally, the Defendants argue that this amendment is not substantially justified and that the prejudice to the Defendants from

permitting Guidance to supplement McDonald's report is obvious.  See Response at 13.

**I.      GUIDANCE HAS FAILED TO PROPERLY DISCLOSE THAT IT WAS SEEKING LOST MARKET-SHARE DAMAGES.**

Though McDonald references the lost future-market-share damages now sought by Guidance in his expert report, Guidance has not previously disclosed them to the Defendants in any certain terms, notwithstanding numerous opportunities to do so.

Under rule 26(a)(1)(A) of the Federal Rules of Civil Procedure, each party must present to the other certain information, even if it is not requested.  In that disclosure, a party must include "[a] computation of each category of damages claimed by the disclosing party . . . ." Fed. R. Civ. P. 26(a)(1)(A)(iii).  This rule on initial disclosures required Guidance to include in its initial disclosures what categories of damages it intended to seek from the Defendants.  According to the Defendants, and Guidance does not dispute this assertion, Guidance did not provide this information in its initial disclosure.

Later in the discovery process, the Defendants sent an interrogatory to Guidance requesting that Guidance "[i]dentify all damages [Guidance] claim[s] in this case"  Response at 2; Dentsply/TDP's Motion in Limine to Exclude Certain Evidence Related to Guidance's Damages Claims Exhibit 1, filed July 31, 2009 (Doc. 219).  To this interrogatory, Guidance answered that it "seeks damages to the full extent permitted by law, including but not limited to treble damages and attorneys' fees."  See id.  Guidance never supplemented this discovery response.

Rule 26(e) requires parties to supplement and correct disclosures if they are incorrect or incomplete in any material way.  See Fed. R. Civ. P. 26(e).  Rule 26(e)(2) applies specifically to expert witnesses, and requires that "[a]ny additions or changes to [the expert report] must be disclosed by the time of the party's pretrial disclosures . . . ." Fed. R. Civ. P. 26(e).  The penalty for

failure is severe, as rule 37 states that, if one "fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

## II.  MCDONALD COULD HAVE CALCULATED THE DAMAGES SOUGHT IN HIS SUPPLEMENTAL REPORT WITH INFORMATION AVAILABLE WHEN GUIDANCE FILED ITS SUIT.

Guidance's most compelling argument is that its supplement is timely under rule 26(e).  It argues that, although it has missed the deadline for supplementing expert reports set down in the scheduling order, rule 26(e) allows supplementation if it is done "in a timely matter" when "the party learns that in some material respect the disclosure or response is incomplete." Fed. R. Civ. P. 26(e).  Guidance contends that the Defendants only recently turned over in discovery information upon which McDonald bases his supplement, and the information was not available by other means. See Motion at 4-6.  Thus, it argues, the Court should not bar it from using this late-discovered evidence.  The Defendants respond that, although it was late in turning over some information that would have been useful to McDonald in refining an estimate of damages from lost future-market-share, McDonald never endeavored to opine as to such damages, even though he has had access to enough information to make a reasonable approximation since the case began.  See Response at 4-6. They also contend that, because Guidance never disclosed this category of damages to the Defendants -- in initial disclosure or in response to an interrogatory specifically requesting it -- and because McDonald's initial report merely made passing reference to it without providing a methodology or means of calculating it -- even though there was sufficient information available to do so -- the Court should deny the late supplementation.  See Response at 2-4.

The Court does not believe that it would be appropriate to allow Guidance to supplement McDonald's report this late in the proceeding for two reasons: (i) Guidance failed to properly

disclose it in response to discovery; and (ii) Guidance's expert had all the tools necessary to create a reasonable approximation of future-market-share damages when he wrote his report and declined to do so.  Part of the purpose of requiring parties to provide one another with expert reports is to avoid one party being ambushed by complex expert testimony -- outside the ken of lay persons by definition -- without having time to consult with another expert to determine if and how the other party's expert testimony can be rebutted.  See Means v. Letcher, 51 Fed. Appx. 281, 282 (10th Cir. 2002) (explaining that part of the purpose of rule 26 expert reports is to "to minimize the expense of deposing experts, and to shorten direct examination and prevent an ambush at trial").  Permitting the supplement would put the Defendants at the kind of disadvantage the Rules endeavor to avoid. Cases must progress to a resolution, and to do that, discovery must eventually end.  The deadline for providing expert reports has already been pushed back twice in this case, and trial is near.  Under some circumstances, the Court might delay the trial to resolve this dispute, but that is not appropriate under these facts, particularly when the Defendant remains bound by a preliminary injunction.  See Memorandum Opinion and Order, filed December 22, 2008 (Doc. 39).  The Court will not push the deadlines back yet again.

