IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

GUIDANCE ENDODONTICS, LLC,
a New Mexico Limited Liability Company,

      Plaintiff,

vs.                                         No. CIV 08-1101 JB/RLP

DENTSPLY INTERNATIONAL, INC.
a Delaware Business Corporation, and
TULSA DENTAL PRODUCTS, LLC,
a Delaware Limited Liability Company,

      Defendants.

and

DENTSPLY INTERNATIONAL, INC.
and TULSA DENTAL PRODUCTS, LLC,

      Counter Plaintiffs,

vs.

GUIDANCE ENDODONTICS, LLC
and DR. CHARLES GOODIS,

      Counter Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff Guidance Endodontics, LLC and

Counterclaim Defendant Charles J. Goodis' Motion for Summary Judgment and Supporting

Memorandum, filed July 31, 2009 (Doc. 226).  The Court held a hearing on September 1, 2009.  The

primary issues are whether the Court will grant Plaintiff/Counterdefendant Guidance Endodontics,

LLC's and Counterdefendant Charles Goodis' motion for summary judgment as to Defendants

Dentsply International, Inc. and Tulsa Dental Products, LLC's counterclaims of: (i) breach of the

Manufacturing and Supply Agreement; (ii) breach of implied covenant of good faith and fair dealing; (iii) false advertising in violation of § 43 of the Lanham Act; (iv) trademark infringement in violation of 15 U.S.C. § 1114; (v) common-law unfair competition; (vi) violation of the New Mexico Unfair Practices Act ("New Mexico UPA"); (vii) unlawful misappropriation of the Defendants' trade values; (viii) fraudulent inducement; (ix) punitive damages; (x) declaratory judgment; and (xi) rescission and/or partial rescission.  The Court grants in part and denies in part the motion.  The Court will rule as follows: (i) grants the motion as to Count I for breach of contract insofar as it alleges breach of Section 4.7 of the Supply Agreement and otherwise denies as to Count I; (ii) grants the motion as to Count II for breach of the implied covenant of good faith and fair dealing; (iii) grants the motion as to the first four alleged instances of false advertising, but denies the motion as to the fifth and sixth instance of false advertising alleged in Count III; (iv) denies the motion as to the trademark infringement alleged in Count V; (v) denies the motion as to Count VI -- common-law unfair competition -- with respect to the Defendants' false-advertising[1] and trademark-infringement grounds, but grants the motion as to the Defendants' trademark-dilution ground for unfair competition; (vi) grants the motion as to the Defendants' New Mexico UPA claim because the Defendants lack standing to bring such claim; (vii) denies the motion as to the Defendants' claim of unlawful misappropriation in Count VIII; (viii) grants the motion as to the Defendants' Count X fraudulent-inducement claims based on the conduct alleged in paragraphs 18-20 of the Counterclaims, but denies the motion as to the conduct alleged in paragraphs 20a-20c; (ix) grants the motion insofar as it seeks a declaration that the Defendants have no obligation to supply

---

[1] The denial of summary judgment as to the common-law false advertising claim is only a partial denial.  The Court grants the motion as to the first four alleged statements of false advertising, even under the common law, as it does with respect to the Lanham Act false advertising claim.

obturators, but denies the motion insofar as it seeks a declaration that the Defendants have no obligations at all under the Supply Agreement; and (x) grants the motion as to the Defendants' request for partial rescission, but denies the motion as to the Defendants' request for rescission.

## FACTUAL BACKGROUND

For the purpose of this motion, the facts are largely undisputed.  See Dentsply/TDP's Response to G/G's Motion for Summary Judgment and Supporting Memorandum at 2, filed August 17, 2009 (Doc. 251)("Response"); Plaintiff Guidance Endodontics, LLC and Counterclaim Defendant Charles J. Goodis' Reply Brief in Support of Motion for Summary Judgment at 1-2, filed August 31, 2009 (Doc. 282)("Reply").  This case concerns a suit that Guidance, a small endodontic-equipment company, has brought against the Defendants, who are both Guidance's rivals and its suppliers.  More background on the lawsuit generally is set forth in the Court's earlier opinion.  See Guidance Endodontics, LLC v. Dentsply Intern., Inc., 2008 WL 6013069, at **1-5 (D.N.M. Dec. 15, 2008)(Browning, J.).

The Defendants are manufacturers and suppliers of a variety of dental/endodontic products that compete with Guidance's products, including endodontic obturators, files, and ovens.  See Verified Complaint and Demand for Jury Trial ¶ 32, at 7, filed November 21, 2008 (Doc. 1) ("Complaint").[2]  Dentsply holds itself out as "the world's largest designer, developer, manufacturer

---

[2] File, obturators, and ovens are all devices that dentists and endodontists use to perform root canal surgery.  Files are small metal drills that cut away the infected part of the tooth.  See Complaint ¶ 109, at 22; Oxford English Dictionary Online, "file, n." (2d ed. 1989, Oxford University Press), available at http://dictionary.oed.com/cgi/entry/50084664 (last accessed Mar. 20, 2010).  The obturator is a device used to fill the whole that the file left.  See Complaint ¶ 109, at 22; Oxford English Dictionary Online, "obturator, n." available at http://dictionary.oed.com/cgi/entry/00329626 (last accessed Mar. 20, 2010)("2. a. . . . A prosthetic device used to close an abnormal opening . . . ."); Motion at 2.  Finally, the oven is the device used to warm some obturators, rendering the filling material malleable and able to be used to fill in the hole that the file left.  See Complaint ¶ 109, at 22.

and marketer of a broad range of products for the dental market," and has over $2.3 billion in sales annually.  Complaint ¶¶ 30, 34, at 7.  The Defendants have a large share of the United States' NiTi[3] rotary file and obturator markets, and Guidance is aware of this fact.  See Affidavit of James G. Mosch ¶¶ 1-4, at 1-2, filed August 17, 2009 (Doc. 251-16)("Mosch Aff."); Complaint ¶ 34, at 7.

### 1.   The Obturator Market.

An obturator is a device used to fill the root canal with gutta percha[4] after the canal has been drilled, cleaned, and shaped.  See Declaration of Charles J. Goodis in Support of His and Plaintiff's Motion for Summary Judgment ¶ 5, at 2, filed July 31, 2009 (executed July 31, 2009)(Doc. 227) ("Goodis Dec.").  Only endodontists and dentists use obturators.  See id.  There are two categories of obturators: (i) ones that are to be used "cold" and (ii) ones that must be heated -- in an endodontic oven -- before use in the patient's mouth.  See id.  Guidance uses the trademark "OneFill" in connection with its obturators, as Section 4.7 of its Supply Agreement with the Defendants permits it to do.  See Declaration of Kyle C. Bisceglie in Support of Plaintiff's and Counterclaim Defendant's Motion for Summary Judgment ¶ 7, at 2 & Exhibit 5, filed July 31, 2009 (executed July 29, 2009)(Doc. 228)("Bisceglie Dec.").  Guidance's OneFill obturators are ones that must be heated before use.  See Goodis Dec. ¶ 6, at 2.

The Defendants, on the other hand, have a brand of obturator called ThermaFil.  See id. They only advertise, market and sell it to dentists, dental schools, and other professions who perform

---

[3] The term NiTi refers to the composition of the alloy out of which the file is made, and means that the file is made of an alloy of nickel and titanium.

[4] Gutta percha is apparently one substance with which an obturator may fill a drilled canal. Gutta-percha itself is "[a] rubbery substance derived from the latex of any of several tropical trees of the genera *Palaquium* and *Payena*, used as an electrical insulator, as a waterproofing compound, and in golf balls."  The American Heritage Dictionary of the English Language at 808 (3d ed.1992).

endodontic procedures -- not to the general public.  See Motion at 2.  Two of the Defendants' other competitors, Coltene/Whaledent, Inc. and J.S. Dental Manufacturing, Inc., market obturators under the trademarked names "SuccessFil" and "Quick-Fill," respectively.  See Bisceglie Dec. ¶ 2-6, at 1-2 & Exhibits 1-5; Motion at 3; Goodis Dec. ¶ 9, at 3.

      **2.**    **The Supply Agreement.**

Guidance and Goodis contend that, on or about July 29, 2008, Guidance and the Defendants entered into a Manufacturing and Supply Agreement (the "Supply Agreement").  Motion at 3; Bisceglie Dec. ¶ 7, at 2 & Exhibit 5.  The Defendants dispute this allegation, arguing that Guidance and Goodis misstate facts about the Supply Agreement.  See Response at 2.  The Defendants maintain that the parties entered into the agreement on August 11, 2008, when Jim Mosch affixed his signature.  See Response at 2 & Exhibit A.  Guidance also contends that, pursuant to that agreement, the Defendants agreed to manufacture all of Guidance's proprietary endodontic products, and Guidance agreed to purchase all of its requirements for such products from TDP, on an exclusive basis.  See Bisceglie Dec. Exhibit 5 ¶¶ 2.1, 2.2, at 3 ("Supply Agreement"); Motion at 3. The Defendants contend that they did not agree to manufacture "all" of Guidance's endodontic products, but only those listed in Exhibit 1 to the Supply Agreement (Guidance Files and Guidance Obturators).  See Response at 2.

Section 4.5 of the Supply Agreement requires TDP to manufacture and provide endodontic files or obturators, which are improvements or successor products of similar design to the Guidance Files or Guidance Obturator, as those terms are defined in the Supply Agreement, as long as Guidance presents product specifications to TDP for such products.  See Supply Agreement ¶ 4.5, at 6.  Guidance is also obliged under Section 4.5 to "indemnify, defend, and hold harmless TDP for all claims, damages and costs arising from any claim that such file or obturator [manufactured

pursuant to Section 4.5] infringes a third party's rights," provided that (i) TDP advises Guidance that it reasonably believes there is a material risk that a third party's rights may be infringed, and (ii) a third party asserts a claim against TDP.  See Supply Agreement ¶ 4.5, at 6; Motion at 3-4.  As of the filing of Guidance's motion, no third party had asserted such a claim against Guidance or TDP.

Section 12.8 of that Supply Agreement provides:

> Each of the parties acknowledges and agrees that in entering into this Agreement it does not rely upon and shall have no remedy in respect to any statement, representation, warranty or undertaking (whether negligently or innocently made) of any person (whether a party to this Agreement or not) other than as expressly set out in this Agreement.

Supply Agreement ¶ 12.8, at 15.  See Motion at 4.

The Defendants allege, with respect to their claim of fraud, that Guidance and Goodis represented to them that, if the Supply Agreement were consummated, Guidance "would not attempt to trade off the reputation, goodwill, intangible trade values, and standing of Dentsply/TDP in the dental community in marketing and selling the Products."  Counterclaims ¶ 18, at 4.  Guidance and Goodis also allegedly represented that they would not market Guidance products for use with Dentsply/TDP products and would not tell Guidance customers that TDP manufactured the Guidance products.  See id. ¶¶ 19-20, at 4.  Finally, the Defendants allege that Guidance and Goodis represented to them that two particular individuals would be a part of Guidance going forward.  See id. ¶¶ 20a-20d, at 4-5.  Article V of the Supply Agreement, "Representations and Warranties," does not contain any of the representations that the Defendants cite in support of their fraud claim.  See Supply Agreement art. V, at 7-8; Motion at 4.

### 3.    The Defendants Eventually Refused to Supply Obturators.

The Defendants sent two letters dated September 25, 2008.  See Complaint Exhibits 8 & 9.  One was from Bill Newell, Vice President and General Manager of Dentsply's Endodontics division

(the "Newell Letter"), and another from Brian Addison, Dentsply's Secretary and General Counsel (the "Addison Letter").  See Complaint Exhibits 8 & 9.  The letters alleged that Guidance had violated Sections 2.4 and 9.1 of the Supply Agreement and the Lanham Act.  See Complaint Exhibits 8 & 9.  In the Newell Letter, the Defendants further informed Guidance that, until the Defendants received written confirmation that Guidance would cease and desist from the offensive conduct described in the Newell Letter -- such as communicating that the Defendants make Guidance's products and stating that Guidance obturators are the same as Thermal Fill obturators -- the Defendants intended to "discontinue the supply of the obturator product."  Complaint Exhibit 8.  In the Addison Letter, the Defendants similarly asked that Guidance confirm in writing that it would cease and desist from making the statements enumerated therein -- the same statements that the Defendants allege violate § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), in Count III of their Counterclaims.  See Complaint Exhibit 9; Defendants' First Amended Counterclaim Against Plaintiff and First Amended Claim Against Dr. Charles Goodis  ¶ 40, at 8, filed April 22, 2009 (Doc. 92)("Counterclaim").

Guidance responded to the Newell and Addison Letters on October 1, 2008, and October 7, 2008, respectively, with assurances that it had taken steps to remedy its alleged violations.  See Complaint Exhibits 10 & 13.  On October 6, 2008, Newell informed Guidance that the Defendants "do not confirm or acknowledge receipt" of Guidance's pending obturator order.  Id. Exhibit 14. On October 14, 2008, Newell wrote to Guidance again, this time stating that Guidance's alleged conduct "is such that there is no way to cure the impacts of it in the market," and informing Guidance that "the only appropriate action at this point in time is to discontinue supplying Guidance with the obturator product."  Id. Exhibit 15.  Thus, the Defendants refused to supply obturators to Guidance.  See id.  The Defendants continued, however, supplying Guidance with EndoTapers.  See

Complaint ¶¶ 133-143, at 26-28.

Section 12.12 of the Supply Agreement requires the parties to mediate any dispute arising out of or relating to the Supply Agreement. <u>See</u> Supply Agreement ¶ 12.12, at 16. The Defendants did not request to mediate the issues raised in the Newell or Addison Letters before ceasing to supply obturators to Guidance. <u>See</u> Bisceglie Dec. Exhibit 6. The parties participated in formal mediation on December 16, 2008, after Guidance filed this lawsuit. <u>See</u> Motion at 5.

### 4.      **Guidance's Marketing Materials and Advertising.**

Each of the statements enumerated in Count III of the Counterclaims was made in the first iteration of Guidance's marketing materials, comprised of: (i) a brochure of Guidance's full line of products; (ii) a two-page "mailer" marketing the EndoTaper files; and (iii) two versions of a two-page "mailer" marketing the OneFill obturators (collectively, the "Marketing Materials"). Declaration of John P. Ferone in Support of Application for Temporary Restraining Order ¶¶ 23, 28, 33, filed November 21, 2008 (Doc. 6)("Ferone Dec."). Later, Guidance removed the Marketing Materials containing the complained-of statements from its website. It is disputed, however, just how much later. Guidance asserts that it removed those material two to three days later, <u>see</u> Motion at 6; Ferone Dec. ¶¶ 25, 26, 29, 30, 34, 35, but the Defendants contend that it took at least one-and-a-half weeks, <u>see</u> Response at 2 & Exhibit B. The dispute is not significant to the resolution of this motion. The Marketing Materials were revised to remove those objectionable statements, as well as any other potentially objectionable statements. <u>See</u> Motion at 6. Guidance contends that the Defendants have not objected to the current version of Guidance's marketing materials and do not allege that anything in the current version violates the Lanham Act or the Supply Agreement. <u>See</u> Bisceglie Dec. ¶ 9, at 2 & Exhibit 7; Motion at 6. The Defendants point out in their response that: (i) Guidance did not pay for the right to trade off of Dentsply/TDP's reputation, intangible trade

value, and standing in the dental community, but nevertheless was doing so; and (ii) some offensive language -- reference to a "Thermal Filling Obturator" -- is still found in the current mailer. Response at 2; id. ¶ E, at 3; id. Exhibit F, at 3-5; Supplement to Ferone Dec., filed December 1, 2008 (Doc. 14).

Guidance also used a series of marketing materials that exalted Guidance products. Guidance advertised OneFill, its heated obturator, as "the Best Thermal Filling Obturator System in the World."  Affidavit of William E. Newell in Support of Dentsply/TDPs' [sic] Response to Guidance and Goodis' Motion for Summary Judgment on Dentsply/TDP's Claims Exhibit 1, filed August 17, 2009 (Doc. 251-8)("Newell Aff."). The OneFill obturator is the same obturator as Densfil and Thermafil, and all three products have the same performance characteristics. See Newell Aff. Exhibit 4; Deposition of Charles James Goodis at 29:16-32:10, 32:25-36:8 (taken April 3, 2009), filed August 17, 2009 (Doc. 251-9)("Goodis Depo."). OneFill, Densfil, and Thermafil were all on the market while Guidance was advertising OneFill as the world's best obturator. See Newell Aff. ¶ 6, at 2.[5]

For a period of time, Guidance had both the EndoTaper and the V-Taper on the market. See Goodis Depo. at 24:16-25:10.  Guidance advertised EndoTaper as the "Best NiTi File System in the World."  Newell Aff. Exhibit 2. It advertised V-Taper as the "best rotary file in the world."  Newell Aff. Exhibit 3, at 2.  Goodis admits that, for some root canals, EndoTaper is better, and for others, V-Taper is better.  See Goodis Depo. at 23:25-26:25.

Guidance also advertised V-Taper as "easier, safer, more efficient" than any other NiTi

---

[5] The Defendants also assert that Guidance has not applied for a patent on EndoTaper or any part of its design.  See Response ¶ R, at 4; Newell Aff. ¶ 7, at 3.  The Court is not sure how this fact is relevant to any of its claims.

rotary file system "in the world."  Response Exhibit J.  It also advertised: "Now you can treat every case better, quicker and safer with EndoTaper."  Response Exhibit K.  V-Taper advertisements stated: "The problem with a constant-tapered instrument is canals do not have a constant taper.  Constant-tapered instruments 'fight' the natural variable taper of the canal (like trying to fit a square peg into a round hole)."  Response Exhibit L.  Yet, EndoTaper advertisements stated that one could use EndoTaper "to create the perfect canal shape more efficiently and easier than any other file system."  Response Exhibit M.  Goodis admitted that EndoTaper does not always create the perfect canal shape.  See Goodis Depo. at 26:4-25.[6]

Dentsply/TDP have trademarked "Thermafil."  That trademark is "incontestable" under 15 U.S.C. § 1065, Motion at 21, and the United States Patent and Trademark Office ("USPTO") has deemed the mark Thermafil to be "more than descriptive."  Response Exhibit T.[7]  Thermafil is a widely recognized term used to identify Dentsply/TDP's heated obturator.  See Deposition of John Paul Ferone at 9:19-10:8 (taken March 31, 2009), filed August 17, 2009 (Doc. 251-17)("Ferone Depo.");  Deposition of Anthony Irwin Rittenberry at 35:8-16 (taken March 31, 2009), filed August 17, 2009 (Doc. 251-18)("Rittenberry Depo.").  Before adopting the term "Thermal Filling" for its marketing materials, Guidance was aware of the mark Thermafil, used by the Defendants, and of its well-recognized status in the endodontic industry.  See Ferone Depo. at 9:19-10:8; Rittenberry

---

[6] After reviewing the deposition testimony to which the Defendants refer, the Court is not certain that Goodis' statements establish this fact.  Guidance did not, however, contest this fact, and so the Court will consider it established.

[7] The Defendants explain the meaning of Exhibit T in their Response, and Guidance does not contest their explanation.  The Defendants state that Exhibit T is the "[USPTO]'s history of prosecution of the Thermafil mark, indicating that no Office Action was initiated to determine Thermafil's secondary meaning," and that such Office Action "would have been required if Thermafil was deemed to be merely descriptive."  Response ¶ BB, at 5.  The Court will explain the meaning of a descriptive mark in discussing the Defendants' Lanham Act claims against Guidance.

Depo. at 35:8-16.  Guidance has now spent tens of thousands of dollars advertising OneFill using the term "Thermal Filling."   Response Exhibit S (showing the amount Guidance has spent, generally, on advertising and promotion).   OneFill and Thermafil are identical in their use and marketplace.  See Motion at 24; Response ¶ Z, at 5.

### 5.     The April 22, 2008 Meeting in Dallas, Texas.

The Defendants' fraud claims arise out of "numerous misrepresentations and omissions . . . made at a meeting in Dallas, Texas on April 22, 2008, concerning [Neal] Williams and [Anthony] Rittenberry's status with Guidance at the time and going forward and Guidance's intentions of building a direct sales organization."  Response ¶ DD, at 6.  The Defendants contend that Goodis, Williams, and Rittenberry implicitly represented to them that Williams and Rittenberry would be employees and part owners of Guidance going forward, and that Rittenberry would lead Guidance's efforts to build a direct sales force.  See Newell Aff. ¶¶ 8-21, at 3-5.  The Defendants also assert that Guidance knew that Williams and Rittenberry would be leaving as early as February of 2008.  See Response Exhibit W.  The Defendants argue that Williams and Rittenberry knew that Guidance could only afford to buy them out if Guidance and Dentsply/TDP entered into the Supply Agreement, and that Guidance would pay them more if Guidance and Dentsply/TDP consummated the Supply Agreement by April 22, 2008.  See id. Exhibits X–Z.  The Defendants insist that Goodis told Williams and Rittenberry what to wear and what to say at the April 22, 2008 meeting.  See id. Exhibit AA.

The Defendants state that they would not have entered into the Supply Agreement, or would not have entered into the Supply Agreement on the same terms, if they had known that Williams and Rittenberry would not be with Guidance going forward.  See Newell Aff. ¶¶ 17, 21, 21-26, at 4-6. The Defendants further state that they subsequently learned that Williams entered into a buy-out

agreement with Guidance on April 18, 2008, and that Rittenberry entered into a buy-out agreement with Guidance on April 22, 2008  See Response Exhibits U-V.  The Defendants contend that appears that Guidance never intended to build a direct sales organization as of April 22, 2008.  See id. Exhibits W, BB.

       **6.**       **The Defendants' Damages Allegations.**

     Guidance's First Set of Interrogatories, Interrogatory No. 3, asked the Defendants to "[d]escribe in detail the basis for Defendants' claim . . . that they have been damaged by Guidance, and identify all documents supporting such allegation."  Dentsply/TDP's Supplemental Responses to Plaintiff Guidance Endodontics, LLC and Counterclaim Defendant Charles J. Goodis' First Interrogatories Nos. 3 & 14, at 1, filed July 31, 2009 (Doc. 228-2)("Damages Interr.").  The Defendants responded that

> Guidance's and Goodis' wrongful actions caused Dentsply/TDP to lose business (or in the alternative nominal damages in the event lost business cannot be quantified with the requisite certainty), allowed Guidance to make unlawful profits which Dentsply/TDP are entitled to recover, entitles Dentsply/TDP to treble damages, punitive damages, attorneys' fees and costs.   Documents which support Dentsply/TDP damages award include the Supply Agreement, Guidance's marketing materials, and Guidance's financial documents. . . .

Damages Interr. at 1-2.  The Defendants later supplemented their response to explain that they also sought damages for "all Guidance's profits from sale of Endotapers and OneFill," and that additional relevant documents included "Dentsply/TDP invoices to Guidance, Guidance's sales records and financial statements."  Id. at 2.

