IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

GUIDANCE ENDODONTICS, LLC,
a New Mexico Limited Liability Company,

        Plaintiff,

vs.                                     No. CIV 08-1101 JB/RLP

DENTSPLY INTERNATIONAL, INC.,
a Delaware Business Corporation, and
TULSA DENTAL PRODUCTS, LLC,
a Delaware Limited Liability Company,

        Defendants,

and

DENTSPLY INTERNATIONAL, INC.
and TULSA DENTAL PRODUCTS, LLC,

        Counter Plaintiffs,

vs.

GUIDANCE ENDODONTICS, LLC
and DR. CHARLES GOODIS,

        Counter Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Dentsply/TDP's Motion for a New Trial Due

to Guidance's Prejudicial Mid-Trial Switch in Position on Whether the V2 is a "New Product" and

Error in Jury Instruction 21, filed February 10, 2010 (Doc. 502). The Court held a hearing on

March 22, 2010 through March 24, 2010. The primary issues are: (i) whether Plaintiff Guidance

Endodontics, LLC changed its litigation position mid-trial, to the prejudice of Defendants Dentsply

International, Inc. ("Dentsply") and Tulsa Dental Products, LLC ("TDP"); (ii) whether the doctrine

of judicial estoppel prohibited Guidance from changing its position regarding the correct interpretation of the parties' Manufacturing and Supply Agreement; (iii) whether the Court erred in one of the jury instructions; (iv) whether the Defendants preserved the above errors for post-trial review; and (v) whether the Court's errors, if any, warrant granting the Defendants a new trial on Guidance's breach-of-contract claim. Because the Court finds that any surprise to the Defendants could not have been prejudicial, and because the Court determines that there was no error in Instruction 21, the Court denies the motion.

## **FACTUAL BACKGROUND**

The suit is a contract dispute that Guidance, a small endodontic-equipment company, brought against the larger Defendants, who were both Guidance's rivals and its suppliers. More background on the lawsuit is set forth in one of the Court's earlier opinions. See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 633 F. Supp. 2d 1257, 1260-67 (D.N.M. 2008) (Browning, J.). The Defendants are manufacturers and suppliers of a variety of dental/endodontic products that compete with Guidance's products, including endodontic obturators, files, and ovens.[1] Guidance and the

---

[1] File, obturators, and ovens are all devices that dentists and endodontists use to perform root canal surgery. Files are small metal drills that cut away the infected part of the tooth. See Verified Complaint and Demand for Jury Trial ¶ 109, at 22, filed November 21, 2008 (Doc. 1)("Complaint"); Oxford English Dictionary Online, "file, n." (2d ed. 1989, Oxford University Press), available at http://dictionary.oed.com/cgi/entry/50084664 (last accessed June 1, 2010). The obturator is a device used to fill the hole that the file leaves. See Complaint ¶ 109, at 22; Oxford English Dictionary Online, "obturator, n." available at http://dictionary.oed.com/cgi/entry/00329626 (last accessed Mar. 20, 2010)("2.a . . . . A prosthetic device used to close an abnormal opening . . . ."); Motion at 2. As Counter-Defendant Dr. Charles Goodis put it: "An obturator is a device used to fill the root canal with gutta percha after the canal has been drilled, cleaned, and shaped." Declaration of Charles J. Goodis in Support of His and Plaintiff's Motion for Summary Judgment ¶ 5, at 2, filed July 31, 2009 (executed July 31, 2009)(Doc. 227). Gutta percha is one substance with which an obturator may fill a drilled canal. Gutta percha is "[a] rubbery substance derived from the latex of any of several tropical trees of the genera *Palaquium* and *Payena*, used as an electrical insulator, as a waterproofing compound, and in golf balls." The American Heritage Dictionary of the English Language at 808 (3d ed. 1992). Finally, the oven is the device used to warm some obturators,

Defendants were parties to a Manufacturing and Supply Agreement, which arose out of a settlement of a separate intellectual-property dispute. The Supply Agreement required the Defendants to supply Guidance with endodontic files, obturators, and ovens, which Guidance would then sell to end-users.[2]

Guidance began selling those endodontic products at low prices compared to the prices that the Defendants charged for the same or similar products. Allegedly as a dirty business tactic to keep Guidance from underselling them in the marketplace, the Defendants stopped supplying endodontic obturators to Guidance. The Defendants told Guidance that they were ceasing to supply obturators because they heard that Guidance was telling its customers and potential customers that the Defendants manufactured the products, which, they alleged, would be in violation of the Supply Agreement. In addition to ceasing to supply obturators, the Defendants refused to manufacture a new endodontic file -- the V2 file -- which Guidance was intending to sell.[3] The Defendants contended that the Supply Agreement required Guidance to supply them with detailed engineering drawings before they were obligated to supply the V2 file. Guidance disputes that the Supply Agreement requires them to provide engineering drawings as a prerequisite to the Defendants

---

rendering the filling material malleable and usable to fill in the hole that the file leaves. See Complaint ¶ 109, at 22.

[2] Throughout this Memorandum Opinion and Order, the Court will refer to the parties' Supply Agreement, dated July 29, 2008. On November 21, 2008, the agreement was filed in support of Guidance's TRO Application as Doc. 2-1. It was introduced at trial as Plaintiff's Trial Exhibit 367. The document the Court refers to as "Exhibit 1" is part of the Supply Agreement. In Doc. 2-1, Exhibit 1 is found at pages 24-39, according to the CM/ECF electronic pagination. The Court will cite to both of these documents in the record as Doc. 2-1, and include any applicable Supply-Agreement paragraph number and the CM/ECF page number.

[3] The Court uses the term "new" in a colloquial sense and is not invoking the language of Article 4.5 of the supply agreement, which governs "new products."

producing the V2.  Finally, the Defendants waged an organized marketing campaign to drive Guidance out of business, which included sales staff falsely representing to actual and potential Guidance customers that Guidance was no longer able to supply endodontic files.  Based on these three categories of conduct, Guidance filed this suit.

Article 4.5 of the Supply Agreement governs new products: "New Products.  If Guidance desires to have TDP manufacture endodontic files or obturators, which are improvements or successor products (of similar design) to the Guidance Files or Guidance Obturator, Guidance will present product specifications to TDP for such products."  Doc. 2.1 ¶ 4.5, at 6.  Exhibit 1 to the Supply Agreement can be separated into and referenced by two distinct sections.  The first part of Exhibit 1 -- located at page 24 of 43 in the CM/ECF pagination -- purports to be a list of the initial Guidance Products in development at the time that the parties executed the Supply Agreement.  See Doc. 2-1, at 24.  The first paragraph of the first part of Exhibit 1 states:

> **The following is a list of products/specifications for the Guidance Products. Guidance from time to time may make minor changes (not to exceed 3 minor changes per year utilizing stock materials and/or processes validated on existing production equipment and complete with engineering drawings detailing product specs and tolerances) to the .04 and .06 taper files by changing the tip, number of flutes, and color of stopper on the files, provided that in any event, TDP shall not be required to make any prototypes for any such changes and TDP would have 120 days from the request to implement the changes on prospectively produced products.  Any dissatisfaction of Guidance with such changed files shall be at its risk and shall not constitute the basis for a claim of a non-conforming product.**

Doc. 2-1, at 24 (bold in original).  Like Article 4.5, the second part of Exhibit 1 to the Supply Agreement also addresses new products.  The first paragraph of that second part states:

> **The following is a list of possible products that Guidance may desire for Dentsply Tulsa to manufacture.  These products are subject to Paragraph 4.5 of the Agreement.  In addition, Guidance agrees that none of the following additional products will be prototyped for a period of eighteen months after the Effective Date of the Agreement and, in the case of niti instruments, no more**

-4-

**than two rounds of prototypes of any instrument will be provided by Dentsply. If additional prototypes are requested, Guidance will be charged a fee for each round of prototypes. All requests for prototypes under this agreement must be submitted with engineering drawing(s) complete with product specs and tolerances.**

Doc. 2-1, at 25 (bold in original).

## **PROCEDURAL BACKGROUND**

On November 21, 2008, Guidance filed a Complaint in federal district court asserting several causes of action against the Defendants, including breach of contract. See Complaint ¶¶ 158-187, at 30-33. At that time, Guidance referred to the V2 file as a "new Guidance product[.]" Complaint ¶ 171, at 31. Guidance also expressed a belief that Article 4.5 of the Supply Agreement applied to the production of the V2 file, as demonstrated by Guidance alleging that the Defendants breached Article 4.5 by demanding engineering drawings before they would produce the V2. See Complaint ¶¶ 169-179, at 31-32.

The position that Article 4.5 applied to the V2 was more clearly stated in Guidance's Memorandum in Support of Application for Temporary Restraining Order, filed November 21, 2008 (Doc. 4)("TRO App. Memo."). In that memorandum, Guidance stated:

> Pursuant to Article 4.5 of the Supply Agreement, if Guidance desired to manufacture new products it was to submit "product specifications" to defendant TDP for such products. (Compl. ¶ 91). On or about September 2, 2008, Guidance submitted such "product specifications" and a prototype acceptable to Guidance was developed at the Plant. (Compl. ¶¶ 92, 102).

TRO App. Memo. at 11 (emphasis added). Guidance filed a declaration by Goodis in support of the TRO application. See Declaration of Charles J. Goodis in Support of Plaintiff's Application for Temporary Restraining Order (executed Nov. 21, 2008), filed November 21, 2008 (Doc. 5)("Goodis Decl."). In his declaration, Goodis refers to the V2 as a "new File," Goodis Decl. ¶ 8, at 2, and a "next-generation file[]," id. ¶ 27, at 6.

-5-

At the TRO hearing, on November 25, 2008, Thomas Gulley, the Defendants' attorney, stated the Defendants' belief that the first part of Exhibit 1 governed the production of the V2:

> MR. GULLEY: . . . The first page of Exhibit 1 . . . at the top in the bold print there is itemization there of what is required for products that have minor changes to them. My clients believe that this V2-Taper product is a change to the EndoTaper that my clients have been making, and the important part of this bolded print is that it begins in the fourth line there that these changes must come complete with engineering drawings, detailing product specs and tolerances.

Transcript of Hearing at 8:16-9:1 (taken Nov. 25, 2008), filed December 9, 2008 (Doc. 25)("Nov. 25 Tr.")(Gulley).  At that same hearing, in response to cross-examination by Mr. Gulley, Goodis testified that the first part of Exhibit 1 applied to the V2 file:

> Q.      If you would, look at the first page of -- Well, take a look at Exhibit 1.  In order to have Dentsply produce the V2 for you, where would that be covered on Exhibit 1?
>
> A.      Are you asking throughout the document, or does it state the V2?
>
> Q.      No. I'm just asking on Exhibit 1. Where does the V2 come in?
>
> * * * *
>
> A.      It was not specified by name as a V2. . . .  It's under the -- under a size for the EndoTaper. . . . Where it says under number 3, "EndoTaper constant taper sizes."
>
> * * * *
>
> Q.      So are you saying that number 3, the EndoTaper constant taper size, on that page is where the V2 falls?
>
> A.      That's where the V2 would fall.

Transcript of Hearing at 132:10-134:20 (taken Nov. 26, 2008), filed December 9, 2008 (Doc. 26)("Nov. 26 Tr.")(Gulley, Goodis).  Goodis testified similarly on December 5, 2008, under questioning by John Kelly, Guidance's attorney:

> Q.      . . . In the court most of the last four days we've been using two terms, EndoTaper file and V2 file.

-6-

A.      Yes.

Q.      Do those terms relate to what's described on page -- first page of Exhibit 1 as an .04 taper file and a .06 taper file?

A.      Yes.

Q.      Okay. Which is which?

A.      The EndoTaper would be an .06 taper file, and the V2 would be an .04 taper file.

Transcript of Hearing at 342:15-25 (taken Dec. 5, 2008), filed December 9, 2008 (Doc. 28)("Dec. 5 Tr.")(Kelly, Goodis).  In closing argument in the TRO hearing, Mr. Gulley again represented that it believed the V2 was covered by the first part, rather than the second part, of Exhibit 1.  See Transcript of Hearing at 570:4-13, 570:21-571:7 (taken Dec. 8, 2008), filed December 14, 2008 (Doc. 29)("Dec. 8 Tr.")(Court, Gulley).  Mr. Gulley disclaimed reliance on a sentence in the second part of Exhibit 1 that states that "[a]ll requests for prototypes under this agreement must be submitted with engineering drawing(s) complete with product specs and tolerances."  Dec. 8 Tr. at 570:4-17 (Court, Gulley).

During the preliminary-injunction hearing, Mr. Kelly stated that "it's clear from the first page of Exhibit 1" that the Defendants are "obligated to manufacture the . . . .04 constant-taper file." Transcript of Hearing at 15:13-17 (taken Dec. 17, 2008), filed February 9, 2009 (Doc. 55)("Dec. 17 Tr.")(Kelly)(emphasis added).  He clarified that the .04 constant-taper file is alternatively known as the V2 file.  See Dec. 17 Tr. at 10:20-24, 11:17-21, 12:7-13 (Kelly).  Mr. Kelly closed his argument on December 18, 2008 in part by stating:

> [W]e all may be a little bit hung up on the fact that [the .04 constant-taper file is] called a V2 file, but the testimony by the people most knowledgeable . . . [was] very clear that the V2 file . . . is a .04 constant-taper file and that that file is specifically listed on [the first part of Exhibit 1 to the Supply Agreement].  And, indeed, there is listed in the middle of the page a .04 taper file.

Transcript of Hearing at 140:4-18 (taken Dec. 18, 2008), filed February 17, 2009 (Doc. 57)("Dec. 18 Tr.")(Kelly).

Various witnesses' deposition testimony likewise corroborated that the V2 was a product listed on the first part of Exhibit 1, and not a New Product subject to Article 4.5. James Mosch, Dentsply's Senior Vice President, testified that he believed the .06 and .04 constant-taper files were Guidance Products which the first part of Exhibit 1, rather than by Article 4.5, governed. See Guidance's Opposition to Dentsply/TDP's "Motion for a New Trial on Whether the V2 is a 'New Product' and Error in Jury Instruction 21" [Doc. 502] at Exhibit B, filed February 24, 2010 (Doc. 510) ("Response")(May 21, 2009 deposition of Mosch).[4] Bill Newell, TDP's Vice President and General Manager, testified in deposition that he believed Guidance's obligation to supply engineering drawings arose, at least in part, from the first part of Exhibit 1. See Response Exhibit C (May 14, 2009 deposition of Bill Newell).

Guidance filed a Motion to Amend Complaint, with a proposed amended complaint, on August 31, 2009. See Plaintiff's Motion to Amend Complaint and for Leave to File Exhibits in Excess of 50 Pages, filed August 31, 2009 (Doc. 286). The Court denied Guidance's request to amend the Complaint, noting: "The Court is convinced . . . that Guidance unduly delayed in moving to amend its Complaint and that the amendment would cause undue prejudice to the Defendants." Memorandum Opinion and Order at 2, filed September 29, 2009 (Doc. 384). Nevertheless, the proposed amended complaint, like the Complaint, stated that V2 was a new file and alleged that the Defendants violated Article 4.5 of the Supply Agreement by demanding engineering drawings

---

[4] The term "Guidance Products" is a defined term in the Supply Agreement. "Guidance Products" refers to "the Guidance Files, Obturators, and Ovens." Doc. 2-1, ¶ 1.2.5, at 2. "Guidance Files" refers to "endodontic files made from nickel-titanium ("NiTi"), as specified in Exhibit 1." Doc. 2-1, ¶ 1.2.2, at 1.

before they would produce it.  See Proposed First Amended Complaint and Demand for Jury Trial ¶¶ 225-235, at 41-42, filed August 31, 2009 (Doc. 286-1)("Prop'd First Am. Compl.").

In the proposed Pretrial Order, which the parties submitted to the Court on August 31, 2009, Guidance arguably maintained that the V2 file was a new product subject to Article 4.5 and that the Supply Agreement was unambiguous.   See Exhibit A: Factual Contentions Underlying Claims/Defenses ¶¶ 66-90, at 14-17, filed October 9, 2009 (Doc. 434-1)(Attachment to the Pretrial Order).  Guidance did not, however, state that it was subject to Article 4.5; rather, Guidance contended that:

66.    In September 2008 Guidance was in the process of developing a new file, called the V2 file, an .04 constant taper file.

67.    The V2 file was to replace Guidance's older V-Taper file that was manufactured by Guidance's previous manufacturer.* [sic]

* * * *

69.    Guidance also included "product specifications" as required by the Supply Agreement.* [sic]

Exhibit A: Factual Contentions Underlying Claims/Defenses ¶¶ 66-69, at 14 (emphasis added).  As the Defendants point out, the statement that Guidance "included 'product specifications' as required by the Supply Agreement," id. ¶ 69, at 14, appears to be an implicit reference to Article 4.5, which places upon Guidance an obligation to supply "product specifications" when it requests that the Defendants manufacture "new products" which are "improvements or successor products . . . to the Guidance Files or Guidance Obturators," Doc. 2-1, ¶ 4.5, at 6.

At trial, many of the exhibits -- most or all of which pre-dated the trial itself -- also supported the assertion that the V2 and the .04 constant-taper file on the first part of Exhibit 1 were one and the same.  See Response Exhibits E-H (electronic-mail transmissions, Plaintiff's Trial Exhibits 763,

437, 621, and 6). Moreover, testimony at both the beginning and end of the trial, either from Guidance's witnesses or elicited by Guidance, also supported finding that the V2 and the .04 constant-taper file were the same. See Transcript of Trial at 745:11-747:2 (taken Sept. 23, 2009), filed December 14, 2009 (Doc. 485)(Gulley, Goodis)(Goodis testifying that the .04 constant-taper file listed on the first part of Exhibit 1 is the V2); Transcript of Hearing at 22:9-24:17 (taken Oct. 6, 2009), filed January 19, 2010 (Doc. 500)("Oct. 6 Tr.")(Kelly, Littleton)(Littleton testifying that the V2 is a .04 constant-taper file). In the end, neither side treated the V2 as a new product under Article 4.5, and neither side argued that the "new product" paragraph at the bottom of the second part of Exhibit 1 applied to the V2.