### A.   GUIDANCE FAILED TO PROPERLY DISCLOSE THAT IT SOUGHT LOST FUTURE-MARKET-SHARE DAMAGES.

Guidance's failure to disclose this category of damages in discovery has already been discussed.  Even if Guidance did not know what categories of damages it would seek at the time of the initial disclosure and of answering the Defendants' interrogatories, it must have known that it planned to seek damages for lost future market share or it would not have known what information to seek from the Defendants in its requests for production.  As the Court understands it, Guidance has never supplemented its initial disclosure or interrogatory responses to even inform the

Defendants that it is seeking general lost profits damages, much less damages under a more complex theory of future market share capture -- the idea that, over time, Guidance would begin to supply a larger and larger percentage of the endodontics market.

McDonald's first report arguably satisfied the purpose of these initial disclosures with respect to the $1.2 million, notifying the Defendants that Guidance was claiming damages for the inability to sell the V2 file to existing V-Taper file customers and providing a computation of those damages.  See Fed. R. Civ. P. 26(a)(1)(A)(iii).  It did not, however, meet that standard for loss of future market share.  The statements by McDonald in his initial report were merely to the effect that Guidance may have other damages based on its plan to capture an increasingly large market share and that more data would be necessary to calculate those damages.  See McDonald's Report at 8-9. This initial report does not provide "a computation," even in the form of an abstract equation, for determining Guidance's growing market share.

**B.      GUIDANCE HAS ALWAYS HAD ENOUGH INFORMATION TO MAKE AN ESTIMATE OF LOST-FUTURE-MARKED-SHARE DAMAGES.**

Even if Guidance was not required to provide a computation of the damages sought, by category, until it had sufficient evidence to arrive at a numeric value, Guidance and Dr. McDonald had all the information that they needed to do so.  They did not need the information that the Defendants disclosed in July to estimate Guidance's lost future-market-share damages.  At the hearing on this motion, Mr. John Kelly, representing Guidance, conceded that McDonald had the necessary data from 2006 at his disposal.  See Transcript of Hearing at 50:14-22 (taken September 11, 2009) (Kelly)("Hearing").  McDonald's report indicates that he relied on the Customer Sales Data turned over by the Defendants on July 27, 2009 and Mosch's affidavit regarding market share, turned over on July 30, 2009 in writing the supplement to his report.  See McDonald's Supplement

at 2-3.  As the Defendants point out, however, the necessary information was available from other sources.  See Response at 4-7.

There were only two pieces of data that the Defendants turned over to Guidance in July, and Guidance alleges that these were critical to their calculation.  The first is the Defendants' sales data. The sales data was "a 55 megabyte CD excel spreadsheet containing over one million sales transactions between 2005 and the present."  Motion at 3.  So far as the Court can discern from reading McDonald's supplemental report, he used this data for one purpose: to come up with a weighted average cost per file charged by the Defendants.  See McDonald's Supplement at 7.  This average cost was allegedly important because files are sold at a volume discount and thus, to know the average amount charged per file, one would need to know how many files an endodontist buys in an average order.  See Hearing at 10:7-11:7 (Kelly).  The Court concedes that the sales data permits a more precise calculation, but a conservative estimate could easily be made.  After all, the prices charged for the Defendants' and other competitors' products are readily available to dentists and endodontists like Goodis.  See Response Exhibits C-H.  McDonald could have made a conservative estimate using the largest volume discount.[2]  It would not yield as large a damages figure, but it would yield a large number, and it could have been refined later without springing this new category of additional damages on the Defendants.  Suddenly increasing damages to more than 62 times the initial estimate would radically change the tenor of this lawsuit, and at a very late stage.