     Interrogatory No. 14 of Guidance's and Goodis' first set of interrogatories asked the Defendants to "[i]dentify all damages you claim in this case, and identify all documents and witnesses that support your damages claims."  Id.  The Defendants specified: (i) loss of business (or nominal damages if the loss cannot be quantified with the requisite certainty); (ii) attorneys' fees

(for having to identify confidential information that Guidance/Goodis wrongfully disclosed); (iii) nominal damages; (iv) Guidance's profits; (v) attorneys' fees and treble damages under 15 U.S.C. § 1117; (vi) attorneys' fees and treble damages under NMSA 1978, § 57-12-10B and C; and (vii) punitive damages. See Damages Interr. at 2-3. Specifically, the Defendants assert that they incurred attorneys' fees because their attorneys had to rectify Guidance's filing this case and related documents publicly, rather than under seal, which they allege breached the Supply Agreements' confidentiality clause. See Affidavit of Thomas P. Gulley in Support of Dentsply/TDP's Response to G/G's Motion for Summary Judgment [Doc. 226], filed August 17, 2009 (Doc. 251-6)("Gulley Aff.").

## PROCEDURAL BACKGROUND

On November 21, 2008, Guidance filed its original Complaint against Dentsply and Tulsa Dental. On December 31, 2008, the Defendants filed their Answer to Guidance's complaint and set forth thirteen counterclaims against Guidance and its owner, Goodis. See Defendants' Answer to Verified Complaint and Demand for Jury Trial, filed December 31, 2008 (Doc. 41). The Defendants then amended their counterclaims to seal them and flesh out their factual allegations. See Defendants' First Amended Counterclaim Against Plaintiff and First Amended Claim Against Dr. Charles Goodis, filed April 22, 2009 (Doc. 92)("Counterclaims"). Those counterclaims that are the subject of this motion.

Guidance filed a motion seeking leave to exceed the page limits set forth in Local Rule 7.5 and obtained consent from the Defendants' counsel to submit a memorandum of up to thirty-five pages in length. See Unopposed Motion to Enlarge Page Limitations for Plaintiff's Motion for Partial Summary Judgment, filed July 31, 2009 (Doc. 223). The Court granted that motion. See Unopposed Order Granting Plaintiff's Unopposed Motion to Enlarge Page Limitations for Plaintiffs'

Motion for Partial Summary Judgment, filed August 3, 2009 (Doc. 229).  The Court now addresses the substance of this lengthy motion.

Guidance and Goodis move the Court, pursuant to rule 56 of the Federal Rules of Civil Procedures, to render summary judgment on Counts I through XIII of the Defendants' counterclaims.  In the Response, the Defendants withdrew Count IV, a claim for violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), and Count IX, a claim for tortious interference with prospective business advantage.  See Response at 16, 26.  The remaining counts are: (i) breach of contract (Count I); (ii) covenant of good faith and fair dealing (Count II); (iii) violation of the Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count III); (iv) violation of 15 U.S.C. § 1114(1) (Count V); (v) common law unfair competition (Count VI); (vi) violation of the New Mexico UPA, NMSA 1978, §§ 57-12-1 to 57-12-26 (Count VII); (vii) unlawful misappropriation of the Defendants' reputation, goodwill, intangible trade values and standing in the dental community (Count VIII); (viii) fraud (Count X); (ix) punitive damages (Count XI); (x) declaratory judgment that the Defendants were not bound to perform because of Guidance's wrongful conduct (Count XII); and (xi) rescission (Count XIII).

Because of the nature of this motion, Guidance did not seek concurrence of opposing counsel.  The Defendants oppose the motion.  Ultimately, for the reasons stated below, the Court will grant in part and deny in part the motion.

## CHOICE OF LAW

This case involves several categories of claims as to which different bodies of law apply.  The Supply Agreement included a choice-of-law provision.  See Supply Agreement ¶ 12.11, at 16.  That provision states: "This agreement shall be deemed to have been made and entered into pursuant to the laws of the State of Delaware.  In the event of any dispute thereunder, this Agreement shall

-14-

be governed by and construed according to the laws of the State of Delaware."  Supply Agreement ¶ 12.11, at 16.  Guidance argues that this provision -- and therefore Delaware substantive law -- applies to its claims for: (i) breach of contract (Count I); (ii) breach of the covenant of good faith and fair dealing (Count II); (iii) fraud (Count X); and (iv) rescission (Count XIII).  See Motion at 8.  The Defendants agree with this determination, and additionally argue that New Mexico law applies to Guidance's claims of: (i) unfair competition (Count VI); (ii) violation of the New Mexico UPA (Count VII); and (iii) unlawful misappropriation (Count VIII), because Guidance's alleged "underlying misconduct is centered in New Mexico and New Mexico still applies the *lex loci delicti* rule in tort choice of law issues."  Response at 2.  Guidance does not disagree with this point.

In filing the underlying suit, Guidance invoked the Court's diversity jurisdiction, so the Court looks to the forum state's choice-of-law rules to determine which state's substantive law to apply.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Pepsi-Cola Bottling Co. v. PepsiCo, Inc., 431 F.3d 1241, 1255 (10th Cir. 2005)("In a diversity action, we apply the substantive law of the forum state, including its choice of law rules.").  The Court therefore applies New Mexico choice-of-law principles in determining what substantive law to apply to each of the state-law Counts in the Complaint.

## 1.    Delaware Law Applies to Counts I, II, X, XII, and XIII Because New Mexico Would Recognize the Choice-of-Law Clause in the Supply Agreement.

Ordinarily, New Mexico will apply the choice-of-law rule of *lex loci contractus* -- the law of the place of contracting -- to issues involving contracts.  See Ferrel v. Allstate Ins. Co., 144 N.M. 405, 421, 188 P.3d 1156, 1172 (2008).  Like most states, however, "New Mexico respects party autonomy; [therefore] the law to be applied to a particular dispute may be chosen by the parties through a contractual choice-of-law provision."  Fiser v. Dell Computer Corp., 144 N.M. 464, 467,

188 P.3d 1215, 1218 (2008)(citing NMSA 1978, § 55-1-301(A)).  See United Wholesale Liquor Co. v. Brown-Forman Distillers Corp., 108 N.M. 467, 470, 775 P.2d 233, 236 (1989).  "[W]hen application of the law chosen by the parties offends New Mexico public policy," however, a New Mexico court "may decline to enforce the choice-of-law provision and apply New Mexico law instead."  Fiser v. Dell Computer Corp., 144 N.M. at 467, 188 P.3d at 1218.  "New Mexico courts will not give effect to another state's laws where those laws would violate some fundamental principle of justice."  Id. at 467, 188 P.3d at 1218 (internal quotations omitted).  In a case such as this one, where the plaintiff has invoked the federal district court's diversity jurisdiction, the Court will accept New Mexico's law regarding whether to honor a contractual choice-of-law provision. See MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc., 436 F.3d 1257, 1260 (10th Cir. 2006)("In cases like this one, where subject matter jurisdiction is based on diversity of citizenship, federal courts must look to the forum state's choice-of-law rules to determine the effect of a contractual choice-of-law clause.").

The choice-of-law provision requires that "any dispute" arising under the Supply Agreement "shall be governed by and construed according to the laws of the State of Delaware."  Supply Agreement ¶ 12.11, at 16.  Neither party has argued that application of Delaware contract law would violate any New Mexico public policy, nor have they cited any authority to that effect.  In the absence of argument by counsel to the contrary, the Court is not willing to find that Delaware law, in general, "violate[s] some fundamental principle of justice."  Fiser v. Dell Computer Corp., 144 N.M. at 467, 188 P.3d at 1218.  The Court will therefore apply Delaware law to the Defendants' contract-related claims: (i) breach of contract (Count I); (ii) breach of the covenant of good faith and

fair dealing (Count II); (iii) fraud (Count X); and (iv) rescission (Count XIII).[8]

Count XII of the Defendants' Counterclaims seeks a declaratory judgment. <u>See</u> Counterclaims ¶¶ 89-91, at 14. When the declaratory judgment is brought under a court's diversity jurisdiction, the court is to apply New Mexico's choice-of-law rules to the case. <u>See</u> <u>Coca-Cola Bottling Co. of Ogden, Inc. v. Coca-Cola Co.</u>, 4 F.3d 930, 933 (10th Cir. 1993)(citing <u>Moore v. Subaru of America</u>, 891 F.2d 1445, 1448 (10th Cir. 1989)). In this case, the declaratory judgment is based on whether the Defendants remain bound to certain promises in the Supply Agreement. <u>See</u> Counterclaims ¶¶ 90-91, at 14. The declaratory action is thus a contract dispute for the purpose of categorization, and Delaware law will therefore govern Count XII.

## 2. **New Mexico Law Applies to Counts VI, VII, and VIII Based on New Mexico's** *Lex Loci Delicti* **Doctrine.**

As mentioned, the Defendants assert that their claims of unfair competition, violation of the New Mexico UPA, and unlawful misappropriation fall under the category of torts and are therefore subject to the *lex loci delicti* rule -- the law of the place of the wrong. <u>See</u> Response at 1-2. Guidance does not contest this assertion, although it also does not cite any New Mexico authority in its motion or reply brief. <u>See</u> Motion at 25-26; Reply at 14-15. Implicit in the Defendants' assertions, and their citation to New Mexico authority for their unfair competition and

_____

[8] There may exist some potential arguments that some of the claims listed are not disputes "under" the Supply Agreement. Neither party makes such arguments, however, and the parties agree that these claims fall within the scope of the choice-of-law provision. The purpose of contract construction is to give legal force to the parties' intent as it is embodied in the contract. Moreover, no party argues that the choice-of-law provision is ambiguous. Accordingly, the Court construes the provision to encompass all of the claims to which the parties agree that it applies. <u>See</u> <u>Watkins v. Beatrice Co.</u>, 560 A.2d 1016, 1020 (Del. 1989)("[T]he purpose of contract interpretation is to give effect to the express intent of the parties."); <u>United Rentals, Inc. v. RAM Holdings, Inc.</u>, 937 A.2d 810, 830 n.92 (Del. Ch. 2007)("[T]he purpose of contract interpretation is to discover the common intent of the parties.").

misappropriation claims, is that the wrong occurred in New Mexico.  Guidance has not argued the point one way or the other.

Under New Mexico choice-of-law principles, when the choice of substantive law is not governed by the agreement of the parties, a court must execute a two-step process.  First, the court must characterize the claim by the "area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue."  Terrazas v. Garland & Loman, Inc., 140 N.M. 293, 296, 142 P.3d 374, 377 (Ct. App. 2006).  There are only a few categories within which claims might fall -- "[t]ort cases, i.e. all 'civil wrongs,' are one class; contracts, i.e., every kind of enforceable promise, is another single class."  James Audley McLaughlin, Conflict of Laws: the Choice of Law Lex Loci Doctrine, the Beguiling Appeal of a Dead Tradition, Part One, 93 W. Va. L. Rev. 957, 989 (1991)(describing the categories as "tort, contract, or some other").  Once categorized, the court must apply the appropriate New Mexico's choice-of-law rules for that category of claim.  See Terrazas v. Garland & Loman, Inc., 140 N.M. at 296, 142 P.3d at 377.  If the underlying claim is categorized as a tort, "New Mexico courts follow the doctrine of *lex loci delicti commissi* -- that is, the substantive rights of the parties are governed by the law of the place where the wrong occurred."  Id. at 296, 142 P.3d at 377.  Where the elements of the underlying claim include harm, the place of the wrong is the place where the harm occurred.  See First Nat'l Bank in Albuquerque v. Benson, 89 N.M. 481, 482, 553 P.2d 1288, 1289 (Ct. App. 1976)(referring to the rule as requiring application of "the law of the State of injury").

The Court has already determined in a prior opinion in this case that it believes the New Mexico UPA should generally be treated like a tort claim for choice-of-law purposes.  See Memorandum Opinion and Order at 18-20, filed September 8, 2009 (Doc. 303).  Further, the conduct underlying the Defendants' New Mexico UPA counterclaim is the same conduct that

underlies their unfair-competition counterclaim.  See Counterclaims ¶¶ 65-71, at 11-12.  So, if the Court finds that the unfair-competition counterclaim should be categorized as a tort claim, the Court will categorize the Defendants' New Mexico UPA claim the same way for choice-of-law purposes.

The Defendants' unfair competition claim is based on three categories of conduct: (i) false advertising; (ii) misappropriation of Guidance's trade values; and (iii) trademark infringement.  The Court cannot find a New Mexico court opinion that categorizes unfair competition -- or unlawful misappropriation -- into a particular area of substantive law for the purposes of choice-of-law analysis.  The Court must therefore predict how the Supreme Court of New Mexico would categorize these claims.

Common-law unfair competition is discussed in the Restatement (Third) of Unfair Competition.  See Restatement (Third) of Unfair Competition §§ 1, 2, 38 (1995).  The causes of action in the Restatement of Unfair Competition, however, appear to have grown out of the Restatement (First) of Torts, implying that they should be categorized as torts.  See Restatement (Third) of Unfair Competition § 2 cmt. b; Restatement (First) of Torts §§ 708-710 (1938)(discussing interference with business relations by use of various trade practices); id. § 760 ("Misrepresentation In Marketing Goods Of Which Another Is The Commercial Source -- Liability To The Other"); id. § 761 ("False Advertising -- Liability To Competitor"); id. § 712 (discussing the elements of fraudulently marketing one's goods or services as those of another).[9]  Furthermore, a portion of the

---

[9] Perusing the Reporters' Notes to the Restatement of Unfair Competition indicates that the drafters drew most, if not all, of the principles therein from the Restatement of Torts.  See, e.g., Restatement (Third) of Unfair Competition § 1 Reporters' Note ("This Section . . . reaffirms the general freedom to compete embodied in the former statement of the rule, Restatement of Torts § 708 (1938), but abandons the exception relating to competition motivated by ill will contained in § 709."); id. § 2 Reporters' Note ("This Section is an expansion of the former rule on liability for false advertising in Restatement of Torts § 761."); id. § 6 Reporters' Note ("This Section combines the substantive principles in §§ 714 and 760 of the Restatement of Torts."); id. § 9 Reporters'

Court's reasoning for categorizing a violation of the New Mexico UPA as a tort claim rings true in the context of these claims as well: "[T]hese claims are grounded in breach of a duty created by law [and] not by any agreement between the parties. Finally, both parties agree that the . . . claims should be treated as tort claims for choice-of-law purposes." Memorandum Opinion and Order at 20 (Doc. 303).[10] The common law, not the parties' agreement, creates the duty not to unfairly compete and the duty not to unlawfully misappropriate trade values. The Court concludes that the Defendants' counterclaim for unfair competition is a tort claim.[11] Furthermore, because the Defendants' claim for unlawful misappropriation essentially reiterates one of the Defendants'

_____

("This topic was originally treated in Restatement of Torts, Chapter 35 -- Confusion of Source (1939)."); id. § 20 Reporters' Note ("The standards governing trademark infringement were formerly treated in Restatement of Torts § 717 (1938)."). The drafters even imply that those Sections that do not clearly have roots in the Restatement of Torts are still dealing with aspects of tort law. See Restatement (Third) of Unfair Competition § 38 cmt. a ("The rules stated in this Chapter deal with rights in intangible trade values. Conduct that interferes with other protected interests may subject the actor to liability under other rules of tort law.")(emphasis added).

[10] In this instance, Guidance does not obviously concede that the claims are tort claims, but they also do not contest that finding.

[11] Numerous other courts also consider unfair competition to be a tort claim. See Wilcox v. Career Step, No. 2:08-CV-998-CW, 2010 WL 624863, at *9 (D. Utah Feb. 19, 2010)("[Ms. Wilcox'] complaint for unauthorized use of her name again sounds in contract, if at all, not under the tort of unfair competition."); Rimkus Consulting Group, Inc. v. Cammarata, No. H-07-0405, 2010 WL 645253, at *61 (S.D. Tex. Feb. 19, 2010)("Unfair competition and civil conspiracy are derivative torts."); Bennett v. Baxter Group, Inc., No. 2 CA-CV 2009-0046, 2010 WL 447790, at *6 (Ariz. Ct. App. Feb. 10, 2010)("[Baxter's] tort claims include: . . . unfair competition . . . ."); Integrated Genomics, Inc. v. Kyrpides, No. 06 C 6706, 2010 WL 375672, at *14 (N.D. Ill. Jan. 26, 2010)("As this court previously recognized, 'the common law tort of unfair competition encompasses a broad spectrum of law . . . .")(internal quotes omitted); Design Res., Inc. v. Leather Indus. of Am., Inc., No. C09-611RSM, 2010 WL 342181, at *1 (W.D. Wash. Jan. 21, 2010)("Plaintiff . . . filed this action alleging . . . various state law torts, including . . . unfair competition . . . ."); Trusted Integration, Inc. v. United States, No. 09-898(ESH), 2010 WL 174143, at *8 (D.D.C. Jan. 20, 2010)("Count II is based on the common-law tort of unfair competition . . . ."); Malletier v. Apex Creative Int'l Corp., No. 04 Civ. 4200(DAB), 2010 WL 23320, at *4 (S.D.N.Y. Jan. 05, 2010)("Artex's marketing and sale of the handbags bearing these marks constitutes . . . state common law torts including . . . unfair competition.").

theories of unfair competition, <u>compare</u> Counterclaims ¶¶ 45-52, at 8-9 and ¶¶ 63-64, at 11 <u>with</u> <u>id.</u> ¶¶ 72-76, at 12, the Court finds that the unlawful misappropriation claim should also be characterized as a tort.[12]

Because the Court categorizes all three claims at issue as torts, it will apply *lex loci delicti* to them all.  The Court finds that much of the advertising conduct about which the Defendants complain occurred in New Mexico, and thus one could assume that many of the lost sales that are the result of the alleged advertising conduct occurred in New Mexico.  The Court therefore finds that New Mexico is a state in which some or all of the Defendants' alleged harm occurred.  Because New Mexico is the *lex loci delicti*, the Court will apply New Mexico substantive law to Counts VI, VII, and VIII.

### 3.    <u>Federal Law Governs Counts III and V, Which Arise Under Federal Law.</u>

The choice-of-law question as to Counts III and V has a simple answer.  As each claim is a substantive federal claim, the Court applies federal law when resolving this motion as to those claims.  <u>See</u> <u>Erie R.R. v. Tompkins</u>, 304 U.S. 64, 78 (1938)("<u>Except in matters governed by</u> . . . <u>acts of Congress</u>, the law to be applied in any case is the law of the state.")(emphasis added); 19 C. Wright, A. Miller & E. Cooper, <u>Federal Practice and Procedure</u> § 4501 (2d ed. 1996)("[T]he substantive law to be applied by the federal courts in any case is state law, except when the matter before the court is governed by . . . an Act of Congress, . . . or, in special circumstances, by federal

---

[12] The <u>Restatement of Conflicts of Law</u> also implies that misappropriation of trade values is a tort.  <u>See</u> <u>Restatement (Second) of Conflicts of Law</u> § 145, cmt. f (1971).  It states: "[T]he place of injury does not play so important a role for choice-of-law purposes in the case of false advertising and the misappropriation of trade values as in the case of <u>other kinds of torts</u>."  <u>Id.</u> (emphasis added). Even if New Mexico law were to hold that the place of the injury is less significant, and that the place where the wrongful conduct occurs should dictate the law to be applied, the place of the conduct and the place of at least part of the alleged injury are the same: New Mexico.

common law.")(emphasis added).  The Court will therefore consult federal law in addressing this motion as to the claims arising under that law.

## RELEVANT LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  See Sports Unlimited, Inc. v. Lankford Enters., Inc., 275 F.3d 996, 999 (10th Cir. 2002)("Summary judgment is appropriate only if the admissible evidence shows 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'")(quoting Fed. R. Civ. P. 56(c).  A party can satisfy this standard as to claims or elements for which the non-movant bears the burden of proof at trial by pointing out that the non-movant has no admissible evidence as to those claims or defenses.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).  Once the movant meets this minimal burden, the non-movant must provide evidence showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.") (internal quotation marks omitted).

When reviewing a motion for summary judgment, the Court should keep in mind three principles.  First, the Court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the Court must resolve all reasonable inferences and doubts in favor

of the non-moving party, and construe all evidence in the light most favorable to the non-moving

party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Third, the Court cannot decide any

issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

**ANALYSIS**

Guidance asks the Court to grant summary judgment in its favor as to all of the Defendants'

counterclaims.  The Defendants, in their response, argue that with respect to Counts II (covenant of

good faith and fair dealing), VI (unfair competition), VIII (unlawful misappropriation), X (fraud),

XI (punitive damages), and XII (declaratory judgment), the Court should treat this motion as a

motion to dismiss under rule 12(b)(6) because Guidance does not reference any facts.  Some of the

arguments in Guidance's summary judgment motion are legal in nature, and the Court may decide

those issues without reference to the facts of this case.[13]  To the extent that Guidance's arguments

attack the legal viability of the Defendants' theories, the Court will address the issues as questions

of law.  Ultimately, some of the Defendants' counterclaims will survive this summary judgment

motion; others will not.

**I.      THE DEFENDANTS ESTABLISH THAT FACTUAL ISSUES EXIST REGARDING THEIR BREACH-OF-CONTRACT CLAIM (COUNT I) WITH RESPECT TO SECTIONS 2.4, 9.1 AND 12.12, BUT NOT AS TO SECTION 4.7.**

In Count I of their Counterclaims, the Defendants allege that Guidance breached four

provisions of the Supply Agreement.  See Counterclaims ¶¶ 30-33, at 6-7.  The first provision,

Section 2.4, requires that Guidance not promote obturators and ovens for use with any endodontic

system that TDP offers for sale.  See Supply Agreement ¶ 2.4, at 3.  Next is Section 4.7, which

---

[13] Examples of purely legal questions that Guidance raises in its motion are whether certain causes of action exist under New Mexico law and whether certain of the Defendants' counterclaims can exist in combination with other of the Defendants' counterclaims.

prohibited Guidance from using certain trade names and prefixes on its trade names.   See Supply

Agreement ¶ 4.7, at 6-7.   Relevant to this motion, Guidance was prohibited from marketing any

product brands using the prefixes "PRO, THERMA and DENTS."   Id.   Third, the Defendants allege

breach of Section 9.1, which requires each party to "use reasonable commercial effort not to disclose

the terms of the [Supply] Agreement" to any third party.   Supply Agreement ¶ 9.1, at 10-11.   Finally,

they allege breach of Section 12.12, which, in the event of a "dispute," requires the parties to

mediate before "resorting to litigation or some other dispute resolution procedure."   Supply

Agreement ¶ 12.12, at 16.   Guidance appears to attack the Defendants' breach-of-contract claims

at three points: (i) no evidence of a breach of Section 4.7; (ii) no evidence of a breach of 12.12; and

(iii) no evidence of any quantification of damages.   See Motion at 8-11; Reply at 3-7.

### A.   DELAWARE LAW ON BREACH OF CONTRACT.

To state a breach of contract claim under Delaware law, one must establish three elements.