### 1.    Guidance's Alleged Mid-Trial Reversal of Position.

Until October 2, 2009, neither party had specifically contended that the Supply Agreement was ambiguous or explicitly asked the Court to construe it. On October 2, 2009, the Court brought the issue up *sua sponte*, outside the jury's presence. At that time, the Court noted:

> Now, something that I have been interested in and not sure where the parties are going, is that nobody has argued this contract is ambiguous, so if everybody's going to take the position that it's unambiguous, then a lot of this course-of-dealing issue is not going to be relevant. . . . [B]oth sides have been rather adamant that it's clear on the face.

Transcript of Trial at 2628:10-19 (taken October 2, 2009), filed May 10, 2010 (Doc. 561) ("Oct. 2 Tr.")(Court). At that time, Kyle Bisceglie, Guidance's attorney, responded that he believed the Supply Agreement was unambiguous, but Mr. Kelly stated for the first time that there was one issue that was arguably ambiguous. See Oct. 2 Tr. at 2629:11-16 (Court, Bisceglie)("THE COURT: . . . Everybody's taken the position that it's unambiguous. And, so . . . MR. BISCEGLIE: Right. Yep."); id. at 2632:7-17 (Court, Kelly)("MR. KELLY: I think I may want -- and, obviously, have to talk to Kyle -- to identify at least one small issue that I think may be ambiguous in the contract

that we haven't . . . explicitly brought").  Mr. Gulley also took the position that the Supply Agreement was unambiguous.  See Oct. 2 Tr. at 2631:5-10 (Court, Gulley)("MR. GULLEY: Our position is it's not ambiguous.").  At the end of the day, however, Mr. Kelly stated that he believed Exhibit 1 was "arguably ambiguous."  Oct 2 Tr. at 2768:6-2770:8 (Kelly).

When Mr. Kelly raised the fact that Exhibit 1 might be ambiguous, the Court and parties discussed what might be the proper roles of judge and jury in resolving the ultimate disputes between the parties.  Some time into that discussion, Mr. Gulley raised the issue that Guidance had been relying on Article 4.5 for its contract claim and that Mr. Kelly's asserted ambiguity might be inconsistent with that prior position.  See Oct. 2 Tr. at 2778:17-2779:12 (Gulley).  Mr. Kelly responded by noting that the Defendants had not filed a motion to dismiss or for summary judgment on the breach-of-contract claim and that nobody had expressly raised the issue of ambiguity in Exhibit 1.  See Oct. 2 Tr. at 2779:16-21 (Kelly).

On October 4, 2009, Guidance filed a motion asking the Court to determine whether the Supply Agreement was ambiguous.  See Motion to Determine Whether Contract Provision is Ambiguous and to Allow Consideration of Expert Testimony on Trade Usage, Custom and Practice to Interpret Ambiguous Provision, filed October 4, 2009 (Doc. 404)("Ambiguity Motion").  The Defendants refer to this motion as the first time that Guidance had, on paper, eschewed its theory that the V2 file was a "New Product" which Article 4.5 governed.  See Motion at 6.  In that brief, Guidance first articulated a theory of the case that points to a disagreement whether the word "files" in the first part of Exhibit 1 refers to files in production or something else.  Ambiguity Motion at 3.  The other purpose of the motion was to advocate that the jury, not the Court, should resolve the contract's ambiguities.  See id. at 4-7.

On October 5, 2009, in discussing Guidance's motion, the Court stated that it was inclined

to instruct the jury that engineering drawings were required, thus narrowing the issue to whether the documents that Guidance provided were detailed engineering drawings.  See, e.g., Transcript of Trial at 2914:20-23 (taken October 5, 2009), filed May 17, 2010 (Doc. 568)("Oct. 5 Tr.") (Court)("THE COURT: . . . I probably am inclined to do no more than say it does require detailed drawings and then . . . leave it to the jury to determine whether detailed drawings were submitted."). The following day, however, the Court concluded that there was ambiguity in the Supply Agreement whether it required Guidance to provide detailed engineering drawings for the V2.  See, e.g., Oct. 6 Tr. 10:7-11 (Court)("THE COURT: . . . I think it's a very close call whether the contract is ambiguous at all. [But] I have concluded that it is[.]"); id. at 11:4-7 (Court)("THE COURT: . . . So, I think in the end there is ambiguity, but I think that the evidence seems to rather strongly indicate that the proper construction is that detailed engineering drawings were required.").

        On the afternoon of October 6, 2009, after the Court's comments earlier in the day, Guidance filed a letter with the Court stating that it believed the V2 file was "listed in the first part of Exhibit 1, # 3."  Letter from John Kelly to the Court at 1 (dated Oct. 6, 2009), filed October 6, 2009 (Doc. 411).  In response, on October 7, 2009, the Defendants filed a letter arguing that Guidance was changing its long-held position that the V2 was governed by Article 4.5 of the Supply Agreement, which referred to New Products.  See Letter from Thomas Gulley to the Court at 1-3 (dated Oct. 7, 2009), filed October 7, 2009 (Doc. 415).  In that letter, Gulley relied on more-or-less the same doctrines and arguments presented in this motion.

        **2.      The Jury Returns a Verdict for Guidance, and the Court Enters Judgment.**

        The jury trial in this case lasted three weeks, running from September 21, 2009 through October 9, 2009.  See Clerk's Minutes Before the Honorable James O Browning at 1, filed September 21, 2009 (Doc. 439).  On Wednesday, October 7, 2009, the Court read the instructions

-12-

to the jury.  See id. at 40.  Those instructions included Guidance's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the New Mexico Unfair Practices Act, NMSA 1978, § 57-12-1 through § 57-12-26 ("NMUPA"), and violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), but made no direct reference to Article 4.5.  See Court's Final Jury Instructions (Given), Instruction No. 18, at 18, filed October 8, 2009 (Doc. 430).  The Court had dismissed Guidance's other claims before trial.  Instruction No. 21, as given to the jury for its deliberations, stated:

### INSTRUCTION NO. 21

The contract is ambiguous whether it required Guidance to provide Dentsply and/or Tulsa Dental with detailed engineering drawings before Dentsply and/or Tulsa Dental would produce the V2 file.  You must determine whether the ".04 Taper" under the section titled "3.  EndoTaper Constant Taper Sizes" on the first page of Exhibit 1 to the Manufacturing and Supply Agreement refers to the V2.  If the ".04 Taper" under the section titled "3.  EndoTaper Constant Taper Sizes" on the first page of Exhibit 1 of the Manufacturing and Supply Agreement does not refer to the V2, then Guidance was required to provide Dentsply and/or Tulsa Dental with such engineering drawings.

If you determine that the V2 and the .04 Taper are the same, there is a further ambiguity what the word "files" means in the bold paragraph at the top of page 1 on Exhibit 1 of the contract.  If you find that the word "file" in the fifth sentence of the paragraph refers to frozen designs of files, and find that Guidance froze the design of the V2, then after that, engineering drawings for the V2 detailing product specs and tolerances were required for minor changes.  If, on the other hand, you find that the word "file" refers only to files in production, the Manufacturing and Supply Agreement does not require Guidance to provide Dentsply and/or Tulsa Dental with engineering drawings detailing product specs and tolerances until it makes minor changes to the files in production.

Court's Final Jury Instructions (Given), Instruction No. 21, at 21.

The jury deliberated for approximately two days.  On October 9, 2009, the jury returned a verdict largely in favor of Guidance.  The jury found that the Defendants breached the Supply Agreement with regard to its failure to supply obturators and its failure to produce the V2 file, and

-13-

found that breach caused Guidance damages.  See Verdict Form ¶¶ 2-4, at 2, filed October 9, 2009 (Doc. 441).  The jury also found that the Defendants breached the implied covenant of good faith and fair dealing and violated the NMUPA, and found that both infractions caused damages to Guidance.  See id. ¶¶ 5-12, at 2-3.  The jury awarded Guidance $500,000.00 in compensatory damages for past harm caused by the breach of contract related to the V2, and $3,580,000.00 in future damages related to that breach.  See Verdict Form ¶¶ 15-16, at 4.  The jury also found that Guidance was entitled to nominal damages of $200,000.00 for the Defendants' unlawful conduct. See Verdict Form ¶¶ 17-21, at 4-5.[5]  Finally, based on the breach of the implied covenant and violation of the NMUPA, the jury awarded Guidance punitive damages of $40,000,000.00.  See Verdict Form ¶¶ 22-23, at 5-6.

The jury also found that Guidance breached the Supply Agreement and willfully engaged in false advertising in violation of the Lanham Act, 15 U.S.C. § 1125.  See Verdict Form ¶¶ 24-27, at 6-7.  The jury awarded the Defendants $93,000.00 in compensatory damages.  See id. ¶ 35, at 8.

On October 22, 2009, Guidance filed a motion asking the Court to enter a final judgment in conformity with the jury's verdict.  See Motion for Entry of Final Judgment, filed October 22, 2009 (Doc. 450).  The Court granted the motion in part, see Order, filed March 31, 2009 (Doc. 537), and entered a judgment similar to the judgment that Guidance sought, see Final Judgment, filed March 31, 2010 (Doc. 538).  This motion is one of several that the Defendants have filed in an effort to avoid the award against it.[6]

---

[5] The Court appreciates the apparent internal contradiction of an award of $200,000.00 in nominal damages.

[6] On October 30, 2009, the Defendants filed Dentsply/TDP's Motion to Set Aside the Punitive Damages Award and the Breach of Implied Covenant Verdict and for Judgment Notwithstanding the Verdict.  See Doc. 454 (asking the Court to set aside the punitive damages

3.      **The Parties' Arguments.**

The Defendants now move for a new trial pursuant to rule 59 of the Federal Rules of Civil Procedure.  They present two primary arguments in support of this motion: (i) that Guidance switched theories mid-way through the trial and that the Court should grant the Defendants a new trial based on the prejudice that Guidance's conduct caused; and (ii) that the Court erred in jury instruction 21, which warrants a new trial.  See Motion at 2.  With respect to the first argument -- Guidance's alleged mid-trial change in theory -- the Defendants point primarily to Guidance's theory that the Defendants' demand for engineering drawings violated Article 4.5 of the Supply Agreement as proof that Guidance believed that the V2 file fell under the second portion of Exhibit 1, rather than the first.  See Motion at 2-3 (citing Complaint ¶¶ 91, 171-74, at 19, 31-32). They also argue that Guidance and Guidance's witnesses referred to the V2 as a "new product," to which Article 4.5 applies.  See Motion at 2-3  (citing Complaint ¶¶ 91, 171-74, at 19, 31-32).[7]  The

---

award).  Although not directly related to the punitive-damages award, on November 9, 2009, the Defendants filed Dentsply/TDP's Motion to Vacate the Jury's Award of Future Damages for Breach of Contract and to Enter Judgment as a Matter of Law on the Future Damages Award.  See Doc. 459 (arguing for a reduction in compensatory damages, which would affect the reasonableness of the award of punitive damages).  On February 10, 2010, they filed this motion, asking the Court to vacate the jury verdict and order a new trial based in part on an allegedly erroneous jury instruction. Also on February 10, 2010, the Defendants filed Dentsply/TDP's Motion to Set Aside the UPA Verdict and Enter Judgment as a Matter of Law or Order a New Trial.  See Doc. 503 (asking the Court to set aside the verdict of liability under the New Mexico UPA because it is one of the bases for awarding punitive damages in this breach-of-contract action).  The Court denied that motion in a Memorandum Opinion and Order filed July 1, 2010 (Doc. 605).  On April 28, 2010, they filed Dentsply/TDP's Motion for New Trial Based on the Punitive Damages Limiting Instruction.  See Doc. 547 (asking the Court to set aside the punitive damages award and order a new trial based on an allegedly erroneous jury instruction).  Also on April 28, 2010, they filed Dentsply/TDP's Motion for Remittitur, or, in the Alternative, for New Trial Under Rule 59.  See Doc. 549 (seeking remittitur of jury's punitive damages verdict or a new trial).

[7] For example, the original Complaint alleged that the "Defendants breached the Supply Agreement by refusing to manufacture new Guidance products, specifically the V2 Taper Files, in violation of Article 4.5."  Complaint ¶ 171, at 31.  Elsewhere, it alleged that the "Defendants have

Defendants insist that such references to the V2 being a "new product" governed by Article 4.5 began as early as the original Complaint, continued into the proposed Amended Complaint, and even made it to the Pretrial Order in this case.  See Motion at 4.  They argue that "[t]he first hint that Guidance might take a new position on the application of Article 4.5 to the V2 came nearly two weeks into the three-week trial."  Motion at 5.  The Defendants recount their view of how the trial played out and accuse Guidance's attorneys of changing their theory by stating, for the first time, on October 2, 2009, that the Supply Agreement might be ambiguous, and by asserting a second alleged ambiguity in the Supply Agreement by letter brief filed on October 6, 2009.  See Motion at 5-8.

The Defendants insist that Guidance's change in position surprised and prejudiced them.  See Motion at 8.  They assert first that it is clear that Guidance's ending position was that the V2 was not a "new product" subject to Article 4.5, and that this position is clearly opposite Guidance's initial position, which was that the Defendants violated Article 4.5 by requiring engineering drawings before producing the V2.  See Motion at 9.  They then argue that this surprise unfairly prejudiced them because, had they known of this new theory, they would have sought evidence -- both in discovery and through cross-examination at trial -- which would have proved that the V2 was, in fact, a new product governed by Article 4.5.  See Motion at 9-11.  Because Guidance made them believe that the applicability of Article 4.5 was uncontroverted, they argue, Guidance's sudden change in position prejudiced them.  See id.  The Defendants argue that, absent Guidance's change in tactics, the jury "would likely not have found for Guidance on the question whether

---

imposed commercially unreasonable requirements not required under the Supply Agreement, such as engineering drawings, and have disallowed necessary communication, such as permitting Dr. Goodis to discuss design of prototypes with Defendants' project manager, in violation of Article 4.5."  Complaint ¶ 172, at 31-32.

Dentsply/TDP breached the Supply Agreement with respect to the V2 file." Motion at 11. They assert that they were likely to win on the merits because, until Guidance proposed this ambiguity whether Article 4.5 governed the V2, the Court was inclined to instruct the jury that Guidance was required to supply engineering drawings and there was no evidence in the record that the documents that Guidance submitted were "engineering drawings complete with product specs and tolerances." Motion at 11-12. The Defendants argue that they were prejudiced because they had no adequate opportunity to respond to Guidance's change in position, as it occurred after they had rested their case-in-chief and, in part, after the Court had instructed the jury. See Motion at 12. Finally, while the Defendants concede that they must, to properly preserve the error for post-trial consideration, take steps to cure it at trial, they argue that they did everything they reasonably could by making timely, specific objections and arguing that the Court should exclude Guidance's new theory. See Motion at 13.

The Defendants' second argument is that the Court should have prohibited Guidance's new theory under the doctrine of judicial estoppel. See Motion at 14-16. They assert that Guidance consistently argued that the V2 was a new product and that Article 4.5 of the Supply Agreement governed its production, and that the Court adopted that legal position. See Motion at 14-15. Because the Court adopted Guidance's prior position, the Defendants assert, Guidance is prohibited from adopting a legal position contrary to the one that the Court adopted. See id. at 14-16.

The Defendants' next basis for requesting a new trial is that the Court allegedly erred in giving Instruction 21 of the Final Jury Instructions. See Motion at 16-27; Court's Final Jury Instructions (Given), Instruction No. 21, at 21, filed October 8, 2009 (Doc. 430). The Defendants argue, however, that the Supply Agreement unambiguously requires engineering drawings for production of the V2 file, regardless whether the V2 falls under the first or second part of Exhibit 1.

<u>See</u> Motion at 16-21.   The Defendants bolster their argument by stating that the indemnity agreement of Article 6.2 supplies further support for the idea that Guidance was required to supply engineering drawings, because the contract puts liability for designs that infringe other parties' patents on Guidance.   <u>See</u> Motion at 20.

The Defendants then make several other arguments why Instruction 21 was erroneous.   First, the Defendants argue that it was error to ask the jury if the .04 constant taper file referred to on the first page of Exhibit 1 was the V2, because there is reference to a .04 constant taper file in both the first and second parts of Exhibit 1.   <u>See</u> Motion at 23-24.   They argue that the correct instruction would have told the jury to determine whether the V2 was the .04 constant-taper file in the first part of Exhibit 1, or was a "new product" subject to Article 4.5 and the second part of Exhibit 1.   <u>See</u> Motion at 24-25.

Second, the Defendants assert, Instruction 21 should not have asked the jury to determine whether the word "files" in the first part of Exhibit 1 referred to frozen designs of files or files in production, both because the issue was not raised to the Court until after the Court had instructed the jury, and because there was "nothing in the Supply Agreement to suggest that . . . the parties intended the word 'files' to mean only 'files in production.'" Motion at 25-26.   They also argue that the meaning of the word "files" in the first paragraph of Exhibit 1 is unambiguous, and argue that interpreting it to mean "files in production" would illogically allow Guidance to make infinite changes to a file design without providing engineering drawings until it is both frozen and produced. Motion at 25-26.   Another illogical result of concluding that "files" means "files in production," the Defendants assert, is that it would mean that the V2 was in the first part of Exhibit 1 for the purposes of avoiding the requirement of engineering drawings, and yet not in the first part of Exhibit 1 for the purpose of limiting the number and permissible kinds of changes.   <u>See</u> Motion at 26.