The second piece of data that Guidance contends was essential to its calculation of damages

_____

[2]Furthermore, McDonald could also have looked in the 2006 Millennium Report, to which he had access when writing his initial report.  Such reports have data on the average price per rotary file or per obturator.  See, e.g., Response Exhibit B, p. 19.  Or Guidance could have purchased a Millennium Report at http://www.mrg.net/reportView.php?repID=502 (last visited September 13, 2009), containing all the information they needed.

-16-

is the Defendants' current market share -- that is, what percentage of persons buying endodontic products buy them from the Defendants as opposed to other suppliers. Again, a close approximation of this information was available. McDonald had access to the 2006 Millennium Report, see McDonald's Report at 2, which is a comprehensive collection of data on the endodontics market.[3] Among that data is the market share of each of the competing companies in that market, including the Defendants. In addition, it is not clear from the supplemental report how McDonald used the market share data once he received it, except perhaps in the Weber survey discussed next. There seems to be no reason why the calculation of future-market-share damages could not have been reasonably estimated with the data at Guidance's disposal earlier in the case.

### C. GUIDANCE COULD HAVE AND SHOULD HAVE IMPLEMENTED WEBER'S SURVEY EARLIER IN THE LITIGATION.

McDonald's supplement also relies heavily on Weber's survey. In her declaration discussing the survey, Weber implies that she relied on the sales data and affidavit that the Defendants turned over in July. See Declaration of Lynne Weber, Ph.D. ¶¶ 9, 15, at 3-4, filed August 31, 2009 (Doc. 287-3)("Weber Dec."). Weber's use of the data, however, is identical to McDonald's. Her survey was designed to "measure respondents' preferences for Guidance products vs. Tulsa Dental products, at a given price differential." Weber Dec. ¶ 8, at 2-3. Weber allegedly used the sales data to develop an average price for one of the Defendants' files and compared it to the average price charged for a Guidance file. See id. ¶ 9, at 3. As discussed above, Weber could have reasonably estimated the average price of one of the Defendants' files from the pricing information that was

---

[3]It is debated whether McDonald had a copy of the 2008 Millennium Report or merely an Executive Summary of that report. Mr. Kelly conceded, however, that McDonald had at least the 2006 report, which he assumes had the same categories of information as the 2008 report. See Hearing at 50:14-20 (Kelly).

readily available or from the Millennium Report that McDonald had in his possession.  The market share data that Guidance acquired from Mosch's July 30, 2009 affidavit was used "as a cross-check on the reasonability of the unit sales being forecast for Guidance."  Id. ¶ 15, at 4.  In short, Weber could have executed her survey and acquired the survey data at the beginning of this lawsuit.

Guidance argues that it had expected to get market research, similar to the survey that Weber conducted, from the Defendants during the course of discovery and did not engage Weber sooner in an effort to save money.  See Hearing at 8:14-24, 50:25-51:20 (Kelly).  Guidance argues that it relied on Weber's expert opinion that a company like Dentsply or Tulsa Dental would have done market research and purchased secondary market research for their own purposes.  See Hearing at 18:18-19:8.  That was a mistake.  It was Guidance's burden to construct its case and marshal its evidence.  As soon as it became clear that some pieces of the puzzle were not going to be forthcoming from the Defendants during discovery -- and within the deadlines set down by the Court -- Guidance should have sought them by other means.  The Court believes that Guidance's reliance on the Defendants to provide market data, even as the deadline for submitting expert reports came and went, without properly disclosing that it sought these lost market share damages or having its expert construct a rough estimate, was a mistake -- the consequences of which should not be shifted to the Defendants.

The Court emphasizes that it is not condoning the Defendants' withholding information relevant to damages in hopes that Guidance would not timely seek it from other sources.  If the Defendants failed to turn over non-privileged documents in response to an appropriate discovery request, there should be repercussions for that conduct.  The Court, however, sees this motion as raising a separate issue.  So far as the Court has determined, the information that was allegedly both (i) not turned over in response to a discovery request; and (ii) essential for calculating these lost

future market share damages was available to Guidance early in the case.  The Court therefore does

not consider the McDonald supplement to have been made in "a timely manner" as rule 26(e)

contemplates.