"[F]irst, the existence of the contract, whether express or implied; second, the breach of an

obligation imposed by that contract; and third, the resultant damage to the plaintiff."   VLIW Tech.,

LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003).   A plaintiff cannot bring a breach of

contract claim seeking only nominal damages.   The Supreme Court of Delaware appears to require

a breach-of-contract plaintiff to show "resultant damage to the plaintiff" to survive a motion to

dismiss.   See VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003)(explaining

that, to survive a motion to dismiss on a breach of contract claim, the plaintiff must demonstrate "the

existence of the contract, whether express or implied; . . . the breach of an obligation imposed by

that contract; and . . . the resultant damage to the plaintiff.").   On the other hand, it appears that,

when there is evidence of damages, but those damages cannot be calculated with the necessary

certainty, the law of Delaware allows the court to award nominal damages.   See Ivize of Milwaukee

v. Compex Litig. Support, LLC, Nos. 3158-VCL, 3406-VCL, 2009 WL 1111179, at *11 (Del. Ch. Apr. 27, 2009)(holding nominal damages could be awarded when existence of damages was clear but quantity could not be proved with the required certainty); LaPointe v. AmerisourceBergen Corp., No. Civ. A. 327-CC, 2007 WL 2565709, at *9 (Del. Ch. Sept. 4, 2007)("To be entitled to compensatory damages, plaintiffs must show that the injuries suffered are not speculative or uncertain, and that the Court may make a reasonable estimate as to an amount of damages.").

The first step in analyzing whether a breach of contract has occurred is to determine what the contract means. The meaning or ambiguity of a contract is a question of law for the court to decide. See HIFN, Inc. v. Intel Corp., No. Civ. A. 1835-VCS, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007)("A determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law."). A contract is ambiguous if it is subject to two or more reasonable interpretations. See Nw. Nat'l Ins. Co. v. Esmark, Inc., 672 A.2d 41, 43 (Del. 1996); Addy v. Piedmonte, No. Civ. A. 3571-VCP, 2009 WL 707641, at *8 (Del. Ch. Mar. 18, 2009). "In analyzing disputes over the language of a contract, we give priority to the intention of the parties [and] start by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language." Paul v. Deloitte & Touche, LLP, 974 A.2d 140, 145 (Del. 2009). "Courts consider extrinsic evidence to interpret the agreement only if there is an ambiguity in the contract." Nw. Nat'l Ins. Co. v. Esmark, Inc., 672 A.2d at 43.[14]

---

[14] In this respect, Delaware and New Mexico law appear to have diverged. Since the Supreme Court of New Mexico decided Mark V., Inc v. Mellekas, 114 N.M. 778, 845 P.2d 1232 (1998), courts in New Mexico have discretion to consider extrinsic evidence of the circumstances surrounding the formation of the contract to help discern whether the contract term is truly ambiguous. See 114 N.M. at 781, 845 P.2d at 1235 ("[E]ven if the language of the contract appears to be clear and unambiguous, 'a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance,' in order to decide whether the meaning of a term or expression contained in the

A party cannot be liable for violating a provision that the other party has waived.  Under Delaware law, however, the burden to establish a waiver of contract right is fairly onerous.  The elements of a waiver of rights "are (1) a right to be waived; (2) the waiving party must know of the right, and (3) he must intend to waive that right."  Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc., 297 A.2d 28, 33 (Del. 1972).

> **B.    UNDER DELAWARE LAW, THE DEFENDANTS HAVE SHOWN THAT A FACTUAL ISSUE EXISTS WITH RESPECT TO SECTIONS 2.4, 9.1 AND 12.12 OF THE SUPPLY AGREEMENT.**

Guidance takes issue with the element of breach as to two of the challenged provisions, 4.7 and 12.12, and with the element of damages as to all provisions.  Guidance does not appear to challenge the Defendants' evidence of a breach of Sections 2.4 and 9.1 of the Supply Agreement, except with respect to damages.  The Court will thus not grant Guidance's motion on the grounds that the Defendants lack evidence of breach of those provisions.

> **1.    The Defendants Have Failed to Show a Factual Issue Whether Guidance Violated Section 4.7 of the Supply Agreement.**

Section 4.7 of the Supply Agreement provides:

> Trademarks. It is understood and agreed that Guidance will sell, market, advertise, and promote the Products only under its own brands or trade names, including, without limitation, "GUIDANCE, V-TAPER, ENDOTAPER, ONEFILL, ONESEAL, and NEGOTIATOR.  Guidance agrees that it will not use the prefixes PRO, THERMA and DENTS as part of its brands or trade names in connection with any of the Products.

Supply Agreement at 6-7.  The Defendants are not particularly forthcoming in their Counterclaims or reply brief regarding how Guidance violated Section 4.7.  In an attachment, they circle a

---

agreement is actually unclear.")(quoting C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. 504, 508, 817 P.2d 238, 242 (1991)).  In short, New Mexico law allows a court to consider extrinsic evidence to help determine whether a contract term is ambiguous; Delaware law does not.

statement that lends some insight -- the Defendants apparently argue that referring to OneFill as a "Thermal Filling Obturator" violates Section 4.7.  <u>See</u> Response Exhibit C.  Guidance argues that the Defendants cannot show a breach of Section 4.7 because that provision expressly permits Guidance to use the trade name "OneFill" in connection with its products.  <u>See</u> Reply at 3. Guidance hypothesizes that the alleged violation is based on the Defendants reading very broadly a portion of Section 4.7 that prohibits Guidance from using "the prefixes PRO, THERMA and DENTS as part of its brands or trade names in connection with any of the products."  <u>See</u> Reply at 3.  It further hypothesizes that the Defendants' alleged breach is based on the fact that the phrase "OneFill Thermal Obturator" has a visual appearance similar to using the prefix "THERMA."  <u>See</u> Reply at 3.  The Court is unconvinced.

Under Delaware law, whether a contract is ambiguous is a question of law for the Court to decide.  <u>See</u> <u>HIFN, Inc. v. Intel Corp.</u>, 2007 WL 1309376, at *9.  A contract is ambiguous if it is subject to two or more reasonable interpretations.  <u>See</u> <u>Addy v. Piedmonte</u>, 2009 WL 707641, at *8. The Court does not believe this provision is subject to more than one reasonable interpretation.

The Supply Agreement's language -- that "Guidance will sell, market, advertise, and promote  the Products only under its own brands or trade names, including, without limitation, . . . ONEFILL" -- is not ambiguous in the context of this dispute.  Section 4.7 expressly permits Guidance to market its product under the name OneFill.  Further, there appears to be no ambiguity as to what the section prohibits -- it prohibits use of the prefixes "PRO, THERMA, and DENTS." Supply Agreement ¶ 4.7, at 6-7.  A prefix is "[a]n element placed at the beginning of a word or stem to adjust or modify its meaning."  <u>Oxford English Dictionary Online</u>, "prefix, n," (2d ed. 1989, Oxford University Press), <u>available at</u> http://dictionary.oed.com/cgi/entry/50186993 (last accessed Oct. 8, 2009).  In the Court's view, this definition would include a series of characters that are

attached to the beginning of the root word, but would not include prior or subsequent words in their entirety.  Use of the phrase "Thermal Filling Obturator" in conjunction with the permissible trade name "OneFill" does not use any of those prefixes.  Indeed, it does not use any prefixes at all. Marketing a product called ThermaOneFill, for instance, would violate this section of the Supply Agreement.  Use of the word "Thermal" immediately following the word "OneFill," however, does not.  The Defendants do not provide any argument regarding how Section 4.7 has otherwise been violated, nor have they pointed the Court to any evidence in the record that would prove that violation.  The Court will hold that there is no material fact in dispute whether Guidance breached Section 4.7 of the Supply Agreement.

**2.      The Defendants Have Shown a Fact Issue Whether Guidance Violated Section 12.12 of the Supply Agreement.**

Section 12.12 of the Supply Agreement provides:

> Mediation.  If a dispute arises out of or relates to this Agreement, or the breach thereof, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation administered by JAMS under its Mediation Rules before resorting to litigation or some other dispute resolution procedure.

Supply Agreement ¶ 12.12, at 16.  The Defendants assert that Guidance breached this provision by filing this lawsuit.  Guidance asserts that it could not have violated this provision because the Defendants waived their right to insist on mediation by failing to mediate before they stopped providing Guidance with obturators, "unilaterally terminating" the Supply Agreement.  Motion at 9.  It implicitly argues that the Defendants' allegations, found in the Newell and Addison letters, represent a "dispute" that had to be mediated before using any other method of dispute resolution, such as ceasing to perform under the contract.  Motion at 9-10.  Guidance also argues that it was not bound to mediate because mediation would be futile, given that the Defendants sent a letter to

Guidance stating that its "conduct is such that there is no way to cure the impacts of it in the market." Motion at 10; Complaint Exhibit 15.

In response, the Defendants assert that they have not waived their right to insist on mediation before litigation. They argue that, under Delaware law, the burden of proving waiver is very high and that Guidance has not met it. See Response at 8. They further point to Section 12.7 of the Supply Agreement, which states "a failure of either side to enforce its rights hereunder shall not be deemed a waiver of such rights unless specifically stated." Response at 8; Supply Agreement ¶ 12.7, at 15. They argue that this provision requires them to specifically state that they waive their right to insist on mediation before that right is waived. See Response at 8. Finally, they contend that they did not waive the right to mediate by unilaterally terminating the Supply Agreement because they did not terminate the agreement when they failed to supply obturators; they continued to supply EndoTaper files and ovens. See Response at 8.

In their reply brief, Guidance argues that a no-waiver clause can be waived just like any other contract provision. See Reply at 6. In other words, it appears to argue that no-waiver clauses like Section 12.7 have no purpose. Pepsi-Cola Bottling Company of Asbury Park v. Pepsico, Inc., 297 A.2d at 33, which Guidance cites for this proposition, appears only to hold that a clause providing that contract amendments must be in writing can be waived by failing to object to an implied modification of the contract terms for fifteen years. See 297 A.2d at 33-34. The Court does not read this case as laying the foundation for ignoring Section 12.7 when the Defendants seek to assert it in their defense.

The Defendants appear to be correct, however, that Guidance's burden in establishing a waiver of contract right is fairly onerous. The elements of a waiver of rights "are (1) a right to be waived; (2) the waiving party must know of the right, and (3) he must intend to waive that right."

Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc., 297 A.2d at 33.  Clearly, the contract provision itself creates the right.  See Supply Agreement at 16.  The Court is also comfortable in concluding that the Defendants knew of the right.  The Court is not, however, confident that the Defendants intended to waive that right.  Guidance provides nothing to support its assertion of waiver except the argument that the Defendants breached the Supply Agreement.  See Motion at 9.  The Court believes that is a dispute to which the Supply Agreement refers.  If Guidance's accusation that the Defendants breaching the contract was enough to nullify the mediation clause, the clause would have very little purpose, as most disputes arise out of alleged breaches.

The cases cited by Guidance to support waiver are inapposite.  Nutzz.com, LLC v. Vertrue, Inc., No. Civ. A. 1231, 2006 WL 2220971, at *8 (Del. Ch. July 25, 2006), for instance, held that actions "inconsistent with [a] right to arbitrate" might result in relinquishing that right.  2006 WL 2220971, at *8.  That case, however, dealt with what Guidance has done -- file suit without first seeking mediation -- rather than the Defendants' conduct, which Guidance alleges breached the contract.[15]  The case does not support the position that actions inconsistent with the contract's terms constitute a waiver of the right to demand mediation.  In DaimlerChrysler Corp. v. Matthews, 848 A.2d 577 (Del. Ch. 2004), the Delaware Chancery Court held only that, where one party asserts his right to non-binding arbitration under a contract's specific dispute resolution protocol, and the other party refuses to submit to such arbitration, the refusing party cannot later assert that the other party was required to arbitrate before bringing suit.  See 848 A.2d 577, 581-82.  Thus -- assuming mediation and arbitration clauses are treated the same -- if Guidance had demanded mediation and

---

[15] Nutzz.com, LLC v. Vertrue Inc. actually strengthens the Defendants' argument on waiver, as it clarifies that "[t]he waiver defense requires clear and convincing evidence of waiver."  2006 WL 2220971, at *8.

the Defendants had refused, then the Defendants would likely have waived their right to demand that Guidance mediate before bringing suit.   Neither of these situations is before the Court, so Guidance's waiver argument does not persuade the Court.  The Court believes there is a factual issue whether Guidance breached the mediation provision of the Supply Agreement.

### 3. The Defendants Have Provided Some Evidence of Damages from Guidance's Alleged Breach of the Supply Agreement.

In its motion, Guidance argues that the Defendants have presented no expert report or other evidence of damages that Guidance's alleged breach of contract caused.  See Motion at 10. Guidance argues that, because damages are an element of a claim for breach of contract and the Defendants have no evidence thereof, summary judgment is appropriate.  See id.  The Defendants respond that they do not need an expert to establish their damages.  See Response at 8.  They argue that they have ample employees competent to testify on the subject of damages, that they are entitled to nominal damages under Delaware law, and that they have attached the affidavit of Mr. Gulley as evidence of their damages in the form of attorneys fees.  See id. at 9.

The only items of evidence that the Court finds attached to the Defendants' response that goes to the issue of damages are: (i) an affidavit by Mr. Gulley; and (ii) a snippet of hearing testimony by James Mosch, a representative of the Defendants.  Although barely, that is enough. In his affidavit, Mr. Gulley states that: (i) he is an attorney for the Defendants; (ii) the Defendants believe that Guidance's act of publicly filing pleadings and other documents violated Section 9.1 of the Supply Agreement; and (iii) the Defendants have paid for his services in attempting to seal those documents.  See Response Exhibit E.  Thus, the Defendants have provided evidence of damages in the form of attorneys fees, which are damages one would expect from a breach of Paragraphs 9.1 and 12.12 of the Supply Agreement.  If Guidance breached Paragraph 9.1, that

conduct arguably forced the Defendants to retain counsel to try to get Guidance's filings put under seal.  If Guidance had not breached Paragraph 12.12, a fact finder might reasonably conclude that litigation might have been avoided and attorneys fees might have been less.  Mr. Gulley's affidavit is sufficient evidence to raise a genuine issue of material fact regarding the Defendants' attorneys fees.

The Defendants' alleged breach of Section 2.4 is more troublesome.  The Defendants concede that they have not provided a means by which to quantify their lost-business damages.  The Defendants cite an unpublished case from the Delaware Chancery court for the proposition that a breach-of-contract action can be maintained on an allegation of nominal damages.  See LaPointe v. AmerisourceBergen Corp., 2007 WL 2565709, at *9.  See also Ivize of Milwaukee v. Compex Litig. Support, LLC, 2009 WL 1111179, at *11.  The Supreme Court of Delaware, however, seems to require a plaintiff to show "resultant damage to the plaintiff" to survive a motion to dismiss its breach of contract claim.  VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d at 612.  It would be nonsensical to require that more elements be pled than be proven.

The Court understands LaPointe v. AmerisourceBergen Corp. and other similar cases to require some evidence that the claimant has suffered actual damages, and that those damages could be quantified, but to allow the claimant to win at trial even if its evidence of the quantity of damages turns out to be insufficient.  See LaPointe v. AmerisourceBergen Corp., 2007 WL 2565709, at *9 ("To be entitled to compensatory damages, plaintiffs must show that the injuries suffered are not speculative or uncertain, and that the Court may make a reasonable estimate as to an amount of damages.").  In that situation, the award of damages can be nominal.  The Court therefore believes that the Defendants have a burden to establish that they have suffered some damages from Guidance's alleged breach of contract.  And, though just barely, the Defendants satisfy this burden.

The Defendants' only evidence of lost-business damages is a snippet of hearing testimony from Mosch, a representative of the Defendants.   In the passage, Mosch discusses some of Guidance's alleged wrongful conduct and states: "[C]learly we had a loss of sales and revenue." Response Exhibit F.  The Court acknowledges that this statement is self-serving.  From it, however, the Court believes that a reasonable jury could be convinced that the Defendants suffered damages to some extent.  While an award of a specific amount on this evidence alone would be speculation, it is enough to prove some damages were sustained.   In their reply brief, Guidance cites some authority that they argue stands for the proposition that the Defendants must provide a "meaningful estimate" of their loss of business damages.  See Reply at 4.  With one exception, Guidance's case law is either irrelevant or support the Court's conclusion that, where there is evidence of damages but no evidence of their quantity, the plaintiff can recover nominal damages.  Jones v. United States, 49 Fed. Cl. 516, 521 (2001)(cited only for the statement that summary judgment is "the 'put up or shut up' moment in a lawsuit"); Yale 41 Assocs. Ltd. P'ship v. Five Shopping Ctr. Co., 16 Fed. Appx. 921, 922-23 (10th Cir. 2001)(holding a liquidated-damages provision void because the party seeking to assert it failed to show that the parties sought to estimate prospective damages when selecting the liquidated damages amount); Merion Spring Co. v. Muelles Hnos. Garcia Torres, S.A., 315 Pa. Super. 469, 492, 462 A.2d 686, 699 (1983)(holding that the evidence proffered by the plaintiff was sufficient to warrant awarding lost profits damages); William B. Tanner Co. v. WIOO, Inc., 528 F.2d 262, 271-72 (3d Cir. 1975)(stating that, under Pennsylvania law, there "can be no award for breach of contract (except in certain cases an award of nominal damages) when there is no evidence produced by which the jury can measure damages"); Ivize of Milwaukee v. Compex Litig. Support, LLC, 2009 WL 1111179, at *11 (holding that a plaintiff could recover nominal damages when there was evidence that he was harmed, but the harm could not be properly

quantified).  In the only case that Guidance cites in which the claimant was not permitted to recover at least nominal damages, <u>TruGreen Companies, LLC v. Mower Brothers, Inc.</u>, No. 06-CV-00024, 2007 WL 1696860 (D. Utah June 8, 2007), the United States District Court for the District of Utah, applying Utah law, found that the defendant should not be burdened with a trial for recovery of nominal damages because there was no evidence that the defendants' conduct caused the harm about which the plaintiff complained.  <u>See</u> 2007 WL 1696860, at *4 ("TruGreen has failed to provide any admissible evidence that shows a causal connection between TruGreen's alleged damages and the alleged wrongful conduct of the Defendants.").  This case is distinguishable from <u>Trugreen Companies, LLC v. Mower Brothers, Inc.</u> in that Mosch's testimony provides the requisite causal connection between Guidance's alleged wrongful conduct and the Defendants' injury, even if the Defendants' cannot quantify that injury.  In short, none of the authority that Guidance cites supports granting summary judgment in this case.

In conclusion it appears that the Defendants have provided some evidence of damages in the form of attorneys fees and, although barely, in the form of loss of business.  The Court will therefore deny Guidance's motion for summary judgment as to the alleged breach of Sections 9.1, 12.12, and 2.4.  The Court will grant the motion to the extent that the Defendants assert a breach of Section 4.7.

## II.   THE DEFENDANTS' CLAIM FOR BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING (COUNT II) FAILS AS A MATTER OF LAW.

The Defendants' next claim upon which Guidance has sought summary judgment is that Guidance violated the implied covenant of good faith and fair dealing. Guidance argues that, because the Defendants' allegations in support of their claim for breach of the implied covenant of good faith and fair dealing mirror their allegations in support of their breach of contract claim, the Court should dismiss the former as duplicative.  <u>See</u> Motion at 11.  It further argues that the

Defendants have failed to state a claim by failing to identify a specific implied contractual obligation that Guidance has breached, nor alleged how the violation denied them the benefits of the contract. See id. at 11-12.  The Defendants respond that their implied covenant claim is not duplicative, but rather is made in the alternative.  See Response at 9.  If the jury finds that Guidance's conduct did not violate the Supply Agreement's express terms, the Defendants would like the jury to be allowed to consider whether that same conduct violated the implied covenant.  See id.

### A.   DELAWARE LAW OF BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

"Stated in its most general terms, the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 442 (Del. 2005).  "[P]arties are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." Id.  The covenant is a way to imply terms in a contract to fill missing contract provisions, whether they be missing through simple oversight or arising from circumstances that neither party predicted. See id.  On the other hand, one cannot assert a breach of the implied covenant for conduct that is governed by the contract's express provisions. See id.; Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 888 (Del. Ch. 2009)("To the extent that Kuroda's implied covenant claim is premised on the failure of defendants to pay money due under the contract, the claim must fail because the express terms of the contract will control such a claim.").

More specifically, to prove a breach of the implied covenant, a party must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damages.

See Kuroda v. SPJS Holdings, L.L.C., 971 A.2d at 888.  Alleging bad faith alone is insufficient to establish a breach of the implied covenant; rather, the claimant must "allege a specific implied contractual obligation and allege how the violation of that obligation denied the plaintiff the fruits of the contract."  Id.  "[A] court should be cautious when implying a contractual obligation and do so only where obligations which can be understood from the text of the written agreement have nevertheless been omitted from the agreement in the literal sense."  Fitzgerald v. Cantor, No. C.A. 16297-NC, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)(emphasis added).  Because of how narrow the cause of action is -- and probably as a result of how comprehensive most modern commercial contracts are -- asserting this cause of action is rarely successful.  See Kuroda v. SPJS Holdings, L.L.C., 971 A.2d at 888.

> **B.    THE TERMS OF THE SUPPLY AGREEMENT GOVERN THE CONDUCT THAT THE DEFENDANTS ALLEGE BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

In their Counterclaims, the Defendants allege two forms of conduct that they allege breached the implied covenant of good faith and fair dealing.  First, they allege that Guidance: (i) "[told] potential and existing customers that Dentsply/TDP made the Products;" and (ii) "market[ed] and promot[ed] OneFill and the ovens for use with Dentsply/TDP's systems."  Counterclaims ¶ 36, at 7.[16]  Guidance argues that, because these factual allegations mirror allegations underlying the

---

[16] The Defendants also allege that Guidance "trad[ed] off Dentsply/TDPs' [sic] reputation, goodwill, intangible trade values, and standing in the dental community."  Counterclaims ¶ 36, at 7.  It appears, however, that this is just elaboration upon the details of the first category of conduct, "telling potential and existing customers that Dentsply/TDP made the Products."  Id.  Guidance could not trade off of the Defendants' intangible trade values without telling its customers that Dentsply/TDP made the products, and it is by telling its customers that Dentsply/TDP made the products that Guidance might be trading off of the Defendants' intangible trade values.  Furthermore, the precise conduct of which the Defendants complain constitutes the basis of their tort claim for unlawful misappropriation (Count VIII).  At least one Delaware court has held that conduct that is tortious, independent of the existence of the contract, cannot form the basis of a claim

Defendants' breach-of-contract claim, the Court must dismiss the claim for breach of the implied covenant of good faith and fair dealing.  <u>See</u> Motion at 11-12.  In response, the Defendants allege that their argument is merely in the alternative.  <u>See</u> Response at 9-10.  In other words, they argue that, if the contract is construed such that the conduct of which they complain was not a breach of the express terms, the conduct was a breach of the implied covenant and "deprived [them] of the benefit of their bargain."  Response at 9.