Finally, the Defendants insist that Instruction 21 erroneously allowed the jury to conclude that engineering drawings were required for more-than-minor changes after the file design was frozen.  See Motion at 27.  They assert that the changes that Goodis sought to make after freezing the design of the V2 file the first time were not minor changes and thus that Guidance was required to supply TDP with engineering drawings before making those changes.  See Motion at 27.

Guidance's response brief focuses primarily on the allegation that it changed its theory mid-way through the trial.  It argues that the Defendants have been aware since very early in the litigation process that Guidance believed that the V2 was the .04 constant-taper file identified in the first part of Exhibit 1, see Response at 1-2, and that their arguments to the contrary are "as untenable as [they] are disingenuous," Response at 2.  Guidance asserts that neither party treated the V2 as a "new product" subject to Article 4.5.  Guidance cites to statements in the TRO hearing, the Preliminary Injunction hearing, depositions, and at trial that indicated that both parties believed that the first part of Exhibit 1 governed the production of the V2.  See Response at 5-10.  If either party had believed that the V2 was a new product, Guidance asserts, there would have been no lawsuit because the express terms of the second part of Exhibit 1 dictates that any "new product" covered by that part "will [not] be prototyped for a period of eighteen months after the Effective Date of the Agreement," Doc. 2-1, at 25, and therefore Guidance would not have been entitled to have the V2 produced until January 29, 2010, see Response at 3, 12.  Rather, Guidance contends that the Defendants were indisputably aware that it believed the V2 was the same as the .04 constant-taper file listed in the first part of Exhibit 1 and that it did not believe the V2 was a "new product" subject to Article 4.5.  Response at 12-13.

Guidance next argues that the Defendants' authority does not stand for the proposition that alleged "surprise and prejudice" warrants a new trial.  Response at 13-15.  Instead, Guidance argues,

the principles in the cases that the Defendants cite are limited to cases in which a party presents expert testimony that was not properly disclosed as rule 26(a)(2) requires.  See Response at 13-14. It also asserts that the Defendants have not fully satisfied the tests set forth in the case law, as they have failed to "show 'an attempt to cure the prejudice such as a motion for a continuance,'" Response at 14 (quoting Hynes v. Energy W., Inc., 211 F.3d 1193, 1203 (10th Cir. 2000)), and did not show that Guidance acted with "bad faith or willfulness," Response at 14 (citing Nalder v. W. Park Hosp., 254 F.2d 1168, 1177 (10th Cir. 2001)).  Guidance also argues that, to the extent it referred to Article 4.5 of the Supply Agreement, the Court properly overlooked that as an error, and correctly allowed it to go forward on its other theory because the Defendants were put adequately on notice of the claim.  See Response at 15.  Moreover, Guidance asserts, the Defendants did not allege surprise or prejudice until the Court announced that it might construe Exhibit 1 as not requiring engineering drawings if the V2 was the .04 constant-taper file on page 1.  See Response at 16-17.  Guidance accuses the Defendants of being the ones who changed their position on interpretation of the Supply Agreement in the midst of trial.  See Response at 17.

Guidance next opposes the Defendants' judicial estoppel argument.  It asserts first that it did not change its position with respect to whether the first or second part of Exhibit 1 governed the V2.[8] See Response at 18-19.  It next argues that judicial estoppel applies only where the party who is changing its position has secured a judgment based on the prior position, and that Guidance did not secure a judgment in this case under any prior theory.  See id.  Finally, it asserts, judicial estoppel applies only where a party is "playing fast and loose with the courts" by changing its position, and

---

[8] The response brief states that the "Defendants did not change their position with respect to whether the V2 was governed by Page 1 or Page 2 of Exhibit 1," but the Court assumes that Guidance intended to assert that it, and not the Defendants, was the one who had been consistent in its position.

there is no evidence that Guidance was engaging in any such "fast and loose" behavior.  Id. at 19-20.

Rather, Guidance calls its reference to Article 4.5 in the Complaint and TRO application a "good

faith mistake" and a "factually incorrect proposition."  Id. at 20.

Finally, Guidance opposes the Defendants arguments that Instruction No. 21 was in any way

erroneous.  It first cites rule 51 as the proper standard for determining whether error in a jury

instruction has been preserved and asserts that the Defendants did not properly preserve any of their

arguments at trial.  See Response at 20-21.  Guidance then opposes the Defendants' arguments on

their merits.  It opposes Defendants' argument that the Court erred in asking the jury to decide if the

.04 constant-taper file on page 1 of Exhibit 1 was the V2, because the Defendants' counsel conceded

at trial that the Instruction should ask the jury to "determine whether the first part of Exhibit 1 . . .

refers to the V2," Response at 21-22, and because the term "V2" is nowhere to be found in the

Supply Agreement or Exhibit 1, Response at 22 n.11.  Guidance opposes the Defendants' objection

to asking the jury to interpret the meaning of the word "files" because, it contends, the allegedly

meaning of the word files that the Defendants propose -- i.e., frozen designs of files -- is "incorrect

as a matter of basic contract interpretation [and] inconsistent with the statements of counsel for

Defendants in open court."  Response at 23-25.[9]

In their reply brief, the Defendants first attack Guidance's response for failing to address the

Defendants' argument that the Supply Agreement unambiguously always requires engineering

drawings, and their argument that the Pretrial Order, much like the Complaint and TRO application,

contends that the Defendants violated Article 4.5 of the Supply Agreement by requiring engineering

---

[9] Guidance opposes the Defendants' third ground for finding Instruction 21 erroneous -- that
the Court should have further instructed the jury that, if the design was frozen and the change sought
was more than minor, Guidance was required to provide engineering drawings -- only on the
grounds that the Defendants failed to preserve the argument.  See Response at 25-26.

drawings rather than "product specifications."  Dentsply/TDP's Reply in Support of Their Motion for a New Trial Due to Guidance's Prejudicial Mid-Trial Switch in Position on Whether the V2 is a "New Product" and Error in Jury Instruction 21 at 1, 12-13, filed March 15, 2010 (Doc. 521) ("Reply").  The Defendants then reiterate their arguments that the Court should grant a new trial because Guidance changed horses mid-trial, and because the mid-trial change in theories both surprised and prejudiced the Defendants.  See Reply at 2-5.  They call Guidance's change in approach a "tactical decision," and not an error, as Guidance now contends, and argue that Guidance cannot rely on a legal theory that was not disclosed in the Pretrial Order.  See Reply at 5-10.  They attempt to discredit or distinguish the evidence to which Guidance refers in its motion, and to demonstrate for the Court how and when they preserved their objections for post-trial review.  See id. at 8-11.

### 4.      The Court Held an Extensive, Two-Day Hearing.

The hearing on this motion spanned almost two full days, and both sides gave extensive argument and answered numerous questions that the Court posed.  Howard Radzely, the Defendants' attorney, touched on four primary points: (i) the Defendants' surprise argument; (ii) their judicial estoppel argument; (iii) their argument that, under Delaware contract law, the Supply Agreement unambiguously required Guidance to provide engineering drawings; and (iv) that Instruction 21 was erroneous as a matter of law.[10]  He conceded that the Court would likely find, if it went through the entire record, that the Defendants' position on the meaning and effect of Exhibit 1 has not been consistent over the course of the litigation.  See Transcript of Hearing at 317:16-318:4 (taken

---

[10] Mr. Radzely is one of several new attorneys that the Defendants have retained to handle the post-trial proceedings in this case.  He did not participate in the trial, as Mr. Kelly pointed out several times during the hearing.

March 23, 2010), filed May 4, 2010 (Doc. 559)("Mar. 23 Tr.")(Court, Radzely).  He spent much of

his time, however, arguing that the Supply Agreement unambiguously always required Guidance

to provide engineering drawings before the Defendants produced the V2 file, no matter in what

section of the Agreement or Exhibit 1 the Court finds the V2.  See, e.g., Mar. 23 Tr. at 322:22-326:7

(Radzely).

      Mr. Kelly conceded that his position changed near the end of the trial from a belief that the

contract was unambiguous in his favor to conceding that the contract was ambiguous in some

respects.[11]  See Mar. 23 Tr. at 357:5-8 (Kelly).  He also conceded that Guidance referenced Article

4.5 in the Complaint and in the TRO application, but asserted that those references could not

possibly have caused the surprise and prejudice that the Defendants now allege.  See Mar. 23 Tr. at

358:1-11 (Kelly).  He asserted that this motion for new trial is really a disguised post-trial motion

for directed verdict on a basis that has never before been asserted in such a motion.  See id. at

357:17-25 (Kelly).  Mr. Kelly stated that, in preparing to file its Complaint and TRO application,

Guidance's attorneys were in a hurry to construe the contract as best it could and make whatever

plausible allegations that it could based on those provision -- "we read [Article 4.5] at the beginning

of the case, . . . and we thought that might apply, too, and we included it in the Complaint."  Mar.

23 Tr. at 368:21-369:4 (Kelly).  Mr. Kelly then summarized that the real issue regarding the V2,

from the very beginning, has been simple -- does Guidance have to provide engineering drawings

---

      [11] The Court finds it likely that Guidance's switch in position was to convince the Court to
consider extrinsic evidence in construing the contract.  Under Delaware law, as Mr. Kelly was
aware, a court cannot consider extrinsic evidence unless the contract is ambiguous; otherwise it must
rely on the four corners of the contract.  See E.I. du Pont de Nemours & Co. v. Shell Oil Co., 498
A.2d 1108, 1113 (Del. 1985)(citations omitted).  Because the Court will find that there was nothing
prejudicial about Guidance switching from arguing the contract was unambiguous to arguing that
it was ambiguous, however, the motive behind this particular switch in position is not determinative.

to the Defendants before the Defendants are required to supply the V2 file? -- it just took Guidance's counsel a while to figure out that the answer to that question would not be found in Article 4.5.  See Mar. 23 Tr. at 370:1-6 (Kelly).  Mr. Kelly also conceded he did not remove all reference to Article 4.5 in the Proposed Amended Complaint, but contended that he did not do so because he wanted to change the Complaint as little as possible, and thereby maximize the likelihood that the Court would grant his motion to amend.  See Mar. 23 Tr. at 401:5-402:9 (Kelly).

On the second day of the hearing, Mr. Kelly wrapped up his argument with a brief review of the case law, and attacking the Defendants' argument that the Supply Agreement unambiguously requires Guidance to provide engineering drawings.  See Transcript of Hearing at 440:14-449:19 (taken March 24, 2010), filed May 4, 2010 (Doc. 560)("Mar. 24 Tr.")(Kelly).  Mr. Radzely argued that, until the first week of October, 2009, the Defendants had not taken a position whether the first or second part of Exhibit 1 covered the V2.  See Mar. 24 Tr. at 461:18-24.  He raised the new argument that, if Guidance were to make a major change to one of the Guidance Products, it would cease to be a Guidance Product and be, instead, covered by the second part of Exhibit 1.  See Mar. 24 Tr. at 462:5-20 (Court, Radzely).  He also conceded that there are categories of products that do not require engineering drawings before production, and that those products were Guidance Products which had a frozen design or for which no additional prototype was necessary.  See Mar. 24 Tr. at 462:21-466:18 (Court, Radzely).  He argued the Supply Agreement was unambiguous in that regard. See Mar. 24 Tr. at 462:21-466:18 (Court, Radzely).

Mr. Radzely also narrowed the dispute in this case regarding Instruction No. 21.  He conceded that he had no problem with last sentence of the first paragraph of the Instruction.  See Mar. 24 Tr. at 468:9-23 (Court, Radzely).  He likewise conceded that he had no problem with the second sentence in the second paragraph of the instruction.  See id. at 474:19-475:6 (Court,

Radzely).  He essentially conceded that the only problem that the Defendants have is with the final

sentence of Instruction 21, which states: "If, on the other hand, you find the word 'file' refers only

to files in production, the Manufacturing and Supply Agreement does not require Guidance to

provide Dentsply and/or Tulsa Dental with engineering drawings detailing product specs and

tolerances until it makes minor changes to the files in production."  Court's Final Jury Instructions,

Instruction No. 21, at 21.  See Mar. 24 Tr. at 475:7-11 (Court, Radzely).  The Defendants'

contention in that regard is that there is no way to construe the Supply Agreement to give the word

"file" the meaning "file in production."  See Mar. 24 Tr. at 475:7-476:19 (Court, Radzely).  Finally,

as argument was coming to a close, Mr. Radzely conceded that the Defendants have never argued

that the V2 file is subject to the second part of Exhibit 1, and therefore that Guidance could not

request prototypes of it before January 29, 2010, as the second part of Exhibit 1 would mandate.

See Mar. 24 Tr. at 507:2-22 (Court, Radzely).[12]

## **RELEVANT LAW REGARDING RULE 51**

Rule 51 governs the procedures that a party must follow when requesting particular jury

instructions, objecting to certain jury instructions, and preserving any alleged error in the jury

instructions for post-trial review.[13]  Under rule 51(d)(1)(A), "a party may assign as error in an

---

[12] It appears that this representation was not entirely accurate, although the only time any of the Defendants' counsel stated that the second part of Exhibit 1 governed the V2 occurred on October 8, 2009, after Mr. Kelly admitted that Exhibit 1 was ambiguous, and there was no talk of the provision which states that products described in the second part of Exhibit 1 will not be prototyped until at least eighteen months after execution of the Supply Agreement.  See Transcript of Trial at 36:12-37:6 (taken Oct. 8, 2009), filed November 16, 2009 (Doc. 467)(Avitia).

[13] The United States Courts of Appeals that have addressed the issue agree that, even where the district court's jurisdiction is based on diversity, the need to make objections to and requests for jury instructions is a procedural matter that federal law must govern.  See Haberman v. The Hartford Ins. Group, 443 F.3d 1257, 1273 (10th Cir. 2006)("In a diversity case, the substance of a jury instruction is a matter of state law, but the grant or denial of a tendered instruction is governed by

instruction actually given, if that party properly objected."  Rule 51 also explains how one makes

a proper objection.  "A party who objects to an instruction or the failure to give an instruction must

do so on the record, stating distinctly the matter objected to and the grounds for the objection."  Fed.

R. Civ. P. 51(c)(1).  In post-trial motions and on appeal, therefore, claims of error are waived if there

was not a proper objection made at trial.  See Royal Maccabees Life Ins. Co. v. Choren, 393 F.3d

1175, 1179 (10th Cir. 2005)("To preserve the objection, a party must proffer the same grounds

raised on appeal, with sufficient clarity to render the grounds 'obvious, plain, or

unmistakable.'")(quoting Comcoa, Inc. v. NEC Tels., Inc., 931 F.2d 655, 660 (10th Cir. 1991))

(internal citation omitted); Medlock v. Ortho Biotech, 164 F.3d 545, 553 (10th Cir. 1999)("Because

the purpose of the objection is to give the court an opportunity to correct any mistake before the jury

enters deliberations, an excessively vague or general objection to the propriety of a given instruction

is insufficient to preserve the issue for appeal.")(citation omitted).  In determining whether a party

made a proper objection, of course, it is important that the Court not rewrite the case's history.

---

federal law.")(quoting Wolfgang v. Mid-America Motorsports, Inc., 111 F.3d 1515, 1525 (10th Cir. 1997)); Starr v. J. Hacker Co., Inc., 688 F.2d 78, 80 (8th Cir. 1982)("In point of fact, whether a party need object to an instruction to preserve the matter for appeal is a question of procedure governed by federal, and not state, practice.")(citing Fed. R. Civ. P. 51); Platis v. Stockwell, 630 F.2d 1202, 1206 (7th Cir. 1980)("We . . . hold that the requirements of Rule 51 must be adhered to in diversity actions in federal court."); Pollock v. Koehring Co., 540 F.2d 425, 426 (9th Cir. 1976)("Although we look to state law for the correct substance of jury instructions, the question whether an incorrect instruction is prejudicially erroneous is a procedural one requiring application of federal law.")(citing Fed. R. Evid. 51); Batesole v. Stratford, 505 F.2d 804, 807 (6th Cir. 1974)("In reviewing a federal district court's charge to the jury in a diversity action, it is well settled that the substance of the instructions is controlled by the applicable state law while the method of objecting thereto is controlled by federal law."); Hopkins v. Metcalf, 435 F.2d 123, 124 (10th Cir. 1970)("Although in a diversity action state law determines the substance of instructions, the grant or denial of instructions is controlled by federal law and the Federal Rules of Civil Procedure."); McNamara v. Dionne, 298 F.2d 352, 355 (2d Cir. 1962)("[I]t seems clear that whether an appellant [in a federal lawsuit] may claim error for failure to give an instruction not requested and as to which no objection was taken for failure to give it involves a matter of procedure [to which federal law applies, even in diversity cases].").

There are, however, some errors that may be raised post-trial, even though there was no timely, specific objection made about them at trial.  See Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079, 1094 (10th Cir. 2007)("[W]hen a party does not object to an instruction before the district court . . . , we can review the district court's decision to administer the instruction only for plain error.").  Rule 51 refers to these as "plain" errors.  The rule states: "A court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights."  Fed. R. Civ. P. 51(c).  The language of the rule, however, is not very helpful in determining what constitutes a plain error.