      **D.**      **GUIDANCE CANNOT URGE THIS SUPPLEMENT AS A MEANS TO STRENGTHEN ITS EXPERT'S REPORT.**

      The Defendants assert that Guidance's attempt to supplement McDonald's report is an effort

to delay the trial or, worse yet, take a surprise advantage over the Defendants.  See Response at 10-

13.  If Guidance was aware that this information was available from other sources, the Court would

have even more reason to deny supplementation.  As it has recognized in the past, "[r]ule 26(e) does

not allow a party to file supplements intended to "deepen" or "strengthen" its own expert's prior rule

26(a)(2)(B) report."  Leviton Mfg. Co., Inc. v. Nicor, Inc., 245 F.R.D. 524, 528 (D.N.M. 2007).

"Although [rule] 26(e) requires a party to 'supplement or correct' disclosure upon information later

acquired, that provision does not give license to sandbag one's opponent with claims and issues

which should have been included in the expert witness' report."  Id. (quoting Beller v. United States,

221 F.R.D. 696, 701 (D.N.M. 2003)(Garcia, J.)).  Though the Court does not accuse either party of

engaging in such tactics, the possibility of such motive spurs the Court to examine the facts and

circumstances closely in this situation.

**III.**      **SUPPLEMENT TO MCDONALD'S EXPERT REPORT AFTER THE DEADLINE FOR DISCLOSURE IS NOT SUBSTANTIALLY JUSTIFIED OR HARMLESS.**

      Guidance argues that the Court should permit McDonald to testify to the opinions in his

supplemental opinion, notwithstanding the usual prohibition on such testimony under rule 37(c),

because this new testimony could not surprise or prejudice the Defendants.  See Motion at 6.  And,

even if it did, they argue, the prejudice was self-inflicted by the Defendants' failure to turn over

certain documents necessary to the opinion.  See id.  The Court believes it has adequately addressed

the second half of the argument in the previous section of this opinion -- McDonald's opinion could have been formed with information available to Guidance and McDonald, so if the Defendants failed to disclose documents in discovery, it would not excuse Guidance's failure to include a computation of the loss of future market share damages in McDonald's first opinion.  The Court focuses on the first argument.  The Defendants respond that the prejudice to them is obvious.  They assert that they should have an opportunity to explore the methodology and design of Weber's survey, and to perform a rebuttal survey.  See Response at 12.  With the preliminary injunction in effect and trial right around they corner, they contend, the only proper solution is to disallow McDonald's new opinion.  See id.

Rule 26(e)(1) provides that a party "is under a duty to supplement" its witness disclosure under Rule 26(a) "if the additional or corrective information has not otherwise been known to the parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1).  Specifically about experts, rule 26(e)(2) proves that "[a]ny additions or changes to this information must be disclosed by the time the party's pretrial disclosures . . . are due." Fed. R. Civ. P. 26(e)(2).  As mentioned above, that date has passed.  The McDonald Supplement, therefore, is untimely.  Rule 37(c) addresses the consequences of a late supplement: "A party that without substantial justification fails to . . . amend a prior response to discovery as required by Rule 26(e)(2), is not, *unless such failure is harmless*, permitted to use as evidence at a trial . . . any witness or information not so disclosed." Fed. R. Civ. P. 37 (c)(1) (emphasis added).

The United States Court of Appeals for the Tenth Circuit has held that a district court "need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose." Woodworker's Supply Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999).  Nevertheless, it should consider these four factors when exercising that

-20-

discretion: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." Woodworker's Supply Inc. v. Principal Mut. Life Ins. Co., 170 F.3d at 993.

The fourth element does not weigh in either direction. The Court has no evidence of bad faith or willfulness on the part of Guidance regarding this late supplemental expert report. Neither, however, can the Court ignore the possibility that Guidance might have been using its initial report to lull the Defendants into defending the case as a large company might defend a one-million-dollar case only to raise the value to seventy-five million dollars at the last minute.

On the other hand, the first element – the prejudice or surprise to the Defendants -- is significant. While the Defendants may not have been surprised that McDonald was opining to damages, they were clearly surprised by a supplement that multiplied the prior value of the case by 62 -- from $1.2 million to $75.2 million. They also would be surprised by McDonald's new opinion because Guidance failed to disclose what measures of damages it would seek in initial disclosure or in answers to interrogatories. Indeed, before McDonald disclosed his original opinion, the Defendants could not determine the methods that Guidance was going to use to determine its damages. Even if the reference to this measure of damages in McDonald's initial report was sufficient to give the Defendants notice that Guidance planned to claim them, which the Court does find, the Defendants were entitled to have an opinion regarding the calculation of those damages before the deadline for supplementing expert reports. See Fed. R. Civ. P. 26(a)(1)(A)(iii) (requiring disclosure of "a computation" of each damages category claimed). All counsel have to allocate their time before a lengthy trial efficiently and intelligently. There is no sound reason to require the Defendants to re-depose McDonald and find a new rebuttal expert this late in the game when