The Defendants have alleged that certain conduct constitutes both a breach of the implied covenant of good faith and fair dealing, and a breach of contract.  In Paragraph 32 of their Counterclaims, the Defendants allege the following conduct as a breach of the Supply Agreement:

> 32.  Guidance breached Sections 2.4, 4.[7], and 9.1of [sic] the Supply Agreement by trading off Dentsply/TDPs' reputation, goodwill, intangible trade values, and standing in the dental community, by telling potential and existing customers that Dentsply/TDP made the Products . . . and by marketing and promoting OneFill and the ovens for use with TDP's systems . . . .

Counterclaims ¶ 32, at 6-7 (emphasis added).  Paragraph 36, relating to the Defendants' claim of a breach of the implied covenant of good faith and fair dealing, alleges that:

> 36.  Guidance breached the implied covenant of good faith and fair dealing in the Supply Agreement by trading off Dentsply/TDPs' reputation, intangible trade values, and standing in the dental community, by telling potential and existing customers

---

for breach of the implied covenant.  The Delaware Superior Court recognized "a thread running through the [implied covenant] cases" that "a breach of an implied covenant of good faith and fair dealing involves commercially unreasonable, as opposed to tortious, behavior."  <u>Debs v. Riley Stoker Corp.</u>, Civ. A. No. 93C-02-248, 1995 WL 108714, at *3 (Del. Super. Jan. 31, 1995)(applying Massachusetts law).  The court in <u>Debs v. Riley Stoker Corp.</u> noted that "it is difficult to avoid the conclusion that Plaintiff is trying to twist an ordinary tort claim into a contract case under the guise of a breach of an implied covenant of good faith and fair dealing."  <u>Id.</u>  The court, notwithstanding "[t]he seemingly broad dicta of Massachusetts law," stripped Debs' implied covenant count down dramatically, apparently granting summary judgment on the claim as to all conduct that was independently tortious.  <u>See</u> 1995 WL 108714, at *4.  In any case, because the Court will not be granting summary judgment on the unlawful misappropriation claim, the Court is not barring the Defendants from recovering based on this conduct.

that Dentsply/TDP made the Products, and by marketing and promoting OneFill and the ovens for use with Dentsply/TDP's systems.

Counterclaims ¶ 36, at 7 (emphasis added).  The alleged conduct is essentially identical.  Guidance sees this fact as fatal to the Defendants' claims.  The Court disagrees.  As the Court understands Delaware law on this issue, the question is not whether the facts alleged as a breach of contract and a breach of the implied covenant are the same, but rather whether the contract governs the conduct alleged as a breach of the implied covenant.  See Kuroda v. SPJS Holdings, L.L.C., 971 A.2d at 888; Fitzgerald v. Cantor, 1998 WL 842316, at *1; Painewebber R&D Partners v. Centocor, Inc., No. C.A. 96C-04-194, 1998 WL 109818, at *4 (Del. Super. Feb. 13, 1998)("The Court is satisfied that the payment obligations of Centocor are encompassed by the express terms of the [Partnership Purchase Agreement] and, as a matter of law, cannot be the subject of any implied covenant."); Massaro Ltd. P'ship (Park West Two) v. Baker & Taylor Inc., 161 Fed. Appx. 185, 186 (3d Cir. 2005)("Implied duties cannot trump the express provisions in the contract.")(quoting John B. Conomos, Inc. v. Sun Co. (R & M), 831 A.2d 696, 706 (Pa. Super. 2003)).

The implied-covenant claim cannot survive if an express term of the contract governs the conduct, and if a prohibition on that conduct cannot "be understood from the text of the written agreement."  Fitzgerald v. Cantor, 1998 WL 842316, at *1.  Essentially, what the Defendants argue is that the complained-of conduct is either a breach of the contract's confidentiality provision or, alternatively, a breach of the implied covenant of good faith and fair dealing.  If it is a breach of contract, then the contract expressly governed the conduct and the implied covenant claim will fail. If it is not a breach of contract, but "can be understood from the text of the written agreement" as being prohibited, the implied covenant governed the conduct.

The Court finds that the implied covenant does not govern the conduct. First, the Court has

previously indicated that it is inclined to think that the contract's confidentiality provision does not encompass the fact that the Defendants manufacture Guidance's products.  See Memorandum Opinion and Order at 48-49, filed December 15, 2008 (Doc. 30).  The confidentiality provision, set out in Paragraph 9.1, requires that the parties each "use reasonable commercial efforts not to disclose the terms of the Agreement and the Confidential Information of the other side to any third party."  Supply Agreement ¶ 9.1, at 10-11.  "Confidential Information" is defined to include "[t]he terms of [the Supply] Agreement," information "the recipient knows or has reason to know is deemed confidential or proprietary by the disclosing side," and other "technical information." Supply Agreement ¶ 1.2.9, at 2.  The confidentiality clause, however, includes an exception for information in the public domain.  See Supply Agreement ¶ 9.2, at 11 ("Notwithstanding the above, neither side shall have liability to the other with regard to any Confidential Information of the other side which the receiving side can demonstrate: . . . was in the public domain at the time it was disclosed . . . .").

The fact that the Defendants entered into the Supply Agreement with Guidance is a matter of public record, at least in the Middle District of Pennsylvania, see Dentsply International Inc. v. Guidance Endodontics, LLC, Civ. No. 1:08-CV-0155, Consent Judgment and Order (M.D. Pa., filed August 15, 2008)(Doc. 44-2), filed in D.N.M. on July 31, 2009 (Doc. 219-15).  The Defendants have implied that the fact that the existence of the Supply Agreement is public information does not necessarily make public whether the Defendants supply products to Guidance or vice versa.  The Defendants, however, tout themselves as "the largest professional dental products company in the world," see Dentsply.com, Providing the Dental Community with Cost-Effective Dental Products, http://www.dentsply.com/default.aspx?pageid=6 (last visited October 12, 2009), whereas Guidance is a small start-up company in New Mexico without facilities to manufacture their own products.

The Court is not convinced that it is confidential that the Defendants produce Guidance's products, given that it is not confidential that the Supply Agreement exists between the two parties.  The Court is, however, convinced that the confidentiality provision of Paragraphs 9.1 and 9.2 governs whether Guidance can disclose that the Defendants make its products.  In other words, the parties crafted and negotiated the confidentiality provision as a means of prohibiting certain disclosures, thus the provision should govern whether the parties are free to disclose certain facts.  It would contravene the parties' negotiated contract terms to find that the implied covenant prohibits disclosure of facts not covered by the confidentiality provision.  Because the contract provision goes directly to the conduct of which the Defendants complain, the Court does not believe that a prohibition on disclosing certain facts "can be understood from the text of the written agreement," so the implied covenant claim fails as to this conduct.  Fitzgerald v. Cantor, 1998 WL 842316, at *1.

Second, an express term of the contract governs Guidance "marketing and promoting OneFill and the ovens for use with TDP's systems."  Counterclaims ¶ 32, at 6-7; id. ¶ 36, at 7.  Paragraph 2.4 of the Supply Agreement uses similar language to describe what it prohibits: "[T]he Guidance Obturators and Guidance Ovens will not be promoted for use with any system offered for sale by TDP or any affiliate of TDP."  Supply Agreement ¶ 2.4, at 3.  Given that the Defendants' allegations mirror the language of the contract, whatever the contract prohibits appears to be what the Defendants' allege.  The express provisions of the contract therefore clearly govern the conduct, and this aspect of the Defendants' claim for breach of the implied covenant of good faith and fair dealing also fails as a matter of law.  The Court will thus grant Guidance's motion for summary judgment as to Count II.

## III. THE DEFENDANTS HAVE SHOWN A FACTUAL ISSUE REGARDING THEIR SECTION 43(a) CLAIM UNDER THE LANHAM ACT (COUNT III), BUT ONLY AS TO TWO OF THE COMPLAINED-OF STATEMENTS.

The Defendants' third counterclaim is that Guidance breached Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). See Counterclaims ¶¶ 38-44, at 7-8. They allege that each of a series of statements included in Guidance's promotional materials constitute a violation of Section 43(a). Those statements are:

1. that OneFill is the "World's Best Thermal Filling Obturator;"

2. that OneFill is the "Best Thermal Filling Obturation System in the World;"

3. that "EndoTaper Complete is the best Endo System in the World;"

4. that "EndoTaper is the Best NiTi File System in the World;"

5. that "[n]ow you can treat every case better, quicker and safer with EndoTaper;" and

6. that EndoTaper "files can be used like ProTaper F1 to F5 or used in a Crown-Down like ProFile, GT, Endo Sequence, or K3 to create the perfect canal shape more efficiently and easier than any other file system."

Counterclaims ¶ 40, at 8. See Response Exhibit G, Attachments 1-3; id. Exhibits K, M.[17] The Defendants assert that each of these statements are false and deceptive, and that they have been harmed because of them. See Counterclaims ¶¶ 40-41, at 8. Guidance moves for summary judgment arguing that these statements are non-actionable puffery, and therefore the claim fails as a matter of law. See Motion at 12. Further, it argues that the Defendants have no evidence of "actual confusion," which Guidance asserts is a required element of the Defendants' claim. See

---

[17] It appears that the Defendants have failed to attach any evidence of statements 1 and 3. Because statements 2 through 4 are roughly equivalent, and the Court would grant the motion as to statements 1 and 3 regardless whether there was evidence of them, the Court will address those statements as though the Defendants had provided such evidence.

Motion at 15.  While the Lanham Act creates a cause of action for two categories of conduct, false

advertising and "passing off," the Court reads Count III of the Counterclaims as asserting only a

false-advertising claim.

### A.      LAW OF FALSE ADVERTISING UNDER THE LANHAM ACT.

While the Lanham Act is generally a statute governing trademarks and other marks, Section

43(a) "is one of the few provisions that goes beyond trademark protection"  Dastar Corp. v.

Twentieth Century Fox Film Corp., 539 U.S. 23, 28-29 (2003).  Section 43(a) "created a federal

remedy against a person who used in commerce either 'a false designation of origin, or any false

description or representation' in connection with 'any goods or services.'"  Dastar Corp. v.

Twentieth Century Fox Film Corp., 539 U.S. at 29.  The provision prohibits:

> [a] person [from], on or in connection with any goods or services, . . . us[ing] in
> commerce any word, term, name, symbol, or device, or any combination thereof, or
> any false designation of origin, false or misleading description of fact, or false or
> misleading representation of fact, which--
>
> (A)    is likely to cause confusion, or to cause mistake, or to deceive as to the
>        affiliation, connection, or association of such person with another person, or
>        as to the origin, sponsorship, or approval of his or her goods, services, or
>        commercial activities by another person, or
>
> (B)    in commercial advertising or promotion, misrepresents the nature,
>        characteristics, qualities, or geographic origin of his or her or another
>        person's goods, services, or commercial activities,

15 U.S.C. § 1125(a)(1) (Section 43(a) of the Lanham Act).  Section 43(a) "prohibits actions like

trademark infringement that deceive consumers and impair a producer's goodwill.  It forbids, for

example, the Coca-Cola Company's passing off its product as Pepsi-Cola or reverse passing off

Pepsi-Cola as its product."  Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. at 32.  It

also encompasses more general claims of  "false advertising."  See Two Pesos, Inc. v. Taco Cabana,

Inc., 505 U.S. 763, 778 (1992)(commenting that, under the original Lanham Act, "[t]he phrase

['false description or representation'] encompassed two kinds of wrongs: false advertising and the common-law tort of 'passing off.'"); Marcinkowska v. IMG Worldwide, Inc., No. 2009-1213, 2009 WL 2562745, at *4 (Fed. Cir. Aug. 20, 2009)(stating that Section 43(a)(1)(B) "of the Lanham Act prohibits false advertising in connection with the name, description, or origin of 'goods or services' in the United States.").

To sustain a claim of false advertising under the Lanham Act, the Defendants must prove: (i) that Guidance made a false or misleading statement of fact in a commercial advertisement about its own or another's product; (ii) the misrepresentation is material, in that it is likely to influence the purchasing decision; (iii) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (iv) Guidance placed the false or misleading statement in interstate commerce; and (v) the Defendants have been or are likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products. See Zoller Labs., LLC. v. NBTY, Inc., 111 Fed. Appx. 978, 982 (10th Cir. 2004) (unpublished).  See also Marcinkowska v. IMG Worldwide, Inc., 2009 WL 2562745, at *4; Scotts Co. v. United Indus. Corp., 315 F.3d 264, 272 (4th Cir. 2002);  Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 310-11 (1st Cir. 2002); IQ Prods. Co. v. Pennzoil Prods. Co., 305 F.3d 368, 375 (5th Cir. 2002); United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998); Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997); Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc., 19 F.3d 125, 129 (3d Cir. 1994).

### 1.      **False or Misleading Statements.**

The "false or misleading" element can be satisfied in one of two ways.  Either the statement must be literally false -- meaning "[u]ntrue," Black's Law Dictionary at 677 (9th ed. 2009) (defining

false and citing "false statement" as an example) -- or it must be misleading -- meaning "literally true but likely to mislead or confuse consumers," <u>Zoller Labs., LLC. v. NBTY, Inc.</u>, 111 Fed. Appx. at 982 (citing <u>Southland Sod Farms v. Stover Seed Co.</u>, 108 F.3d at 1139 (9th Cir. 1997)).  The use of the disjunctive "or" implies that only one of the two need be shown, and if the statement is proved to be literally false, "a violation may be established without evidence of consumer deception." <u>Zoller Labs., LLC. v. NBTY, Inc.</u>, 111 Fed. Appx. at 982 (quoting <u>Scotts Co. v. United Indus. Corp.</u>, 315 F.3d at 272).  Literal falsity can be either on the face of the statement or by necessary implication.  <u>See</u> <u>Zoller Labs., LLC. v. NBTY, Inc.</u>, 111 Fed. Appx. at 982 (citing <u>Southland Sod Farms v. Stover Seed Co.</u>, 108 F.3d at 1139 (9th Cir. 1997)).  Falsity on the face of the statement refers to where the statement, standing alone, is clearly not true.  To prove falsity by necessary implication, on the other hand, "[the] plaintiff must demonstrate, by extrinsic evidence, that the challenged advertisements tend to mislead or confuse consumers."  <u>Zoller Labs., LLC. v. NBTY, Inc.</u>, 111 Fed. Appx. at 982 (quoting <u>Scotts Co. v. United Indus. Corp.</u>, 315 F.3d at 272).[18]  It thus appears that only when a statement is literally false on its face can the plaintiff move forward with its claim without any extrinsic proof of either actual or likely confusion among the consumer public.

### 2.   <u>Puffing, Puffery, to Puff.</u>

A corollary to the "false or misleading statement" element is the concept of "puffing." <u>Black's Law Dictionary</u> defines puffing as:

> **puffing. 1.** The expression of an exaggerated opinion -- as opposed to a factual

---

[18] The United States Court of Appeals for the Tenth Circuit explained that a claim is "literally false by necessary implication" when the false claim is not explicitly stated, but, "considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been . . . ."  <u>Zoller Labs., LLC. v. NBTY, Inc.</u>, 111 Fed. Appx. 978, 982-83 (10th Cir. 2004).  The Defendants do not base their Section 43(a) claim on any implied false statements, so the Court does not use this analysis.

> misrepresentation -- with the intent to sell a good or service.  ● Puffing involves expressing opinions, not asserting something as a fact.  Although there is some leeway in puffing goods, a seller may not misrepresent them or say that they have attributes that they do not possess.

Black's Law Dictionary at 1353.  The Tenth Circuit's definition is similar: "The term puffery is used to characterize those vague generalities that no reasonable person would rely on as assertions of particular facts."  Alpine Bank v. Hubbell, 555 F.3d 1097, 1106 (10th Cir. 2009).[19]  The Tenth Circuit has also quoted with approval Judge Learned Hand's characterization of this principle:

> There are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity.  If we were all scrupulously honest, it would not be so; but, as it is, neither party usually believes what the seller says about his own opinions, and each knows it.  Such statements, like the claims of campaign managers before election, are rather designed to allay the suspicion which would attend their absence than to be understood as having any relation to objective truth.  It is quite true that they induce a compliant temper in the buyer, but it is by a much more subtle process than through the acceptance of his claims for his wares.

Alpine Bank v. Hubbell, 555 F.3d at 1106 (quoting Vulcan Metals Co., Inc. v. Simmons Mfg. Co., 248 F. 853, 856 (2d Cir. 1918)).  "[F]alse advertising law defines the puffery defense categorically [as] claims 'not capable of measurement' that 'consumers would not take seriously.'" David A. Hoffman, The Best Puffery Article Ever, 91 Iowa L. Rev. 101, 108 (2006).  In analyzing a statement to determine if it is puffery or an assertion of fact, the Tenth Circuit has advised that "context matters," and that "[t]he relative expertise of the speaker and the listener can be a critical factor." Alpine Bank v. Hubbell, 555 F.3d at 1106.  Moreover, the size of the audience is yet another factor, and the larger the audience the more likely it is that the statement is puffery.  See id. at 1106-07 (commenting that "mass advertising expressed in vague terms (as in political campaigns) is not

---

[19] Although the Tenth Circuit was discussing puffery in the context of a negligent-misrepresentation claim under Colorado law, it gave no indication that it was describing puffery solely as that doctrine applies under Colorado law.

-45-

relied on by rational adults."). As its definition implies, if a statement is "mere puffery," it cannot constitute a statement of fact and therefore cannot serve as the basis for a false advertising claim under the Lanham Act. See Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d 489, 495-96 (5th Cir. 2000).

**B.    MOST OF GUIDANCE'S ALLEGED FALSE ADVERTISING IS NON-ACTIONABLE "PUFFING."**

Under the standards set forth above, the first four statements that the Defendants assert as violative of the Lanham Act are puffery. The latter two are probably not. As to those latter two, Guidance's only alternate argument for summary judgment is that the Defendants lack evidence of actual confusion. As the Court has noted, however, actual confusion need not be shown when the alleged violation is literally false, and the Defendants' theory of recovery is based on the alleged literal falsity of Guidance's statements. The Court will therefore grant the motion as to this claim in part -- specifically as to Guidance's assertions that its products are the best in the world -- but deny it as to statements 5 and 6, using objectively verifiable comparisons.

**1.    Guidance and Puffing.**

Guidance argues that its statements are mere puffery. The Defendants respond that the assessment of truth or falsity in advertising is a question of fact for the jury to decide. See Response at 10. They appear to imply that, if statements are literally false, they cannot be mere puffery, and therefore must go to the jury. See id. While it is generally a question of fact whether an advertisement is literally false, see X-IT Products, L.L.C. v. Walter Kidde Portable Equipment, Inc., 155 F. Supp. 2d 577, 628 (E.D. Va. 2001), the Court feels it can dismiss the Defendants' Lanham Act claim as to some of the alleged statements as a matter of law.

### a.    Best in the world.

Statements 1-4 of which the Defendants complain can all be grouped into a single category, which the Court will call the Best category.  Each claims that one of Guidance's products is the "best in the world."  Response Exhibit G & Attachments 1-3.  That is the quintessence of puffery.  Whether one thing or another is the "best" is a normative assessment that involves weighing potentially infinite and sometimes immeasurable factors.  One may say that a particular pen is "the best" because it costs two dollars, weighs an ounce, makes a very fine line and "feels right" in the user's hand.  Another user might not place so much emphasis on price, prefer a thicker line, and simply disagree with whether the writing utensil "feels right."  This distinction does not necessarily make the first user's assessment wrong.  The same could be true of an endodontic file.

As some courts have recognized, statements that a product is the "World's Best" are too general to be considered factual and constitute "puffing."  In re Sterling Drug, Inc., 102 F.T.C. 395, § II.A.1 (1983)("We agree [that] the phrases, 'Bayer is 100% aspirin—the world's best aspirin,' and 'Bayer works wonders,' are merely puffing because the ad does not discuss any comparison of Bayer's 'quality' with other brands of aspirin."); Atari Corp v. 3DO Co., No. C 94-20298 RMW (EAI), 1994 WL 723601, at *1 (N.D. Cal. May 16, 1994)(finding that declaring something to be the "Most Advanced . . . in the Universe" is puffing).  As Professor J. Thomas McCarthy has expressed:

> Puffing may [] consist of a general claim of superiority over a comparative product that is so vague and indeterminate that it will be understood as a mere expression of opinion.  Expressions of opinion cannot be actionable under § 43(a).  Advertising claims that a product or service is "better" and "superior" fall into this category.

4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:38 (4th ed. 1997).  Under these standards, statements 1-4 are clearly puffery and not actionable under the Lanham Act Section 43(a).

Furthermore, the other factors that the Tenth Circuit considers in analyzing whether a statement is puffing -- context, relative expertise of seller and consumer, and size of the audience -- all weigh in favor of finding these statements to be puffing.  See Alpine Bank v. Hubbell, 555 F.3d at 1106-07.  The statement were made in marketing materials, wherein a seller is expected to cast his wares in the best possible light to tempt consumers to buy his product rather than any other.  The consumers of Guidance's products are relatively sophisticated.  Endodontic products are rarely bought by anyone other than dentists or, more often, endodontists, both of whom should have substantial experience using these products and must have a thorough understanding of their characteristics, given the precision work -- in the soft tissue of another human's mouth, no less -- for which the devices are used.  Finally, because these statements were made in advertising, the audience is about as large as it can be under the circumstances.  Combined with the distinctly subjective nature of describing something as "the best," these factors further reinforce the notion that the first through fourth statements of which the Defendants complain are puffery.  The Court will grant Guidance's motion as to those four statements.

The Court can relatively easily distinguish the cases that the Defendants cite, which they contend demonstrate that asserting something is "best" is not puffery.  In Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144 (2d Cir. 2007), for instance, DIRECTV had stated in its advertising that one could not "get the best picture out of some big fancy big screen TV without DIRECTV.  It's broadcast in 1080i."  497 F.3d at 154.  In that case, however, the United States Court of Appeals for the Second Circuit found that the statement implicitly asserted that "it is impossible to get 'the best picture' -- i.e., a '1080i'-resolution picture -- from any source other than DIRECTV."  Id.  The Second Circuit further found that such an assertion was "flatly untrue" because viewers can get a 1080i-resolution picture via HD programming through a traditional cable service provider.  Id.  In

-48-

other words, DIRECTV did not say that it was "the best cable service in the world"; it stated that one could not get the "best picture" (specifically, a 1080i-resolution picture) from sources other than DIRECTV.   Similarly, in W.L. Gore & Associates, Inc. v. Totes Inc., 788 F. Supp. 800 (D. Del. 1992), the United States District Court for the District of Delaware found that the statement that a particular rainsuit was made from the "best waterproof fabric you can find" was literally false. 788 F. Supp. at 807.  That statement is different from alleging that the rainsuit was "the best in the world."  Whether a fabric is waterproof is verifiable, and when two things are waterproof one might be able to compare them to one another and verify which is waterproof.  When there is evidence that a fabric is not waterproof at all, however, as there was in W.L. Gore & Associates, Inc. v. Totes Inc., it is false to say that it is the "best" waterproof fabric, see 788 F. Supp. at 807, not because the speaker alleged that the fabric was the best, but because he or she alleged it was waterproof.  That, however, is not the situation before the Court.  Finally, Hipsaver Co. v. J.T. Posey Co., 497 F. Supp. 2d 96 (D. Mass. 2007), which, the Defendants allege stands for the proposition that the term "best" is specific enough to be actionable, discusses the statement that the product "reduced the impact force [on the wearer's hip] by 90%, the *best* results of any hip protector available." 497 F. Supp. 2d at 99 (emphasis in original).  Although the Massachusetts district court saw fit to italicize the word "best" in the referenced sentence, the Court is not willing to assume, without more, that this means it should consider "best" to be an actionable false statement regardless of its context.  The Court finds the Defendants' cited cases unpersuasive.