The Tenth Circuit has said that a court need not consider a jury-instruction error to be "plain error" unless the error was "patently, plainly erroneous and prejudicial."  Williams v. W.D. Sports, N.M., Inc., 497 F.3d at 1094 (quoting Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1141 (10th Cir. 2006)).  The Tenth Circuit will not reverse a district court for failure to address an unpreserved error in the jury instructions under the plain-error rule except "in an exceptional circumstance, where the error was patently erroneous and prejudicial and where fundamental injustice would otherwise occur."   Abuan v. Level 3 Commc'ns, Inc., 353 F.3d 1158, 1173 (10th Cir. 2003).  The Rules Advisory Committee commented, in response to the 2003 amendments to rule 51, on the factors that should influence a court's plain-error analysis.  The committee stated:

> The court's duty to give correct jury instructions in a civil action is shaped by at least four factors.
>
> The factor most directly implied by a "plain" error rule is the obviousness of the mistake. The importance of the error is a second major factor. The costs of correcting an error reflect a third factor that is affected by a variety of circumstances. In a case that seems close to the fundamental error line, account also may be taken of the impact a verdict may have on nonparties.

Fed. R. Civ. P. 51 advisory committee's note (2003).

-27-

## RELEVANT LAW REGARDING JUDICIAL ESTOPPEL

In a diversity action, the state substantive law that controls the cause of action also controls the doctrine of judicial estoppel.  See Okland Oil Co. v. Conoco, Inc., 144 F.3d 1308, 1325 (10th Cir. 1998)(discussing a district court's failure to apply judicial estoppel and stating that, "[i]n a diversity case, we look to state law to determine whether and how to apply these doctrines"); In re Osborn, 24 F.3d 1199, 1207 n.11 (10th Cir. 1994)("In a federal question case, we rejected the doctrine of judicial estoppel.  However, where state law substantively controls, as here, we have applied the law of the state in question.")(internal citations omitted); Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc., 874 F.2d 1346, 1363 (10th Cir. 1989) ("Inasmuch as the application of judicial estoppel in this diversity action goes to the adequacy of [a plaintiff's] legal remedy, we look to the appropriate state law to determine whether judicial estoppel is recognized."); Ellis v. Ark. La. Gas Co., 609 F.2d 436, 440-41 (10th Cir. 1979)(holding, in response to an assertion of judicial estoppel, that, "[a]pplying the governing principles of Oklahoma law, we hold Arkla's claim is not barred."); Bayview Loan Serv. v. Boland, No. 08-CV-566, 2009 WL 3234270, at *7 (D. Colo. Sept. 30, 2009).  But see Sain v. EOG Res., Inc., 204 Fed. Appx. 739, 741 n.2 (10th Cir. 2006)(assuming without deciding that federal law governed application of judicial estoppel to a jurisdictional issue, because neither party raised the choice-of-law issue and because "the parties' and the district court's assumption that federal law governed the judicial estoppel issue was reasonable.").  The claim at issue in this opinion is Guidance's claim for breach of contract, which the parties and Court have agreed that Delaware law governs.  See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., No. CIV 08-1101 JB/RLP, 2010 WL 1608949, at **8-9 (D.N.M. Mar. 23, 2010)(Browning, J.); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., No. CIV 08-1101 JB/RLP, 2009 WL 3672452, at **5-6 (D.N.M. Oct. 2, 2009)(Browning, J.).  The

Court thus discusses the law of judicial estoppel as it exists under Delaware law.

Judicial estoppel under Delaware law is a equitable doctrine that is primarily concerned with protecting the integrity of the judicial process.  See Banther v. State, 977 A.2d 870, 884-85 (Del. 2009)("The primary concern of the doctrine of judicial estoppel is to protect the integrity of the judicial process."); Motorola Inc. v. Amkor Tech., Inc., 958 A.2d 852, 859 (Del. 2008)("The doctrine is meant to protect the integrity of the judicial proceedings.").  The doctrine "prevents a litigant from advancing an argument that contradicts a position previously taken that the court was persuaded to accept as the basis for its ruling."  Motorola Inc. v. Amkor Tech., Inc., 958 A.2d at 859; Lynch v. Thompson, No. C.M. 2488-K, 2009 WL 1900464, at *4 (Del. Ch. June 29, 2009) ("Judicial estoppel is an equitable doctrine designed to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.")(quoting Julian v. E. States Constr. Serv., Inc., No. CIV 1892-VCP, 2009 WL 1211642, at *6 (Del. Ch. May 5, 2009)).  The latter requirement is important -- "parties raise many issues throughout a lengthy litigation such as this, and only those arguments that persuade the court can form the basis for judicial estoppel."  Motorola Inc. v. Amkor Tech., Inc., 958 A.2d at 859.[14]

Notwithstanding the well-delineated requirements, however, it is always in the court's discretion whether to apply the judicial-estoppel doctrine in a given case.  See id. ("Judicial estoppel 'is an equitable doctrine invoked by a court at its discretion.'")(quoting New Hampshire v. Maine,

_____

[14] At least in the situation where a criminal defendant seeks to judicially estop the government from taking a particular position, the Supreme Court of Delaware has required "a preliminary showing of manipulation, fraud or bad faith" in order to invoke the doctrine of judicial estoppel.  See Banther v. State, 977 A.2d 870, 884 (Del. 2009).  It is not clear whether this bad-faith requirement applies in the civil context, where one litigant attempts to estop another.  Because the Court will find that the Defendants' judicial estoppel argument fails on other elements, however, the Court will not delve unnecessarily into this minutia of Delaware law.

532 U.S. 742, 750 (2001)).  Some of the factors that Delaware courts use to inform their decisions

whether to apply the doctrine of judicial estoppel in a particular case are: (i) whether the party's later

position is "clearly inconsistent" with its earlier position; (ii) whether the party succeeded in

persuading the court to accept the party's earlier position, so that accepting the inconsistent position

in a later proceeding would make it appear that the court had been misled; (iii) whether the party

seeking to assert the inconsistent position would derive an unfair advantage from the new position;

and (iv) whether the party asserting judicial estoppel would suffer an unfair detriment if the

opposing party is not estopped.  Julian v. E. States Constr. Serv., Inc., 2009 WL 1211642, at *6.

### RELEVANT DELAWARE LAW REGARDING CONTRACT CONSTRUCTION

Under Delaware law, when construing a contract, a court is to determine the meaning of the

contract solely from its face.  See Paul v. Deloitte & Touche, LLP, 974 A.2d 140, 145 (Del. 2009)

("In analyzing disputes over the language of a contract, we give priority to the intention of the

parties [and] start by looking to the four corners of the contract to conclude whether the intent of the

parties can be determined from its express language."); Del. Bay Surgical Servs., P.C. v. Swier, 900

A.2d 646, 650 (Del. 2006)("[W]e review de novo a question of contract interpretation as a question

of law."); OSI Sys., Inc. v. Instrumentarium Corp., 892 A.2d 1086, 1090 (Del. Ch. 2006)("[T]he

proper interpretation of language in a contract, while analytically a question of fact, is treated as a

question of law both in the trial court and on appeal.")(internal quotes omitted)(citing Pellaton v.

Bank of N.Y., 592 A.2d 473, 478 (Del. 1991)); Del. P.J.I. Civ. § 19.15 Comment (2000).  "[A] court

must construe the agreement as a whole, giving effect to all provisions therein.  Moreover, the

meaning which arises from a particular portion of an agreement cannot control the meaning of the

entire agreement where such inference runs counter to the agreement's overall scheme or plan." E.I.

du Pont de Nemours & Co. v. Shell Oil Co., 498 A.2d at 1113 (citations omitted).  In analyzing the

parties' apparent intent, Delaware courts use an objective standard: "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. 1992).

When the parties' intent, as expressed in the contract language, is clear and unambiguous, a court is not to consider any extrinsic evidence in determining the parties' intent; when there is no ambiguity, such extrinsic evidence could only be used either to create ambiguity or to reinforce an already clearly correct interpretation. See Halliburton Co. v. Highlands Ins. Grp., Inc., 811 A.2d 277, 280 n.9 (Del. 2002)(quoting Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997)). On the other hand, where the contract language is ambiguous -- i.e., subject to two or more reasonable interpretations, see Eagle Industries, Inc. v. DeVilbiss Health Care, Inc., 702 A.2d at 1232; Northwestern National Insurance Co. v. Esmark, Inc., 672 A.2d 41, 43 (Del. 1996); Addy v. Piedmonte, No. Civ. A. 3571-VCP, 2009 WL 707641, at *8 (Del. Ch. Mar. 18, 2009) -- the court may consider things outside the text of the contract to determine its meaning, see Pellaton v. Bank of N.Y., 592 A.2d at 478 ("When there is uncertainty in the meaning and application of the terms of the contract, . . . the trial court[] will consider testimony pertaining to antecedent agreements, communications and other factors which bear on the proper interpretation of the contract."). Ultimately, whether a contract is ambiguous is a question of law that the court must decide. See HIFN, Inc. v. Intel Corp., No. Civ. A. 1835-VCS, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007)("A determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law."). One must be wary, though, because "[a] contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d at 1196. In the face of an ambiguity,

however, the Court is permitted to consider any extrinsic evidence that might shed light on the meaning of the ambiguous provisions.  See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1232 (stating that, when there is an ambiguity, "the interpreting court must look beyond the language of the contract to ascertain the parties' intentions."); Nw. Nat'l Ins. Co. v. Esmark, Inc., 672 A.2d at 43 ("Courts consider extrinsic evidence to interpret the agreement only if there is an ambiguity in the contract."); Pellaton v. Bank of N.Y., 592 A.2d at 478.

To state a breach of contract claim under Delaware law, one must establish three elements. "[F]irst, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003).  A plaintiff cannot bring a breach-of-contract claim seeking only nominal damages.  The Supreme Court of Delaware appears to require a breach-of-contract plaintiff to show "resultant damage to the plaintiff" to survive a motion to dismiss.  VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d at 612 (explaining that, to survive a motion to dismiss on a breach of contract claim, the plaintiff must demonstrate "the existence of the contract, whether express or implied; . . . the breach of an obligation imposed by that contract; and . . . the resultant damage to the plaintiff.").  On the other hand, it appears that, when there is evidence of damages, but those damages cannot be calculated with the necessary certainty, the law of Delaware allows the court to award nominal damages. See Ivize of Milwaukee v. Complex Litig., Support, LLC, Nos. 3158-VCL, 3406-VCL, 2009 WL 1111179, at *11 (Del. Ch. Apr. 27, 2009) (holding nominal damages could be awarded when existence of damages was clear but quantity could not be proved with the required certainty); LaPointe v. AmerisourceBergen Corp., No. Civ. A. 327-CC, 2007 WL 2565709, at *9 (Del. Ch. Sept. 4, 2007)("To be entitled to compensatory damages, plaintiffs must show that the injuries suffered are not speculative or uncertain, and that the

Court may make a reasonable estimate as to an amount of damages.").

**ANALYSIS**

The Defendants ask the Court to grant them a new trial on two general grounds. First, the Defendants assert that Guidance changed its litigation theory mid-way through trial, and that mid-trial switch surprised and prejudiced them. Second, they argue that Jury Instruction No. 21 was erroneous and that the error was harmful. Guidance disagrees with both propositions, arguing that it has been consistent in its arguments throughout the trial -- in fact, Guidance argues that the Defendants have changed their position when it appeared advantageous for them to do so -- and that Instruction No. 21 was proper. With respect to the first argument, the Court concludes that, while Guidance's early position was inconsistent with its position at the end of the case, that inconsistency was likely attributable to its failure to fully develop its legal theories regarding construction of the Supply Agreement, and that any inconsistency could not reasonably have prejudiced or surprised the Defendants. With respect to the Defendants' second argument, the Court concludes that Instruction 21 was not erroneous, and properly reflected the two relevant ways in which the Supply Agreement was ambiguous. The Court thus finds that it properly submitted Instruction 21 to the jury and denies the Defendants' motion for new trial.

## I.   THE COURT'S CONSTRUCTION OF THE CONTRACT.

The Court spent several hours -- both during the trial to prepare the jury instructions and after the trial in ruling on this motion -- analyzing the Supply Agreement in an effort to determine what obligations it placed on who and when. In conformity with Delaware law, the Court sought to resolve as many of the relevant details of the contract without the aid of extrinsic evidence, relying instead solely on the text contained within the four corners of the Supply Agreement. See Paul v. Deloitte & Touche, LLP, 974 A.2d at 145 ("In analyzing disputes over the language of a contract,

we give priority to the intention of the parties [and] start by looking to the four corners of the

contract to conclude whether the intent of the parties can be determined from its express language."); 

Del. Bay Surgical Servs., P.C. v. Swier, 900 A.2d at 650; OSI Sys., Inc. v. Instrumentarium Corp., 

892 A.2d at 1090; Halliburton Co. v. Highlands Ins. Grp., Inc., 811 A.2d at 280 n.9; Del. P.J.I. Civ. 

§ 19.15 Comment (2000).  The Court endeavored to look at the contract in its entirety, not focusing 

on or giving unequal weight to any particular provision.  See E.I. du Pont de Nemours & Co. v. Shell 

Oil Co., 498 A.2d at 1113.  And in making its determinations, the Court has asked not what these 

parties likely believed the contract would mean, but what reasonable persons in the parties' positions 

would have thought that it meant.  See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 

616 A.2d at 1196.

      First, Article 1.2 of the Supply Agreement defines some important terms.  "Guidance 

Products," for example, refers to "the Guidance Files, Obturators, and Ovens."  Doc. 2-1, ¶ 1.2.5, 

at 2.  "Guidance Files" refers to "endodontic files made from nickel-titanium ("NiTi"), as specified 

in Exhibit 1."  Doc. 2-1, ¶ 1.2.2, at 1.  Article 4.5 provides some steps the parties must go through 

if Guidance wants the Defendants to produce "New Products," but also sheds light on the definition 

of the term "New Product" for the purposes of the Supply Agreement.  Doc. 2-1, ¶ 4.5, at 6.  Article 

4.5, entitled "New Products," sets forth the procedure Guidance and the Defendants must go through 

if Guidance wants TDP to "manufacture endodontic files or obturators, which are improvements or 

successor products (of similar design) to the Guidance Files or Guidance Obturators."  Doc. 2-1, 

¶ 4.5, at 6.[15]  In other words, something is a "new product" if it is an "endodontic file[] or 

_____

      [15] Article 4.5 also describes a process through which the parties would go to minimize the 
likelihood that Guidance's new product design would infringe on any other party's intellectual 
property rights.

obturator[], which [is] an improvement or successor product . . . to the Guidance Files or Guidance Obturators." Id.  A "New Product" is, therefore, something other than a "Guidance Product."  The requirement for such new products, as stated in Article 4.5, is that Guidance give the Defendants "product specifications" for the new product.  Doc. 2-1, ¶ 4.5, at 6.

The Court's construction of the Supply Agreement, and the distinction between Guidance Products and New Products, is further reenforced by the structure and content of Exhibit 1.  Visually and by its language, Exhibit 1 is separated into two parts.  The visual separation is that there are two paragraphs in bold typeface that begin with the phrase, "[t]he following is a list of."  Each bold paragraph is followed by a list of products and specifications.  The implication is that each paragraph delimits a section of Exhibit 1 and describes the content of that section.  That inference is why the Court has referred, and will refer, to the two parts as the first and second parts of Exhibit 1.  The first part states: "The following is a list of products/specifications for the Guidance Products."  Doc. 2-1, at 24.[16]  The second part states: "The following is a list of possible products that Guidance may desire for Dentsply Tulsa to manufacture."  Doc. 2-1, at 25.  The second part also specifies that Article 4.5 of the Supply Agreement applies to those "possible products."  Doc. 2-1, at 25.  It thus appears that the first part of Exhibit 1 further defines the Guidance Products, while the second part of Exhibit 1 defines things that are not the Guidance Products.  Moreover, while the second part of Exhibit 1 appears to describe New Products -- it explicitly states that Article 4.5 applies to the products therein -- it is not clear that the second part of Exhibit 1 is an exhaustive list of the New Products to which Article 4.5 might apply.

The question thus arises: What does Guidance have to do before the Defendants are obligated

_____

[16] From this point on in this opinion, the Court will quote Exhibit 1 without the bold typeface contained in the document.

to produce the Guidance Products?  Considering only the provisions the Court has detailed to this point, the answer might be: Nothing.  First, there is no prerequisite to the production of the Guidance Products in the body of the Supply Agreement.[17]  Next, the Court finds that the only part of Exhibit 1 which applies to the Guidance Products is the first part, which states:

> The following is a list of products/specifications for the Guidance Products. Guidance from time to time may make minor changes (not to exceed 3 minor changes per year utilizing stock materials and/or processes validated on existing production equipment and complete with engineering drawings detailing product specs and tolerances) to the .04 and .06 taper files by changing the tip, number of flutes, and color of stopper on the files, provided that in any event, TDP shall not be required to make any prototypes for any such changes and TDP would have 120 days from the request to implement the changes on prospectively produced products.

Doc. 2-1, at 24.  One party might point to the second sentence of this paragraph, specifically where it states "Guidance from time to time may make minor changes . . . complete with engineering drawings detailing product specs and tolerances," as mandating that Guidance provide engineering drawings before TDP produces a Guidance Product.  That sentence, however, appears to apply only where Guidance wishes to make a minor change to the Guidance Product.  Until there is a Guidance Product, and until there is a request for a change, this paragraph does not mandate that Guidance provide TDP with engineering drawings before TDP is obligated to produce the Guidance Product.

A reasonable construction of the first part of Exhibit 1 is that the contract does not address the process through which the parties will produce the Guidance Products in the first instance; rather, it assumes the Guidance Products will be in production and on the market.  Under such a construction, if a product is a Guidance Product, the parties will confer privately in a way that is not described in the Supply Agreement to develop the Guidance Products in the first instance, and, once

---

[17] Recall that the Court has concluded that Article 4.5 applies only to New Products, which are a category distinct from Guidance Products.

that product is on the market, any changes will have to be made through the process described in the first part of Exhibit 1.  This construction is particularly appealing given the lack of any reference to the initial design process and the fact that the first part of Exhibit 1 discusses only "minor changes," which it appears to define as "changing the tip, number of flutes, and color of stopper on the files."  Doc. 2-1, at 24.  The development process of the file would presumably involve changes more substantial than those, and therefore a reasonable inference is that the Supply Agreement and Exhibit 1 simply do address the process through which Guidance and the Defendants will develop the Guidance Products.