Guidance could have, with due diligence, disclosed this measure of damages during the discovery period.  And with this case on its way toward trial and a preliminary injunction in effect over the Defendants, neither party can cure the surprise and prejudice.  The Court is therefore convinced that it should deny Guidance's motion to supplement McDonald's expert report and not permit McDonald to testify as to damages from lost future-market share at trial.

## IV.   GUIDANCE'S REPLY BRIEF IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO SUPPLEMENT EXPERT REPORT OF BRIAN McDONALD.

Because Guidance filed its motion on the eve of trial, and because the Court was to begin a four-day criminal trial on Monday, September 14, 2009, the Court heard oral argument on this motion on Friday, September 11, 2009.  By that time, because briefing was occurring on an expedited schedule, Guidance had not yet filed a reply.  Guidance agreed to proceed with the hearing, but asked the Court to allow it to file a reply, which it filed on September 14, 2009.  Even though Guidance largely raises in its reply the same points as it made at the hearing on its motion, the Court has carefully reviewed each of the arguments.

First, Guidance asserts that it is the Defendants' fault, by failing to disclose certain data until late July, that McDonald could not prepare his opinion on lost future-market-share damages in his initial opinion.  See Reply Brief in Further Support of Plaintiffs' Motion for Leave to Supplement Expert Report of Brian McDonald at 3-4, filed September 14, 2009 (Doc. 323)("Reply").  In support of this contention, they attached a declaration of Dr. McDonald stating that data on price elasticity of demand and actual price differential between Guidance and Dentsply products were essential to his calculation.  See Declaration of M. Brian McDonald, Ph.D. ¶ 5, at 2, filed September 14, 2009 (Doc. 323-2)("McDonald Dec.").  McDonald states that he did not have "adequate" data to pursue any approach to calculate lost future market share.  Id. ¶ 6, at 3.  He contends that the 2006

Millennium Report, to which he had access, was unreliable and would have overstated the average price charged per file or obturator by Guidance's competitors.[4]

Similarly, Guidance argues that the Defendants' price list, another document to which McDonald had access when preparing his initial report, does not provide all the information necessary to McDonald's opinion. See Reply at 5. It argues that the document merely gives lists of prices and does not disclose how many of each product customers bought, and in what quantities. Guidance argues that this additional information was necessary to develop the price differential between Guidance and Dentsply products. See Reply at 5-6. That information, in turn, was necessary to create the survey questions that Weber used. See Reply at 5-6. Thus, because Guidance did not have access to the Defendants' sales data, Guidance argues, it could not have executed its market survey sooner than it did. See id. at 8-9.

All of these arguments have the same underlying problem: Guidance and McDonald could have provided a reasonably accurate estimate of these damages within the time allotted for providing and supplementing expert reports. For example, McDonald could have developed alternative opinions using the lowest possible price (highest quantity of the least expensive files and obturators) and the highest possible price (lowest quantity of the most expensive files and obturators). He could have used the numbers in the 2006 Millennium Report, and refined his calculation if and when better data became available. Even if Guidance underestimated its future market capture by 50%, this large, multi-million-dollar damages figure would have at least tipped off the Defendants that this

---

[4] Guidance disputes the Defendants' belief that Guidance already had access to the 2008 Millennium Report. See Reply at 7. Although this belief should not have affected whether the Defendants turned over their copy of the 2008 Millennium Report in discovery, which Guidance argues they did not, the Defendants' belief was probably based on McDonald's first expert report. That report lists "'U.S. Market for Endodontic Devices 2009,' Millennium Research Group, Toronto ON Canada, October 2008" among the documents reviewed.

suit was potentially worth tens of millions of dollars, rather than one million.  Again, the purpose of discovery and initial disclosures is to avoid one side ambushing the other.  This last minute addition to McDonald's report has the feel of such an ambush, regardless whether that was Guidance's intent.