### b.    Superlatives.

The fifth and sixth statements that the Defendants allege to violate Section 43(a) are more problematic.  In them, Guidance states that "[n]ow you can treat every case better, quicker and safer with EndoTaper," and that EndoTaper "files can be used like ProTaper F1 to F5 or used in a Crown-

Down like ProFile, GT, Endo Sequence, or KS to create the perfect canal shape more efficiently and easier than any other file system."  Counterclaims ¶ 40, at 8; Response Exhibits K, M.  Unlike merely stating that its product is the "best," here Guidance alleges more specifically what its product can do.  The question, then, is whether saying someone can do things "better," "quicker," and "safer" with a product, or that the product can do something "more efficiently" and "easier," is puffing or a factual assertion.  The Court concludes that while the issue is a close one, these statements are not so clearly of a subjective nature that it will dismiss the claims as a matter of law.

Whether one product is "better" than another, of course, is just a slightly weaker variety of the broad assertion that the product is "the best" -- clearly puffery.  See Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d at 498 (stating that "[the] simple statement, 'Better Pizza,' epitomizes the exaggerated advertising, blustering, and boasting by a manufacturer upon which no consumer would reasonably rely.");  NetQuote, Inc. v. Byrd, 504 F. Supp. 2d 1126, 1133 (D. Colo. 2007) (Ebel, J.)(recognizing that "a simple statement that one's products are better than a competitors likely is 'mere puffing.'").  On the other hand, asserting that ones product can do something "more efficiently," "easier," "quicker," or "safer" is more specific.  It is not so inherently clear that no reasonable consumer would believe that those statements could be true.  See Castrol, Inc. v. Pennzoil Co., 987 F.2d 939, 945 (3d Cir.1993)(holding that stating a motor oil provides "longer engine life and better engine protection" is not puffery); X-IT Prods., L.L.C. v. Walter Kidde Portable Equip., Inc., 155 F. Supp. 2d at 628 (holding that referring to a product as "safe" is objectively verifiable and therefore not puffing).

One can potentially test whether one product performs a task "quicker" or "safer" than another product.  These statements make a more explicit comparison between Guidance files and other brands of files regarding particular characteristics that would be important to a consumer.  A

reasonable consumer, therefore, might believe that Guidance had performed tests and had deduced that its file is superior in these ways.  According to the Defendants, that consumer would be wrong.  The Defendants allege that Guidance has done no testing to determine whether its product outperforms its competitors in these ways.  The Court finds that the bulk of these statements -- "safer," "more efficiently," "easier," "quicker" -- are objectively verifiable and that a reasonable consumer might believe that the seller had actually engaged in some sort of testing before making these statements.  They are therefore not puffing.  And because the fifth and sixth statements that the Defendants allege are not clearly puffing, the Court will not grant Guidance summary judgment as to those allegations.

### 2.   Actual Confusion.

The second basis on which Guidance seeks summary judgment on the Defendants' Lanham Act claim is that the Defendants have failed to prove evidence of "actual confusion" among the consumer public.  Motion at 15.  In response, the Defendants do not allege that they have any evidence of actual confusion.  Rather, they argue that Guidance's statements are literally false and that they therefore need no evidence of actual confusion.  See Zoller Labs., LLC. v. NBTY, Inc., 111 Fed. Appx. at 982 (stating that, if the statement is proved to be literally false, "a violation may be established without evidence of consumer deception.")(quoting Scotts Co. v. United Indus. Corp., 315 F.3d at 272).  Because the Defendants do not assert that any of the challenged statements were true-yet-misleading or "literally false by necessary implication," they do not need evidence of actual confusion.  The Court therefore will not dismiss the claims for want of such evidence.

### 3.   Literal Falsity.

Although the Court does not read Guidance's motion as seeking summary judgment based on the fact that the challenged statements are truthful, the Defendants devote much space in their

response to arguing that Guidance's statements must be literally false. <u>See</u> Response at 12-15. They do so primarily by pointing out inconsistencies in the statements of Guidance's marketing materials and Goodis' statements. <u>See</u> <u>id.</u> For example, one of the challenged statements is that "EndoTaper files can . . . create the perfect canal shape more efficiently and easier than any other file system." Response at 13; <u>id.</u> Exhibit M. At the same time, other advertisements for Guidance's V-Taper file alleges that the V-Taper is "easier, safer, more efficient, and less expensive than any other NiTi rotary file system in the world." Response at 13; <u>id.</u> Exhibit J. The Defendants argue that, because both the EndoTaper and the V-Taper are NiTi rotary file systems, both statements cannot be true -- one is therefore necessarily false. <u>See</u> Response at 13. While it appears both statements cannot be true simultaneously, this incongruity does not demonstrate <u>which</u> one is false. Nevertheless, the Court need not pass judgment on this issue, because Guidance does not seek summary judgment based on the truth of its advertising statements, but only on their status as "puffery" -- and resulting inability to be categorized as true or false -- and on the Defendants' lack of evidence of consumer confusion. On those bases, the Court will grant Guidance's motion as to the first through fourth statements alleged in the Defendants' Counterclaims, which refer to Guidance products as "the best in the world," but deny the motion as to statements five and six, which allege that the Guidance products are superior to other products in specific ways.

## IV.    THE DEFENDANTS HAVE DEMONSTRATED A FACTUAL ISSUE REGARDING THEIR CLAIM FOR VIOLATION OF 15 U.S.C. § 1114(b) (COUNT V).

In Count V of the Defendants' Counterclaims, the Defendants allege that Guidance's use of the phrases "OneFill Thermal Filling Obturator" and "Thermal Filling Obturator" in its marketing materials "is likely to and has caused confusion, mistake, and deception" in violation of 15 U.S.C. § 1114(1)(a) and (1)(b). Counterclaims ¶¶ 53-62, at 10-11. They further allege that Guidance knew

that the use of those phrases would be a colorable imitation of the Defendants' mark, "Thermafil,"

and intended to cause confusion, mistake, and deception.  Id. ¶¶ 58-59, at 10.  Guidance argues that

the Court should dismiss Count V because there is no likelihood of confusion as a matter of law,

based on the six-factor test that the Tenth Circuit articulated in Sally Beauty Supply Co. v.

Beautyco, Inc., 304 F.3d 964, 972 (10th Cir. 2002).  See Motion at 19-25.  Guidance argues that five

of the six factors articulated in Sally Beauty Supply Co. v. Beautyco, Inc. weigh in favor of finding

no likelihood of confusion, and that such an overwhelming ratio justifies finding no likelihood of

confusion as a matter of law.  See id. at 25.[20]  The Defendants respond that factors one, three, four,

and six weigh in their favor and that the outcome of factors two and five will depend on the jury's

determination of disputed facts, thus summary judgment is inappropriate.  See Response at 16.  They

also take issue with Guidance's apparent understanding of how a trademark is analyzed.  See id. at

21.  They contend that, contrary to Guidance's assertions, the mark "Thermafil" is more than merely

"descriptive."  Id. at 22.

### A.    LAW ON TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114(1).

Section 1114 of Title 15 of the United States Code prohibits a person who does not have the

consent of a trademark registrant from:

> (a) us[ing] in commerce any reproduction, counterfeit, copy, or colorable imitation
> of [the] registered mark in connection with the sale, offering for sale, distribution,
> or advertising of any goods or services on or in connection with which such use is
> likely to cause confusion, or to cause mistake, or to deceive; [and from]
>
> (b) reproduc[ing], counterfeit[ing], copy[ing], or colorably imitat[ing the] registered
> mark and apply[ing] such reproduction, counterfeit, copy, or colorable imitation to
> labels, signs, prints, packages, wrappers, receptacles or advertisements intended to

---

[20] Guidance admits that this issue is generally a question of fact for the jury, but cites the
Court to authority stating that it is "amenable to summary judgment in appropriate cases."  Motion
at 25 (citing Sally Beauty Supply Co. v. Beautyco. Inc., 304 F.3d at 972).

> be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . .

15 U.S.C.A. § 1114 (2005).  A trademark registrant, however, may recover under this section only if "the acts [were] committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive."  Id.  In short, the statute "prohibits the unauthorized use of a counterfeit or imitation of the registered mark likely to cause confusion in the marketplace concerning the source of the different products."  Sally Beauty Co. v. Beautyco, Inc., 304 F.3d at 972.

One key element of any claim under 15 U.S.C. § 1114(1)(a) or (1)(b) is that there exists a likelihood of confusion between the registered mark and the mark being used by the alleged infringer.  See Sally Beauty Co. v. Beautyco, Inc., 304 F.3d at 972.  In the Tenth Circuit, whether a likelihood of confusion exists between two marks depends on an analysis of six (non-exhaustive) factors.  Those factors are: "(1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks."  Sally Beauty Co. v. Beautyco, Inc., 304 F.3d at 972 (citing King of the Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d 1084, 1089-90 (10th Cir. 1999)).  This inquiry is generally a factual one that the jury should make, but if the factors weigh overwhelmingly in one direction or another, the Court can decide as a matter of law whether there exists a likelihood of confusion.  See 304 F.3d at 972 ("[L]ikelihood of confusion is a question of fact but one amenable to summary judgment in appropriate cases.").

**B.   FACTUAL ISSUES EXIST WHETHER THERE IS A LIKELIHOOD OF CONFUSION BETWEEN THE DEFENDANTS' MARK AND GUIDANCE'S MARKETING MATERIALS.**

Guidance asserts that almost all of the articulated factors that might show a likelihood of confusion weigh in its favor.  See Motion at 25.  The Defendants argue that at least four, and possibly all six of the factors weigh in their favor.  See Response at 16.  The Court believes that, based on the evidence in the summary judgment record, the factors weigh in favor of Guidance. Nevertheless, the factors do not weigh so heavily in Guidance's favor that the Court should take this issue from the jury.  The Court will thus deny the motion with respect to the Defendants' claim of trademark infringement under the Lanham Act.

**1.   Similarity of Marks: the Marks Are Not So Clearly Similar that the Court Should Take the Question from the Jury.**

The first element to consider is the degree of similarity between the marks.  That element "rests on sight, sound, and meaning." and the Court "must determine whether the allegedly infringing mark will confuse the public when singly presented, rather than when presented side by side with the protected trademark."  Sally Beauty Co. v. Beautyco, Inc., 304 F.3d at 972.  When doing so, a court is to weigh the similarities more heavily than the differences, "particularly when the competing marks are used in virtually identical products packaged in a similar manner."  Id.  In this case, the parties dispute the similarity between the Defendants' mark, "Thermafil," and Guidance's use of the phrases "Thermal Filling Obturator" and "OneFill Thermal Filling Obturator" in its advertising materials.

The Court first notes that a jury should determine this factual issue unless the answer is so clear that the Court can determine it as a matter of law.  See Sally Beauty Co. v. Beautyco, Inc., 304 F.3d at 972 ("In this circuit, likelihood of confusion is a question of fact but one amenable to

summary judgment in appropriate cases."). Furthermore, because the analysis involves three aspects -- sight, sound, and meaning of the marks, each of which is closely related to experiencing the mark in use -- the Court believes that disposition of the issue on summary judgment should be done sparingly. See id. In this case, the marks have some substantial differences. Thermafil is a single word, whereas Guidance's phrases have three and four words, respectively. The difference in number of words and syllables leads to a difference in how Thermafil sounds in relation to Guidance's phrases. On the other hand, there is substantial overlap between the two, and the Tenth Circuit has commented that "similarities are to be weighed more heavily than differences, particularly when the competing marks are used in virtually identical products packaged in a similar manner." Sally Beauty Co. v. Beautyco, Inc., 304 F.3d at 972. The similarities are readily apparent: "OneFill Thermal Filling Obturator" and "Thermal Filling Obturator." This element is not a slam dunk for either party, and thus the Court is inclined to let the jury decide this issue.

The Court finds much of the authority cited by the parties for this issue to be unhelpful and leads the Court to the conclusion that this is a fact-intensive analysis that must be done on a case-by-case basis. For instance, the most closely analogous cases seem to be Medi-Flex, Inc. v. Nice-Pak Products, Inc., 422 F. Supp. 2d 1242 (D. Kan. 2006), and Sally Beauty Co. v. Beautyco, Inc., 304 F.3d 964 (10th Cir. 2002). In Medi-Flex, Inc. v. Nice-Pak Products, Inc. the United States District Court for the District of Kansas noted that, in terms of sight and sound, the words "chloraprep" and "chlorascrub" looked and sounded largely similar, and, to an extent, had similar meanings. See 422 F. Supp. 2d at 1249-50. On the other hand, there were distinctions between the two products; they had dissimilar packaging, and there were distinctions in the meaning and sound of their names. See id. Sally Beauty Co. v. Beautyco, Inc. is similar. In it, the Tenth Circuit found that the marks "Generic Value Products" and "GENERIX" were not similar, based primarily on the fact that

differences in the number of words and the sound of the phrases.  304 F.3d 972-73.  The Court notes

that, in its view, "GENERIX" and "Generic Value Products" are more dissimilar than "Thermafil"

and "Thermal Filling Obturator."   The visual difference between the former two is more

pronounced, given that "GENERIX" is expressed entirely in capital letters.  Also, the sound of

"Thermafil" is more similar to "Thermal Filling Obturator" than "GENERIX" is to "Generic Value

Products" because the one word, "Thermafil," pulls sounds from the first two words of "Thermal

Filling Obturator."  Finally, the summary judgment record does not give the Court a firm foundation

for deciding all the similarities and dissimilarities.  The Court is not prepared to hold, as a matter

of law, that "Thermafil" and "Thermal Filling Obturator" are not similar.

### 2.      The Remaining Factors Are Not So Overwhelming that the Court Should Decide Likelihood of Confusion as a Matter of Law.

The remaining elements are no more decisive than the first.  Guidance argues that the Goodis

did not intend to copy the Defendants' "Thermafil" mark when he began referring to OneFill as a

"Thermal Filling Obturator," and thus that this factor weighs in its favor.  See Motion at 22-23.  The

Defendants allege the opposite, pointing to various circumstantial evidence of Goodis' intent, and

argue that the factor weighs in their favor.  See Response at 17-18.  Guidance argues that the lack

of evidence of actual confusion weighs in favor of finding a likelihood of confusion.  See Motion

at 19-20.  The Defendants again point to circumstantial evidence of "G/G's deceptive commercial

practice, which permits a presumption of actual confusion," and asserts that this factor weighs in

their favor.  Response at 18-19.  Guidance and the Defendants agree that the relation of the goods

and the competition between the parties weigh in favor of finding a likelihood of confusion.  See

Motion at 24; Response at 19.  Guidance argues that the degree-of-care-used-by-consumers factor

weighs in its favor, because the consumers of these products are trained professionals who "are not

easily confused."  Motion at 24-25.  The Defendants do not directly contest this alleged fact, but suggest a contradiction between this argument and Guidance's damages theory.  See Response at 19.

The Court cannot conclude as a matter of law that there is no likelihood of confusion between the Defendants' mark "Thermafil" and the statements in Guidance's marketing materials, referring to OneFill as a "Thermal Filling Obturator."  Some factors appear to weigh in Guidance's favor -- and the Defendants concede one of them -- but the factors are not so overwhelming that the Court is comfortable taking the question from the jury.  See Sally Beauty Co. v. Beautyco, Inc., 304 F.3d at 972.  The Court will therefore deny the motion with respect to the Defendants' claim under 15 U.S.C. § 1114(1).

## V.   THE DEFENDANTS HAVE SHOWN A FACTUAL ISSUE REGARDING THEIR CLAIM FOR UNFAIR COMPETITION (COUNT VI).

In Count VI, the Defendants contend that the "wrongful acts described in Counts III [Lanham Act Section 43(a)], IV [withdrawn Lanham Act claim], and V [15 U.S.C. § 1114(1)] constitute common law unfair competition to the damage of Dentsply/TDP."  Counterclaims at 11.  In other words, the Defendants assert that Guidance committed common-law unfair competition through three categories of conduct: (i) it used the phrases "Thermal Filling Obturator" and "OneFill Thermal Filling Obturator," and thereby infringed on the Defendants' trademark, "Thermafil;" (ii) Guidance's use of the term "Thermal Filling Obturator" diluted the Defendants' "Thermafil" mark; and (iii) it made false or misleading statements in advertising.  With respect to these claims, Guidance relies primarily upon its arguments against Counts III, IV, and V.  See Motion at 25-26. It argues first that this Count is duplicative of Counts III, IV, and V, and that the Court should dismiss Count VI on that basis.  Guidance then argues that the Court should dismiss Count VI

because it should grant summary judgment as to Counts III, IV, and V, and the same arguments apply to this claim.  See Motion at 25-26.

The Defendants respond first that merely being duplicative of its asserted Lanham Act causes of action is not a reason to dismiss a claim, as multiple claims can be pled in the alternative.  See Response at 22.  Further, they argue, the same set of facts can support multiple claims, and therefore that Counts III, IV, V, and VI rest on the same factual allegations is not problematic.  See Response at 23.  Finally, they assert that the claim is not duplicative at all, because common-law unfair competition is more broad and covers a wider range of wrongful conduct than the Lanham Act.  See Response at 23.

### A.    LAW ON COMMON-LAW UNFAIR COMPETITION.

The common law of unfair competition does not prohibit one market participant from attempting to divert customers from his competitors, or even divert customers from one competitor in particular.   Common-law unfair competition bars only particular methods of competing, specifically: (i) deceptive marketing or false advertising; (ii) trademark infringement; (iii) misappropriation of the trade values of another; or (iv) conduct otherwise "determined to be actionable as an unfair method of competition."  Restatement (Third) of Unfair Competition § 1 & cmt. a (1995).  At issue in this case are categories (i), (ii), and (iii) -- false advertising, trademark infringement, and misappropriation of trade values.  There is some doubt whether any of the grounds for the Defendants' unfair competition claim are valid, given the pervasive statutory schemes that the New Mexico Legislature has established to deal with the same conduct, and the lack of substantial case-law guidance from New Mexico courts.

There appears to be only one New Mexico case citing to the Restatement (Third) of Unfair Competition, and that case cites it for a method of unfair competition that the Defendants do not

bring.  See Pincheira v. Allstate, 144 N.M. 601, 613, 190 P.3d 322, 334 (2008)(citing and adopting

portions of the Restatement (Third) of Unfair Competition dealing with trade secrets).  Nevertheless,

the Defendants argue that, in the absence of New Mexico case law to the contrary, this Restatement

is the law that the Court should apply.  See Response at 23 ("The full scope of a claim for common

law unfair competition can best be found by reference to the Restatement (Third) of Unfair

Competition, approved of and relied on for guidance by the New Mexico Supreme Court in, for

example, Pincheira v. Allstate . . . .").

### 1.    **Common-Law False Advertising**.

The Introductory Note to Chapter 2 of the Restatement (Third) of Unfair Competition

explains "This Chapter [2] addresses the rules governing liability for injury to the commercial

interests of competitors and others arising from . . . representations falsely describing the qualities

or characteristics of a seller's goods or services, often referred to as 'false advertising.'"

Restatement (Third) of Unfair Competition Introductory Note to Ch. 2.  Section 2 sets forth the

general principal:

> One who, in connection with the marketing of goods or services, makes a
> representation relating to the actor's own goods, services, or commercial activities
> that is likely to deceive or mislead prospective purchasers to the likely commercial
> detriment of another under the rule stated in § 3 is subject to liability to the other for
> the relief appropriate under the rules stated in §§ 35-37.

Restatement (Third) of Unfair Competition § 2.

> A representation is to the likely commercial detriment of another if: (a) the
> representation is material, in that it is likely to affect the conduct of prospective
> purchasers; and (b) there is a reasonable basis for believing that the representation
> has caused or is likely to cause a diversion of trade from the other or harm to the
> other's reputation or good will.

Id. § 3.

2.      **Common-Law Trademark Infringement.**

New Mexico has passed a Trademark Act.  See NMSA 1978, §§ 57-3B-1 to 57-3B-17.

Section 2 of the Trademark Act states that it is intended "to provide a system of state trademark

registration and protection substantially consistent with the federal system . . . under the Trademark

Act of 1946."  NMSA 1978, § 57-B3-2.  While the Court has found no New Mexico case law

addressing the issue, it appears that the New Mexico Legislature has determined to extinguish the

common-law cause of action for trademark infringement, if indeed New Mexico has ever adopted

it.  Before 1997, the New Mexico Trademark Act included a provision that explicitly "preserve[d]

the common law rights to trademarks acquired in good faith at any time."  See S & S Invs., Inc. v.

Hooper Enters., Ltd., 116 N.M. 393, 395, 862 P.2d 1252, 1254 (Ct. App. 1993)(citing NMSA 1989,

§ 57-3-12).  In 1997, the New Mexico Legislature repealed most of Article 3 of Chapter 57, and

recodified much of it into Article 3B.  Article 3B lacks any provision expressly retaining common-

law trademark rights.  It is thus likely that trademark infringement claims must be based on

trademarks recognized under federal trademark law or the New Mexico Trademark Act.  To the

extent that such a claim exists, however, it is likely to have the same elements as a claim of

trademark infringement under the Lanham Act.  See Utah Lighthouse Ministry v. Found. for

Apologetic Info. & Research, 527 F.3d 1045, 1049-50 (10th Cir. 2008)("Trademark infringement

is a type of unfair competition; the two claims have virtually identical elements and are properly

addressed together"); NMSA 1978, § 57-3B-2 ("The purpose of the Trademark Act is to provide a

system of state trademark registration and protection substantially consistent with the federal system

[and] the construction given the federal act should be examined as persuasive authority for

interpreting and construing the Trademark Act.").

3.     **Common-Law Trademark Dilution**.

The Restatement says the following about the cause of action for common-law trademark

dilution:

> (1) One may be subject to liability under the law of trademarks for the use of a
> designation that resembles the trademark, trade name, collective mark, or
> certification mark of another without proof of a likelihood of confusion only under
> an applicable antidilution statute.   An actor is subject to liability under an
> antidilution statute if the actor uses such a designation in a manner that is likely to
> associate the other's mark with the goods, services, or business of the actor and:
>
>> (a) the other's mark is highly distinctive and the association of the mark with
>> the actor's goods, services, or business is likely to cause a reduction in that
>> distinctiveness; or
>>
>> (b) the association of the other's mark with the actor's goods, services, or
>> business, or the nature of the actor's use, is likely to disparage the other's
>> goods, services, or business or tarnish the images associated with the other's
>> mark.