Some ambiguity, however, is introduced later in Exhibit 1.  Under the heading "3. EndoTaper Constant Taper Sizes:" there is a list of what appears to be specifications for endodontic files.  The relevant text states:

> EndoTaper Constant Tapers:
> .06 Taper – Sizes 10 – 50 (Designs are frozen and attached)
> .10 Taper – Size 10 (Design is not frozen -- Dentsply will make two rounds of prototypes for each size.  Guidance will be charged a fee for any additional requested prototypes[)].
> .04 Taper – Sizes 15, 20, 25 (Designs not frozen -- Dentsply will make two rounds of prototypes for each size.  Guidance will be charged a fee for any additional requested prototypes[)].

Doc. 20-1, at 24.  The parenthetical expressions following each of the size descriptions is the first indication that the Supply Agreement might relate to the development of the Guidance Products.  It is only here that there is some indication that there may be a prerequisite to the production of the Guidance Products, but the Supply Agreement does not explain precisely what that prerequisite is.  One reasonable construction is that a product's design must be frozen before the Defendants must produce the Guidance Product at issue -- indeed, that is the position that the Defendants took in this case.  Neither the Supply Agreement nor Exhibit 1, however, define what it means for a design to

be "frozen."  The word frozen is found nowhere else in the Supply Agreement or Exhibit 1.  Also reasonable, in the Court's view, is construing the contract to make those parentheticals merely informative, memorializing the state of the design process at the time of executing the Supply Agreement.  This construction is bolstered by the absence of any other discussion of the initial development process anywhere else in the Supply Agreement or Exhibit 1.  On this point, therefore, the contract is ambiguous.  See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d at 1232; Nw. Nat'l Ins. Co. v. Esmark, Inc., 672 A.2d at 43; Addy v. Piedmonte, 2009 WL 707641, at *8.

The second part of Exhibit 1 also contains some terms that the Court should address.  That part states, for instance, that Guidance agrees that none of the products listed therein will be prototyped for a period of eighteen months after the effective date of the Agreement.  See Doc. 2-1, at 25.  The second part of Exhibit 1 also requires that "[a]ll requests for prototypes under this agreement . . . be submitted with engineering drawing(s) complete with product specs and tolerances" -- the same language used in the parenthetical on the previous page.  Doc. 2-1, at 25.[18] If a product is a "possible product," rather than a Guidance Product, the second part of Exhibit 1 requires that engineering drawings must accompany requests for prototypes, but that such requests will not be fulfilled before January 29, 2010.  See Doc. 2-1, at 25.

One possible construction of the Supply Agreement is that, where the second part states that engineering drawings must accompany all requests for prototypes, it refers as well to the prototypes referenced in the parentheticals in the first part which mention frozen designs.  After all, the second part of Exhibit 1 says "[a]ll requests for prototypes under this agreement."  Doc. 2-1, at 25 (emphasis

---

[18] Because Exhibit 1 to the Supply Agreement uses the same language about "engineering drawings detailing product specs and tolerances" in two places, the Court finds it likely that the engineering-drawings requirement of Exhibit 1 is distinct from Article 4.5's "product specifications" requirement.

added).   On the other hand, the first and second parts of Exhibit 1 are separate, and it would be sloppy drafting to put a term applicable to the whole contract in the last sentence of a paragraph in the second part of a two-part addendum to the contract, especially where the first sentence of that paragraph introduced a list of "possible products" that Guidance "may" desire the Defendants to manufacture.   Unlike the first part of the Exhibit, the second part deals prospectively with products that are not presumed to already be in production.   Furthermore, where the Supply Agreement refers to itself as the Agreement -- with a capital A -- the second part of Exhibit 1 sets forth a requirement of engineering drawings for prototypes "under this agreement," with a lowercase a.   The other sentences in that paragraph discuss prototypes, and it is not unreasonable to think that the phrase "this agreement" refers, not to the Supply Agreement, but to the second part of Exhibit 1.   The Supply Agreement is ambiguous in this regard as well.

When considering the precise facts of this case, a second question arises: Is the V2 file a New Product, or a Guidance Product?   This question has no clear answer within the four corners of the Supply Agreement or Exhibit 1.   The term "V2" is not used in the Supply Agreement.   The contract is thus ambiguous in this regard as well.[19]

---

[19] The issue whether the V2 is a particular file described on Exhibit 1 might be better described as a fact question for the jury rather than a contract ambiguity that the jury must resolve. If it is better characterized as a fact question and not a contract ambiguity, that might provide a basis for finding that Instruction No. 21 was erroneous.  If the form in which the Court submitted this jury issue was the only error in the instruction, however, the Court would find that the error was harmless, because the Court would ask the jury essentially the same question in either case -- is the V2 one of the files listed in the first part of Exhibit 1?  The Court does not believe the jury would come to a different conclusion depending on whether it characterized the question as a fact issue or a contract ambiguity.

**II.     GUIDANCE CHANGED ITS POSITION MID-TRIAL, BUT ONLY INSOFAR AS IT ESCHEWED A THEORY THAT WAS INCONSISTENT WITH ANOTHER THEORY IT HAD CONSISTENTLY PRESENTED.**

The Defendants contend that Guidance changed its position mid-trial on what provisions of the Supply Agreement applied to the Defendants' production of the V2. The Defendants contend that Guidance's position which went to the jury -- that the V2 was not a "new product" under Article 4.5 of the Supply Agreement -- was a surprise and a new position, and that the last-minute change prejudiced them in their defense. Guidance argues that there was no switch in position, and that, if there was, the switch in position could not have surprised or prejudiced the Defendants.

There is authority in the Tenth Circuit for the proposition that a last-minute change in litigation position is a basis for a motion for new trial. The Tenth Circuit has stated that "[s]urprise during trial, by major variance in theory or defense, undisclosed until after the trial is underway, is a long-established ground for granting a new trial motion." Senters v. Black & Decker, 123 Fed. Appx. 354, 360 (10th Cir. 2005)(quoting Sanford v. Crittenden Mem'l Hosp., 141 F.3d 882, 886 (9th Cir. 1998)). "When a party requests a new trial on the basis of surprise testimony it must be able to show (1) surprise, (2) prejudice, and (3) an attempt to cure the prejudice[.]" Senters v. Black & Decker, 123 Fed. Appx. at 359.[20]

The Court thinks the most important factor in its analysis is the ultimate positions of both parties: the Defendants contended that it did not have to produce the V2 file unless and until

---

[20] In briefing and at the hearing, Guidance argued that the doctrine laid down by Senters v. Black & Decker and other cases is limited to the situation in which a party is surprised by a last-minute change in expert testimony or by the giving of an expert opinion that was not properly disclosed as required under rule 26(a)(2). The Court need not resolve that legal question, however, because the Court finds that the Defendants cannot meet the core requirements of surprise or prejudice, and thus that the Defendants are not entitled to a new trial based on their surprise argument.

Guidance supplied detailed engineering drawings, and Guidance argued that the engineering-drawings requirement did not apply to production of the V2 file.  Those positions were consistent throughout the trial.  The dispute now is whether subtle changes in how each party supported their respective belief were permissible, and whether any such changes in theory surprised or prejudiced the Defendants.  The Court concludes that Guidance did not change its position in any significant way, and that, even if it did, the Defendants could not have been surprised or prejudiced by that change.

### A.   GUIDANCE DID NOT CHANGE ITS POSITION IN ANY SIGNIFICANT WAY.

The Defendants' motion rests on a factual premise: that they were surprised to learn "mid-trial" that Guidance was no longer arguing Article 4.5 does not govern parties' rights and responsibilities with respect to the V2 file.  The record does not support the Defendants' assertion that Guidance engaged in a "mid-trial change in position," and that the Defendants suffered both "surprise" and "prejudice."  The Court does not believe that the Defendants can soundly contend that Guidance's dismissal of its Article 4.5 argument surprised them at trial.  What the record shows is that, since the TRO hearing on November 25, 2008, both Guidance and Goodis' counsel, and the Defendants' counsel, understood that the V2 was Goodis' informal project name for the .04 constant taper listed on the first part of Exhibit 1 to the Supply Agreement.

As the Court's analysis heretofore indicates, it is inconsistent to argue that a product is covered both by Article 4.5 and by the first part of Exhibit 1 -- the first part of Exhibit 1 lists the Guidance Products, whereas Article 4.5 applies to things that are not the Guidance Products.  And Guidance alleged a breach of Article 4.5 at the beginning of the case, but essentially dismissed that claim at the end of the case -- that switch could be characterized as a change in position.  On the

other hand, the record shows that both parties were intentionally eliciting testimony that the V2 file was one of the files listed in the first part of Exhibit 1.  Moreover, both attorneys stated in argument at various times in the history of the case that their clients' position was that the V2 was on the first part of Exhibit 1.  Given that both attorneys had represented that the V2 was on the first part of Exhibit 1, and that the evidence was strong that the V2 was one of the files listed in the first part of Exhibit 1, it is difficult to see how the Defendants could have been surprised when Mr. Kelly asserted that fact by letter dated October 6, 2009.

The way this case has progressed, the arguments presented by both sides, and the excerpts of the record upon which each party relies, leave the Court with the impression that this is a case in which neither side solidified its legal and factual theories before proceeding to trial.  It might be that neither party stopped to consider how the Supply Agreement and Exhibit 1 functioned and interacted, and that failure to consider the interpretation is why it appears that both parties have changed positions throughout the course of this litigation.  The Defendants initially pointed to the first part of Exhibit 1 as the source of Guidance's obligation to provide detailed engineering drawings, which, based on their current legal position, would mean that the V2 was not in the second part of Exhibit 1, nor bound by the requirements of Article 4.5 of the Supply Agreement.  Guidance initially contended that the Defendants violated Article 4.5 of the Supply Agreement when they demanded that Guidance provide detailed engineering drawings before producing the V2 file, which appeared to mean that Guidance believed the V2 was a New Product subject to Article 4.5 of the Supply Agreement.  At the end of the trial, it was the Defendants who asserted that the V2 file was a New Product, subject to Article 4.5 of the Supply Agreement and thus arguably found in the second part of Exhibit 1 -- a position contrary to that which they initially advanced.  Likewise, at the end of the trial, it became clear that Guidance was giving up its breach-of-contract theory based

-42-

on Article 4.5, likely because it realized that the theory was inconsistent with its assertions that the V2 was one of the files listed in the first part of Exhibit 1. It was not exactly a switch in position, however, because Guidance had always asserted that the V2 was found in the first part of Exhibit 1.

Unfortunately, the likely cause of these apparent theory switches is that neither party properly nailed down their understanding of how their contract operates before proceeding to trial.[21] Mr. Kelly, for example, admitted that, at least at the point of constructing the Complaint, he included the claim under Article 4.5 merely because he "read [it] at the beginning of the case [and] thought [it] might apply, too." Mar. 23 Tr. at 368:21-369:4 (Kelly). As the transcript excerpts that both parties provided indicate, both parties were making arguments that conflated Article 4.5 and the first part of Exhibit 1. At the beginning, while Guidance asserted that the Defendants violated Article 4.5 of the Supply Agreement, it also intentionally elicited testimony that the V2 was listed in the first part of Exhibit 1, and Mr. Kelly made argument to that effect during the preliminary injunction hearing on December 17, 2008. See Dec. 17 Tr. at 15:13-17 (Kelly). These statements appear to be contradictory given that the first part of Exhibit 1 describes the Guidance Products, and that Article 4.5 refers to "[n]ew products" which are "improvements or successor products . . . to the Guidance [Products]"[22] -- i.e., things that are not the Guidance Products. It was thus clear as soon as Mr. Kelly made this argument and the parties elicited this testimony that Guidance was taking

---

[21] While the parties may prefer the Court assume their opposing counsel were intentionally hiding the ball on their positions regarding interpretation of the Supply Agreement and Exhibit 1, the Court believes the parties were not fully prepared, at the last moment, to address thoroughly the interplay between some of the Supply Agreement's provisions.

[22] Article 4.5 specifically refers to Guidance Files and Guidance Obturators, and not to Guidance Products. The Supply Agreement defines the Guidance Products as "Guidance Files, Obturators, and Ovens," so the Court's alteration is not perfectly accurate, but it better conveys the Court's meaning. For the purpose of this analysis, that Article 4.5 does not apply to Guidance Ovens is immaterial.

two inconsistent positions.  Article 4.5 would not apply to any product listed in the first part of Exhibit 1.  Guidance now admits this reality, having had nine months, a three week trial, and several more months to consider how the contract should be construed.  The result of this initial error, however, is that Guidance was not asserting a new theory when it stated that the V2 was one of the files listed in the first part of Exhibit 1.  Instead, when Guidance decided not to pursue its theory under Article 4.5, it was cleaning up the logical inconsistency of its prior position.  It is not new that Guidance asserts that the V2 is found in the first part of Exhibit 1; rather, it is new that the parties have realized that this position cannot logically coexist with the position that the Defendants violated Article 4.5 by demanding that Guidance provide detailed engineering drawings.

Differently stated, the Court is not convinced that Guidance changed its litigation position, but rather believes that Guidance misconstrued the contract and thus initially made some imprecise and inconsistent allegations.  They alleged that adding the requirement of engineering drawings violated Article 4.5, but they did not allege that the V2 file is <u>not</u> found on the first part of Exhibit 1.  The Defendants have pointed to no place in the record where Guidance asserted that the V2 was <u>not</u> on the first part of Exhibit 1, other than through a contract-construction argument regarding whether Article 4.5 could possibly apply to products listed in the first part of Exhibit 1.[23]  The Defendants allege surprise and prejudice -- not by Guidance asserting something new; it had asserted all along that the V2 file was listed on the first page of Exhibit 1 -- but rather by Guidance remedying its inconsistency to assert only one of two inconsistent positions.  Regardless of any surprise or prejudice, therefore, the Court finds that Guidance did not change its position.

---

[23] As the Court has explained, the Court does not believe it is possible for Article 4.5 to apply to a product that is listed in the first part of Exhibit 1.  This fact does not necessarily mean, however, that it was prejudicially inconsistent for one party to believe that a product could both be on the first part of Exhibit 1 and yet bound to comply with Article 4.5.

At some points during the hearing, it seemed as though Mr. Radzely was complaining about Guidance's switch in position on the issue whether the contract was ambiguous.  See, e.g., Mar. 23 Tr. at 321:15-24 (Radzely).  Indeed, Mr. Kelly admitted that Guidance changed its position in this regard.  See Mar. 23 Tr. at 357:5-8 (Kelly).  The Court is not convinced that such a change in position was legally significant or harmful to the Defendants.  Guidance had consistently argued that the Supply Agreement did not require Guidance to provide detailed engineering drawings before the Defendants were required to supply the V2 file.  First, just because two parties argue that a contract is unambiguous does not mean that the contract is unambiguous.  For example, two parties can present the Court with different constructions of a contract, and each argue that the contract is unambiguous and should be construed in the manner that the party proposes.  In such a case, one or both parties are wrong.  When a party asserts that a contract is unambiguous, that party is often taking the position that the only reasonable interpretation of the contract is the one that the party proposes.  When a party concedes that a contract is ambiguous, it is admitting that there might be other reasonable constructions of the contract, but nevertheless arguing that the Court should adopt that party's construction, instead of the construction advocated by the opposing party.  In both situations, the party believes the Court should adopt its construction and should reject that of the opposing party; the only difference is whether the party is willing to acknowledge that some other construction is reasonable.  Switching between arguing that a contract is ambiguous and that it is unambiguous is not, without more, a change in the parties' theory or litigation position.

The Defendants had repeatedly stated that they believed the first paragraph of Exhibit 1 was at least one source of Guidance's obligations to supply the engineering drawings.  Up until October 2, 2009, when Guidance's counsel first acknowledged that there might be an ambiguity in Exhibit 1, it is not clear what Guidance believed Exhibit 1 unambiguously meant.  Guidance

appeared to be proceeding on the erroneous belief that the first part of Exhibit 1 and Article 4.5 both

governed the production of the V2, and so Guidance's acknowledgment that Exhibit 1 might be

ambiguous did not change its position on the meaning of the Supply Agreement.[24]  Acknowledging

that the Supply Agreement might be ambiguous, in that situation, had no legal effect.

    In sum, the Defendants have failed to show the Court a point at which Guidance asserted that

the V2 was not listed on the first section of Exhibit 1, and therefore they have failed to convince the

Court that Guidance changed its litigation position.  Rather, Guidance had been arguing and eliciting

evidence since the beginning of the case to show that the V2 file was listed on the first part of

---

    [24] Again, other than Guidance's initial reliance on Article 4.5 for its breach-of-contract claim against the Defendants, the Defendants have not shown the Court anything which indicates that Guidance did not initially believe that the V2 file was on the first page of Exhibit 1.  The Defendants believed that the V2 was found on the first page of Exhibit 1, based on its reliance on the first paragraph of Exhibit 1 as a basis for demanding engineering drawings, and the uncontroverted testimony to that effect.  It is hard to fathom how Guidance's alleged last-minute switch to a position consistent with the Defendants' position could have prejudiced the Defendants.  It is also unclear how the Defendants would have changed their litigation tactics if they knew that Guidance believed the V2 was listed on the first page of Exhibit 1 -- especially in light of the fact that the Defendants already believed it to be true.  They assert in their briefing that they would have sought to elicit testimony that the V2 was a "new product," and therefore governed by Article 4.5 and the second part of Exhibit 1, but that evidence would be contrary to their own litigation position for much of the trial.  Moreover, if the Defendants believed that Guidance was locked into its litigation position that the V2 was a "new product" governed by Article 4.5 and the second part of Exhibit 1, they should have moved to dismiss or for summary judgment because the Supply Agreement states that the Defendants are under no obligation to prototype -- or, presumably, to produce -- any of the products on the second part of Exhibit 1 until, at the earliest, January 29, 2010, eighteen months after the effective date of the Supply Agreement.  See Doc. 2-1, at 25.  The Defendants would have had a good chance of winning judgment as a matter of law if they believed Guidance had locked itself into arguing that the second part of Exhibit 1 applied to the V2 file.  The most reasonable inference from the events that unfolded was that no party had sat down and developed the comprehensive contract construction from which it now argues.  The other possibility is that the Defendants had been watching the case very carefully, intentionally not pointing out that Guidance's theory based on Article 4.5 would preclude it from arguing that the V2 was one of the Guidance Products described in the first part of Exhibit 1, so that they could later try to corner Guidance into arguing in favor of Article 4.5 and assert that any other argument on which Guidance might potentially prevail was a prejudicial surprise.  Neither basis, in the Court's eyes, justifies upsetting the jury's verdict.