Guidance asserts that one other reason it did not act faster in commissioning its own market survey is that the Defendants chose to object to its requests for production regarding market research, rather than merely telling Guidance that it had no such documents.  As mentioned above, it was an assumption on the part of Guidance that the Defendants had such materials.  Even if that assumption was based on the opinion of one of its experts that the Defendants surely had such documents, Guidance was aware of the deadline for submitting expert reports and for supplementing those reports.  When it became clear that the Defendants were not going to turn over the requested market research, whether because they did not have such reports or purely from obstinance, Guidance should have acted.  Guidance was aware of the schedule of deadlines regarding expert reports.  It should not have gambled on whether such data would eventually be forthcoming from the Defendants.

Guidance also argues that this supplement is harmless to the Defendants.  See Reply at 10. The Court disagrees.  This case is ready for trial, and while the Defendants might have had a hint that Guidance was going to supplement its expert report, it was proceeding on the notion that this was an approximately one-million dollar case.  The Defendants did not know how McDonald intended to calculate these additional damages and have not prepared a rebuttal expert with regard to this opinion.  While Guidance asserts that any prejudice can be cured by an opportunity to depose McDonald before trial, this additional discovery on the eve of trial will not provide the Defendants with an expert that is prepared to rebut McDonald's testimony nor allow the Defendants to change

-24-

their tactics, as they might have if they had known this was worth seventy-five million dollars.

Finally, Guidance contends that, because the Court permitted the Defendants to supplement the report of the Defendants' rebuttal expert, Dr. Ben Johnson, it is only fair to allow Guidance to supplement its expert report. The Court sees these scenarios as materially different. First, Guidance did not request that the Court strike the Defendants' rebuttal expert or its supplemental report. To the contrary, Guidance demanded a proper report because it believed the submitted report did not conform to the requirements of rule 26. The Court therefore was not presented with the issue of whether Guidance was prejudiced by permitting Johnson to supplement his report. Second, the problem with Johnson's report was not that it was a surprise, but that it was insufficiently detailed and lacked certain pieces of information -- a list of prior testimony and Johnson's signature. See Plaintiff Guidance Endodontics, LLC and Counterclaim Defendant Charles J. Goodis' Memorandum in Opposition to Defendants' Motion to Allow Substitution of Rebuttal Expert [Docket No. 210] at 4-5, filed August 17, 2009 (Doc. 252). Further, although Johnson's final report was not submitted to the Court, the Court's understanding is that Johnson was to testify only whether the V2 file was a suitable substitute for the V-Taper file and that his initial report, while allegedly technically deficient, gave his opinion and the basis therefor. In relevant part, Johnson's "report" stated:

> Based on your meaning of acceptable substitute, I would say no. The V2 would be less flexible than the V-Taper and I would have to assume I chose the V-Taper because of its flexibility since there are many .04 constant taper files in the market place to choose from. The only reason to chose V-Taper in the first place was either flexibility, smaller coronal shape, or brand loyalty.

See Dentsply/TDP's Motion to Allow Substitution of Rebuttal Expert Exhibit 2, at 16, filed July 29, 2009 (Doc. 210-3). On the other hand, the supplement to McDonald's report is substantive, adding new calculations that had never before been disclosed in any meaningful way to the Defendants. Finally, Guidance had no need to find and retain a rebuttal expert to the Defendants' rebuttal expert.

In short, the Court is not convinced that permitting the Defendants to supplement its allegedly deficient report provides a reason to allow Guidance to supplement its report with an additional calculation of damages that had never before been presented to the Defendants.

**IT IS ORDERED** that Plaintiff 's Motion for Leave to Supplement Expert Report of Brian McDonald is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kyle C. Bisceglie
Renee M. Zaystev
Olshan, Grundman, Frome, Rosenzweig
   & Wolosky, LLP
New York, New York

-- and --

John J. Kelly
Donald A. DeCandia
Ryan Flynn
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Albuquerque, New Mexico

   *Attorneys for the Plaintiff and Counterdefendants*

Brian M. Addison
   Vice President, Secretary, and General Counsel
Dentsply International, Inc.
York, Pennsylvania

-- and –

Thomas P. Gulley
Rebecca L. Avitia
Lewis and Roca, LLP
Albuquerque, New Mexico

   *Attorneys for the Defendants and Counter-Plaintiffs*