Restatement (Third) of Unfair Competition § 25.   The New Mexico Trademark Act discusses

dilution in one section:

> A.  The owner of a mark that is famous in this state shall be entitled, subject to the
> principles of equity, to an injunction against another's use of a mark, commencing
> after the owner's mark becomes famous, that causes dilution of the distinctive
> quality of the owner's mark and to obtain other relief as is provided in this section.
> In determining whether a mark is famous a court may consider factors such as, but
> not limited to:
>
>> (1) the degree of inherent or acquired distinctiveness of the mark in this state;
>>
>> (2) the duration and extent of use of the mark in connection with the goods
>> and services;
>>
>> (3) the duration and extent of advertising and publicity of the mark in this
>> state;
>>
>> (4) the geographical extent of the trading area in which the mark is used;
>>
>> (5) the channels of trade for the goods or services with which the owner's
>> mark is used;

-62-

> (6) the degree of recognition of the owner's mark in its trading area and in
> the other's trading area, and in the channels of trade in this state; and
>
> (7) the nature and extent of use of the same or similar mark by third parties.
>
> B.  The owner shall be entitled only to injunctive relief in this state in an action
> brought under this section, unless the subsequent user willfully intended to trade on
> the owner's reputation or to cause dilution of the owner's mark. If willful intent is
> proven, the owner shall also be entitled to the remedies set forth in the Trademark
> Act, subject to the discretion of the court and the principles of equity.

NMSA 1978, § 57-3B-15 (titled "Injury to business reputation; dilution").  The only case to discuss

this provision in any depth is Jordache Enterprises, Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482 (10th

Cir. 1987), and it was dealing with the pre-1997-recodification statute.[21]  It found that there were

three grounds upon which dilution could be found: "(1) injury to the value of the mark caused by

actual or potential confusion, (2) dimunition [sic] in the uniqueness and individuality of the mark,

or (3) injury resulting from use of the mark in a manner that tarnishes or appropriates the goodwill

and reputation associated with plaintiff's mark."  Jordache Enters., Inc. v. Hogg Wyld, Ltd., 828

F.2d at 1489 (quoting L.L. Bean, Inc. v. Drake Publishers, Inc., 811 F.2d 26, 30 (1st Cir. 1987)).

### B.  THE DEFENDANTS' UNFAIR-COMPETITION CLAIM BASED ON FALSE ADVERTISING WILL SURVIVE SUMMARY JUDGMENT.

The Defendants rely wholly on the facts alleged in their Lanham Act false advertising claim

to support a claim of false advertising under common law.  See Counterclaims ¶¶ 63-64, at 11.

Guidance argues that this claim, and the unfair competition claims based on trademark infringement

and trademark dilution, are duplicative of Counts III, IV, and V of the Counterclaims.  See Motion

at 25.  It also argues that, because the Court should grant summary judgment on Counts III, IV, and

---

[21] Enterprise Rent-A-Car Co. v. Advantage Rent-A-Car, Inc., 330 F.3d 1333, 1340 (Fed. Cir. 2003), and Advantage Rent-A-Car, Inc. v. Enterprise Rent-A-Car, Co., 238 F.3d 378, 380 (5th Cir. 2001), also  cite to the New Mexico anti-dilution statute, but do not provide any substantial analysis.

-63-

V, the Court should also grant summary judgment on Count VI.  See Motion at 25-26; Reply at 14-15.[22]  The Defendants argue that these claims can be pled in the alternative, and that the common-law tort of unfair competition covers a wider range of conduct, thus making the claims distinct.  See Response at 22-23.

There is essentially no case law in New Mexico that sets forth the parameters of a common-law claim of false advertising.  The Court thus relies on the Restatement (Third) of Unfair Competition.  It says that false advertising occurs when one, "in connection with the marketing of goods or services, makes a representation relating to the actor's own goods . . . that is likely to deceive or mislead prospective purchasers to the likely commercial detriment of another . . . ."  Id. § 2.

> A representation is to the likely commercial detriment of another if: (a) the representation is material, in that it is likely to affect the conduct of prospective purchasers; and (b) there is a reasonable basis for believing that the representation has caused or is likely to cause a diversion of trade from the other or harm to the other's reputation or good will."

Id. § 3.

Guidance attacks this claim on two bases: that the representations are non-factual "puffing" and that the Defendants have no evidence of actual confusion.  See Motion at 12-17 (arguments related to the Defendants' Lanham Act claim).  The Court has concluded that two of the statements are not puffery, and that the Court will not grant summary judgment on that basis.  Furthermore, Guidance has not provided the Court with authority stating that, under the common law, evidence

---

[22] Guidance recognizes the similarity between unfair-competition claims under the common law and Lanham Act claims.  See Response at 25 ("As a general rule, the same facts which support a claim for trademark infringement or common law unfair competition will support an action under Section 43(a) of the Lanham Act.")(quoting King-Size, Inc. v. Frank's King Size Clothes, Inc., 547 F. Supp. 1138, 1163 (S.D. Tex. 1982), and citing Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research, 527 F.3d at 1050).

of actual confusion is necessary when the claimant's theory is based on literal falsity.  The language

of the <u>Restatement (Third) of Unfair Competition</u> does not appear to contain such a requirement,

as it requires only that the representations be "likely to deceive or mislead prospective purchasers."

<u>Id.</u> § 2.  Because the Court has denied the motion as to the Defendants' counterclaim for false

advertising under the Lanham Act, and it appears that the law of false advertising under New

Mexico common law would be the same, the Court will likewise deny Guidance's motion as to this

aspect of the Defendants' unfair competition counterclaim.  <u>See</u> <u>Zoller Labs., LLC. v. NBTY, Inc.</u>,

111 Fed. Appx. at 982 (stating that, if the statement is proved to be literally false, "a [false

advertising] violation may be established without evidence of consumer deception.")(quoting <u>Scotts</u>

<u>Co. v. United Indus. Corp.</u>, 315 F.3d at 272).

### C.   THE DEFENDANTS' UNFAIR-COMPETITION CLAIM BASED ON TRADEMARK INFRINGEMENT WILL SURVIVE.

The second aspect of the Defendants' unfair-competition claim is based on the common-law

concept of trademark infringement.  The Court interprets this part of the Defendants' Count VI as

a claim under the New Mexico Trademark Act, because it is uncertain whether a true common-law

claim of trademark infringement still exists in New Mexico, and, if it does, it is likely that it would

have the same elements as a claim of trademark infringement under the New Mexico Trademark

Act.  To the extent that this Count is a common-law claim, and such a claim exists, the Tenth Circuit

has recognized that a common-law unfair-competition claim for trademark infringement and a claim

for violation of Section 43(a) of the Lanham Act have essentially the same elements and should be

analyzed together when entertaining a motion for summary judgment.  <u>See</u> <u>Utah Lighthouse</u>

<u>Ministry v. Found. for Apologetic Info. & Research</u>, 527 F.3d at 1050.  Because the Court has held

that the Lanham Act claim for trademark infringement will proceed to trial, the Court holds the same

for the common-law trademark-infringement claim.  Furthermore, to the extent that the claim is one

for statutory trademark infringement under the New Mexico Trademark Act, the Court finds that the

elements of such a claim would be identical to a claim of trademark infringement under the Lanham

Act.  See NMSA 1978, § 57-3B-2.  The Court therefore denies Guidance's motion for summary

judgment as to the trademark-infringement aspect of the unfair-competition counterclaim.

### D.   THE COURT WILL GRANT GUIDANCE'S MOTION AS TO THE DEFENDANTS' UNFAIR-COMPETITION CLAIM BASED ON TRADEMARK DILUTION.

Guidance's only argument supporting summary judgment on this claim is the argument that

it initially asserted against the Defendants' dilution claim under the federal law: that the mark

allegedly diluted is not sufficiently "famous," as the statute defines that term.  See Motion at 17-18.

The Defendants essentially conceded that point by withdrawing their federal trademark-dilution

claim.  See Response at 16, 23-24 n.4 ("Dentsply/TDP have withdrawn their claim for dilution under

the Lanham Act in recognition of the fact that their marks may not be 'famous' outside the dental

community.").  The Defendants did not withdraw the trademark-dilution aspect of their unfair-

competition claim.   See id. at 23-24 n.4. ("Dentsply/TDP are still entitled to common law

compensation for dilution of their marks by G/G in the dental community.").  Ultimately, the Court

grants the motion as to this aspect of the unfair-competition claim.

Because New Mexico courts tend to follow Restatement law when dealing with issues of first

impression, and in the absence of any state law on the subject, the Court concludes that the Supreme

Court of New Mexico would likely follow the Restatement's view on common-law claims of

trademark dilution.  See, e.g., State v. Santiago, 147 N.M. 76, 217 P.3d 89, 97 n.3 (2009)(citing the

Restatement (Second) of Torts); Pincheira v. Allstate Ins. Co., 144 N.M. at 613, 190 P.3d at 334

(citing the Restatement (Third) of Unfair Competition); Crespin v. Albuquerque Baseball Club,

LLC, 147 N.M. 62, 216 P.3d 827, 834 (Ct. App. 2009)(citing the Restatement (Third) of Torts and

the Restatement (Second) of Torts); Sandoval v. Baker Hughes Oilfield Operations, Inc., 146 N.M.

853, 215 P.3d 791, 810 (Ct. App. 2009)(citing the Restatement (First) of Torts); Martin v. Franklin

Capital Corp., 145 N.M. 179, 183, 195 P.3d 24, 28 (Ct. App. 2008)("The Restatement (Second) of

Torts supports our view."); New Mexico ex rel. Hanosh v. N.M. Envtl. Improvement Bd., 145 N.M.

269, 271, 196 P.3d 970, 972 (Ct. App. 2008)(citing the Restatement (Second) of Judgments).  The

Restatement's view is that such claims exist if there is an applicable anti-dilution statute.  See

Restatement (Third) of Unfair Competition § 25.  New Mexico has such a statute.  See NMSA 1978,

§ 57-3B-15.  That statute also requires that the trademark at issue be "famous."  Id. ("The owner of

a mark that is famous in this state shall be entitled . . . .").  The standards for famousness are

somewhat different under New Mexico, as opposed to federal, law, compare NMSA 1978, § 57-3B-

15A with 15 U.S.C. § 1125(c), but the differences do not change the outcome in this case.

     The Defendants fail to direct the Court to any evidence of the fame of the Thermafil mark.

In fact, they do not cite to a single exhibit in that portion of their response brief.  The Court has also

examined all of the exhibits provided, and found that none of them draw a link between the

Thermafil mark and the New Mexico endodontic market.  Such a link between the mark and the

State seems essential to establish that the mark is famous for purposes of the New Mexico anti-

dilution statute.  See NMSA 1978, § 57-3B-15A ("The owner of a mark that is famous in this state

. . . .");  id. § 57-3B-15A(1)-(7).[23]  Furthermore, there is no indication that the New Mexico statute,

which is to be interpreted with reference to federal law on the topic, see NMSA 1978, § 57-3B-2,

---

[23] The best evidence that the Court has provided is a snippet of deposition testimony from
Rittenberry wherein he agrees that "Thermafil is a recognized name in the endodontic industry" and
states that "Endodontists in the United States know Thermafil as Ben Johnson's lotto ticket."
Response Exhibit Q, p. 2.

would allow "fame" to be assessed only with respect to the market within which the product is sold. The Defendants concede that the Thermafil mark is not famous outside of that market and implicitly concede that federal law requires fame outside that market.  See Response at 23-24 n.4.  With no evidence of the fame of the Thermafil mark in New Mexico, no argument why Thermafil would be considered famous under New Mexico law, and concessions that Thermafil is not famous outside the endodontic marketplace and that federal law requires such fame, the Court will dismiss the Defendants' unfair-competition claim based on trademark dilution.  The Court therefore will grant Guidance's motion as to this theory of the Defendants' unfair-competition counterclaim.

## VI.   THE DEFENDANTS HAVE NO STANDING TO ASSERT THEIR NEW MEXICO UPA CLAIM (COUNT VII).

Count VII of the Defendants' Counterclaims alleges that Guidance has violated the New Mexico UPA.  See Counterclaims at 11.  They specifically allege that the acts described in Counts III, IV, and V are a violation of Section 57-12-3.  See Counterclaims ¶¶ 66-68, at 11.  Guidance contends that the Defendants do not have standing to assert a cause of action under the New Mexico UPA.  See Motion at 26.  It argues that the UPA protects "consumers" -- i.e. one who seeks or acquires goods or services -- and that the Defendants were sellers, not consumers.  Motion at 26. Guidance therefore asks the Court to dismiss this claim because of the Defendants' lack of standing as a consumer.  See Motion at 27.  The Defendants respond that their New Mexico UPA claim is not based upon the sales occurring under the Supply Agreement, wherein the Defendants are sellers; rather, the claim is "for [Guidance's] misconduct in selling products to the endodontic public." Response at 24 (emphasis in original).  The Defendants appear to argue that they can bring the claim on behalf of Guidance's customers.  See Response at 24-25.

## A.      LAW OF STANDING UNDER THE NEW MEXICO UPA.

The New Mexico UPA prohibits "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce."  NMSA 1978, § 57-12-3.  The UPA provisions that creates a private right of action are Section 57-12-10A and -10B, which state:

> A.      A person likely to be damaged by an unfair or deceptive trade practice or by an unconscionable trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable. . . .
>
> B.      Any person who suffers any loss of money or property, real or personal, as a result of any employment by another person of a method, act or practice declared unlawful by the Unfair Practices Act may bring an action to recover actual damages or the sum of one hundred dollars ($100), whichever is greater. . . .

NMSA 1978, § 57-12-10B.[24]  This provision makes no distinction between whether the plaintiff is a buyer or seller of goods.  The definition of an unfair or deceptive trade practice, however, makes such a distinction.  Under Section 57-12-2D, an unfair or deceptive trade practice is "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made <u>in connection with the sale, lease, rental or loan of goods or services</u> . . . that may, tends to or does deceive or mislead any person . . . ."  NMSA 1978, § 57-12-2.

<u>Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.</u> 137 N.M. 524, 113 P.3d 347 (Ct. App. 2005), appears to be the only New Mexico case discussing the issue who has standing to bring a claim under the New Mexico UPA.  In that case, Santa Fe Custom Shutters ("SFCS") entered into an agreement with Home Depot, whereby SFCS would supply shutters to Home Depot and Home Depot would endeavor to market those shutters to its customers.  <u>See</u> 137 N.M. at 527, 113 P.3d at 350.  A representative of Home Depot made several statements to SFCS that caused

---

[24] NMSA 1978, § 57-12-8A also creates a right of action, but that Section refers to the attorney general's right to bring claims of violation of the Unfair Practices Act.

SFCS to invest large amounts of money in increasing its production and storage capacity. See id. In the end, "[t]he relationship between SFCS and Home Depot soured," and Home Depot severed the relationship with SFCS. See 137 N.M. at 528, 113 P.3d at 351. SFCS sued Home Depot on multiple bases, one of which was the New Mexico UPA. See 137 N.M. at 528, 113 P.3d at 351.

The trial in Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc. court found Home Depot liable under four alternative theories, one of which was the UPA. See id. Both parties appealed. See id. Home Depot's argument against liability under the New Mexico UPA was that SFCS had no standing to bring claims under the UPA because it was not a "consumer." 137 N.M. at 529, 113 P.3d at 352. The Court of Appeals of New Mexico agreed. See 137 N.M. at 529-30, 113 P.3d at 352-53.

The New Mexico Court of Appeals in Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc. noted that "the legislature has not chosen to treat sellers and buyers identically under the UPA." 137 N.M. at 530, 113 P.3d at 353. Thus, "the UPA gives standing only to buyers of goods and services." Id. The Court of Appeals rejected SFCS' argument that SFCS's standing was based on a purchase of services from Home Depot -- namely, the service of marketing SFCS's shutters to Home Depot customers.

> We have not found any case treating the activities of a buyer of goods or services in promoting sales to its own customers of purchased goods or services as a separate sale of marketing services to the manufacturer or supplier of the goods or services. We hold that Home Depot's activities in marketing SFCS's shutters and installation services to Home Depot's own customers was not a sale of marketing services to SFCS for purposes of Section 57-12-2(D); with respect to SFCS-Home Depot transactions, SFCS was a seller of goods and services, not a buyer. As a seller of goods and services, SFCS lacks standing to bring a UPA claim against Home Depot.

137 N.M. at 530, 113 P.3d at 353.

The Court has addressed a similar issue in an unrelated context in Pedroza v. Lomas Auto

-70-

Mall, Inc., 663 F. Supp. 2d 1123 (D.N.M. 2009)(Browning, J.), and reached a seemingly contrary result.  In that case, the issue was whether a plaintiff asserting a New Mexico UPA claim must prove that the defendant's UPA violation caused it actual damages, or whether proof of the violation alone was enough.  See Pedroza v. Lomas Auto Mall, Inc., 663 F. Supp. 2d at 1126.  The jury had answered "Yes" to the question whether a violation occurred, but "No" to the question whether the violation caused damages to the Plaintiff.  Id.  Interpreting the law of the Supreme Court of New Mexico, the Court held that, even where a jury concludes that the UPA violation did not cause damages to the plaintiff, that the plaintiff is nevertheless entitled to receive the statutory minimum damages of $100.00.  See id. at 1135-36.  In response to the argument that such a rule would allow anyone to sue under the New Mexico UPA, the Court stated:

> [T]he Court [does not] see Page & Wirtz Construction Co. v. Solomon[, 110 N.M. 206, 794 P.2d 349 (1990),] as creating a standing problem that allows anyone to sue and receive damages for a UPA violation unconnected to them.  In federal court, Article III standing will serve to restrict such lawsuits.  To the extent that Page & Wirtz Construction Co. v. Solomon creates such a problem in state court, that is beyond the Court's power to correct.

Pedroza v. Lomas Auto Mall, Inc., 663 F. Supp. 2d at 1136.  Thus, one could interpret Pedroza v. Lomas Auto Mall, Inc. as identifying a rule of New Mexico law that, as long as a plaintiff can establish Article III standing in federal court, the plaintiff may bring a New Mexico UPA claim.

### B.   THE DEFENDANTS DO NOT HAVE STANDING TO ASSERT A DAMAGES CLAIM UNDER THE NEW MEXICO UPA, BUT COULD ASSERT A CLAIM FOR INJUNCTIVE RELIEF.

In this case, Guidance insists that the Defendants lack statutory standing to bring a claim under the New Mexico UPA.  The Court agrees.  The Court finds persuasive the statutory construction analysis of Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc., and finds that a UPA claim may only be based on unfair practices in connection with the sale of goods

-71-

or services -- thus that it must be brought by a purchaser, not a seller.  See 137 N.M. at 530, 113 P.3d at 352 ("If the legislature had defined an unfair or deceptive trade practice in terms of misrepresentations made in connection with the sale *or purchase* of goods or services, we might be inclined to recognize a claim against Home Depot as a buyer of goods and services.")(emphasis in original).  A review of the specific instances of conduct that the New Mexico UPA explicitly includes as unlawful shows that they are largely conduct in which only a seller could reasonably engage.  See NMSA 1978, §§ 57-12-2D(1) through 57-12-2D(18)(explicitly declaring unlawful conduct such as, inter alia, making representations about the goods or services involved in the transaction or offering goods or services without intent to supply them).  Furthermore, the very nature of the legislation at issue, to protect consumers, implies that only a consumer should be able to take advantage of its protections.  This holding is consistent with the Court's prior ruling in Pedroza v. Lomas Auto Mall, Inc., because the plaintiff in that case was a purchaser, who could have standing under Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A, Inc., even if he could not prove causation or actual damages.  In sum, to bring a claim under the New Mexico UPA, one must be a buyer of goods or services.[25]

This case is nearly analogous to the situation Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc. placed before the New Mexico Court of Appeals.  The plaintiff, SFCS, sued the entity to which it was supplying its product -- Home Depot.  Here, the claimants, Dentsply and TDP, are suing the entity to which it was supplying its product -- Guidance.  Arguably, this case begs for a finding of no standing even more than did Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.  In this case, Guidance had no concomitant service obligation to the

---

[25] The claimant could also be a lessee, renter, or borrower, as described in NMSA 1978, § 57-12-2D.

Defendants, other than to purchase the products, whereas Home Depot was arguably obligated to

provide a service to SFCS by marketing the SFCS shutters.[26]  The Defendants present no authority

for their argument that they can assert New Mexico UPA claims against Guidance for Guidance's

representations to Guidance's customers.  As such, the Court finds that the Defendants do not have

standing to assert a claim under the New Mexico UPA.  As such, the Court will grant Guidance's

motion for summary judgment as to Count VII.[27]

## VII.   THE DEFENDANTS HAVE DEMONSTRATED A FACTUAL ISSUE REGARDING THEIR CLAIM FOR MISAPPROPRIATION OF REPUTATION, GOODWILL, INTANGIBLE TRADE VALUES, AND STANDING IN THE DENTAL COMMUNITY.

The Defendants allege in Count VIII of their Counterclaims that Guidance's conduct has

"unlawfully traded off and misappropriated [the Defendants'] reputation, goodwill, intangible trade

values, and standing in the dental community."  Counterclaims at 12.  Guidance asks the Court to

dismiss this claim because it is not a valid cause of action in New Mexico.  See Motion at 27.  The

Defendants assert that unlawful misappropriation is a valid cause of action in New Mexico because

it is derivative of the torts of common-law unfair competition and tortious invasion of privacy, both

of which are valid causes of action in New Mexico.  See Response at 25.

---

[26] The posture of the cases appears, at first glance, to be reversed.  Guidance and SFCS are both small, local companies whereas Dentsply/TDP and Home Depot are large, national corporations.  In Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc., however, the larger, national company is buying products from the smaller, local company, whereas in this case, the small, local company is buying products from the larger, national company.

[27] This ruling is different from the inclination that the Court gave the parties after the hearing on this motion.  This inconsistency is insignificant because the Court nevertheless concluded, on other grounds, prior to charging the jury and sending them back to deliberate, that the Defendants could not assert a claim under the New Mexico UPA.  This is therefore a harmless error because, for a different reason, the jury was never asked whether Guidance violated the New Mexico UPA.