Exhibit 1; indeed, that position was how they sought to prove that the Defendants had any obligation to produce it at all. Rather than switching positions mid-trial, Guidance merely relinquished a theory that was inconsistent with another position that it had consistently taken during this litigation.

### B.   GUIDANCE'S ALLEGED CHANGE IN POSITION DID NOT REASONABLY SURPRISE THE DEFENDANTS.

The Court is also unconvinced that Guidance's decision to forego its Article 4.5 claim reasonably surprised the Defendants. The Defendants had relied upon the first part of Exhibit 1 as a basis for the engineering-drawing requirement, implicitly acknowledging that the V2 was one of the files listed therein. They had also heard testimony, depositions, and arguments from Guidance and various witnesses, which indicated that Guidance also thought that the V2 was one of the files listed on the first part of Exhibit 1. If the Defendants had not identified the inconsistency between Guidance's reliance on the first part of Exhibit 1 and its reliance on Article 4.5, Guidance's decision to drop its claim based on Article 4.5 would have no effect on the Defendants' position -- the first part of Exhibit 1 could still be the source of the engineering-drawings requirement.[25] The alternative is that the Defendants had identified the inconsistency between the two positions that Guidance had taken, and were hoping that Guidance would not see it, so that eventually they could corner Guidance into reliance on Article 4.5 instead of the first part of Exhibit 1 -- just as they are doing now. If that were the case, the Defendants could not reasonably have been surprised when Guidance saw that it might be walking into a trap and dropped the legal position that might cost it its claim.

_____

[25] In the situation where the Defendants did not identify the inconsistency between applying Article 4.5 and the first part of Exhibit 1 to the same product, it might surprise the Defendants when Guidance ceased reliance on Article 4.5. In that case, however, the Court would still find that the Defendants were not prejudiced, because the Defendants had previously asserted the position to which Guidance allegedly switched and because the Defendants would have great difficulty mounting a case to argue to the contrary of Guidance's position, as the Court explains below.

Thus, to the extent that one can say that Guidance changed its litigation position during the trial, the Court does not believe that the change surprised the Defendants.

Mr. Radzely argued in the hearing that this issue of surprise was not an evidentiary issue, implying that the Court should ignore the substantial amount of trial testimony that Guidance has presented to the Court and conclude that, because Guidance did not remove its Article 4.5 claim from its Complaint, the Defendants were surprised when Guidance sent the Court a letter stating that it believed the V2 to be the .04 taper file on the first part of Exhibit 1. See Mar. 23 Tr. at 336:7-22 (Radzely). The Court agrees that a litigant's position is not changed by the presentation of evidence that tends to undercut its theory. On the other hand, Mr. Kelly stated, early in the litigation, that Guidance believed the V2 was one of the products in the first part of Exhibit 1 -- i.e., a Guidance Product. Moreover, Guidance repeatedly elicited testimony to that effect from Goodis, at several hearings and at trial. At that point, the Defendants, if they were paying careful attention, should have foreseen that Guidance would be asserting that the V2 was in the first part of Exhibit 1, even if they had missed Mr. Kelly's argument to that effect at the preliminary-injunction hearing. The Court finds that Guidance's assertion that the first part of Exhibit 1 covered the V2 did not surprise the Defendants.[26]

---

[26] The Court is also skeptical about how much the inclusion of one passing reference to language found in Article 4.5 in the Pretrial Order, where all other allegations regarding Article 4.5 had been removed, could have misled the Defendants. To the contrary, Guidance asserted as a defense to one of the Defendants' counterclaims that Article 4.5 "does not impose any duty on Guidance." Pretrial Order at 10, filed October 9, 2009 (Doc. 434). The only reference to Article 4.5 is in Guidance's contested factual allegations in Exhibit B. Out of the 207 contested factual allegations, two arguably indicate a "reliance" on Article 4.5. First, fact 66 refers to the V2 as a "new file." Pretrial Order Exhibit B, ¶ 66, at 14. Second, the 69th paragraph asserts that Guidance "included 'product specifications' as required by the Supply Agreement." Pretrial Order Exhibit B ¶ 69, at 14. Article 4.5 is not referenced by name, although the Defendants correctly point out that the phrase "product specifications" is found in Article 4.5, and thus this statement might appear to concede that Article 4.5 governs development of the V2. The Court does not, however,

**C.   GUIDANCE'S CHANGE IN POSITION, IF ANY, DID NOT PREJUDICE THE DEFENDANTS.**

Moreover, assuming that Guidance changed its position and that the Defendants were surprised, the Court is not convinced that they were prejudiced in any significant respect.  The Defendants assert that they would have changed their discovery and litigation tactics if this change in position had been known to them earlier.  See Motion at 8-9.  They claim they would have served Guidance with discovery regarding the change in position and that they would have sought to elicit evidence that the V2 was, in fact, a New Product subject to Article 4.5.  See id. at 8-10.  They also argue that, without this late-in-the-game change in position, the jury would very likely have found in favor of the Defendants because the parties and Court believed that one of the only issues for the jury to resolve was whether the documents that Guidance submitted to the Defendants constituted "detailed engineering drawings," and the only testimony on that issue had been in the negative.  Motion at 11-12.  Finally, they argue that the timing of the alleged change in position deprived them of a reasonable opportunity to respond to Guidance's new position, because Mr. Kelly's letter stating that the V2 file was listed in the first part of Exhibit 1 occurred after the Defendants rested their case in chief.

The Court is unpersuaded.  To the extent that the change in theory about which the Defendants complain was Guidance arguing that first page of Exhibit 1 governs production of the V2, the Court finds it difficult to believe that the Defendants were prejudiced when Guidance adopted a position that the Defendants had adopted early in the case.  The Defendants had been aware for a long time that Guidance believed the V2 was one of the products listed on the first part

---

find this fact dispositive.  The Court finds more persuasive the number of allegations relating to Article 4.5 that were contained in the Complaint and the Proposed Amended Complaint, but were absent from the Pretrial Order.

of Exhibit 1.  They had heard Mr. Kelly argue it, had argued it themselves, and had heard several witnesses testify to that fact during hearings and at trial.  They might have known that the position was inconsistent with an argument that Article 4.5 applied to the V2.  If they saw the inconsistency between the two positions, and were aware that Guidance was choosing to move forward on the theory that the V2 was one of the files on that first part of Exhibit 1 covered, they would have difficulty arguing to the contrary.  The Defendants had already argued, early in the case, that the first part of Exhibit 1 covered the V2, and would have had to change their position.  Their witnesses had testified that the requirement of engineering drawings on the V2 came from the first part of Exhibit 1, so they would have had to impeach those witnesses or to produce even more witnesses that would testify to the contrary.

Even if Guidance had dismissed its claim based on Article 4.5 early in the litigation, giving the Defendants more time to prepare their case accordingly, the Defendants would be all but precluded from taking the position that the V2 was a New Product that Article 4.5 governed, once the parties stepped back and analyzed the structure of the contract.  Any attempt to show that the V2 was a New Product subject to Article 4.5 would most likely have failed.  Deposition testimony, testimony at the preliminary injunction and TRO hearings, and documents disclosed in discovery supported that the V2 was a Guidance Product, i.e., one of the products that the parties knew would be supplied pursuant to the Supply Agreement.  See Nov. 26 Tr. at 132:10-134:20 (Gulley, Goodis); Dec. 5 Tr. at 342:15-25 (Kelly, Goodis); Response Exhibits B (Mosch's deposition), C (Newell's deposition), E-H (electronic-mail messages); Sept. 23 Tr. at 745:11-747:2 (Gulley, Goodis); Oct. 6 Tr. at 22:9-24:17 (Kelly, Littleton).  The testimony was essentially uniform, and much of it from the Defendants' witnesses, that the V2 was one of the products listed in the first part of Exhibit 1 -- further supporting the fact that it was one of the Guidance Products.  See Doc. 2-1, at 24 ("The

following is a list of products/specifications for the Guidance Products."). Article 4.5 applies to the "manufacture [of] endodontic files or obturators, which are improvements or successor products . . . to the Guidance Files or Guidance Obturators," Doc. 2-1, ¶ 4.5, at 6, and therefore does not, according to its plain language construed in light of the whole contract and not considering any of the extrinsic evidence, apply to the Guidance Files or Guidance Obturators. Again, therefore, the Defendants would have had to have found evidence to contradict some of their own witnesses' statements if they wanted to show that the V2 was a "New Product" subject to Article 4.5.

Even if the Defendants were successful in proving the V2 was a New Product, they would then have had to face the argument that Guidance now presents: if the V2 is not a Guidance Product, it must be a "possible product" under the second part of Exhibit 1.[27] If it is a "possible product," the parties agreed that the Defendants would not prototype it until January 29, 2010 at the earliest, yet the Defendants have never asserted the language in the second part of Exhibit 1 as a basis for refusing to produce the V2 file. Mar. 24 Tr. at 507:2-22 (Court, Radzely). In other words, the Court believes the Defendants' litigation position, had they been aware of Guidance's decision not to pursue its claim under Article 4.5, would have been the same or worse than it was in the case as the parties tried it.

---

[27] The Court does not believe the plain language of the Supply Agreement leads unambiguously to a construction that equates New Products under Article 4.5 and possible products under the second part of Exhibit 1, but Guidance introduced evidence tending to show that the Defendants intended Exhibit 1 to describe all products that they would ever have to produce for Guidance under the Supply Agreement, and such evidence would tend to undercut the possibility that a product could be a New Product under Article 4.5, and yet not a possible product under the second part of Exhibit 1. It would thus be difficult to prove that the V2 is a New Product under Article 4.5 without explaining why the Defendants did not refuse to produce it pursuant to the eighteen-month provision of the second part of Exhibit 1. See Mar. 24 Tr. at 507:2-22 (Court, Radzely)(conceding that the Defendants had never contended that the eighteen-month provision applied to the V2).

The Court is also not persuaded by the Defendants' argument that they were prejudiced because, if the Court had instructed the jury as it said it was inclined to, they likely would have won the case.  The Court's inclinations are not law.  Just because the Court states that it is inclined to do something does not mean that either party is legally entitled to have the Court do as it said it was inclined to do.  The Court gives its inclinations, at least in part, so that the parties may act on them.  If a party believes the Court would be in error if it did as it was inclined to do, it can explain how or why the action would be incorrect and ask the Court to reconsider.  In this case, Guidance saw an inconsistency in its position and sought to remedy it, which caused the Court to change its opinion of what would be a proper jury instruction.  The Defendants were not entitled to the instruction that the Court suggested it might give, so they cannot be prejudiced by the Court not giving that instruction.[28]  The Court thus concludes that, because Guidance did not change its theory, because Guidance's eschewing of a theory it had not seriously pursued did not surprise the

---

[28] The Court notes that much of this motion might have been avoided by judicious use of discovery, such as requests for admission under rule 36.  It has always been clear that neither the Supply Agreement nor Exhibit 1 referred to something called the "V2," but the Defendants presumably learned early on during discovery that the V2 was a name Goodis had given to a .04 constant-taper endodontic file.  The Defendants could have asked Guidance to admit that it believed the V2 was a new product subject to Article 4.5 of the Supply Agreement.  Such a request could appear redundant, given the allegation in the Complaint, but it would have established that the V2 was a New Product and perhaps entitled the Defendants to summary judgment on the breach-of-contract claim relating to the V2.  They could also have made the following two requests, if they perceived some confusion relating to Exhibit 1: (i) please admit that the V2 is the .04 constant-taper file to which the first part of Exhibit 1 to the Supply Agreement, found on pages 24-25 of Document 2-1 of the Court's docket, refers; and (ii) please admit that the V2 is the .04 constant-taper file to which the second part of Exhibit 1 to the Supply Agreement, found on pages 25-28 of Document 2-1 of the Court's docket, refers.  An affirmative answer to either request would have locked Guidance in to that theory, and a negative answer to both would have alerted the Defendants that a contract-construction dispute was in their future.  As with their failure to propound interrogatories aimed at Guidance's New Mexico Unfair Practices Act claim, see Memorandum Opinion and Order at 12 n.7, filed July 1, 2010 (Doc. 605), the Defendants could have avoided many of their current problems with more careful and thoughtful use of the discovery tools that the federal rules provide.

Defendants, and because the Defendants were not prejudiced, the Defendants' surprise argument fails.

The Defendants' assertion that it was a tactical decision for Guidance to rely on Article 4.5 in its Complaint then not pursue the claim, see Reply at 5-10, is untenable.[29]  Guidance did not hide its belief that the V2 was one of the files listed in the first part of Exhibit 1.  The Defendants voiced their belief that the V2 was on the first part of Exhibit 1 several times as well.  At any moment the Defendants could have pointed out the inconsistency between that position and belief that Article 4.5 governed production of the V2, but they did not.  The Court is likewise not persuaded by the Defendants analogizing Guidance's relinquishing its reliance on Article 4.5 to support its breach of contract claim to an attempt to add a new theory of recovery.  See Reply at 7.  This dropping of a theory is not a "new theory" in the way the Defendants suggest -- Guidance had apparently believed that a product could be subject to both Article 4.5 and to the first part of Exhibit 1.  It ceased its reliance on the former, apparently realizing that it was inconsistent with a reliance on the first part of Exhibit 1.  The Defendants took an unreasonable risk in relying, if they did, on Guidance's implied position on an issue of contract interpretation to establish an element of their defense.

The Defendants, in their reply brief, also attempt to attack the probative value of the testimony and documents on which Guidance relies in its response.  Their argument, however, misses the mark.  The purpose of that evidence is not to prove that the V2 was, in fact, the .04 constant-taper file found on the first page of Exhibit 1.  Rather, that Guidance sought the documents in discovery, and introduced the testimony in hearings and at trial, demonstrated that Guidance continuously took the litigation position that the V2 was the .04 constant-taper file on the first page

---

[29] The Court can scarcely count the number of times in this action that one party has accused the other of gamesmanship.

of Exhibit 1.  In other words, the Defendants want to show that Guidance never <u>tried</u> to prove the V2 was the .04 constant-taper file on the first page of Exhibit 1, but instead arguing that Guidance failed to <u>successfully</u> prove that fact.  That Guidance tried, in this context, is enough.[30]  The Court denies the Defendants' motion for new trial on the basis of Guidance's alleged switch in theory.

## III.   <u>JUDICIAL ESTOPPEL DOES NOT BAR GUIDANCE'S POSITION ON THE V2.</u>

The Defendants' second basis for seeking a new trial is that the doctrine of judicial estoppel should prohibit Guidance from taking the position that it did with respect to the V2.  They argue that Guidance took the position that the V2 was a New Product under Article 4.5 of the Supply Agreement, and that the Court adopted that position in its opinions regarding Guidance's request for a TRO and request for a preliminary injunction.  <u>See</u> Motion at 14-15.  Guidance responds that there are three reasons the Court should not judicially estop it from taking its position on the V2: (i) it did not change its position whether the first or second page of Exhibit 1 governed the V2; (ii) it never successfully procured a judgment in its favor under the theory that the second part of Exhibit 1 governed the V2; and (iii) it is clear that Guidance was not "playing fast and loose with the court[.]" Response at 18-19.  The Court finds that judicial estoppel does not bar Guidance's final litigation position.

Judicial estoppel under Delaware law is an equitable doctrine, intended to protect the integrity of the judicial process.  <u>See</u> <u>Banther v. State</u>, 977 A.2d at 884-85; <u>Motorola Inc. v. Amkor Tech., Inc.</u>, 958 A.2d at 859.  The doctrine "prevents a litigant from advancing an argument that contradicts a position previously taken that the court was persuaded to accept as the basis for its ruling."  <u>Motorola Inc. v. Amkor Tech., Inc.</u>, 958 A.2d at 859.  <u>See</u> <u>Lynch v. Thompson</u>, 2009 WL

---

[30] And, of course, Goodis' testimony alone was enough to make it a jury question, which the jury apparently resolved in Guidance's favor.

1900464, at *4.  The latter requirement is important -- "parties raise many issues throughout a lengthy litigation such as this, and only those arguments that persuade the court can form the basis for judicial estoppel."  Motorola Inc. v. Amkor Tech., Inc., 958 A.2d at 859.  On the other hand, it is always in the court's discretion whether to apply the judicial-estoppel doctrine in a given case.  See id.  Some of the factors that Delaware courts use to inform their decision whether to apply the doctrine of judicial estoppel in a particular case are: (i) whether the party's later position is "clearly inconsistent" with its earlier position; (ii) whether the party succeeded in persuading the court to accept the party's earlier position, so that accepting the inconsistent position in a later proceeding would make it appear that the court had been misled; (iii) whether the party seeking to assert the inconsistent position would derive an unfair advantage from the new position; and (iv) whether the party asserting judicial estoppel would suffer an unfair detriment if the opposing party is not estopped.  Julian v. E. States Constr. Serv., Inc., 2009 WL 1211642, at *6.