**A.      NEW MEXICO WOULD USE THE RESTATEMENT LAW OF UNLAWFUL MISAPPROPRIATION.**

There appears to be no case law on the tort of unlawful misappropriation in New Mexico. Guidance has not, however, provided authority that such a claim does not exist in New Mexico. The Court is not willing to assume that the Supreme Court of New Mexico, if faced with a plaintiff asserting the unlawful misappropriation tort, would declare that there is no such cause of action. New Mexico generally follows the American Law Institute's Restatements of the Law. The Restatement (Third) of Unfair Competition says the following about unlawful misappropriation:

> One who causes harm to the commercial relations of another by appropriating the other's intangible trade values is subject to liability to the other for such harm only if:
>
> > * * *
>
> > (b) the actor is subject to liability for an appropriation of the commercial value of the other's identity under the rules stated in §§ 46-49; or
>
> > (c) the appropriation . . . is actionable as a breach of contract, or as an infringement of common law copyright as preserved under federal copyright law.

Restatement (Third) of Unfair Competition § 38. Section 46, to which Section 38(b) refers, states: "One who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade is subject to liability . . . ." Restatement (Third) of Unfair Competition § 46. "Proof of deception or consumer confusion is not required for the imposition of liability under this Section." Id. cmt. b.

**B.      DEFENDANTS HAVE SHOWN A GENUINE ISSUE OF FACT WITH REGARD TO UNLAWFUL MISAPPROPRIATION.**

The Court concludes that the Supreme Court of New Mexico would likely recognize the tort of unlawful misappropriation, even though no case law that the Court has found has mentioned it.

-74-

Although Guidance does not address whether the Defendants have provided evidence of each of the tort's elements, the Court concludes that they have.

The Defendants accuse Guidance of telling its customers that Guidance products are repackaged Dentsply/TDP products. See Counterclaims ¶¶ 27, 32, at 6-7 ("Guidance and Goodis . . . [told] potential customers and existing customers that Dentsply/TDP made the Products and that the Products were the same as Dentsply/TDP's products, and [] market[ed], promot[ed], and [sold] the Products for use with systems offered for sale by TDP."). The Defendants have provided some evidence to this effect. Mosch testified:

> Not only have they not taken reasonable efforts [to avoid disclosing the terms of the Supply Agreement], but they have overtly gone to their customers and misappropriated the image of Dentsply and told customers that these products are manufactured by Dentsply. So again, we can't talk about the obscurity, but the reality is, they took no -- they took the opposite of reasonable efforts on the confidentiality agreement, and disclosed this.
>
> * * * *
>
> Dentsply is an excellent company. We are the largest dental manufacturer in the world. We have tremendous reputation with our customers. No company has a broader product line. We have an extraordinary quality image in the marketplace. We are an innovator. We do more clinical education than any company. We provide more free product and support to dental schools and dental organizations. We do a tremendous amount of charitable giving. We have a tremendous reputation as a quality manufacturer.
>
> And essentially what Guidance tried to do was misappropriate that as well as our brand standing in the marketplace for free. And they did not pay for that right in the agreement. . . .

Response Exhibit F (testimony of James Mosch) at 20:12-22:2 (Mosch). This testimony, if believed, establishes that Guidance, "without consent," used the Defendants' name "for purposes of trade." Restatement (Third) of Unfair Competition § 46. Mosch also testified that such misappropriation "causes harm to the commercial relations" of the Defendants. Response Exhibit F at 22:14-23:10,

24:7-27:1 (Gulley, Mosch).  This testimony, while the minimum that the Defendants could have produced to achieve this result, shows genuine factual issues that preclude summary judgment.

## VIII.   THE DEFENDANTS HAVE POINTED TO A FACTUAL ISSUE REGARDING THEIR FRAUD (COUNT X) AND RESCISSION (COUNT XIII) CLAIMS.

Counterclaim Count X accuses Guidance of fraudulent inducement to contract, and Count XIII asks the Court to grant the Defendants rescission based on that fraudulent inducement.  See Counterclaims at 13-14.[28]  Guidance seeks summary judgment as to the Defendants' fraud and rescission claims on four grounds.  First, that the integration clause, Section 12.8 of the Supply Agreement, bars them.  Guidance asserts that, under Delaware law, when a contract has a clause stating that the parties did not rely on any extrinsic statements or representations in entering the contract, a party cannot later allege that it was fraudulently induced to enter into the contract by such extrinsic statements or representations.  See Motion at 29.  Second, Guidance argues that Delaware law forbids tort claims when the underlying allegedly tortious conduct is a breach of contract.  See Motion at 30-31.  Third, it argues that the Defendants cannot base their fraud claim on Guidance's withholding certain information because Guidance did not have a duty to disclose anything to the Defendants.  See Motion at 31-32.  Finally, Guidance argues that, to the extent that the Defendants' fraud claim can be interpreted as a claim that Guidance failed to keep a promise to keep its prices high, the alleged promise would constitute illegal price-fixing, and therefore any cause of action arising out of a failure to abide by that illegal alleged promise should fail as violative of public policy.  See Motion at 32.

In response, the Defendants assert that the integration clause bars only the parties from

---

[28] Since the filing of their Counterclaims, the Defendants have withdrawn their claim of fraud and are proceeding only on a defense of fraudulent inducement against Guidance, insisting that Guidance induced them to enter the Supply Agreement.

relying on outside statements or representations that were "negligently or innocently made."

Response at 26.  The Defendants are asserting that Guidance's statements were fraudulently made,

not negligently or innocently made, and therefore the integration clause does not bar their claim for

fraud.  <u>See</u> Response at 26.  Next, they assert that their fraud claim is wholly distinct from their

breach-of-contract claim.  Their fraud claim is premised on the notion that, if Guidance had been

truthful about certain facts, the Defendants would not have entered into this Supply Agreement with

Guidance, whereas their breach-of-contract claim asserts that Guidance did not perform as required

under the contract that was formed.  <u>See</u> Response at 27-29.  Third, the Defendants argue that,

although Guidance may have had no duty to disclose initially, they acted in such a way as to create

a false impression which then gave rise to a duty to disclose to prevent the statements made from

being misleading.  <u>See</u> Response at 29.  Finally, they contend that Guidance's fourth argument is

"unsupported poppycock" in that it is based on speculation whether the fraud claim "amounts to an

allegation that Guidance promised to keep its prices high."  Response at 30.

### A.    RELEVANT LAW ON FRAUD AND FRAUDULENT INDUCEMENT.

"As a general rule, fraud claims are inappropriate for summary adjudication because such

claims raise issues of state of mind."  <u>J.A. Moore Const. Co. v. Sussex Assocs. Ltd. P'ship</u>, 688 F.

Supp. 982, 989 (D. Del. 1988).  Under Delaware law, a party can "prevail on [a] fraudulent

inducement claim" if it can "satisfy the elements of common law fraud."  <u>Haase v. Grant</u>, No.

3041-CC, 2008 WL 372471, at *2 (Del. Ch. 2008).  Those elements are:

> 1) the existence of a false representation, usually one of fact, made by the defendant;
> 2) the defendant had knowledge or belief that the representation was false, or made
> the representation with requisite indifference to the truth; 3) the defendant had the
> intent to induce the plaintiff to act or refrain from acting; 4) the plaintiff acted or did
> not act in justifiable reliance on the representation; and 5) the plaintiff suffered
> damages as a result of such reliance.

-77-

Kronenberg v. Katz, 872 A.2d 568, 585 (Del. Ch. 2004)(quoting H-M Wexford LLC v. Encorp, Inc., 832 A.2d 129, 144-45 (Del. Ch. 2003)).  See Haase v. Grant, 2008 WL 372471, at *2.  The United States District Court for the District of Delaware articulated Delaware's requirements: "[F]alse representation of material fact, knowingly made with intent to be believed, to one who, ignorant of its falsity, [justifiably] relies thereon and is thereby deceived." J.A. Moore Const. Co. v. Sussex Assocs. Ltd. P'ship, 688 F. Supp. at 989 (quoting Harman v. Masoneilan Int'l, Inc., 442 A.2d 487, 499 (Del. 1982), citing Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074 (Del. 1983)(stating that reliance must be justifiable)).  See Haas v. Grant, 2008 WL 372471, at *2 n.16 (stating that, in the context of fraud, "Delaware courts use 'justifiable' interchangeably with 'reasonable.'").  A statement can support a fraudulent inducement claim if it was "false at the time [it was] made." Haase v. Grant, 2008 WL 372471, at *2.

Furthermore, fraud "may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak." Stephenson v. Capano Dev., Inc., 462 A.2d at 1074.  "Thus, one is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading." Id. (citing Lock v. Schreppler, 426 A.2d 856, 860-61 (Del. Super. 1981), and Leech v. Husbands, 152 A. 729, 731-32 (Del. Super. 1930)).  Fraud can likewise be committed by conduct as well as by words, if that conduct constitutes a misrepresentation of fact. See Norton v. Poplos, 443 A.2d 1, 5 (Del. 1982)("[A] misrepresentation is merely an 'assertion not in accordance with the facts,' and such an assertion may be made by conduct as well as words.")(citing Restatement (Second) of Contracts, § 159 (1981)).  Furthermore, "a statement or assertion may be facially true [and yet] constitute an actionable misrepresentation if it causes a false impression as to the true state of affairs, and the actor fails to provide qualifying information to cure the mistaken belief." 443 A.2d at 5.  The Supreme Court of Delaware has

recognized that "[a] single word, even a nod or a wink or a shake of the head or a smile or gesture intended to induce another to believe in the existence of a nonexisting fact may be fraud." Nicolet, Inc. v. Nutt, 525 A.2d 146, 149 (Del. 1987)(quoting Gibbons v. Brandt, 170 F.2d 385, 391 (7th Cir. 1948)).  It therefore appears that almost anything -- statement, omission in the face of a duty to disclose, or action -- can constitute a fraud if it was intended to, and did, cause a false belief in a party, upon which that party relied to its detriment.

One thing that might stop a claim of fraudulent inducement in its tracks, however, is a non-reliance clause that encompasses the statements at issue.  Delaware law states that, if a contract is between sophisticated parties with a course of dealing between them and states that the parties are not relying on any statements outside the contract's express terms, a claim of fraudulent inducement must fail, because reliance on such statements is inherently unreasonable and unjustifiable given that the parties agreed they would not rely on them.  See Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co., No. C.A. 19209, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002)("Delaware courts have held that sophisticated parties may not reasonably rely upon representations that are inconsistent with a negotiated contract, when that contract contains a provision explicitly disclaiming reliance upon such outside representations."); Great Lakes Chem. Corp. v. Pharmacia Corp., 788 A.2d 544, 556 (Del. Ch. 2001)("I conclude that in these circumstances, Delaware law permits explicit contract disclaimers to bar . . . fraud claims.  Because the parties' contractually agreed-to disclaimers extinguish the fraud claims being asserted here, Counts I and III will be dismissed.").  On the other hand, the Supreme Court of Delaware has stated that "[i]t is clear . . . that a merger clause does not preclude a claim based upon fraudulent misrepresentations." Norton v. Poplos, 443 A.2d at 6.  Thus, at least in some circumstances, such a clause will not bar a claim for fraud or, as in this case, fraudulent inducement.  See id. at 6-7.  In Progressive Int'l Corp. v. E.I. Du

Pont de Nemours & Co., the Delaware Chancery Court distinguished Norton v. Poplos from Great

Lakes Chem. Corp. v. Pharmacia Corp. by the fact that

> the particular disclaimer provision at issue in Norton was an unnegotiated
> "boilerplate" clause in a real estate contract. Later cases [such as Great Lakes Chem.
> Corp. v. Pharmacia Corp.] have held that such disclaimer provisions are enforceable
> when the parties to the agreement are sophisticated entities that carefully negotiated
> its provisions, as was the case [in Progressive Int'l Corp. v. E.I. Du Pont de Nemours
> & Co.].

2002 WL 1558382, at *7 n.36.  The Delaware Chancery Court recently clarified the standard for

determining whether a merger or anti-reliance clause will bar a claim for fraudulent inducement.

The court acknowledged that it had "honored clauses in which contracted parties have disclaimed

reliance on extra-contractual representations, which prohibit[ed] the promising party from reneging

on its promise by premising a fraudulent inducement claim on statements of fact it had previously

said were neither made to it nor had an effect on it."  Abry Partners V, L.P. v. F & W Acquisition

LLC, 891 A.2d 1032, 1056 (Del. Ch. 2006).

> [T]his court has . . . honored contracts that define those representations of fact that
> formed the reality upon which the parties premised their decision to bargain.  This
> sort of definition minimizes the risk of erroneous litigation outcomes by reducing
> doubts about what was promised and said, especially because the contracting parties
> have defined that in writing in their contract.
>
> [T]his court consistently has respected the law's traditional abhorrence of fraud in
> implementing this reasoning.  Because of that policy concern, we have not given
> effect to so-called merger or integration clauses that do not clearly state that the
> parties disclaim reliance upon extra-contractual statements.  Instead, we have held
> . . . that murky integration clauses, or standard integration clauses without explicit
> anti-reliance representations, will not relieve a party of its oral and extra-contractual
> fraudulent representations.

Abry Partners V, L.P. v. F & W Acquisition LLC, 891 A.2d 1032, 1058-59 (Del. Ch. 2006).

### B.  PARAGRAPH 12.8 DOES NOT BAR THE DEFENDANTS' CLAIM FOR FRAUDULENT INDUCEMENT.

The Supply Agreement has a paragraph that appears to be an integration or non-reliance

clause.  <u>See</u> Supply Agreement ¶ 12.8, at 15.  That paragraph provides:

> 12.8   <u>No Reliance on Additional Representations, Undertakings & Warranties</u>. Each of the parties acknowledges and agrees that in entering into this Agreement it does not rely upon and shall have no remedy in respect of any statement, representation, warranty or undertaking (whether negligently or innocently made) of any person (whether a party to this Agreement or not) other than as expressly set out in this Agreement.

Supply Agreement ¶ 12.8, at 15.  The Defendants argue that the first parenthetical of the provision, "whether negligently or innocently made," shows that the parties intend this provision to bar reliance on representations or statements extrinsic to the Supply Agreement only if made "negligently or innocently."  Response at 26.  By negative implication, therefore, it did not, according to the Defendants, prohibit reliance on fraudulent statements.  <u>See id.</u>  In reply, Guidance cites authority discussing statutory interpretation to argue that such parenthetical expressions "should be read as illustrative, rather than exclusive."  Reply at 18 (citing <u>Chickasaw Nation v. United States</u>, 534 U.S. 84, 85 (2001)).  Guidance points to the other parenthetical, "whether a party to this Agreement or not," as an example of language that is merely illustrative, and insists that the Court should consider the first parenthetical the same way.  <u>See</u> Reply at 18.[29]

---

[29] <u>Chickasaw Nation v. United States</u> is clearly distinguishable.  First, the Supreme Court of the United States in <u>Chickasaw Nation v. United States</u> was construing a federal statute and not a contract between private parties.  <u>See</u> 534 U.S. at 86-87.  Second, the provision that the Supreme Court was construing included the tell-tale word "including" before the list of items that the Supreme Court found were illustrations.  <u>See id.</u> at 89.  The Supreme Court went on at great length as to the meaning of the word "including," which is notably absent from Paragraph 12.8 of the Supply Agreement.  <u>See id.</u> at 89-91.  In this case, the parenthetical begins with the word "whether," which is traditionally used to express available alternatives.  <u>See</u> The American Heritage Dictionary of the English Language at 2033 (3d ed.1992)("whether: . . . 2. used to introduce alternative possibilities . . . .").  Finally, the Supreme Court rested its decision on other considerations, most notably that it could not "give the chapter 35 reference independent operative effect without seriously rewriting the language of the rest of the statute."  <u>Chickasaw Nation v. United States</u>, 534 U.S. at 89.  Reading the parenthetical in Paragraph 12.8 to be a limitation on the broad statement that it follows is not inconsistent with any other aspect of the Supply Agreement.

First, the Court must determine, as a matter of law, whether the contract is ambiguous.  Nw. Nat'l Ins. Co. v. Esmark, Inc., 672 A.2d at 43; HIFN, Inc. v. Intel Corp., 2007 WL 1309376, at *9 ("A determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law.").[30]  The Court concludes that, as to this issue, it is not.  Rather than "illustrative," the Court finds the parenthetical expressions are intended for clarification.  Under Delaware law, a court should give effect to all contract language if it is possible to do so.  See Sonitrol Holding Co. v. Marceau Investissements, 607 A.2d 1177, 1184 (Del. 1992)("The cardinal rule of contract construction is that, where possible, a court should give effect to all contract provisions.").  Furthermore, when interpreting the terms of a contract, where there exist both specific language and general language that appear to conflict, the specific language is considered to qualify the general language.  See DCV Holdings, Inc. v. ConAgra, Inc., 889 A.2d 954, 961 (Del. 2005)("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."); Sonitrol Holding Co. v. Marceau Investissements, 607 A.2d at 1184 ("It is true . . . that 'where there is an inconsistency between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions.'.").

The Court can construe the contract to give effect to the parenthetical expressions only if it does not consider them to be mere illustrations.  Guidance's assertion that the second parenthetical, the phrase "whether a party to this Agreement or not," is merely illustrative and "not [meant] to exclude any class of persons," is unpersuasive.  Naturally, the phrase does not exclude any class of persons, because the phrase includes all persons.  The union of the set of all persons who are parties

---

[30] The Court notes that, until trial, neither party appeared to argue that any provision of the Supply Agreement was ambiguous.

to the Agreement and the set of all persons who are not parties to the Agreement, together, is all persons that exist.  On the other hand, without the phrase "whether a party to this Agreement or not," one might argue that the contract is ambiguous whether the preceding phrase, "of any person," referred to all persons in the world, or only those persons that are also parties to the Agreement.[31] The parenthetical cured that potential ambiguity.  In other words, the second parenthetical clarifies to what exactly the prior phrase, "of any person," referred.

It seems logical that the first parenthetical might have been intended to have the same effect -- clarifying the intent of the parties with respect to the language that they used.  Without that phrase, one might assume that "any statement, representation, warranty, or undertaking" referred to statements, representations, warranties, and undertakings that were made innocently, negligently, or fraudulently.  Why the parties would illustrate what it means to be a statement, representation, warranty, or undertaking by explaining that one could be negligently or innocently made makes little sense.  Why not state "whether negligently, innocently, or fraudulently made?"  Or, if illustration is all that the parties intended, why not mention only that such statements could be negligently made?  The proper way to give effect to the language of the first parenthetical, as Delaware law would demand that we do, is to interpret it as qualifying the more general language that it follows. See DCV Holdings, Inc. v. ConAgra, Inc., 889 A.2d at 961 ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision

---

[31] The Court acknowledges that it would be unlikely to find the phrase "any person" to be ambiguous, and would likely find that it included both persons that are parties to the contract and those that are not.  The parties might have wanted to make the contract "air tight" and cover all possible bases.  Furthermore, under that view, the language "whether a party to this Agreement or not" is neither more nor less specific than the language "any person," thus it is both unclear and irrelevant which language controls under Delaware law.  The same is not true of the first parenthetical, "whether negligently or innocently made," which is more specific than the language that it qualifies.

ordinarily qualifies the meaning of the general one."); Sonitrol Holding Co. v. Marceau
Investissements, 607 A.2d at 1184.  The Court therefore finds that Paragraph 12.8 of the Supply
Agreement qualifies the promise that the parties do not rely on "any statement, representation,
warranty or undertaking," and specifies precisely what kind of statements, representations,
warranties, and undertakings the parties disclaim reliance upon.  Upon application of the general
rules of contract construction, the Court finds that the interpretation proposed by Guidance is not
reasonable, and therefore Paragraph 12.8 is not ambiguous.  See Nw. Nat'l Ins. Co. v. Esmark, Inc.,
672 A.2d at 43 (stating a contract is ambiguous only if subject to two reasonable interpretations);
Addy v. Piedmonte, 2009 WL 707641, at *8.  Paragraph 12.8 does not bar the Defendants' claim
for fraudulent inducement.

    Guidance tries to distinguish the case law that allows claims for fraudulent inducement in
the face of an integration clause from other cases that disallow such claims by differentiating
between "anti-reliance" clauses and traditional "merger" clauses.  Reply at 18.  The Court notes,
however, that the only authority that either party cites from the Delaware Supreme Court regarding
this issue deals with what Guidance would presumably term an "anti-reliance" provision.  In Norton
v. Poplos, the merger clause at issue "stat[ed] that the parties have read and understood the contract,
and that 'they do not rely on any written or oral representations not expressly written in (the)
contract.'"  Norton v. Poplos, 443 A.2d at 6 (parentheses in original).  That case held, fairly clearly,
that "a merger clause," which, in that case, appears to be the same as Guidance's so-called "anti-
reliance" clause, "does not preclude a claim based upon fraudulent misrepresentations."  Id.  Later
Delaware cases, as the Court has cited, appear to qualify the rule set forth in Norton v. Poplos.  The
Court rejects this argument because it finds, under Delaware law, that Paragraph 12.8 is an anti-
reliance clause, but does not include non-reliance on statements that are proved to have been made

fraudulently.

### C.    THE DEFENDANTS' FRAUDULENT-INDUCEMENT CLAIM IS NOT BARRED AS A VARIANT OF A BREACH-OF-CONTRACT CLAIM.

Guidance's next argument for summary judgment on the Defendants' fraudulent inducement claim is that the fraud claim is just a repetition of the Defendants' breach-of-contract claim. <u>See</u> Motion at 30-31. The Defendants respond that their fraudulent-inducement claim is clearly different from their breach-of-contract claim, and that they have evidence that Guidance intentionally withheld material information and acted in a way that was inconsistent with that information, intending that the Defendants would rely on the facts implied by Guidance's conduct. <u>See</u> Response at 28-29. More specifically, the Defendants' claim of fraudulent inducement is premised in large part on the alleged fact that Guidance represented that Rittenberry, Guidance's Vice President of Sales, and Williams, Guidance's Head of Operations, would remain employees of Guidance and would work to build a direct-sales force to market Guidance's products. <u>See</u> Counterclaims ¶¶ 20a-20d, at 4-5. The Defendants assert that, in deciding to enter the Supply Agreement, they relied upon Guidance's implicit representation that these individuals would remain employees of Guidance. <u>See</u> <u>id.</u>; <u>id.</u> ¶¶ 83-85. To the extent that the Defendants' fraudulent inducement claim is based on these facts -- and, indeed, they are the only facts that the Defendants argue in their Response -- these facts are substantially different from those asserted as a breach of the Supply Agreement. <u>Cf.</u> Counterclaims ¶¶ 30-33, at 6-7. The Court finds that the Defendants' fraudulent-inducement claim based on these facts is genuine and is not merely a breach-of-contract claim to which the Defendants have affixed the words "fraudulently." The Court will not grant the motion for summary judgment on this basis with respect to the facts alleged in Paragraphs 20a-20d.