The Court will not apply the judicial-estoppel rule in this case.  While Guidance's position that the V2 is found in the first part of Exhibit 1 is arguably[31] inconsistent with a position it previously took in the case -- that Article 4.5 controls the development of the V2 -- and the Court arguably[32] adopted that position in its ruling on the applications for a TRO and a preliminary

---

[31] The Court says Guidance's position at the end of the trial was "arguably" inconsistent with its earlier position because, as the Court has noted, Guidance has always taken the position that the first part of Exhibit 1 governs the V2.  That position has always been inconsistent with the idea that Article 4.5 of the Supply Agreement governs the V2.  Guidance's position at the end of the trial was not internally inconsistent, but it was partially inconsistent with the position it had taken early on, because Guidance no longer asserted that Article 4.5 was relevant to the V2.

[32] The Court says that it arguably adopted that position because, while the Court made some statements in ruling on the TRO and preliminary injunction requests about how it initially believed the Supply Agreement operated, and what obligations it placed on the respective parties, the Court was working on a compressed timetable and only determining whether Guidance had shown a substantial likelihood of succeeding on the merits of a breach-of-contract claim regarding the V2.

injunction, the Court will exercise its discretion and decline to apply the doctrine of judicial estoppel.  As the Court has expressed, Guidance's ending position -- that the first part of Exhibit 1 to the Supply Agreement, and not Article 4.5, governed the V2 file -- is not "clearly inconsistent" with its prior position.  Guidance's prior position was internally inconsistent and all that Guidance did was pick a horse and ride it, even though that decision meant effectively dismissing its claim based on Article 4.5 of the Supply Agreement.  Again, Guidance was not wholly successful in persuading the Court to adopt its position, as the Court rejected Guidance's request for a TRO and for a preliminary injunction with respect to the V2.  It does not appear Guidance received an unfair advantage from its change in position, except in the sense it avoided taking a position that was clearly wrong because it was internally inconsistent.  Nor did the Defendants suffer an unfair detriment.  The factors thus weigh in favor of declining to apply the doctrine of judicial estoppel.

## IV.    JURY INSTRUCTION NO. 21 IS NOT ERRONEOUS UNDER ANY THEORY THAT THE DEFENDANTS HAVE PRESENTED.

The Defendants advance several arguments why the Court should find that Instruction No. 21 of the Court's Final Jury Instructions was erroneous.  First, they assert that the Supply Agreement was unambiguous that, in any and all circumstances, Guidance was required to supply the Defendants with engineering drawings before the Defendants were obligated to supply the V2.  See Motion at 17-20.  Second, they argue that the instruction was erroneous because both the first and second parts of Exhibit 1 listed a .04 constant-taper file.  See Motion at 24-25.  Third, they argue that Instruction No. 21 was erroneous because it allowed the jury to find that the word "files" in the

---

See Memorandum Opinion and Order at 39-41, filed December 15, 2008 (Doc. 30); Memorandum Opinion and Order at 3-4, filed December 22, 2008 (Doc. 39).  The Court is not convinced that such statements should satisfy the requirements for judicial estoppel.  Because the Court declines to apply the doctrine in any event, however, the Court need not resolve whether it truly adopted Guidance's position in those early opinions.

first part of Exhibit 1 meant "files in production."  Motion at 25-27.  Finally, they argue that the

Instruction was erroneous because it did not also instruct the jury that, even if first part of Exhibit

1 governed the V2's production, that engineering drawings were required if Guidance sought to

make changes to the V2 that were not minor.  See Motion at 27.

###   A.   THE SUPPLY AGREEMENT DOES NOT UNAMBIGUOUSLY REQUIRE ENGINEERING DRAWINGS FOR THE V2.

The Defendants contend that, by its terms, the Supply Agreement required Guidance to

submit engineering drawings regardless whether the V2 file is a new product under Article 4.5.

They argue that, regardless of which part of Exhibit 1 applied to the V2, the contract explicitly

requires detailed engineering drawings.  The Court disagrees.[33]

As the Court has set forth, the Supply Agreement does not unambiguously contemplate the

development process for the V2 or that of any of the Guidance Products.  On the contrary, with the

exception of the parentheticals following the design specifications for the Guidance Files in the first

part of Exhibit 1, the Supply Agreement and Exhibit 1 appear to assume that the Guidance Products

are already in production.  In fact, it is only the presence of parentheticals that state "Designs

frozen" and "Designs not frozen" that adds ambiguity to the contract; otherwise, the Court might

find that the contract unambiguously does not require Guidance to supply engineering drawings for

_____

[33] To the extent that the Defendants are now asserting that the contract should be construed such that, if Guidance sought to make a change to a Guidance Product other than one of the minor changes enumerated in the bold paragraph at the beginning of the first part of Exhibit 1, the product would cease to be a Guidance Product and thereafter be governed by the second part of Exhibit 1, that argument is new and has no place in these post-trial motions.  Moreover, it is not something that the Court can determine from the plain language of the Supply Agreement or Exhibit 1.  Even if it were a reasonable construction of the Supply Agreement and Exhibit 1, it is not clear that such a rule would apply before the Guidance Product at issue had gone into production.  As the Court has mentioned, one can reasonably construe the Supply Agreement to be wholly silent on the initial design process of the Guidance Products, as the only reference to that process appears to be in the unhelpful parentheticals following the specifications for the Guidance Files.

those products on the first part of Exhibit 1.

Indeed, Mr. Radzely agreed that, under the Defendants' interpretation of the contract, there are categories of products for which engineering drawings are not required. See Mar. 24 Tr. at 462:21-466:18 (Court, Radzely). The Court's concern was that Mr. Radzely could not -- even after the Court probed extensively -- clearly describe what those categories were. The impression with which the Court was left was that the Defendants believe that, if a product is in production, if its design is frozen, or if there is an existing prototype that needs no further modification, there is no need for design drawings. See Mar. 24 Tr. at 462:21-468:1 (Court, Radzely). That may indeed be what the Defendants and Guidance intended when they signed the Supply Agreement and included Exhibit 1, but it is not unambiguous from the face of the Supply Agreement. See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d at 1196 ("The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.").

The presence of the phrases "Designs frozen" and "Designs not frozen" could reasonably be construed to draw a distinction between the products on the first part of Exhibit 1 that had their designs frozen and those products on the first part of Exhibit 1 that did not have their designs frozen. That interpretation is not, however, a necessary one. It would also be reasonable to construe the parentheticals in Exhibit 1 as simple references to the current status of the design process with respect to those files, isolated from the remainder of the Supply Agreement and Exhibit 1. That the contract nowhere defines the term "frozen" is further support for that interpretation. Based on this ambiguity, the Court agreed to ask the jury whether the term "files" in the first part of Exhibit 1 meant files in production or frozen designs of files. Those were the two options made available by the ambiguity: the presence of parentheticals referencing the status of the files in terms of "frozen"

-58-

or "not frozen."

The lynchpin of the Defendants' argument that the Supply Agreement unambiguously required that Guidance provide engineering drawings before the Defendants had to produce the V2 is untenable.  The Defendants argue first that the parentheticals following the specifications for the Guidance Files have an unambiguous meaning: if the design is not frozen, Guidance will have to order at least one prototype from the Defendants.  See Motion at 17-18; Doc. 2-1, at 24 ("Designs not frozen – Dentsply will make two rounds of prototypes for each size.  Guidance will be charged a fee for any additional requested prototypes.").  Their argument further requires the Court to find that the last sentence in the first paragraph of the second part of Exhibit 1 unambiguously applies to prototype orders under those parentheticals.  See Motion at 18; Doc. 2-1, at 25 ("All requests for prototypes under this agreement must be submitted with engineering drawing(s) complete with product specs and tolerances.").  Under this construction, if the V2 was a New Product governed by Article 4.5 and the second part of Exhibit 1, engineering drawings would be required, and if the V2 is the .04 constant-taper file with an unfrozen design on the first part of Exhibit 1, engineering drawings would be required to get the necessary prototypes produced.  The Court, however, finds neither of the Defendants' proposed constructions are unambiguous from the face of the Supply Agreement.

The Defendant proposes an arguably reasonable interpretation of Exhibit 1, but there are other reasonable interpretations that do not mandate engineering drawings for the V2 no matter what.  The Court has already explained how those function.  The parentheticals, while they may have the meaning that the Defendants ascribe to them, might also be notices of the status of the design process with respect to those files.  That the words are in parentheses following the specifications of the Guidance Files, and that the parentheticals include undefined terms of unclear

meaning, gives some credence to that interpretation.   Moreover, it is also reasonable that the sentence, "[a]ll requests for prototypes under this agreement must be submitted with engineering drawing(s) complete with product specs and tolerances," in the second part of Exhibit 1 might apply only to the possible products described in the second part of Exhibit 1.   Only its use of the phrase "[a]ll requests for prototypes under this agreement" suggests otherwise.   Without deciding which of these interpretations was the most likely, the Court properly concluded that the Supply Agreement is ambiguous whether Guidance had to provide engineering drawings before the Defendants had to supply the V2 file.

### B.    THAT THE .04 CONSTANT TAPER IS IN BOTH PARTS OF EXHIBIT 1 DOES NOT RENDER IT ERRONEOUS.

The Court is somewhat perplexed by the Defendants' argument that Instruction No. 21 is erroneous because the .04 constant-taper file appears in both the first and second part of Exhibit 1. The relevant language from Instruction No. 21 is:

> You must determine whether the ".04 Taper" under the section titled "3. EndoTaper Constant Taper Sizes" on the first page of Exhibit 1 to the Manufacturing and Supply Agreement refers to the V2.   If the ".04 Taper" under the section titled "3. EndoTaper Constant Taper Sizes" on the first page of Exhibit 1 of the Manufacturing and Supply Agreement does not refer to the V2, then Guidance was required to provide Dentsply and/or Tulsa Dental with such engineering drawings.
>
> If you determine that the V2 and the .04 Taper are the same, there is a further ambiguity what the word "files" means in the bold paragraph at the top of page 1 on Exhibit 1 of the contract. . . .

Court's Final Jury Instructions, Instruction No. 21, at 21. The Defendants' fact is correct -- the first part of Exhibit 1, under the subheading "EndoTaper Constant Taper Sizes," has a line beginning: ".04 Taper - Size 15, 20, 25," and the second part of Exhibit 1, under the subheading "EndoTaper Constant Tapers," has two lines that state: "Tapers: .02, .04, ,08, .10," and "Sizes: 10 - 60," respectively.   Doc. 2.1, at 24-26.   There are thus variations of the .04 constant-taper file in both the

first and second parts of Exhibit 1.  The Court's confusion comes from how exactly the Defendants believe this renders Instruction No. 21 inappropriate.

First, the Court notes that this argument is a new one that the Defendants did not raise by timely objection to the jury instruction.  The Defendants' counsel was assisting the Court in crafting this instruction and had ample opportunity to object to the instruction, as rule 51 requires, to preserve error.  They did not, however, so the Court will review this objection only for plain error. Because the Court finds that Instruction No. 21 was not erroneous based on the fact that there is a .04 constant-taper file in both the first and second parts of Exhibit 1, the Court will not grant the Defendants a new trial on this basis.

Even if the Defendants had established that the V2 is a .04 constant-taper file, which the Court believes the evidence established, their argument does nothing but further underscore the first ambiguity in the contract -- is the .04 constant-taper file listed in the first part of Exhibit 1 the V2 file, or is the V2 the .04 constant-taper file listed on the second part of Exhibit 1?  Rather than make the instruction invalid, the Court believes that the existence of a .04 constant-taper file in both parts of Exhibit 1 provides further reason for asking the jury to determine if the V2 was the .04 constant-taper file on the first, or second, part of Exhibit 1.

Moreover, the instruction is carefully worded to ensure that the jury knew that the Court was asking it if the V2 was the .04 constant-taper file <u>on the first page of</u> Exhibit 1.  The second paragraph does not use the same "on the first page of" phraseology, but the question is structured such that it is easily inferred that the second paragraph is a continuation of the analysis requested in the first paragraph.  A reasonable reader would understand that, when the Court says "[i]f you determine that the V2 and the .04 Taper are the same," it is asking the reader to continue his or her analysis if "the '.04 Taper' under the section titled '3. EndoTaper Constant Taper Sizes' on the first

page of Exhibit 1 to the Manufacturing and Supply Agreement refers to the V2." The Court finds no error here.

>    **C.    THE COURT DID NOT ERR IN INSTRUCTING THE JURY THAT THE WORD "FILES" IN THE FIRST PART OF EXHIBIT 1 COULD MEAN FILES IN PRODUCTION.**[34]

The Defendants' next basis for asserting Instruction No. 21 was erroneous is that, they argue, there was no basis in the language of the contract, nor in the evidence at trial, that the word "files" in the first paragraph of the first part of Exhibit 1 might refer to "files in production." The Court has already addressed this contention in its explanation of its construction of the Supply Agreement and Exhibit 1. Again, the Supply Agreement -- even considering Exhibit 1 -- is ambiguous whether it even applies to the development process of the Guidance Products. With the exception of the ambiguous parentheticals following the specifications for the Guidance Files, the Supply Agreement appears to be written under the assumption that the Guidance Products, including the .04 constant-taper file, are already in production. It is true that neither the Supply Agreement nor Exhibit 1 use the phrase "files in production." On the other hand, if the Supply Agreement was not intended to govern the development process of the Guidance Products, limitations on those products would only apply once they were in production and on the endodontic market. Moreover, if the Supply Agreement was not intended to govern the development process, it would have no reason to specify that the first part of Exhibit 1 applied only to files in production. The Defendants might find it inartful to refer to this ambiguity as an ambiguity in the meaning of the word "files," rather than to ask the jury to consider whether the contract as a whole was intended to apply to the production

---

[34] The Court is convinced that the Defendants preserved this argument by their repeated objections to the inclusion of the instruction asking the jury to determine the meaning of the word "files" in the first part of Exhibit 1.

process of the V2 file, but the end result is the same.  In sum, the Court does not find the absence of the words "in production" in the first part of Exhibit 1 of the Supply Agreement makes the Court's interpretation unreasonable nor renders Instruction No. 21 erroneous.

The Court is unpersuaded by the Defendants' argument that there was no evidence that anyone believed that the word "files" meant "files in production."[35]  First, the presence or absence of ambiguity is to be determined without the aid of extrinsic evidence, and so the Court must determine if there are multiple reasonable interpretations without concern for whether anyone testified that they believed those interpretations to be correct.  See Halliburton Co. v. Highlands Ins. Grp., Inc., 811 A.2d at 280 n.9; Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d at 1232. The Court has concluded, from the fact of the contract as a whole, that it is ambiguous whether the parties intended the word "files" in the first part of Exhibit 1 to refer to files that were being produced by the Defendants, or frozen designs of files.  Moreover, while there might not have been testimony aimed directly at confusion whether the word "files" meant "files in production" or "frozen designs of files," there was testimony regarding the prior production process with the .06 constant-taper file, known as the EndoTaper, and the beginning of the production process for the .04 constant-taper file known as the V2.  That testimony was, essentially, that the production process for the EndoTaper involved a back-and-forth between Goodis and TDP and eventual production of the EndoTaper without requiring Goodis to supply engineering drawings, and that the development process for the V2 began the same way.  The evidence was sufficient to show that Goodis could

---

[35] Guidance aptly notes that there is equally little justification for instructing the jury that "files" means "frozen designs of files."  Response at 23-25.  The only language that vaguely suggests that interpretation is the parenthetical expressions stating "Designs frozen" or "Designs not frozen."  The relevance of the frozen/unfrozen distinction is not immediately apparent, as the term is not defined elsewhere in the Supply Agreement or Exhibit 1.  That "files" means "frozen designs of files" is only slightly more obvious than that "files" means "files in production."

reasonably have believed that the V2 was going to be developed using the same process as the EndoTaper, without the requirement of engineering drawings, and thus that the initial development of the V2 was not bound by the terms of the Supply Agreement or Exhibit 1, except that Exhibit 1 informed Goodis that he would only be entitled to two more "free" prototypes now that the Supply Agreement was executed.  This evidence tends to show that Goodis believed that the language in the first paragraph of Exhibit 1 did not apply to the V2 until it was in production and he desired to make a "minor change" to that file.[36]

The Defendants also suggest that the Court's construction of the contract was inconsistent with the plain language of the contract and the parties' intent, and that it would lead to an illogical result of the V2 being on the first part of Exhibit 1 for some purposes but not for others.  See Motion at 25-27.  The Court rejects both arguments.  First, as the Court has explained, the Court's interpretation is of the plain language of the contract and is not inconsistent with that language.  It is only through the Defendants' introduction of extrinsic evidence -- extrinsic evidence that is controverted in some respects -- that the Court's interpretation appears at all inconsistent with the Supply Agreement's plain language.  Mr. Radzely's assertion, for example, that engineering drawings are always required before the Defendants must produce any product, unless: (i) the design is frozen, (ii) there is a prototype in existence that does not need to be altered, or (iii) the file is in production, includes substantial information that is not unambiguous from the structure and language of the Supply Agreement.  The meaning and relevance of a frozen file, for example, is absent from the Supply Agreement.  The structure of the contract makes it questionable, at best,

---

[36] The Court agrees that there was evidence to the contrary, and evidence which might tend to show that Goodis' understanding in this regard was unreasonable.  The Court does not, however, believe that the contrary evidence was sufficient to justify taking the question of contract interpretation from the jury and deciding it as a matter of law.

whether engineering drawings are required for the two prototypes of the V2 that the Defendants guaranteed Guidance in the first part of Exhibit 1.  The statement that engineering drawings must accompany all requests for prototypes exists as the last sentence of a paragraph in the second part of Exhibit 1, which is discussing a different category of products than the first part of Exhibit 1.  The remainder of that paragraph discusses when Guidance may request prototypes of the products listed in the second part of Exhibit 1.  It is thus reasonable to find that "requests for prototypes" mentioned in the second part of Exhibit 1 only applies to requests for prototypes of the products described in the second part of Exhibit 1.[37]

The Court does not find its construction problematic in that the V2 was contained in the first part of Exhibit 1 for some purposes but not for others, as the Defendants argue.  See Motion at 26. The Court's construction finds that the first part of Exhibit 1 governs the V2 for all purposes; the ambiguity is whether the contract applies to the initial design and production process.  If the Supply Agreement does not govern the design and production process, it does not limit the number or type of changes Guidance may make while engaged in the interactive design process of the V2.  The Court likewise rejects the Defendants' argument that this construction is inconsistent with the testimony at trial that the Supply Agreement was drafted to address the excessive back-and-forth between Goodis and the Defendants' design teams in producing the Guidance Files.  As with other

---

[37] Moreover, according to the Court's recollection and the portions of the record that the parties have brought to the Court's attention, the Defendants never requested an instruction that dug deeper into this requirement or further drew out the issue of prototypes.  The Court does not recall any request that Instruction 21 perhaps include a reference to the need for prototypes, nor any argument that the fact that Guidance would need to request further prototypes for the V2 meant that engineering drawings were required, notwithstanding that it fell under the first part of Exhibit 1. The Court's Instruction No. 21 essentially gave the parties all that it believed anyone requested, based on the ambiguities that the Court decided were present, including a clear instruction that if the V2 was not in the first part of Exhibit 1, engineering drawings were required.

factual/evidentiary arguments the Court has addressed, it may be that this construction is inconsistent with some of the Defendants' testimony, but the Court did not, and should not, consider extrinsic evidence in determining whether the contract was ambiguous.  Moreover, the testimony of the back-and-forth design process of the EndoTaper, and the initial back-and-forth design process of the V2, support the proposition that the design process was to continue as it had, unaffected by the Supply Agreement.  In other words, the Court believed there was evidence to support both constructions, so the Court found the Supply Agreement ambiguous and instructed the jury accordingly.