On the other hand, the Defendants do not point the Court to any evidence, nor do they make

any argument, to refute Guidance's assertions with respect to the other ground upon which they allege fraudulent inducement. See Response at 26-30. Paragraphs 18-20 of the Defendants' Counterclaims appear to be an effort by the Defendants to turn a breach-of-contract claim into a fraud claim by claiming that Guidance had no intention of performing when the contract was entered. They point to no attached evidence that would tend to corroborate that claim, nor do they make any argument to that effect in the Response. As Guidance aptly points out, a breach-of-contract claim cannot be "bootstrapped" into a fraud claim merely by asserting, without evidence, that the other party never intended to perform the contract. See Motion at 30-31 (citing Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 889 (Del. Ch. 2009); Pinkert v. John J. Olivieri, P.A., No. CIV. A. 99-380-SLR, 2001 WL 641737, at *5 (D. Del. May 24, 2001); Data Mgmt. Internationale v. Saraga, No. Civ. A. 05C-05-108, 2007 WL 2142848, at *3 (Del. Super. July 25, 2007)). Instead, the fraud must occur by breach of an independent duty that the law imposes.

The Defendants allege the exact same conduct in Paragraphs 18-20 of their Counterclaims to support their claim of fraudulent inducement that they allege as a breach of contract; the Defendants assert that Guidance represented that it would not engage in the complained-of conduct at a meeting before entering the contract. Although semantically creative, this allegation is no different from asserting that Guidance entered a contract intending not to perform. There will always be a period of time before signing a contract in which each party knows what the terms of that contract will be and are implicitly promising that, if the contract is consummated, it will honor those terms. Given that the Defendants contend that this exact same conduct constitutes a breach of contract, it is clear that they believe that this conduct is what the contract prohibits. Thus, the situation in this case seems no different from the conditional promise found in every contract negotiation, "if we enter this contract, we promise that we will be bound by its terms." The

Defendants' allegations therefore boil down to merely alleging that Guidance entered the contract intending not to perform. Because they have no evidence to support their claim of Guidance's intent at the time of contracting, this claim appears to be the kind of "bootstrapping" of a contract claim into a fraud claim that Delaware law prohibits. See Kuroda v. SPJS Holdings, L.L.C., 971 A.2d at 889 ("Where . . . the plaintiff's claim arises solely from a breach of contract, the plaintiff 'generally must sue in contract, and not in tort.'"); Data Mgmt. Internationale v. Saraga, 2007 WL 2142848, at *3 ("Even an intentional, knowing, wanton, or malicious action by the defendant will not support a tort claim if the plaintiff cannot assert wrongful conduct beyond the breach of contract itself."); Pinkert v. John J. Olivieri, P.A., 2001 WL 641737, at *5 ("A breach of contract claim cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform.")(quoting Iotex Commc's, Inc. v. Defries, No. CIV. A. 99-380-SLR, 1998 WL 914265, at *5 (Del. Ch. Dec. 21, 1998))(alterations omitted). Thus, the Court will grant Guidance summary judgment on the Defendants' fraudulent-inducement claim to the extent that it relies on the conduct alleged in Paragraphs 18-20 of the Defendants' Counterclaims.

### D.   GUIDANCE HAD A DUTY TO DISCLOSE IF IT CREATED A FALSE IMPRESSION THAT COULD HAVE MISLED THE DEFENDANTS.

Guidance's third argument in support of summary judgment on the Defendants' fraud claim is that the claim is based on its omissions, and an omission can only constitute a fraud when there exists an affirmative duty to disclose the facts withheld. See Motion at 31-32 (citing Pig Improvement Co. v. Middle States Holding Co., 943 F. Supp. 392, 406 (D. Del. 1996)). The Defendants respond that this case does not involve an omission, but that it involves conduct and statements that were misleading. See Response at 29. The Court agrees with the Defendants. The

-87-

Defendants have provided evidence that, viewed on the light most favorable to them -- as it must be in this motion for summary judgment by Guidance -- tends to show that Guidance intentionally represented that Rittenberry and Williams would be remaining with Guidance going forward. If the evidence is believed, the Defendants will have shown that Guidance acted in a way that was not in accord with the facts -- thereby making a misrepresentation -- with knowledge that it might deceive the Defendants and make more likely the successful consummation of the Supply Agreement.

Specifically, the Defendants provide an affidavit of Bill Newell stating that, at a meeting in Dallas, Texas, Guidance, represented by Goodis, Rittenberry, and Williams, met with the Defendants, represented by Mosch, Vanderslice, and Newell. Newell attests that Rittenberry and Williams were active participants in negotiations and discussions at the Dallas meeting, acting as though they were going to continue being employees of Guidance going forward. See Newell Aff. ¶¶ 8-15, at 3-4. Newell further states that he recalls Rittenberry referring to Guidance with the phrase "we," indicating that he was a part of the Guidance team and, implicitly, would continue to be part of Guidance. Id. ¶ 15, at 4. The meeting occurred in April 22, 2008. See Counterclaims ¶ 12-20d, at 3-5 (stating that the meeting occurred in late April, 2008); Response at ¶ DD, at 6 (pinpointing the date of the meeting as April 22, 2008). The Defendants have attached the agreements through which Goodis' bought out Williams' and Rittenberry's ownership interest in Guidance, which are dated April 18, 2008 and April 22, 2008, respectively. These documents are evidence that Williams and Rittenberry knew they were going to sell their ownership interest to Goodis at the time of the April 2008 meeting with the Defendants. If they knew, at the meeting, that they would no longer be with Guidance, and yet they represented to the Defendants that they would be, this impression could be a fraud on the Defendants and is a question for the jury.

The Defendants have also attached evidence of Goodis orchestrating the Dallas meeting, and

Rittenberry's and Williams' motive in going through with the ruse.  Electronic-mail transmissions between Goodis, Rittenberry, and Williams gave Rittenberry's and Williams' motivation for leaving Guidance.  See Response Exhibit W.  Other electronic-mail transmissions stated that Guidance would buy out Rittenberry's and Williams' interest in Guidance only if there is a worthwhile deal struck with the Defendants.  See id. Exhibit X & Y.  Goodis also told Williams and Rittenberry that the buy-out amount would be reduced if "the deal" was not signed by April 22.  Id. Exhibit Z. Finally, they attach an electronic-mail transmission from Goodis to Rittenberry and Williams instructing them on what to wear and say at the Dallas meeting, without which Goodis might have been the primary -- or only -- speaker for Guidance, which, in turn, might have conveyed to the Defendants that Rittenberry and Williams had no interest in the continued business relationship between Guidance and the Defendants.  See Response Exhibit AA.  The combined weight of this evidence creates a genuine issue of material fact whether Guidance intended to create a false impression in the mind of the Defendants, upon which the Defendants would then act.  The Court will therefore deny Guidance's motion on the Defendants' claim of fraudulent inducement on this basis.

### E.    GUIDANCE'S FOURTH GROUND FOR SUMMARY JUDGMENT ON THE DEFENDANTS' FRAUD CLAIM IS TOO SPECULATIVE.

Guidance asserts that the Defendants' fraud claim amounts to an allegation that Guidance promised to keep its prices high but did not follow through on that promise, and that such a promise would violate the Sherman Act and constitute illegal price-fixing.  See Motion at 32-33.  It argues that the Court should dismiss the Defendants' claim of fraud because it would violate public policy to allow a party to sue another for fraud based on the other party's refusal to break the law.  See id. at 32.  It points to testimony of Mosch who stated that, "in reliance on the belief that Mr. Williams

and Mr. Rittenberry would continue to serve in [their current] positions, [the] Defendants gave

Guidance 'a significant financial advantage' with respect to the pricing and the credits that were

provided in the Supply Agreement.'" Motion at 32 (citing Transcript of Hearing at 65:5-14 (taken

December 18, 2008), filed January 6, 2009 (Doc. 43)).   Guidance asserts that the only way to

interpret this statement is that:

> (a) employing Rittenberry and Williams would increase Guidance's overhead and require Guidance to charge higher prices; (b) Defendants wanted to ensure that Guidance kept its overhead and prices higher; (c) by eliminating Rittenberry and Williams, Guidance is able to sell its products at nearly half the price of Defendants' competing products; and (d) Guidance lowering its overhead and prices injured Defendants.

Motion at 32-33.  While Guidance might have uncovered the Defendants' ulterior motive in wishing

to keep Rittenberry and Williams on the Guidance team, the Court finds this chain of reasoning a

bit too tenuous to be taken as true as a matter of law in light of other possible, lawful motives that

could have prompted the Defendants' actions.[32]  Many factors could have informed the Defendants'

decision to enter the agreement when Rittenberry and Williams were part of the Guidance team,

such as trusting Rittenberry and Williams and not trusting Goodis.[33]  The Defendants may have felt

that the Goodis, standing alone, would not have been able to sustain a large enough customer base

to make the Supply Agreement worthwhile to the Defendants, whereas a direct-sales force headed

by Rittenberry would.  See Newell Aff. ¶¶ 10-21, at 3-5.  The Court will therefore deny the motion

---

[32] The Court need not decide whether a purchaser's agreement to keep its retail prices at a certain level would constitute illegal price-fixing in violation of federal law.  For purposes of this motion, even assuming such price maintenance would be illegal, the Court does not believe that such a theory requires summary judgment.

[33] This theory is supported by the fact that Rittenberry was a former Tulsa Dental "sales and marketing employee and was highly thought of by [Tulsa Dental]."  Newell Aff. ¶ 10, at 3. Furthermore, "[f]rom his employment at [Tulsa Dental], Rittenberry knew the endodontic products industry and the companies in it and he knew TDP and its direct sales model."  Id. ¶ 14, at 4.

as to the Defendants' claim of fraudulent inducement insofar as it rests on the representations at the

Dallas meeting -- described in Paragraphs 20a-20d of the Defendants' Counterclaims -- but will

grant the motion as to the representations described in Paragraphs 18-20 of the Counterclaims.

###### F.   THE DEFENDANTS' RESCISSION CLAIM SURVIVES BECAUSE ITS FRAUDULENT-INDUCEMENT CLAIM SURVIVES.

The Defendants' final counterclaim, Count XIII, seeks rescission of the Supply Agreement

because Guidance fraudulently induced the Defendants to enter into the Supply Agreement, or, in

the alternative, partial rescission eliminating the Defendants' obligation to supply obturators.  See

Counterclaims at 14-15.  Guidance first argues, as it did with respect to the Defendants' fraud claim,

that this claim is barred by the Supply Agreement, Section 12.8, which provides that "[e]ach of the

parties acknowledges and agrees that in entering into this Agreement it does not rely upon and shall

have no remedy in respect to any statement, representation, warranty or undertaking . . . of any

person . . . other than as expressly set out in this Agreement."  Motion at 34 (quoting Supply

Agreement ¶ 12.8, at 15).  As discussed above, Guidance asserts that Delaware law bars claims of

fraudulent inducement when the contract at issue contains a merger or integration clause like Section

12.8 of the Supply Agreement.  See Motion at 34 (citing Progressive Int'l Corp. v. E.I. Du Pont de

Nemours & Co., 2002 WL 1558382, at *7).  Regarding the Defendants' alternative relief, that the

Court allow them to partially rescind the contract and relieve them of any obligation to supply

obturators, Guidance contends that the contract obligations are not divisible and that, unless the

contract obligations are divisible, a contract cannot be partially rescinded.  See Motion at 34.  The

Defendants' response as to the integration clause is the same as in response to the motion as to

Count X.  See Response at 31.

1.      **Delaware Law on Rescission.**

In Delaware, rescission is an equitable remedy causing the "abrogation or 'unmaking' of an agreement," through which a court "attempts to return the parties to the status quo."  Norton v. Poplos, 443 A.2d 1, 4 (Del. 1982).  "Common grounds for rescission of a contract for the sale of real property include fraud, misrepresentation and mistake."  Id.  Delaware courts will sometimes grant rescission if a contract was induced by an innocent misrepresentation because "it would be unjust and inequitable to permit a person who has made false representations, even innocently, to retain the fruits of a bargain induced by such representations."  Id.  Moreover, a Delaware court may even grant rescission based on a truthful statement, if it leaves a false impression in the mind of the listener that the speaker then fails to remedy with additional disclosure.  See id. at 5 ("[A]lthough a statement or assertion may be facially true, it may constitute an actionable misrepresentation if it causes a false impression as to the true state of affairs, and the actor fails to provide qualifying information to cure the mistaken belief.").  Finally, one need not make a specific statement to be guilty of misrepresentation, as a misrepresentation can also be made through conduct.  See id.  Based on this authority, the Court believes that, if the Defendants succeed on their claim for fraudulent inducement, they should be entitled to rescission of the Supply Agreement.  The Court will therefore deny Guidance's motion for summary judgment on the Defendants' claim for rescission.

2.      **The Court Will Deny the Defendants' Request for Partial Rescission Because the Supply Agreement Is Not Severable.**

Generally, a contract may be rescinded in part "where the contract is severable or divisible from the rest of the contract, or if there are extreme circumstances."  17B C.J.S. Contracts § 459 (2009).  A severable or divisible contract is "[a] contract that includes two or more promises each

of which can be enforced separately, so that failure to perform one of the promises does not necessarily put the promisor in breach of the entire contract." Black's Law Dictionary at 373 (9th ed. 2009).[34] "When a contract is severable or divisible, each part may be independent for the purpose of rescission." Eastern States Petro. Co. v. Universal Oil Prods. Co., 49 A.2d 612, 616 (Del. Ch. 1946). On the other hand, "a defrauded complainant cannot accept the benefits received under a contract on the one hand and shirk its disadvantages on the other. In other words, it cannot cause the rescission of a contract in part and its approval in part, as self interest may dictate." Id. Whether a contract is severable is an issue of contract construction, and "the essential question is to ascertain the intention of the parties." Orenstein v. Kahn, 119 A. 444, 445 (Del. 1922). Again, such issues of contract construction are a question of law unless and until the Court finds that the contract is ambiguous on the point at issue. Nw. Nat'l Ins. Co. v. Esmark, Inc., 672 A.2d at 43; HIFN, Inc. v. Intel Corp., 2007 WL 1309376, at *9 ("A determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law.").

Severable contracts are not common. Generally, "[t]he parties' intent to enter into a divisible contract may be expressed in the contract directly, through a so-called 'severability clause,' as well as indirectly, as when the contract contains promises to do several things based upon multiple distinct considerations." 15 R. Lord, Williston on Contracts § 45:6 (4th ed.). As Professor Richard Lord recognized, "the absence of [a severability] clause has been cited as a factor tending to indicate that the contract is entire rather than divisible in the situation where it is alleged that a default under

_____

[34] Black's Law Dictionary also directed the Court to a helpful quote: "A severable contract . . . is one the consideration of which is, by its terms, susceptible of apportionment on either side, so as to correspond to the unascertained consideration on the other side, as a contract to pay a person the worth of his services so long as he will do certain work; or to give a certain price for every bushel of so much corn as corresponds to a sample." I. Horniman, Wharton's Law Lexicon at 215 (13th ed. 1925).

one part of a contract does not excuse performance of the other party under another part on the ground of divisibility." Id.  "Whether a contract is divisible or entire is a question of intent which must be determined from the terms and subject matter of the contract, together with any pertinent explanatory circumstances." Equitable Trust Co. v. Delaware Trust Co., 30 Del. Ch. 118, 128, 54 A.2d 733, 738 (1947).  See Orenstein v. Kahn, 119 A. at 445.  As the Supreme Court of Delaware stated almost a century ago, "In determining whether a contract is divisible or entire, the essential question . . . is: 'Did the parties give a single assent to the whole transaction, or did they assent separately to several things?'" Orenstein v. Kahn, 119 A. at 446 (quoting 2 Williston on Contracts, § 863).

The Supply Agreement at issue is not divisible.  While, at the moment, the Defendants are still performing a portion of the Supply Agreement and not performing another, the Court is not convinced that this fact shows that the contract is divisible or severable.  The Supply Agreement is a complex mesh of heavily negotiated obligations imposed on each party.  Each party had to weigh the combined benefit of the provisions in its favor against the combined detriment of the obligations imposed on it.  There is no sound way for the Court to determine which obligations and benefits the parties found to weigh the most heavily in one direction or another.  To grant the Defendants the remedy they seek, the Court would have to find the obligation to supply obturators to Guidance was severable from the remainder of the Supply Agreement to the point that it could be considered a separate contract.  The Court, however, cannot on the record before it determine whether Guidance or the Defendants would have entered into the Supply Agreement if it did not provide for the supply and purchase of obturators, nor whether either party would agree to enter a contract that provided only for the sale and purchase of obturators.  Furthermore, some unknown portion of the consideration that the Defendants gave and that Guidance received was to settle a trademark

infringement action, and it is impossible from the record to know how that might have factored in to the calculus of each party regarding the price at which the Defendants would provide obturators to Guidance.  In short, the Court finds that, on the record before it, the contract is not severable.

The Court will therefore decline to allow the Defendants partial rescission for several reasons.  First, it will not allow the Defendants to rescind the portion of the Supply Agreement dealing with obturators without re-writing the Supply Agreement to be a different contract than that into which the parties agreed to enter.  Also, the ground upon which the Defendants assert their right to rescind -- fraudulent inducement to enter the Supply Agreement -- is not clearly tied to their obligation to supply obturators.  Finally, if the Defendants succeed on their claim for fraudulent inducement, they are entitled to rescission of the entire contract and thus there is no need to consider whether the Court should permit them partial rescission in the alternative.  Insofar as Guidance seeks summary judgment denying the Defendants claim for partial rescission as a remedy for Guidance's alleged fraudulent inducement, the Court will grant the motion.  The Court will deny the motion to the extent that it seeks summary judgment on the Defendants' claim for rescission, however, because the Defendants will be entitled to rescission if they can establish that Guidance fraudulently induced them to enter the Supply Agreement.

## IX.   THE COURT WILL DISMISS THE DEFENDANTS' CLAIM FOR PUNITIVE DAMAGES (COUNT XI) AS A SEPARATE COUNT, BUT PERMIT RECOVERY OF PUNITIVE DAMAGES IF THE DEFENDANTS CAN PROVE ENTITLEMENT.

Count XI alleges that Guidance's actions were "intentional, willful, and malicious without privilege or justification," entitling the Defendants to punitive damages.  Counterclaims at 14. Guidance argues that the Court must dismiss this claim because a request for punitive damages is not a separate cause of action.  See Motion at 33.  The Defendants respond that they set their punitive damages claim in a separate Count because it has ties to Counts I through X, and was

-95-

therefore not properly placed in only one of those Counts.  See Response at 30-31.  They also argue that, based on the liberal pleading standard of rule 8 of the Federal Rules of Civil Procedure, the Court should not dismiss their request for punitive damages merely because they placed the request in its own separate count.  See Response at 31.

The Court agrees that it should not summarily dismiss a request for punitive damages, if based on a properly pled cause of action, simply because it is set out under a different heading from the causes of action that allegedly gave rise to it.   That is especially true given that Count XI was explicit that it sought punitive damages for "Guidance's and Goodis's wrongful actions described in Counts I through X."  Counterclaims at 14.  Guidance is correct, however, that requesting punitive damages is not a separate cause of action that should be set out separately in the Complaint.  The Court will therefore grant the motion as to the Defendants' separate punitive damages Count, but permit the Defendants to recover punitive damages if the jury finds liability on a claim or claims that would allow recovery of punitive damages and the jury further finds that the Defendants are entitled to them.

## X.     THE DEFENDANTS HAVE DEMONSTRATED THE EXISTENCE OF A FACTUAL ISSUE REGARDING THEIR DECLARATORY JUDGMENT CLAIM (COUNT XII).

In Count XII, the Defendants seek a judgment declaring that they have no obligations under the Supply Agreement -- or, alternatively, that they have no obligation to supply obturators -- because of Guidance's alleged material breach.  See Counterclaims at 14.  Guidance's argument for summary judgment on this Count has two facets.  First, it argues that the Court should grant the motion as to Count XII if it granted the motion as to Counts I and II.  See Motion at 33.  Because the Court did not grant summary judgment as to all of Count I, the Court denies the motion for summary judgment of Count XII on that basis.  Guidance's second argument is that, because the

remedy of partial rescission is not available to the Defendants, they should not be allowed to seek a declaration that they have no obligation to supply obturators, which would, in effect, be granting them the same remedy as a partial rescission.  See Motion at 33-35.  The Court has held that partial rescission is inappropriate in this case because the contract at issue is not divisible.  The Court thus agrees that, to the extent that the Defendants seek a declaratory judgment that they have no obligation to supply obturators under the contract, the Court will grant the motion.  To the extent that it requests the declaration on the basis that the Guidance has breached the contract, the Court has held that the Defendants have raised a genuine issue of fact as to at least part of their breach-of-contract claim.  The Court will therefore deny that aspect of Guidance's motion for summary judgment.

**IT IS ORDERED** that Plaintiff Guidance Endodontics, LLC and Counterclaim Defendant Charles J. Goodis' Motion for Summary Judgment and Supporting Memorandum is granted in part and denied in part.  The Court: (i) grants the motion as to Count I for breach of contract insofar as it alleges breach of Section 4.7 of the Supply Agreement, but otherwise denies as to Count I; (ii) grants the motion as to Count II for breach of the implied covenant of good faith and fair dealing; (iii) grants the motion as to the first four alleged instances of alleged false advertising, but denies the motion as to the fifth and sixth instance of false advertising alleged in Count III; (iv) denies the motion as to the trademark infringement alleged in Count V; (v) denies the motion as to Count VI -- common-law unfair competition -- with respect to the Defendants' false-advertising[35] and trademark-infringement grounds, but grants the motion as to the Defendants' trademark-dilution

---

[35] Again, the denial of summary judgment as to the common-law false advertising claim is only a partial denial.  The Court grants the motion as to the first four alleged statements of false advertising, under the common law, just as it does with respect to the Lanham Act false-advertising claim.

ground for unfair competition; (vi) grants the motion as to the Defendants' New Mexico UPA claim because the Defendants lack standing to bring such claim; (vii) denies the motion as to the Defendants' claim of unlawful misappropriation in Count VIII; (viii) grants the motion as to the Defendants' Count X fraudulent-inducement claims based on the conduct alleged in paragraphs 18-20 of their Complaint, but denies the motion as to the conduct alleged in paragraphs 20a-20c; (ix) grants the motion insofar as it seeks a declaration that the Defendants have no obligation to supply obturators, but denies the motion insofar as it seeks a declaration that the Defendants have no obligations at all under the Supply Agreement; and (x) grants the motion as to the Defendants' request for partial rescission, but denies the motion as to the Defendants' request for rescission.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kyle C. Bisceglie
Renee M. Zaystev
Olshan, Grundam, Frome, Rosenweiz
  & Woldosky, LLP
New York, New York

-- and --

John J. Kelly
Donald A. DeCandia
Ryan Flynn
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Albuquerque, New Mexico

     *Attorneys for the Plaintiff and Counterdefendants*

Howard M. Radzely
W. Brad Nes
Morgan Lewis & Bockius LLP
Washington, D.C.

-- and --

R. Ted Cruz
Morgan Lewis & Bockius LLP
Houston, Texas

-- and --

Brian M. Addison
  Vice President, Secretary, and General Counsel
Dentsply International, Inc.
York, Pennsylvania

-- and --

Thomas P. Gulley
Rebecca Avitia
Lewis and Roca LLP
Albuquerque, New Mexico

*Attorneys for the Defendants and Counterplaintiffs*