> ### D.   THE DEFENDANTS DID NOT PRESERVE THEIR ARGUMENT THAT NON-MINOR CHANGES TO FROZEN FILES REQUIRED ENGINEERING DRAWINGS, AND ANY ERROR WAS NOT PLAIN.

The Defendants' final argument why Instruction No. 21 was erroneous is that there was no instruction telling the jury that "engineering drawings were required for more than minor changes after the design was frozen."  Motion at 27.  Guidance asserts that this error was not properly preserved, and so the Court should not consider it.  See Response at 25-26.  The Court agrees with Guidance.

This motion is the first time this construction of the Supply Agreement has ever been proposed, and no request for such an instruction was made at trial.  See Fed. R. Civ. P. 51(d)(1) ("A party may assign as error . . . (B) a failure to give an instruction, if that party properly requested it and -- unless the court rejected the request in a definitive ruling on the record -- also properly objected.").  The Defendants are thus entitled to relief based on this argument only if the Court finds that omitting such an instruction was plain error.  See Fed. R. Civ. P. 51(d)(2) ("A court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights.").  A court need not consider a jury-instruction error to be

"plain error" unless the error was "patently, plainly erroneous <u>and</u> prejudicial." <u>Williams v. W.D.</u>
<u>Sports, N.M., Inc.</u>, 497 F.3d at 1094 (emphasis added). The Tenth Circuit will not reverse a district
court for failure to address an unpreserved error in the jury instructions under the plain-error rule
except "in an exceptional circumstance, where the error was patently erroneous and prejudicial and
where fundamental injustice would otherwise occur." <u>Abuan v. Level 3 Commc'ns, Inc.</u>, 353 F.3d
1158, 1173 (10th Cir. 2003). The Federal Rules Advisory Committee has suggested that courts
consider the following factors in determining whether an error is "plain": (i) obviousness of the
mistake; (ii) importance of the error; (iii) cost of correcting the error; and (iv) the impact the verdict
may have on nonparties. <u>See</u> Fed. R. Civ. P. 51 advisory committee's note (2003).

The Court does not believe the plain-error rule applies. First, it is not clear that the
Defendants' addition to Instruction No. 21, or something similar to it, is necessary -- <u>i.e.</u>, it is not
clear that there is error at all. The Supply Agreement is silent on changes to the Guidance Products
other than those minor changes, so the plain language of the contract has no provision requiring
engineering drawings for non-minor changes. On the other hand, the Court can understand a
construction of the contract that might make a similar instruction appropriate: Because Exhibit 1
only contemplates "minor" changes to the Guidance Products, any change other than those minor
changes makes that product a New Product, and thus no longer a Guidance Product. Under that
construction, as soon as Guidance sought to make a major change to one of the Guidance Products,
the product would suddenly be bound by the requirements of Article 4.5 and the second part of
Exhibit 1. Again, that is only a possible -- and possibly reasonable -- interpretation of the contract.
The alternative that the Court believes Guidance was, perhaps inartfully, trying to convince the
Court to adopt is likewise plausible: That the Supply Agreement was inapplicable to the initial

design of the V2 because it assumed that the Guidance Products would be in production.[38]  On the

other hand, an instruction similar to the one the Defendants' motion suggests might be reasonable,

and might have been relevant if the jury determined that "files" meant something other than "files

in production."  It therefore would not have been error to include an instruction similar to that which

the Defendants suggest.  On the other hand, the Court is not convinced that it was error to omit such

an unrequested instruction.

　　　　The Court finds no error in omitting an instruction that instructs the jury to find that

"engineering drawings were required for more than minor changes after the design was frozen."

Motion at 27.  In fact, it would have been error to instruct the jury as the Defendants suggest.  Only

if the jury found that the word "files" meant "frozen designs of files" would it have been arguably

proper to instruct them that engineering drawings were required for non-minor changes.  If the jury

determined that the Supply Agreement did not address the development process for the Guidance

Products, there is no language in the contract from which one could reasonably find an engineering-

drawings requirement for non-minor changes during the initial development.  In other words, it

would have been more clearly error for the Court to include the language the Defendants propose

than it was that the Court omitted it.  The Defendants have failed to show the Court a valid way in

which Instruction No. 21 might have been improved.

　　　　Moreover, even if the Court construes the Defendants' argument as asserting another

instruction -- i.e., something to the effect of, "if the jury finds that the word 'files' in the first part

of Exhibit 1 refers to frozen designs of files, Guidance was required to supply engineering drawings

---

[38]Strictly speaking, these two interpretations are not mutually exclusive.  If, however, the
latter is an appropriate interpretation of the Supply Agreement, there is no need to instruct the jury
on the former because it would not apply to the V2 until the V2 was in production.

for non-minor changes to those frozen designs" -- the Court is not convinced that the omission of

such an instruction would be erroneous.  The Defendants' position through much of the case was

that they put the engineering-drawings requirement in place because Goodis was pestering them

with repeated small changes to his file design.  The distinction between major and minor changes

was never seriously investigated during the trial.  It thus appeared that the Defendants were arguing

that Goodis made minor changes to the V2, and therefore that the first part of Exhibit 1 required him

to provide engineering drawings.  The Court's decision to use the phrase "minor changes" was an

effort to conform to the language of Exhibit 1.  The Court can always, in a jury trial involving a

contract, add more instructions further elucidating the meaning and interpretation of the contract's

terms.  Omission of such instructions is not invariably error.  For the sake of the jury and the parties

-- and for its own sake -- the Court makes an effort to include instructions only on those aspects of

the contract that the parties assert are relevant to their dispute.  Doing otherwise would result in

hundreds of pages of instructions, many of which will only confuse and bog-down the jury.  It is

difficult enough to draft jury instructions on the litigated issues without worrying about phantom

issues.  Because the distinction between minor and major changes was never seriously pressed, and

because the battle appeared to be over minor changes, it was not necessary to explore what the

Supply Agreement and Exhibit 1 required for non-minor changes.

Even assuming the Court erred, however, the error is not plain.  This is not an exceptional

case.  While the punitive damages award is one of the largest in New Mexico history, see Scott

Sandlin, Duke City Dentist Awarded $44 Million, Albuquerque Journal, Oct. 13, 2009 ("An

Albuquerque dentist who founded a small dental equipment firm based on a tool he designed has

been awarded $44 million by a federal jury in a breach-of-contract case -- one of the largest in state

history."), there does not appear to be a significant probability that the lack of this one sentence

contributed to that punitive-damages award.  See Wilkins v. Packerware Corp., 260 Fed. Appx. 98, 102 (10th Cir. 2008)(holding that an un-objected-to error can warrant reversal where the party "can (1) show error that was (2) plainly evident, (3) affected his substantial rights, and (4) seriously affected the fairness, integrity, or public reputation of the judicial proceedings.")(emphasis added). The case was, at times, a complicated one; but the Court does not believe it was exceptionally complex or significantly more difficult than any other commercial contract case that takes three weeks to try.  It did not present any significant federal issues, constitutional issues, or a liberty interest.  But for the size of the punitive damages award, this case had slid under the radar as far as press coverage.  Moreover, there were always at least four attorneys in the room arguing as the Court sought to develop accurate jury instructions, and neither the Court nor the attorneys saw this potential problem with Instruction No. 21.  Or, if they saw any problem, they did not mention it. It was not clear that the Supply Agreement took a position on major changes to the Guidance Products, nor that the distinction between major and minor changes would be particularly important to any party's theory of the case.  It is speculation to suggest such a distinction was important to a jury when it was not important to the attorneys.  The Court instructed the jury in line with the language of Exhibit 1: "If you find that the word 'file' in the fifth sentence of the paragraph refers to frozen designs of files, and find that Guidance froze the design of the V2, then after that, engineering drawings for the V2 detailing product specs and tolerances were required for minor changes."  Court's Final Jury Instructions, Instruction No. 21, at 21 (emphasis added). See Doc. 2-1, at 24 ("Guidance from time to time may make minor changes . . . complete with engineering drawings detailing product specs and tolerances.").  The Court thus finds that this potential error, if there was any, was not "patently, plainly erroneous and prejudicial," Williams v. W.D. Sports, N.M., Inc., 497 F.3d at 1094, especially because the issue of instructing the jury on major changes

was not brought to the Court's attention, and the error certainly did not "affected the fairness, integrity, or public reputation of the judicial proceedings."  Wilkins v. Packerware Corp., 260 Fed. Appx. at 102.  See Abuan v. Level 2 Commc'ns, Inc., 353 F.3d at 1173 ("We may only reverse [under the plain-error standard] in an exceptional circumstance, where the error was patently erroneous and prejudicial and where fundamental injustice would otherwise occur.").

The factors that the Rules Advisory Committee suggest also weigh in favor of finding no plain error.  As the Court has already mentioned, the error, if any, was not obvious.  Rather, the alleged error involved an aspect of the contract's construction that was neither clear nor clearly relevant.

The Court also concludes that the error, if any, was probably not important.  The Defendants make no effort to explain why the alleged error was important, or how the outcome might have been different if the instruction had been as they propose.  The Motion states only that "the jury could have incorrectly concluded that Guidance had frozen the design but still did not have to produce engineering drawings even though the requested changes were more than minor changes."  Motion at 27 (emphasis added).  The Defendants' concern is improbable.  It is conceivable that the jury found that the word "files" meant "frozen designs of files," found that Guidance froze the design of the V2, found that Goodis then sought to change the design of the V2, found that Goodis' desired change was not minor, then concluded that, because Instruction No. 21 only addresses minor changes, that no engineering drawings were required.  This chain of logic is unlikely for several reasons.  First, because the need for the additional sentence in the instruction would be conditioned on the jury finding that "files" meant "frozen designs of files," omission of the instruction would make no difference if the jury found that "files" meant "files in production."  Second, the jury could have found that Goodis did not freeze the design of the V2.  Given the evidence, such a finding is

improbable, but possible, thus decreasing the probability that inclusion of the instruction would have changed the outcome of the case. Third, for the alleged error to be material, the jury would have to conclude that Goodis did not seek to make minor changes. Even if there were also non-minor changes, one minor change would trigger the first part of Exhibit 1 and impose an engineering-drawings requirement. Finally, the jury would have to make the illogical step of finding that, even though engineering drawings are required for minor changes, major changes could be made without engineering drawings.

On the other hand, under Guidance's theory of Exhibit 1 as the Court now understands it, if the jury found that Exhibit 1 referred only to files in production, it would be adopting the construction that the Supply Agreement does not govern the process of designing and developing the V2. Under that construction, whether the changes were major or minor would be irrelevant so long as the product being developed was still the same V2 that was listed in the first part of Exhibit 1. The jury could reasonably have concluded that, by listing the V2 on the first part of Exhibit 1, the Defendants were promising that they would jointly develop it with Guidance and, once it was developed and on the market, Guidance would have to submit engineering drawings for minor changes. It is thus unlikely that inclusion of the requested instruction would have changed the outcome of the case.

At this point, the cost of correcting the alleged error -- having a new trial with corrected instructions -- would be steep, both for the parties and for the Court. Resolving this issue the first time required significant discovery and a three-week jury trial, not to mention numerous days spent arguing motions and discovery disputes. While that cost is less than the punitive-damages verdict the Defendants now face, the Court still believes that the cost weighs against finding plain error. Moreover, if the problem is the size of the punitive damages award, the Court should address that

problem directly, and not search out imperfections in jury instructions that probably had no real impact on the verdict.

Finally, the impact of the verdict on third-parties is relatively minimal, and, in any case, indirect.  The Defendants did not present evidence or argument on the effect of the verdict on third parties, so the Court is admittedly speculating in its analysis of this factor.  The significant judgment against the Defendants might result in some Dentsply or TDP employees losing their jobs, but, given their size and wealth, see Dentsply.com, Providing the Dental Community with Cost-Effective Dental Products, http://www.dentsply.com/default.aspx?pageid=6 (last visited August 3, 2010) (Dentsply touting itself as "the largest professional dental products company in the world"); Press Release (dated July 29, 2010)(Dentsply announcing net sales for the second quarter of 2010 increased 2.2%, to $565.1 million), even that result is unlikely.  The Dentsply shareholders might suffer a temporary loss in stock value, but there is no reason to think it is something from which Dentsply will not recover.  In all, the weight of the factors the Advisory Committee propose suggest that the Court should not find plain error in this situation.  The Court will therefore reject this final basis for finding Instruction No. 21 erroneous and deny the Defendants' motion for new trial.

In contract cases like this one, the parties are well advised to solidify early in the case their understanding of how the contract works, or, if not their understanding of how the contract actually works, their understanding of how the party will argue that the contract works.  Having a solidified theory on contract construction early in the game will prevent the pitfall into which both parties fell in this case, of appearing to take inconsistent positions throughout the course of the litigation.  The Court understands why litigants might prefer not to take a firm position in a law suit; after all, if a party does not commit to a theory, it can continue to change and adapt its theory as the case progresses and the Court makes rulings on various other issues.  Having a consistent, well-planned

theory, however, can avoid many post-trial problems.  A party should also, to the extent possible, demand that the opposing party explain its understanding of how the contract works, through the use of discovery devices like requests for admission and interrogatories.  Because parties are allowed to plead causes of action in the alternative, it is not always safe to rely on a party's allegations to determine how it ultimately will decide a contract is constructed.  See 18B C. Wright, A. Miller, & E. Cooper, Fed. Prac. & Proc. Juris. § 4477, at 559-60 (2d ed. 2002)("Given the great freedom permitted by modern federal procedure to assert inconsistent positions in a single action . . . reliance on positions initially taken by an adversary is not well advised.").  It is not always easy to pin down the opposing party on its interpretation of a difficult contract like the one involved in this case, but an admission that a particular provision is binding, for example, would be uncontrovertable evidence that the provision does apply.  In this case, such a request for admission, at a time when Guidance was still relying upon Article 4.5, would have actually locked Guidance into asserting the Article 4.5 applied because evidence to the contrary would be inadmissible.  See Fed. R. Civ. P. 36(b) ("A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended.").  The Court would have then been able to instruct the jury that, as a matter of law, the .04 constant-taper file in the first part of Exhibit 1 was not the V2; rather, the V2 was a New Product subject to Article 4.5 and the second part of Exhibit 1.  That, however, is a different case; here, the jury found, as it was entitled to find, that the V2 was the .04 constant-taper file on the first part of Exhibit 1.  This theory was not the result of an impermissible change in trial strategy, nor was Instruction No. 21 erroneous.  The Court will therefore deny the Defendants' motion for new trial on these two grounds.

**IT IS ORDERED** that Dentsply/TDP's Motion for a New Trial Due to Guidance's Prejudicial Mid-Trial Switch in Position on Whether the V2 is a "New Product" and Error in Jury

Instruction 21 is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kyle C. Bisceglie
Renee M. Zaystev
Olshan, Grundman, Frome, Rosenzweig
   & Wolosky, LLP
New York, New York

-- and --

John J. Kelly
Donald A. DeCandia
Ryan Flynn
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Albuquerque, New Mexico

      *Attorneys for the Plaintiff and Counterdefendants*

Brian M. Addison
   Vice President, Secretary, and General Counsel
Dentsply International, Inc.
York, Pennsylvania

-- and --

Thomas P. Gulley
Rebecca Avitia
Bannerman & Johnson, PA
Albuquerque, New Mexico

-- and --

R. Ted Cruz
Morgan Lewis & Bockius, LLP
Houston, Texas

-- and --

Howard M. Radzely
W. Brad Nes
Morgan Lewis & Bockius, LLP
Washington, D.C.

*Attorneys for the Defendants and Counterplaintiffs*