# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

GUIDANCE ENDODONTICS, LLC,
a New Mexico Limited Liability Company,

      Plaintiff,

vs.                                      No. CIV 08-1101 JB/RLP

DENTSPLY INTERNATIONAL, INC.,
a Delaware Business Corporation, and
TULSA DENTAL PRODUCTS, LLC,
a Delaware Limited Liability Company,

      Defendants,

and

DENTSPLY INTERNATIONAL, INC.
and TULSA DENTAL PRODUCTS, LLC,

      Counter Plaintiffs,

vs.

GUIDANCE ENDODONTICS, LLC
and DR. CHARLES GOODIS,

      Counter Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

      **THIS MATTER** comes before the Court on Dentsply/TDP's Motion for Remittitur, or, In

the Alternative, For a New Trial Under Rule 59, filed April 28, 2010 (Doc. 549)("Motion for

Remittitur"). The Court held a hearing on September 1, 2010. The central question before the Court

is whether the punitive damages award of $40,000,000.00 is so excessive that the Defendants failed

to receive fair notice that their conduct would subject them to such a severe penalty.  See <u>BMW of</u>

N. Am., Inc. v. Gore, 517 U.S. 559, 574 (1996). The primary issues are (i) whether the Defendants' conduct is sufficiently reprehensible to support the punitive damages award; (ii) whether the ratio of compensatory damages to punitive damages -- in this case approaching 1:10 -- is excessive; and (iii) whether the punitive damages award is an outlier, or "the difference between this remedy and the civil penalties authorized or imposed in comparable cases," BMW of N. Am., Inc. v. Gore, 517 U.S. at 574, is so great as to render the award unconstitutional. Because each of the Supreme Court of the United States' guideposts counsels in favor of remittitur, the Court finds that the punitive damages award is constitutionally excessive and will therefore grant the Defendants' Motion.

## FACTUAL BACKGROUND

This lawsuit arises out of a business dispute between Plaintiff and Counter-Defendant Guidance Endodontics, LLC, a small endodontic equipment company that Counter-Defendant Dr. Charles Goodis owns, and the much larger Defendants and Counter-Plaintiffs Dentsply International, Inc. and Tulsa Dental Products, LLC (collectively, "the Defendants"), who are both Guidance Endodontics' rivals and its suppliers. The Defendants are manufacturers and suppliers of certain endodontic instruments -- including endodontic files, obturators, and ovens -- that compete with Guidance Endodontics' products. Guidance and the Defendants were parties to a Manufacturing and Supply Agreement, which arose as a settlement of a separate intellectual-property dispute. The Supply Agreement required the Defendants to supply Guidance with endodontic instruments, which Goodis designed and which Guidance Endodontics planned to sell to end-users.

Guidance Endodontics began selling its endodontic products at extremely low prices compared to the prices that the Defendants charged for the same or similar products. According to Guidance Endodontics' allegations and the jury's findings as reflected in its verdict, the Defendants

stopped supplying endodontic obturators to Guidance Endodontics as a dirty business tactic to keep Guidance from underselling them in the marketplace.  In addition to ceasing the supply of obturators, the Defendants refused to manufacture a new endodontic file that Goodis designed -- the V2 file -- which Guidance Endodontics intended to sell.  Finally, the Defendants, who dominate the endodontics instrument market, initiated an organized marketing campaign to drive Guidance Endodontics out of business.  Specifically, the Defendants' sales staff falsely represented to actual and potential Guidance Endodontics customers that Guidance was no longer able to supply endodontic files.  Based on these three categories of conduct, Guidance Endodontics filed this suit.

## **PROCEDURAL BACKGROUND**

After a three-week jury trial, <u>see</u> Clerk's Minutes at 1, filed Sept. 21, 2009 (Doc. 439), the jury in this matter found that the Defendants breached their Manufacturing and Supply Agreement with Guidance in two ways: (1) by ceasing the supply of obturators to Guidance Endodontics, and (2) by refusing to manufacture Guidance Endodontics' newly designed V2 file.  <u>See</u> Redacted Jury Verdict at 2 (filed October 9, 2009)(Doc. 441).  The jury also found that the Defendants breached the implied covenant of good faith and fair dealing and committed a willful violation of the New Mexico Unfair Practices Act, NMSA 1978, §57-12-1 through -26 (1967).  <u>See</u> Redacted Jury Verdict at 2-3.  As compensatory damages, the jury awarded $4.08 million related to the Defendants' refusal to manufacture the V2 file.  <u>See</u> Redacted Jury Verdict at 4.  The jury awarded $200,000.00 in "nominal damages" related to the Defendants' failure to provide obturators.  <u>See</u> Redacted Jury Verdict at 4-5.  Finding that the Defendants' breach of the implied covenant of good faith and fair dealing was in bad faith and that Guidance Endodontics was entitled to punitive damages for the Defendants' breach of contract, the jury awarded Guidance Endodontics

$40,000,000.00 in punitive damages.  <u>See</u> Redacted Jury Verdict at 5-6.

The Defendants in this case alleged that Guidance Endodontics fraudulently induced them to enter the Manufacturing and Supply Agreement; breached the Manufacturing and Supply Agreement; and engaged in false advertising, trademark infringement, misappropriation of trade values, and unfair competition.  <u>See</u> Redacted Jury Verdict at 1, 6-7.  The jury found that Guidance Endodontics had committed no fraudulent inducement, no trademark infringement, no unfair competition, and no misappropriation of trade values.  <u>See</u> Redacted Jury Verdict at 6-7.  Although the jury found that Guidance Endodontics breached the Manufacturing and Supply Agreement, it determined that the Defendants suffered no damages as a result.  <u>See</u> Redacted Jury Verdict at 6. However, the jury awarded $93,000.00 in compensatory damages in favor of the Defendants and against Guidance Endodontics on the Defendants' claim of false advertising.  <u>See</u> Redacted Jury Verdict at 6-8.

In their Motion for Remittitur, the Defendants argue that the punitive damages award in this case is unconstitutionally excessive under each of the Supreme Court's three guideposts.  <u>See</u> Motion for Remittitur at 2 (referring to <u>BMW of N. Am., Inc. v. Gore</u>, 517 U.S. at 575).  First, the Defendants argue their conduct in this case is "not sufficiently reprehensible to justify a $40 million punitive damages award."  <u>See</u> Motion for Remittitur at 2.  Specifically, the Defendants note that their conduct "did not result in any physical harm and did not demonstrate an indifference to or reckless disregard for the health and safety of others."  <u>Id.</u>  Particularly in contract cases, "where the parties can and should contractually protect themselves by providing for explicit remedies in the event of breach, the permissible ratio of punitive damages to actual damages should be relatively modest."  Motion for Remittitur at 4 (quoting <u>FDIC v. Hamilton</u>, 122 F.3d 854, 862 (10th Cir.

4

1997)).  The Defendants also contend that factors the Supreme Court has identified as relevant to reprehensibility do not support punitive damages on the order of a 10:1 ratio of punitive to compensatory damages.  See Motion for Remittitur at 7-9.  For instance, the Defendants argue that Guidance Endodontics is not financially vulnerable given that Counter-Defendant Goodis' annual income as an endodontist "approached or exceeded $1 million per year."  See Motion for Remittitur at 7 (citing Morgan v. New York Life Ins. Co., 559 F.3d 425, 442 (6th Cir. 2009)("Based on [plaintiff's] salary [of $500,000.00 to $1,000,000.00 a year] . . . and the $6,000,000 compensatory damages award . . . it would seem to be a stretch to describe him as financially vulnerable.")).  The Defendants also claim that their conduct does not involve repeated action, but instead a single contractual relationship.  See Motion for Remittitur at 8 (citing FDIC v. Hamilton, 122 F.3d at 862 ("Although the dispute concerning the bank's performance of its promises stretched out over some time, the alleged act of fraud -- *the making of a contractual promise to make certain repairs -- was a single event arising from a single contractual relationship.*" (emphasis in Motion for Remittitur))).  Finally, whereas the Defendants acknowledge that the jury in this case found that the Defendants acted with malice, trickery, or deceit, the Defendants claim that "courts have not hesitated to significantly remit punitive damages awards despite the tautological fact of a jury finding of willfulness and deceit."  Motion for Remittitur at 8 (citing Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc., 181 F.3d 446, 467 (3d Cir. 1999)).

The Defendants argue, with respect to the second guidepost identified by the Supreme Court in BMW of North America, Inc. v. Gore, that in cases featuring a significant compensatory damages award, "a ration of punitive-to-compensatory damages larger than 1:1 should not be upheld."  See Motion for Remittitur at 2.  The Defendants point to the Supreme Court's opinion in State Farm

5

Mutual Automobile Insurance Co. v. Campbell, wherein the Court stated: "When compensatory damages are substantial, then a lesser ratio, perhaps *only equal to compensatory damages*, can reach the outermost limit of the due process guarantee." See Motion for Remittitur at 10 (quoting 538 U.S. 408, 425 (2003) (emphasis added)).

Regarding the third guidepost from BMW of North America, Inc. v. Gore, the Defendants argue that "neither comparable civil penalties nor comparable punitive damages awards put Dentsply/TDP on notice that it might be susceptible to a punitive damages award 10 times as large as the already substantial compensatory damages awarded." Motion for Remittitur at 2. The Defendants argue that "the only arguable civil penalty for comparable conduct is the claim that Dentsply/TDP violated Section 57-12-2(D)(17) of the New Mexico Unfair Trade Practices Act ('UPA')." Motion for Remittitur at 14. Under the UPA, the Defendant contend that their maximum exposure was to potential liability for $300.00, which would not have put them on sufficient notice that they would risk a punitive award on the order of $40,000,000.00. See Motion for Remittitur at 14.

The Defendants also argue that the $200,000.00 award for "nominal damages" is "unlawfully excessive" and should be remitted. See Motion for Remittitur at 17. Under Delaware law, the Defendant argue that "the proper amount of nominal damages is between six cents and one dollar." Motion for Remittitur at 17 (collecting cases). Moreover, the Defendants argue that "[t]he Tenth Circuit has made clear that when a nominal damages award is excessive, the award must be reduced as a matter of law." Motion for Remittitur at 18 (citing Mollinger-Wilson v. Quizno's Franchise Co., 122 F. App'x 917 (10th Cir. 2004)).

Guidance Endodontics opposes the Defendants' Motion for Remittitur. With regard to the

first <u>BMW of North America, Inc. v. Gore</u> guidepost, the reprehensibility of the Defendants' conduct, Guidance Endodontics argues that it was a fledgling company that had never operated at a profit, and, although its founder, Counter-Defendant Dr. Goodis, earned a high income, it was Guidance Endodontics and not Goodis which the Defendants' targeted with their conduct.  <u>See</u> Pl.'s Memo. Of Law in Opp. To Dentsply/TDP's Motion for Remittitur at 13, filed May 24, 2010 (Doc. 575) ("Response").  While Goodis used his income to keep Guidance Endodontics afloat while the Defendants sought to eliminate it, Guidance Endodontics argues that "Dr. Goodis was not obligated to support Guidance with his hard-earned income from his practice." <u>See</u> Response at 13.  Guidance further contends that the Defendants' conduct in this case was not "the kind of 'single instance' conduct that weighs against reprehensibility."  Response at 15.  Finally, Guidance Endodontics points out the evidence at trial showing that the Defendants intentionally and maliciously sought to use its market power to put Guidance out of business.  <u>See</u> Response at 16.

In considering the second <u>BMW of North America, Inc. v. Gore</u> guidepost, the relationship of punitive damages to any compensatory award, Guidance Endodontics argues that the Court should consider not only the compensatory damages actually awarded, but those which could have been awarded based on the Defendant's conduct.  <u>See</u> Response at 18 (citing <u>BMW of N. Am., Inc. v. Gore</u>, 517 U.S. at 581 (holding that courts should consider "the harm likely to result from the defendant's conduct as well as the harm that has actually occurred"); <u>TXO Prod. Corp. v. Alliance Resources Corp.</u>, 509 U.S. 443, 453 (1993) (holding that courts should consider "the potential harm that [the defendant's] actions could have caused")).  Likewise, Guidance Endodontics points to authority from the District of New Mexico holding that attorney's fees, which are compensable pursuant to the New Mexico Unfair Practices Act, are considered compensatory damages.  <u>See</u>

Response at 22.  Upon consideration of available compensatory damages as well as attorney's fees, Guidance Endodontics argues that the actual punitives to compensatory damages ratio is closer to 2:1 or 1.5:1 as opposed to the nearly 10:1 figure utilized by the Defendants.  See Response at 23. Guidance Endodontics further contends that a 1:1 ratio is not appropriate in this case because the facts of this case are distinguishable from those in Exxon Shipping Co. v. Baker, where there were "no earmarks of exceptional blameworthiness."  See Response at 25.  Finally, Guidance Endodontics argues that a remittitur to a 1:1 ratio would not serve the purpose of punitive damages -- namely, to deter the Defendants from similar behavior in the future.  See Response at 29.

Guidance Endodontics disagrees with the Defendants' view that there are no civil or criminal penalties for the Defendants' conduct which might have put the Defendants on notice that they were potentially facing significant punitive damages.  See Response at 30.  Most significantly, Guidance Endodontics suggests that the Defendants could have been subject to up to $1,000,000.00 in fines and/or ten years in prison for violations of the Sherman Act.  See Response at 30-31 (citing 15 U.S.C. § 2).

As for the $200,000.00 "nominal damages" award, Guidance Endodontics contends that the Defendants have waived any argument that this award should be remitted as excessive.  See Response at 33.  First, Guidance Endodontics points out that the Defendants did not object to Question 21 on the verdict form, see Response at 33, which reads:

> 21.    In a lump sum, state the amount of nominal damages you are awarding to Guidance.
> $_____

Redacted Jury Verdict at 5, filed October 9, 2009 (Doc. 441).  Second, Guidance Endodontics argues that the Defendants have waived any challenge to the nominal award because they failed to request

a jury instruction that would have limited nominal damages awarded.  See Response at 33.

At the Court's hearing on the Defendants' Motion for Remittitur, the Court indicated: "[H]aving sat through the trial, seen the verdict and read the briefing that I have read, that some reduction in fees is appropriate -- not fees -- the punitive-damages award, and I guess I'm at least tentatively persuaded that it probably needs to be down in the one-to-one ratio."  Motions Hearing (held September 1, 2010) Transcript at 12:20-25, filed November 8, 2010 (Doc. 626). Acknowledging that certain factors weigh slightly in plaintiff's favor, the Court commented: "I still think that the factors that are present in plaintiff's favor are there weakly and counsel that I grant this motion for remittitur."  Motions Hearing Tr. at 98:19-21 (held September 1, 2010), filed November 8, 2010 (Doc. 626).  Regarding the "nominal" damages award, the Court remarked at the conclusion of the hearing that it was "inclined to grant the motion for remittitur on the nominal damages."  Motions Hearing Tr. at 98: 22-23 (held September 1, 2010), filed November 8, 2010 (Doc. 626).

## LAW REGARDING PUNITIVE DAMAGES

A chronology of the Supreme Court's and the United States Court of Appeals for the Tenth Circuit's caselaw on the constitutional limitations on punitive damages reveals an increasingly restrictive view of punitive damages awards that greatly exceed compensatory damages.  The Court cannot, as a district court that must faithfully follow controlling constitutional cases, say that the Supreme Court has replaced the guideposts in BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), for constitutional analysis with the bright-line test in Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008), which is now used in maritime cases, but even the Supreme Court's opinion in State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408 (2003), states that "[w]hen

compensatory damages are substantial, then a lesser ratio [of punitive to compensatory], <u>perhaps only equal to compensatory damages</u>, can reach the outermost limit of the due process guarantee." 538 U.S. at 425 (emphasis added).  Coupled with the analysis of <u>Exxon Shipping Co. v. Baker</u>, which remains instructive, even if not controlling in constitutional cases, it may be difficult to justify under the Due Process Clause more than a one to one ratio in cases involving substantial compensatory, purely economic damages.

1. **The Case Law from the Supreme Court and the Tenth Circuit Concerning Punitive Damages.**

In <u>Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.</u>, 492 U.S. 257, 262 (1989), the Supreme Court held that the Excessive Fines Clause of the Eighth Amendment did not apply to a punitive damages award in a civil case between private parties.  <u>See</u> 492 U.S. at 262 (noting that "our cases long have understood [the Eighth Amendment] to apply primarily, and perhaps exclusively, to criminal prosecutions and punishments.").  The Supreme Court held that,

> even if we were prepared to extend the scope of the Excessive Fines Clause beyond the context where the Framers clearly intended it to apply, we would not be persuaded to do so with respect to cases of punitive damages awards in private civil cases, because they are too far afield from the concerns that animate the Eighth Amendment.

492 U.S. at 275.  Although it ultimately declined to review the punitive damages award in <u>Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.</u> under the Due Process Clause of the Fourteenth Amendment because the petitioners had not previously raised that argument before the District Court or the Court of Appeals, and had made no mention of the argument in their petition for certiorari, the Supreme Court nonetheless noted: "There is some authority in our opinions for the view that the Due Process Clause places outer limits on the size of a civil damages award made pursuant to a statutory scheme." <u>Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal,</u>

10

Inc., 492 U.S. at 277.  Although only five justices joined in all parts of the majority opinion in

Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., all nine justices concurred that

the Due Process Clause might be used in future cases to limit punitive damages awards.  See

Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. at 280-282 (Brennan, J.,

concurring in part, joined by Marshall, J.)("I join the Court's opinion on the understanding that it

leaves the door open for a holding that the Due Process Clause constrains the imposition of punitive

damages in civil cases brought by private parties."); Browning-Ferris Indus. of Vt., Inc. v. Kelco

Disposal, Inc., 492 U.S. at 282-283 (O'Connor, J., concurring in part, joined by Stevens,

J.)("[N]othing in the Court's opinion forecloses a due process challenge to awards of punitive

damages or the method by which they are imposed . . . .").

In Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 15 (1991), the Supreme Court

confronted the questions of whether and to what extent the Due Process Clause might limit punitive

damages awards in civil cases between private litigants.  See 499 U.S. at 15.  The Supreme Court

held:

> One must concede that unlimited jury discretion -- or unlimited judicial discretion
> for that matter -- in the fixing of punitive damages may invite extreme results that jar
> one's constitutional sensibilities.  We need not, and indeed we cannot, draw a
> mathematical bright line between the constitutionally acceptable and the
> constitutionally unacceptable that would fit every case.  We can say, however, that
> general concerns of reasonableness and adequate guidance from the court when the
> case is tried to a jury properly enter into the constitutional calculus.  With these
> concerns in mind, we review the constitutionality of the punitive damages awarded
> in this case.

499 U.S. at 18-19 (internal citations omitted).  The underlying facts of Pacific Mut. Ins. Co. v.

Haslip involved a life insurance agent for Pacific Mutual Insurance Company who sold life

insurance to a number of employees of an Alabama municipality.  See 499 U.S. at 4.  Although the

11

insureds' employer paid the insureds' premiums to the insurance agent, he misappropriated most of

the funds and failed to forward notices of lapsed coverage to the insureds.  See Pacific Mut. Ins. Co.

v. Haslip, 499 U.S. at 5.  The insureds sued both the insurance agent and Pacific Mutual Insurance

Company, and the jury awarded $1,040,000.00 in total damages to plaintiff Cleopatra Haslip,

including $4,000.00 in out-of-pocket expenditures and compensatory damages of $200,000.00.  See

id. at 6 n.2.  Recognizing that the district court had adequately instructed the jury and that the

appellate courts had properly analyzed the verdict for excessiveness, the Supreme Court ultimately

held that the punitive damages award was constitutional.  See Pacific Mut. Ins. Co. v. Haslip, 499

U.S. at 19-23.  Specifically, the Supreme Court found:

> We are aware that the punitive damages award in this case is more than 4 times the
> amount of compensatory damages, is more than 200 times the out-of-pocket
> expenses of respondent Haslip, and, of course, is much in excess of the fine that
> could be imposed for insurance fraud under Ala.Code §§ 13A-5-11 and 13A-5-12(a)
> (1982), and Ala.Code §§ 27-1-12, 27-12-17, and 27-12-23 (1986).  Imprisonment,
> however, could also be required of an individual in the criminal context.  While the
> monetary comparisons are wide and, indeed, may be close to the line, the award here
> did not lack objective criteria.  We conclude, after careful consideration, that in this
> case it does not cross the line into the area of constitutional impropriety.
> Accordingly, Pacific Mutual's due process challenge must be, and is, rejected.

499 U.S. at 23-24.

The Supreme Court affirmed a punitive damage award of $10 million in its next punitive

damages case.  See TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 446 (1993).  The jury

in TXO Production Corp. v. Alliance Resources Corp. awarded compensatory damages of only

$19,000.00.  See TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. at 446.  In the plurality opinion,

Justice Stevens, joined by Chief Justice Rehnquist and Justice Blackmun, emphasized that the

potential harm from the defendant's conduct went beyond the damage that actually occurred: "It is

appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have

caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to the other victims that might have resulted if similar future behavior were not deterred." TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. at 460-61 (emphasis original). The defendant, TXO Production Corp., was a large oil and gas company conducting business in twenty-five states, whereas the plaintiff, Alliance Resource Corp., was a smaller company that owned mineral rights in a tract of land that TXO Production considered potentially profitable. See id. at 447. TXO Production made a deal with Alliance Resource to acquire its interest, subject to a provision that Alliance Resource would return the consideration TXO Production paid if TXO Production's attorneys found that Alliance Resource's title had failed. See 509 U.S. at 447-48. Knowing that Alliance Resource's title was valid, TXO Production attempted to induce a third party to sign an affidavit stating otherwise, according to the plaintiff, so that TXO Production would not have to pay royalties on the oil and gas revenues generated on the property, pursuant to the parties' agreement. See 509 U.S. at 449. The jury was ultimately persuaded to agree with Alliance Resource, given its award.

Acknowledging "the shocking disparity between the punitive damage award and the compensatory award," Justice Stevens wrote:

> [T]he shock dissipates when one considers the potential loss to [Alliance Resources], in terms of reduced or eliminated royalties payments, had [TXO Production] succeeded in its illicit scheme. Thus, even if the actual value of the "potential harm" to [Alliance Resource] is not between $5 million and $8.3 million, but is closer to $4 million, or $2 million, or even $1 million, the disparity between the punitive award and the potential harm does not, in our view, "jar one's constitutional sensibilities."

509 U.S. at 462 (quoting Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. at 18). Noting Justice O'Connor's dissenting opinion, in which Justice White and Justice Souter joined, wherein she asserted the "plausible argument" that the sizeable punitive damage award "is explained by the

jury's raw, redistributionist impulses stemming from antipathy to a wealthy, out-of-state, corporate

defendant," TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. at 468 (Kennedy, J., concurring),

Justice Kennedy wrote:

> There is, however, another explanation for the jury verdict, one supported by the record and relied upon by the state courts, that persuades me that I cannot say with sufficient confidence that the award was unjustified or improper on this record: TXO acted with malice.  This was not a case of negligence, strict liability, or *respondeat superior*.  TXO was found to have committed, through its senior officers, the intentional tort of slander of title.  The evidence at trial demonstrated that it acted, in the West Virginia Supreme Court's words, through a "pattern and practice of fraud, trickery and deceit" and employed "unsavory and malicious practices" in the course of its business dealings with respondent.  "The record shows that this was not an isolated incident on TXO's part -- a mere excess of zeal by poorly supervised, low level employees -- but rather part of a pattern and practice by TXO to defraud and coerce those in positions of unequal bargaining power."

TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. at 468-69 (Kennedy, J., concurring).

### a. *BMW of North America, Inc. v. Gore.*

In BMW of North America, Inc. v. Gore, the Supreme Court found for the first time that a

punitive damages award was unconstitutionally excessive and in violation of the Due Process

Clause's substantive component.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 585-86.  Noting

that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a

person receive fair notice not only of the conduct that will subject him to punishment, but also of

the severity of the penalty that a State may impose," the Supreme Court set forth three guideposts

for lower courts to consider when determining the constitutionality of a punitive damages award.

See BMW of N. Am., Inc. v. Gore, 517 U.S. at 574-75.  The BMW of North America, Inc. v. Gore

guideposts are: (i) the reprehensibility of the defendant's conduct; (ii) "the disparity between the

harm or potential harm suffered by [the plaintiff] and his punitive damages award;" and (iii) "the

difference between this remedy and the civil penalties authorized or imposed in comparable cases."

14

517 U.S. at 575.

The plaintiff in BMW of North America, Inc. v. Gore purchased a BMW automobile and later learned that the vehicle had been repainted after it was damaged before its delivery to the plaintiff.  See 517 U.S. at 562.  The manufacturer admitted it was company policy not to disclose such damage to new cars when the cost of repair was less than three percent of the car's suggested retail price.  See 517 U.S. at 562.  In addition to compensatory damages in the amount of four-thousand dollars, the jury awarded punitive damages in the amount of four-million dollars.  See 517 U.S. at 565.  On appeal, the Supreme Court of Alabama remitted the punitive damages award to two-million dollars.  See 517 U.S. at 567.

With regard to the first guidepost, the reprehensibility of the defendant's conduct, the Supreme Court held that "BMW's conduct was not sufficiently reprehensible to warrant imposition of a $2 million exemplary damages award."  517 U.S. at 580.  Noting that "[t]he $2 million punitive damages awarded to Dr. Gore by the Alabama Supreme Court is 500 times the amount of his actual harm as determined by the jury," 517 U.S. at 582, the Supreme Court found the relationship between punitive and compensatory damages to be "breathtaking" and held that it "must surely 'raise a suspicious judicial eyebrow,'" 517 U.S. at 583.  With regard to the third guidepost, the Supreme Court held that "the $2 million economic sanction imposed on BMW is substantially greater than the statutory fines available in Alabama and elsewhere for similar malfeasance."  517 U.S. at 584.  Thus, the Supreme Court reversed and remanded the Supreme Court of Alabama's remitted amount.  See 517 U.S. at 586.

In the first punitive damages case the Tenth Circuit considered after BMW of North America, Inc. v. Gore, the Tenth Circuit remitted a punitive damages award to an amount

"approximately six times the actual and potential damages plaintiffs suffered." Cont'l Trend Res., Inc. v. OXY USA, Inc., 101 F.3d 634, 643 (10th Cir. 1996)(reversing district court's denial of remittitur and reducing punitive damages award of $30 million to $6 million). A number of punitive damages decisions thereafter used the six to one ratio. See United Phosphorous, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1231 (10th Cir. 2000)(affirming as constitutional a punitive damages award of $653,217.00 where compensatory damages were $67,694.00, after noting that adding the plaintiff's lost profits to the compensatory damages would "bring[] the punitive to harm ratio down to less than 6:1"); Fed. Deposit Ins. Corp. v. Hamilton, 122 F.3d 854, 862 (10th Cir. 1997)("[W]e reverse the $1,200,000.00 punitive damage award entered by the district court, and order a remittitur to $264,000.00, an amount representing six times the actual damages suffered by the Hamiltons.").

On the other hand, also after BMW of North America, Inc. v. Gore, case law from the Tenth Circuit suggested that it would allow punitive to compensatory damages ratios of greater than ten to one. See United Phosphorous, Ltd. v. Midland Fumigant, Inc., 205 F.3d at 1230 (10th Cir. 2000)(noting that "the 10:1 ratio is not a sacred line in the sand, across which no punitive award may venture without feeling the wrath of an appellate court's constitutional sword"). Indeed, in some cases, the Tenth Circuit permitted punitive to compensatory ratios greater than ten to one. See Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1272-73 (10th Cir. 2000)(holding that punitive damages award of $295,000.00 was not constitutionally excessive despite compensatory damages of only $5,000.00, because "both the Supreme Court and this court acknowledge that low awards of compensatory damages may support a higher ratio if a particularly egregious act has resulted in a small amount of economic damages"); Bielicki v. Terminix Int'l Co., 225 F.3d 1159, 1165 (10th Cir. 2000)(affirming as constitutional the district court's award of punitive damages

16

where "[t]he ratio between the punitive damages and compensatory damages awarded by the jury is 12 to 1").

        b.      ***State Farm Mutual Automobile Insurance Co. v. Campbell*.**

The Supreme Court returned to the question of the constitutional limits on punitive damages in State Farm Mutual Automobile Insurance Co. v. Campbell, where the Supreme Court considered a bad-faith failure to settle claim brought by an insured against its insurer.  The jury at the district-court level awarded $1 million in compensatory damages and $145 million in punitive damages. See 538 U.S. at 412.  The Supreme Court found the question whether punitive damages were excessive to be "neither close nor difficult."  538 U.S. at 418.  Although it found that "State Farm's handling of the claims against the Campbells merits no praise," 538 U.S. at 419, the Supreme Court found that the punitive damages award -- or at least the analysis of the first guidepost, reprehensibility -- was based more on State Farm's "nationwide policies than for the conduct directed toward the Campbells," 538 U.S. at 420.  The Supreme Court declined to impose any bright-line ratio of punitive to compensatory damages under the second guidepost, but held that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  538 U.S. at 425.  With regard to the third guidepost, the Supreme Court found: "The most relevant civil sanction under Utah state law for the wrong done to the Campbells appears to be a $10,000 fine for an act of fraud, an amount dwarfed by the $145 million punitive damages award."  538 U.S. at 428 (internal citation omitted).  The Supreme Court noted that, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  538 U.S. at 425.  All in all, the Supreme Court held in State Farm Mutual Automobile

Insurance Co. v. Campbell that:

> An application of the Gore guideposts to the facts of this case, especially in light of the substantial compensatory damages awarded (a portion of which contained a punitive element), likely would justify a punitive damages award at or near the amount of compensatory damages. The punitive award of $145 million, therefore, was neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of the property of the defendant.

538 U.S. at 429.

After the Supreme Court's holding in State Farm Mutual Automobile Insurance Co. v. Campbell, the Tenth Circuit affirmed an award with a ratio of twenty to one. See Haberman v. The Hartford Ins. Group, 443 F.3d 1257, 1263 (10th Cir. 2006)(considering a $100,000.00 punitive damage award with actual damages of $5,000.00). Noting the Supreme Court's admonition in State Farm that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," the Tenth Circuit nonetheless affirmed the twenty to one ratio. Haberman v. The Hartford Ins. Group, 443 F.3d at 1272. The Tenth Circuit found it persuasive, with the reprehensibility of the defendant's conduct, that the compensatory damages were relatively low. See 443 F.3d at 1272 ("We are not convinced that the low award of compensatory damages in this case cannot support the more than single digit ratio.").

### c. *Exxon Shipping Co. v. Baker*.

Although the binding precedential value of the Supreme Court's most recent punitive damages decision in Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008) is limited to maritime cases, see Exxon Shipping Co. v. Baker, 554 U.S. at 513, some commentators view the decision as signaling an intention to adopt a bright-line punitive to compensatory damages ratio of one to one in all cases, see, e.g., Joni Hersch & W. Kip Viscusi, Punitive Damages by Numbers: *Exxon Shipping Co. v. Baker*, 18 Sup. Ct. Econ. Rev. 259, 260 (2010)(stating that, "[g]iven the earlier

18

statements by the Court in State Farm v. Campbell," and "the Court's reliance in Exxon Shipping Co. v. Baker on statistical analyses of punitive damages that are not specific to maritime cases, there is considerable likelihood that the 1:1 ceiling ultimately will have ramifications beyond maritime cases."); Michael L. Brooks, Uncharted Waters: The Supreme Court Plots the Course to a Constitutional Bright-Line Restriction on Punitive Awards in *Exxon Shipping Co. v. Baker*, 62 Okla. L. Rev. 497, 517-18 (Spring 2010)("[A]lthough the precise holding in Exxon may be narrow, the case is likely to have a substantial impact on the constitutional dimension of punitive damages."). But see Erwin Chemerinsky, A Narrow Ruling on Punitive Damages, Trial, Sept. 2008, at 62, 63 ("[T]he Court was clear that it was dealing only with punitive damages in maritime cases.  At most, its reasoning can be applied to other areas of federal common law where punitive damages are allowed.").

Exxon Shipping Co. v. Baker was a lawsuit brought by commercial fishermen and native Alaskans for economic damages arising from the grounding of the supertanker *Exxon Valdez* on a reef off the Alaskan coast, which caused millions of gallons of crude oil to spill into Prince William Sound.  See 554 U.S. at 476.  After the United States Court of Appeals for the Ninth Circuit remitted the matter twice, the punitive damages award on appeal to the Supreme Court was $2.5 billion.  See Exxon Shipping Co. v. Baker, 554 U.S. at 481.  Total compensatory damages in the case were $507.5 million.  See 554 U.S. at 515.  The Supreme Court held that punitive damages in maritime cases should be limited to a one to one ratio.  See 554 U.S. at 513.  Although it did not decide Exxon Shipping Co. v. Baker on constitutional grounds, but rather pursuant to maritime law, the Supreme Court held: "In *State Farm*, we said that a single-digit maximum is appropriate in all but the most exceptional of cases, and '[w]hen compensatory damages are substantial, then a lesser ratio, perhaps

only equal to compensatory damages, can reach the outermost limit of the due process guarantee.'"

Exxon Shipping Co. v. Baker, 554 U.S. at 514-15.

Justice Ginsburg appears to be among those who view Exxon Shipping Co. v. Baker as a sign of things to come in the Supreme Court's due-process jurisprudence. In her dissent, she wrote:

> In the end, is the Court holding only that 1:1 is the maritime-law ceiling, or is it also signaling that any ratio higher than 1:1 will be held to exceed "the constitutional outer limit"? On next opportunity, will the Court rule, definitively, that 1:1 is the ceiling due process requires in all of the States, and for all federal claims?

Exxon Shipping Co. v. Baker, 554 U.S. at 524 (Ginsburg, J., dissenting).

As constitutional scholar Erwin Chemerinsky has noted, the Supreme Court's "reasoning was less about maritime law and more about the need for predictable and consistent rules for punitive damages awards." Chemerinsky, supra at 62. Along these lines, the Supreme Court expressly rejected the "verbal" approach to judicial review of punitive damages -- the approach taken in the Supreme Court's prior punitive damages jurisprudence -- in Exxon Shipping Co. v. Baker. See Exxon Shipping Co. v. Baker, 554 U.S. at 503-504. After reviewing examples of state-law jury instructions on punitive damages, the Supreme Court noted:

> These examples leave us skeptical that verbal formulations, superimposed on general jury instructions, are the best insurance against unpredictable outliers. Instructions can go just so far in promoting systemic consistency when awards are not tied to specifically proven items of damage (the cost of medical treatment, say), and although judges in the States that take this approach may well produce just results by dint of valiant effort, our experience with attempts to produce consistency in the analogous business of criminal sentencing leaves us doubtful that anything but a quantified approach will work.

554 U.S. at 504. The Supreme Court found that, rather than imposing caps on punitive damages, "the more promising alternative is to leave the effects of inflation to the jury or judge who assesses the value of actual loss, by pegging punitive to compensatory damages using a ratio or maximum

multiple." 554 U.S. at 506. Since <u>Exxon Shipping Co. v. Baker</u>, there have been no Tenth Circuit opinions regarding punitive damages.

> 2. **<u>Determining the Constitutional Limits on Punitive Damages Awards</u>.**

Even in the context of a constitutional due-process analysis, the Supreme Court has recognized the value of "pegging punitive to compensatory damages using a ratio." <u>Exxon Shipping Co. v. Baker</u>, 554 U.S. at 506. <u>See</u> <u>Pacific Mut. Life Ins. Co. v. Haslip</u>, 499 U.S. 1, 23 (1991)(holding that, while "the punitive damages award in this case is more than 4 times the amount of compensatory damages" and "may be close to the line," the award "d[id] not cross the line into the area of constitutional impropriety"); <u>BMW of N. Am., Inc. v. Gore</u>, 517 U.S. at 580-81 (adopting as a "guidepost" the requirement "exemplary damages must bear a 'reasonable relationship' to compensatory damages"). Indeed, the Supreme Court has held: "Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S. at 425. "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S. at 425. Because the Supreme Court's reasoning in <u>Exxon Shipping Co. v. Baker</u> applies in cases outside the realm of maritime law, the Court will consider the reasoning, along with the guideposts identified in <u>BMW of N. Am., Inc. v. Gore</u>, mindful that the <u>BMW of N. Am., Inc. v. Gore</u> constitutional analysis controls the Court's analysis in non-maritime cases. <u>Cf.</u> <u>Agostini v. Felton</u>, 521 U.S. 203, 237 (1997)("[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should

follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (citation omitted)).

     **a.**     **The First *BMW of N. Am., Inc. v. Gore* Guidepost: "Some Wrongs Are More Blameworthy Than Others."**

The reprehensibility of the Defendant's conduct is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." BMW of N. Am., Inc. v. Gore, 517 U.S. at 575. The Supreme Court has set forth five characteristics of conduct that may be relevant to the reprehensibility guidepost: (i) whether the harm was physical versus economic; (ii) whether the conduct evidences "an indifference to or reckless disregard of the health and safety of others"; (iii) the financial vulnerability of the target of the conduct; (iv) whether the conduct involved repeated action versus an isolated incident; and (v) whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 419.

Under these factors, more reprehensible conduct, such as violence or the threat of violence, and "trickery and deceit," is considered more deserving of substantial punitive damage awards. BMW of N. Am., Inc. v. Gore, 517 U.S. at 575. Where a plaintiff experiences purely economic harm, on the other hand, a substantial punitive damage award is less justified. See BMW of N. Am., Inc. v. Gore, 517 U.S. at 575. The Supreme Court has also noted, however, that "the infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty." BMW of N. Am., Inc. v. Gore, 517 U.S. at 577. See Exxon Shipping Co. v. Baker, 554 U.S. at 494 (internal citations and quotations omitted)(recognizing that "[a]ction taken or omitted in order to augment profit represents an enhanced degree of punishable culpability"). Likewise, "heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect (increasing chances of getting away with

it), or when the value of the injury and the corresponding compensatory award are small (providing low incentives to sue)."  Exxon Shipping Co. v. Baker, 554 U.S. at 494.

      **b.**    **The Second *BMW of N. Am., Inc. v. Gore* Guidepost: Punitive Damages Must Bear a Reasonable Relationship to Compensatory Damages.**

      "The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff."  BMW of N. Am., Inc. v. Gore, 517 U.S. at 580.  In the constitutional context -- as opposed to the maritime context -- the Supreme Court has eschewed a mathematical formula.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 582 ("Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula").  A punitive damages award of more than 500 times the compensatory damages, however, may be too great to pass constitutional muster.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 583 ("In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis.  When the ratio is a breathtaking 500 to 1, however, the award must surely 'raise a suspicious judicial eyebrow.'" (internal citation omitted)).  Even before Exxon Shipping Co. v. Baker, absent exceptional circumstances, a ratio of greater than ten to one was likely to be deemed constitutionally excessive.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 581 (noting that the difference between punitive and actual damages in TXO Prod. Corp v. Alliance Res. Corp. "suggested that the relevant ratio was not more than 10 to 1").  Indeed, in most cases, the maximum ratio of punitive to compensatory damages permitted by the Due Process Clause appears to be nine to one.  See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425 ("Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").  At the same time as it appeared to

23

uphold a nine to one ratio of punitive to compensatory damages generally, the Supreme Court in State Farm Mutual Automobile Insurance Co. v. Campbell also noted that: "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425. Previously, the Supreme Court had affirmed a punitive damages award of "more than 4 times the amount of compensatory damages," although it noted that this award "may be close to the line." Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. at 23-24.

The Supreme Court noted several studies of punitive damage awards in Exxon Shipping Co. v. Baker, expressing its concern with "the stark unpredictability of punitive awards":

> Courts of law are concerned with fairness as consistency, and evidence that the median ratio of punitive to compensatory awards falls within a reasonable zone, or that punitive awards are infrequent, fails to tell us whether the spread between high and low individual awards is acceptable. The available data suggest it is not. A recent comprehensive study of punitive damages awarded by juries in state civil trials found a median ratio of punitive to compensatory awards of just 0.62:1, but a mean ratio of 2.90:1 and a standard deviation of 13.81. Even to those of us unsophisticated in statistics, the thrust of these figures is clear: the spread is great, and the outlier cases subject defendants to punitive damages that dwarf the corresponding compensatories. The distribution of awards is narrower, but still remarkable, among punitive damages assessed by judges: the median ratio is 0.66:1, the mean ratio is 1.60:1, and the standard deviation is 4.54. Other studies of some of the same data show that fully 14% of punitive awards in 2001 were greater than four times the compensatory damages, with 18% of punitives in the 1990s more than trebling the compensatory damages. And a study of "financial injury" cases using a different data set found that 34% of the punitive awards were greater than three times the corresponding compensatory damages.

554 U.S. at 499-500 (citations omitted). Relying on empirical studies of punitive damages awards, the Supreme Court determined that the median ratio for all types of cases -- ranging from those with the least blameworthy conduct triggering punitive damages to those featuring malice -- is less than one to one. See 554 U.S at 512 ("These studies cover cases of the most as well as the least

blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions.  The data put the median ratio for the entire gamut of circumstances at less than 1:1 . . . .").

### c.   The Third *BMW of N. Am., Inc. v. Gore* Guidepost: Civil or Criminal Penalties in Comparable Cases Can Provide Notice of Potentially Significant Punitive Damages.

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness."  BMW of N. Am., Inc. v. Gore, 517 U.S. at 583.  While "[t]he existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action," the Supreme Court has cautioned that "[p]unitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award."  Nonetheless, courts should "accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue."  Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 301 (1989)(O'Connor, J., concurring in part and dissenting in part).

### d.   All Three *BMW of N. Am., Inc.* Guideposts Need Not Be In Agreement.

Tenth Circuit decisions suggest that all three BMW of North America, Inc. v. Gore guideposts need not be in agreement to support a finding that a punitive damages award is constitutionally excessive.  For example, in both Continental Trend Resources, Inc. v. OXY USA, Inc., 101 F.3d at 641 and United Phosphorous, Ltd. v. Midland Fumigant, Inc., 205 F.3d at 1231, the Tenth Circuit found that, while the reprehensibility and ratio guideposts both supported their ultimate decision, the facts in those cases "d[id] not lend themselves to comparison with statutory penalties."  Cont'l Trend Res., Inc. v. OXY USA Inc., 101 F.3d at 641.  See United Phosphorous,

Ltd. v. Midland Fumigant, Inc., 205 F.3d at 1231 ("A finding of common law fraud does not lend itself to comparison with statutory penalties.").

> **e.** **The Defendant's Wealth is Relevant to the Determination of Punitive Damages.**

Beyond the BMW of North America, Inc. v. Gore factors, the Tenth Circuit also permits consideration of the defendant's wealth when determining whether the punitive damages awarded comport with the Due Process Clause. See Cont'l Trend Res., Inc. v. OXY USA, Inc., 101 F.3d at 641. On the one hand, the Tenth Circuit acknowledged that "the Supreme Court in BMW downplayed the defendant's wealth as a justification for increasing punitive damages." 101 F.3d at 641. On the other hand, however, the Tenth Circuit found that the Supreme Court "places in the constitutional calculus the question of the minimum level of penalty necessary to achieve the state's goal of deterrence." Cont'l Trend Res., Inc. v. OXY USA, Inc., 101 F.3d at 641.[1]

In Federal Deposit Insurance Corp. v. Hamilton, 122 F.3d 854 (10th Cir. 1997), the Tenth Circuit found that the wealth of the defendant in that case, NationsBank, "cut[] the other way," contrasted with the BMW of North America, Inc. v. Gore guideposts. 122 F.3d at 862. The defendant's conduct was not significantly reprehensible given that the injury was economic and that "it arises out of a contractual relationship where the parties can and should contractually protect

---

[1] Thus, the Court in Continental Trend Resources, Inc. v. OXY USA, Inc. quoted BMW of North America, Inc. v. Gore:

> The sanction imposed in this case cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal. The fact that multimillion dollar penalty prompted a change in policy sheds no light on the question whether a lesser deterrent would have adequately protected the interests of Alabama consumers.

517 U.S. at 584-85.

themselves by providing for explicit remedies in the event of breach."  Fed. Deposit Ins. Corp. v. Hamilton, 122 F.3d at 862 (noting that, under these circumstances, "the permissible ratio of punitive damages to actual damages should be relatively modest").  Also, the Tenth Circuit found that there were not "any civil or criminal penalties applicable to the conduct engaged in by NationsBank," suggesting that "NationsBank was not on notice that its conduct could give rise to substantial non-compensatory liability."  Fed. Deposit Ins. Corp. v. Hamilton, 122 F.3d at 862.  Still, a punitive to compensatory ratio of six to one was permitted after remittitur, based, in part, on the Tenth Circuit's consideration of the defendant's wealth:

> Although we have been cautioned that the size of the defendant should not ordinarily be a very significant factor, we have also concluded that it is not irrelevant either. OXY, 101 F.3d at 641.  NationsBank is undeniably a large financial institution, and the $44,000 in fraud damages cannot be expected to serve as much of a deterrent to any future misconduct.  Hence, constitutionally, a higher ratio of punitive to actual damages is warranted here than would be the case if the base level of compensatory damages were a significantly higher figure relative to the size of the defendant.

Fed. Deposit Ins. Corp. v. Hamilton, 122 F.3d at 862.  In Deters v. Equifax Credit Info. Servs., Inc., the Tenth Circuit stated:

> In assessing the reasonableness of the punitive damages award in the instant case, we must consider the purposes of such a remedy, namely to punish and deter.  In this respect, the wealth and size of the defendant are relevant considerations.  We agree with the district court that Equifax's gross operating revenue of $1.8 billion in 1996 could be considered in levying a substantial punitive damages award.

202 F.3d at 1233.

> ### f.      Litigation Costs, Including Attorney's Fees, Are Appropriately Considered When Evaluating Constitutionality of Punitive Damages Awards.

The Tenth Circuit has also noted that "the costs of litigation in order to vindicate rights is an appropriate element to consider in justifying a punitive damages award."  Cont'l Trend Res., Inc.

v. OXY USA Inc., 101 F.3d at 642 (citing O'Gilvie v. Int'l Playtex, Inc., 821 F.2d 1438, 1447 (10th Cir. 1987), cert. denied, 486 U.S. 1032 (1988)). Thus, because there was evidence in the Contintental Trend Resources, Inc. v. OXY USA Inc. case that "OXY thought it could impose its corporate will on plaintiffs," and because the plaintiffs had to endure a three-week trial, a lengthy appellate process, and significant post-trial litigation, the Tenth Circuit felt it was appropriate to consider the likely legal costs in addition to the compensatory damages when evaluating whether the punitive damages award was excessive. 101 F.3d at 642 ("Nothing in BMW would appear to prohibit consideration of the cost of those legal proceedings in determining the constitutionally permissible limits on the punitive damages award.").

## LAW REGARDING REMITTITUR

"When a court concludes that there was error only in the excessive damage award, but not error tainting the finding of liability, it may order a remittitur or grant a new trial if the plaintiff refuses to accept the remittitur." Klein v. Grynberg, 44 F.3d 1497, 1504 (10th Cir. 1995). "A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages." Cartel Asset Mgmt. v. Ocwen Fin. Corp., 249 F. App'x 63, 80-81 (10th Cir. 2007)(quoting Johansen v. Combustion Eng'g, 170 F.3d 1320, 1331 (11th Cir. 1999)). "No judgment for a remittitur may be entered without the plaintiff's consent because the Seventh Amendment prohibits the court from substituting its judgment for that of the jury's regarding any issue of fact." Sloan v. State Farm Mut. Auto. Ins. Co., 360 F.3d 1220, 1225 (10th Cir. 2004). The plaintiff therefore has "the option of a new trial in lieu of remitting a portion of the jury's award." Sloan v. State Farm Mut. Auto. Ins. Co., 360 F.3d at 1225.

1.      **Post-remittitur Retrial May Be Limited to Damages Alone, under Certain Circumstances.**

"Courts of appeals have broad discretion in deciding whether to limit the issues when remanding for a new trial." Morrison Knudsen Corp. v. Fireman's Fund Ins. Co., 175 F.3d 1221, 1255 (10th Cir. 1999).  The seminal case concerning the propriety of a retrial in part is Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494 (1931), a common-law breach of contract case, where the trial court had erroneously instructed the jury on the appropriate measure of damages available on the defendant's counterclaim. See 283 U.S. at 496.  The United States Court of Appeals for the First Circuit had directed a new trial limited to the question of damages only, and the plaintiff argued that the First Circuit's order, pursuant to which the jury would not have considered liability on the counterclaim, denied it a right to trial by jury.  See 283 U.S. at 496-97.  The Supreme Court held that "where the requirement of a jury trial has been satisfied by a verdict according to law upon one issue of fact, that requirement does not compel a new trial of that issue even though another and separable issue must be tried again." Gasoline Prods. Co. v. Champlin Ref. Co., 283 U.S. at 499. Finding, however, that "the question of damages on the counterclaim is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a new trial," the Supreme Court ordered "a new trial of all the issues raised by the counterclaim." Gasoline Prods. Co. v. Champlin Ref. Co., 283 U.S. at 500-01.

The Tenth Circuit has noted, in light of Gasoline Products Co. v. Champlin Refining Co., that full retrials are required in two instances -- "when an error or insupportable damages award calls into question the propriety of the *original* jury's finding of liability" and, looking forward to the new jury's inquiry, "when two issues are inextricably intertwined." Morrison Knudsen Corp. v.

29

Fireman's Fund Ins. Co., 175 F.3d at 1255-56 (emphasis added).  A retrial as to damages only was appropriate in Morrison Knudsen Corp. v. Fireman's Fund Insurance Co., a breach-of-contract case under federal contract law, because there was a "distinction between the questions relevant to liability and those relevant to damages."  175 F.3d at 1257.  Moreover, "[t]here are fundamental differences between contract-termination damages under federal-contracting law, on the one hand, and breach-of-contract damages at common law, on the other."  Morrison-Knudsen Corp. v. Fireman's Fund Ins. Co., 175 F.3d at 1258.

The Tenth Circuit deemed a limited retrial appropriate again in Trejo v. Denver & Rio Grande W. R.R. Co., 568 F.2d 181 (10th Cir. 1977), a case under the Federal Employer Liability Act.  See 568 F.2d at 185.  The Tenth Circuit noted that "damages and contributory negligence [are] normally so interwoven in a FELA case that it would rarely be proper to submit to a jury the question of damages without also permitting them to consider the conduct of the plaintiff."  568 F.2d at 184.  Nonetheless, the Tenth Circuit limited retrial to the issue of damages only where the trial court had erroneously instructed the jury that it should include medical expenses as part of the employee's damages despite a lack of any evidence as to medical expenses at trial and the employee's waiver of any claim to medical expenses.  See Trejo v. Denver & Rio Grande W. R.R. Co., 568 F.2d at 183.  Recognizing that the plaintiff had "a legitimate and important interest in the finality of that judgment, and should not, because of erroneous instructions on damages, be required to relitigate the issue of liability," the Tenth Circuit held that a limited retrial was proper.  Trejo v. Denver & Rio Grande W. R.R. Co., 568 F.2d at 185 ("Where, as here, we can protect the plaintiff's interest in the determination of liability without prejudicing the rights of the defendant, we should do so.").

In K-B Trucking Co. v. Riss International Corp., 763 F.2d 1148 (10th Cir. 1985), a fraud case, the Tenth Circuit also determined there was insufficient evidence to support a jury's award of compensatory damages against one of two defendants.  See 763 F.2d at 1162.  The Tenth Circuit remanded that case, directing the trial court to enter a remittitur order as to the damages against the one defendant, "or otherwise for a new trial on the issue of damages against Riss."  K-B Trucking Co. v. Riss Int'l Corp., 763 F.2d at 1163.  The Tenth Circuit held:

> We believe that the issues are sufficiently distinct with regard to the liability of World Leasing and Riss and the damages against Riss so that if plaintiffs refuse to accept the reduced amount of damages against Riss, plaintiffs may proceed with a new trial against Riss limited to the appropriate amount of damages for which Riss is liable.

763 F.2d at 1163, n.22.

Where "a new trial on less than all the issues could not be had without confusion and uncertainty," a new trial should be had as to liability as well as damages.  Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc., 703 F.2d 1152, 1178 (10th Cir. 1981), cert. denied 464 U.S. 824 (1983).  See Evans v. Fogarty, 241 F. App'x 542, 563 (10th Cir. 2007)("With respect to all individual plaintiffs we hold, like the Malandris panel, that they are free to accept the remittitur ordered by the district court or, in the alternative, to pursue a new trial as to all issues, including liability.").

In addition to reasons of potential confusion, "a new trial on damages only is not proper if there is reason to think that the verdict may represent a compromise among jurors with different views on whether defendant was liable or if for some other reason it appears that the error on the damage issue may have affected the determination of liability."  11 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2814, at p. 155-56 (2d ed. 1995).  See also Nat'l R.R. Passenger

31

Corp. v. Koch Indus., Inc., 701 F.2d 108, 110 (10th Cir. 1983)("While a court may order a new trial

on damages only, it should not do so if it has reason to believe the jury reached a compromise

verdict" (citations omitted)).   Whereas a court may look for a damages award that is "grossly

inadequate" when determining whether a verdict is a compromise verdict, this factor is not the only

indicator of compromise.   See Nat'l R.R. Passenger Corp. v. Koch Indus., Inc., 701 F.2d at 110

(noting other indicators of compromise such as the length of jury deliberation and a close question

of liability).

    While partial retrials are generally disfavored, see, e.g., Gasoline Prods. Co. v. Champlin

Ref. Co., 283 U.S. 494, 500 (1931)(holding that a partial retrial is improper "unless it clearly appears

that the issue to be retried is so distinct and separable from the others that a trial of it alone may be

had without injustice."), a partial retrial of punitive damages is particularly inappropriate:

> A punitive damage claim is not an independent cause of action or issue separate from
> the balance of a plaintiff's case.  It is part and parcel of a liability determination and
> does not have any independent being until a jury has decided, based on the
> preponderance of the evidence, that not only was a defendant's conduct negligent,
> but that it was gross, willful, wanton or malicious.  Proof of gross, willful, wanton
> or malicious conduct by a defendant is not separate from proof of a defendant's
> negligence.  The evidence proving negligence establishes liability and the degree of
> negligence is determinative in the award of punitive damages.

Mason v. Texaco, Inc., 948 F.2d 1546, 1554 (10th Cir. 1991).

### 2.      Remittitur of Excessive Nominal Damages Is Appropriate.

> Nominal damages are a trifling sum awarded to a plaintiff in an action, where there
> is no substantial loss or injury to be compensated, but still the law recognizes a
> technical invasion of his rights or a breach of the defendant's duty, or in cases where,
> although there has been a real injury, the plaintiff's evidence entirely fails to show
> its amount.

Black's Law Dictionary 392 (6th ed. 1990).   Where the prevailing party has failed to prove

compensatory injury or specified damages, the Tenth Circuit has found that "only nominal damages

32

[a]re appropriate" and ordered remittitur.  Evans v. Fogarty, 241 F. App'x 542, 562 (10th Cir. 2007)(holding that compensatory awards in favor of two separate § 1983 plaintiffs of $177,000.00 and $88,500.00, respectively, "finds no basis in the record" and remanding the verdict with "directions that the trial court enter a remittitur order for acceptance of judgment of $1 in nominal damages against Fogarty and $1 in nominal damages against Fritz.").  But see Cartel Asset Mgmt. v. Ocwen Fin. Corp., 249 F. App'x 63, 82 (10th Cir. 2007)(holding that the trial court erred in *sua sponte* reducing compensatory damages award to nominal damages without a new trial; "the interests of justice require Cartel have a chance to correct its evidentiary shortcomings before reducing the jury's award to only $1 nominal damages.").

The Tenth Circuit has previously encountered remittitur of at least one award of "nominal" damages greater than one dollar.  See Ray v. City of Edmond, 662 F.2d 679, 680 (10th Cir. 1981). In Ray v. City of Edmond, an excessive force case brought pursuant to 42 U.S.C. § 1983, the jury awarded "nominal" damages of $25,000.00 against a municipality and $50.00 each against two individual police officers.  See 662 F.2d at 680.  "Following defense motions for a new trial or a judgment notwithstanding the verdict, the district court granted the motion for a new trial unless the plaintiff agreed to remit all nominal damages awarded save one dollar per defendant."  Ray v. City of Edmond, 662 F.2d at 680.  Because the plaintiff did not appeal the remittitur of the "nominal" damages award, the Tenth Circuit did not consider it.  Ray v. City of Edmond, 662 F.2d at 680.

Other courts that have considered the question have found that a reduction of "nominal" awards of greater than one dollar is appropriate.  See, e.g., Richmond v. City of Brooklyn Ctr., No. Civ. 03-3195MJDJSM, 2005 WL 1843332, at *4-5 (D. Minn. July 29, 2005)(reducing award of "nominal" damages in the amount of $35,000.00 to $1.00), rev'd on other grounds, 490 F.3d 1002

33

(2007)("We conclude that Officer Bruce is entitled to qualified immunity.  Accordingly, we do not reach Officer Bruce's arguments regarding the exclusion of certain evidence or Richmond's arguments on the reduction of nominal damages or a new trial on actual damages.").  In Richmond v. City of Brooklyn Center, the United States District Court for the District of Minnesota found that "[o]ther courts have consistently limited nominal damages awards to nominal amounts such as one dollar."  2005 WL 1843332, at *5 (collecting cases).

The United States Court of Appeals for the Eighth Circuit affirmed remittitur of a $75,000.00 "nominal" award to $1.00 in Corpus v. Bennett, 430 F.3d 912 (8th Cir. 2005).  The plaintiff in Corpus v. Bennett alleged violations of his constitutional rights during arrest, but he was not able to prove any compensable injury.  See 430 F.3d at 914.  The trial court gave the following jury instruction: "If you find that plaintiff is entitled to a verdict in accordance with these instructions, but do not find that the plaintiff has sustained substantial damages, then you may return a verdict for plaintiff in some nominal sum such as one dollar."  Corpus v. Bennett, 430 F.3d at 914.  The verdict form in the case asked the jury the following question: "If defendant Tony Bennett's use of excessive force was not a direct cause of substantial injuries to plaintiff Jose Corpus, what nominal sum of money will fairly and adequately compensate plaintiff Jose Corpus for the deprivation of his constitutional rights?"  Corpus v. Bennett, 430 F.3d at 914.  On appellate review of the district court's *sua sponte* reduction of the award to one dollar, the Eighth Circuit found no error in the district court's finding that the jury's verdict was internally consistent.  See Corpus v. Bennett, 430 F.3d at 916 ("The jury's answers on the special verdict form are consistent if they are read to find no actual injury to Corpus but to award $75,000.00 to compensate Corpus for the deprivation of his constitutional rights in the absence of actual injury.  The district court did not err in resolving the

jury's answers to the special interrogatories in this consistent fashion."). Likewise, the Eighth Circuit found no error in the reduction of the award to one dollar, noting that "the district court had a duty to make the nominal damages award conform to the law." Corpus v. Bennett, 430 F.3d at 916 (noting further that "one dollar is recognized as an appropriate value for nominal damages" (citation omitted)).

Contrary to the Eighth Circuit, the United States Court of Appeals for the Second Circuit determined it was error to remit an award of $75,000.00 in "nominal" damages to $1.00 where the trial court's instructions did not define nominal damages. Auwood v. Harry Brandt Booking Office, Inc., 850 F.2d 884, 892 (2nd Cir. 1988)("The court's instructions to the jury, however, did not mention the $1.00 figure and were not a model of clarity, either individually or in combination."). The Second Circuit noted "it seems highly likely that the jury believed it was arriving at figures that were designed to be compensatory" because it made several "nominal" awards in differing amounts. Auwood v. Harry Brandt Booking Office, Inc., 850 F.2d at 893. Lacking any reference to one dollar or any other specific figure, the court's instructions "could well have been interpreted as meaning that nominal damages were simply the minimum amount the jury found plaintiffs should be awarded." 850 F.2d at 892.

## ANALYSIS

The Court believes that the Supreme Court's reasoning for limiting punitive damages in Exxon Shipping Co. v. Baker to a one to one ratio of punitive to compensatory damages is equally applicable in non-maritime cases. Nevertheless, the Court will apply the guideposts in BMW of North America, Inc. v. Gore, which remains controlling on a district court. In any case, the Court would reach the same result, especially in light of the Supreme Court's statement in State Farm

Mutual Automobile Insurance Co. v. Campbell that, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  538 U.S. at 425.

**I.      THE $40,000,000.00 PUNITIVE DAMAGES AWARD IS CONSTITUTIONALLY EXCESSIVE AND SHOULD BE REMITTED.**

According to the greater weight of the guideposts in BMW of North America, Inc. v. Gore, the Court finds that the forty-million-dollar punitive damages award in this case is constitutionally excessive.  The Defendants' conduct in this case is not so reprehensible as to justify an award of nearly ten times the compensatory damages awarded.  The harm caused is purely economic as opposed to physical; thus, the Defendants' conduct does not evince "an indifference to or reckless disregard of the health and safety of others."  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 419.  The difference between the punitive damages awarded, and the civil penalties authorized or imposed in comparable cases, is too great.  Perhaps most significantly, the punitive damages award also does not bear a reasonable relationship to the compensatory damages awarded in this case.  In State Farm Mutual Automobile Insurance Co. v. Campbell, the Supreme Court -- addressing a compensatory award of $1 million -- stated that, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  538 U.S. at 425 (emphasis added).  Accordingly, the Supreme Court held:

> An application of the Gore guideposts to the facts of this case, especially in light of the substantial compensatory damages awarded (a portion of which contained a punitive element), likely would justify a punitive damages award at or near the amount of compensatory damages.  The punitive award of $145 million, therefore, was neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of the property of the defendant.

36

State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 429.  Consequently, in light of the substantial compensatory award in this case, and in accord with the Supreme Court's holding in State Farm Mutual Automobile Insurance Co. v. Campbell, reinforced by the Supreme Court's reasoning in Exxon Shipping Co. v. Baker, which suggests a bright-line one to one limit on punitive to compensatory damages, the Court concludes that due process requires that it remit Guidance Endodontics' punitive damages award to be equal to its compensatory damages, because the Defendants did not have fair notice that their conduct could subject them to such punishment or that the State might impose so severe a penalty.

### A.   THE SUPREME COURT'S REASONING IN *EXXON SHIPPING CO. V. BAKER* APPLIES IN NON-MARITIME CASES.

"[T]he consensus today is that punitives are aimed not at compensation but principally at retribution and deterring harmful conduct."  Exxon Shipping Co. v. Baker, 554 U.S. at 492.  With these goals in mind, the Supreme Court reasoned that punitive awards should "reach a generally accepted optimal level of penalty and deterrence in cases involving a wide range of circumstances, while producing fairly consistent results in cases with similar facts."  Exxon Shipping Co. v. Baker, 554 U.S. at 500.  But this result, unfortunately, has not the been the case.  BMW of North America, Inc. v. Gore, the Supreme Court's controlling case on punitive damages, involved a four-million-dollar punitive damages award, while a similar case in the same state produced a similar compensatory award and "no punitive damages at all."  Exxon Shipping Co. v. Baker, 554 U.S. at 500 (citing BMW of N. Am., Inc. v. Gore, 517 U.S. at 565 n.8).  Despite its efforts to curb outlier awards as reflected in BMW of North America, Inc. v. Gore and its progeny, the Supreme Court has found that the available data indicates the spread between high and low individual awards is not acceptable.

37

> A recent comprehensive study of punitive damages awarded by juries in state civil trials found a median ratio of punitive to compensatory awards of just 0.62:1, but a mean ratio of 2.90:1 and a standard deviation of 13.81. . . .  The distribution of awards is narrower, but still remarkable, among punitive damages assessed by judges: the median ratio is 0.66:1, the mean ratio is 1.60:1, and the standard deviation is 4.54.

Exxon Shipping Co. v. Baker, 554 U.S. at 499-500 (internal quotations omitted).  In cases involving financial injury, a separate study found that thirty-four percent of punitive awards were greater than three times the corresponding compensatory damages.  See Exxon Shipping Co. v. Baker, 554 U.S. at 500.

Assuming, as the Supreme Court has, that "the greater share of the verdicts studied in these comprehensive collections reflect reasonable judgments about the economic penalties appropriate in their particular cases," Exxon Shipping Co. v. Baker, 554 U.S. at 512, there is much support for remitting the 10:1 punitive damages award in this case.  First, the data indicates that "the compensatory award exceeds the punitive award in most cases."  Exxon Shipping Co. v. Baker, 554 U.S. at 512.  Moreover,

> [i]n a well-functioning system, we would expect that awards at the median or lower would roughly express jurors' sense of reasonable penalties in cases with no earmarks of exceptional blameworthiness within the punishable spectrum (cases like this one, without intentional or malicious conduct, and without behavior driven primarily by desire for gain, for example) and cases (again like this one) without the modest economic harm or odds of detection that have opened the door to higher awards.

Exxon Shipping Co. v. Baker, 554 U.S. at 512-13.

While Guidance Endodontics argues that this case contains the kind of intentional, malicious, purely-for-financial-gain conduct that might support a ratio of ten to one, the Court does not find facts that support such an award in this particular case, which does not involve a personal injury.  Had the Defendants calculated -- similar to Ford in the famous exploding Ford Pinto litigation -- that

38

some risk of personal injury to the public was worth a cost savings in the manufacture of its products, the Court might feel differently.  But the present case involves financial injury only, and the injury involved is not one experienced by the general public but instead by a competitor who was both sophisticated and adept.  See Motion at 7 (noting that "Guidance[] was a national commercial enterprise" that was "sophisticated and aided by legal counsel").  Unlike committing a criminal act, like stealing property worth a certain dollar amount, the Defendants in this case played hardball -- crossing the line into unlawful activity -- using all the resources available to them to be successful in the business.  On the other hand, the evidence showed that while Guidance Endodontics did not have the Defendant's market share, it also employed sharp business tactics with a similar motivation toward success in the business.  Goodis did not reveal, for example, that he was going to severely undercut the Defendants' price for similar products.  As a result, Goodis' move caught the Defendants by surprise.

Guidance Endontics' significant compensatory award counsels further in favor of a smaller award -- one closer to the median ration of 0.6:1.  In Exxon Shipping Co. v. Baker, the Supreme Court noted that "a single-digit maximum is appropriate in all but the most exceptional of cases, and '[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.'"  554 U.S. at 514-15 (quoting State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425).

The Court believes, like some commentators, that the Supreme Court is likely to apply a bright-line one to one limit.  Though it was ultimately decided under maritime law, the Supreme Court's reasoning in Exxon Shipping Co. v. Baker is equally applicable to the present case and indicates that remittitur on the order of one to one is appropriate.  This is particularly true because

39

of the substantial compensatory award in this case.  See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425 ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." (emphasis added)).  Nevertheless, because BMW of North America, Inc. v. Gore remains binding upon lower courts, the Court must faithfully and honestly apply the factors in that case.  Cf. Agostini v. Felton, 521 U.S. at 237("[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (citation omitted)).

## B.   THE GREATER WEIGHT OF THE *BMW OF N. AM., INC. V. GORE* GUIDEPOSTS COUNSELS IN FAVOR OF REMITTITUR.

Even if the Supreme Court's decision in Exxon Shipping Co. v. Baker is not binding in this case, and even if the Court were to limit the Supreme Court's reasoning in Exxon Shipping Co. v. Baker only to maritime cases, the guideposts in BMW of North America, Inc. v. Gore counsel in favor of remittitur.  While the Defendants breached the Manufacturing and Supply Agreement, and their actions were not in good faith, both parties to this litigation displayed tough business practices. The Court cannot find that the character of the Defendants' actions was so markedly reprehensible in comparison with the character of Guidance Endodontics' actions as to justify a punitive damages award of ten times the substantial compensatory damages awarded to Guidance Endodontics.

### 1.   The Defendants' Actions Were Not Significantly Reprehensible.

While the Defendants breached the Manufacturing and Supply Agreement with Guidance Endodontics in bad faith, the Defendants' actions can be characterized as "hard ball."  The Court finds it difficult to categorize the Defendants' conduct in this case as significantly reprehensible.

40

Three of the five factors that the Supreme Court cited in <u>State Farm Mutual Automobile Insurance Co. v. Campbell</u> -- the only factors that can be evaluated in this case involving purely economic harm -- suggest that, while the Defendants' conduct was reprehensible, it was not the sort of conduct that would support a sizeable punitive damages award.  Moreover, the purely economic harm suffered by the plaintiffs in this case does not, in the Court's view, support damages approaching ten times the compensatory damages awarded.

> **a.     Guidance Endodontics Was Somewhat Financially Vulnerable Compared to the Defendants.**

As the Defendants point out, "Dr. Goodis' company, Guidance, was a national enterprise, and Dr. Goodis' annual income as an endodontist approached or exceeded $1 million per year,"[2] and Guidance Endodontics is "sophisticated and aided by legal counsel."  Motion at 7.  As such, Guidance Endodontics is not the most vulnerable of plaintiffs.  As compared with the Defendants, however, Guidance Endodontics is financially vulnerable.  In fact, Guidance Endodontics' financial vulnerability is what motivated the Defendants' bad-faith breach of contract in this case.  As Guidance Endodontics argued at trial, and as the jury appears to have found, the Defendants undertook their sue-and-license strategy because their competitors, including Guidance Endodontics, were financially vulnerable by comparison and were therefore unable to continue to compete while also participating in the Defendants' continuing litigation.  All in all, this factor counsels slightly in favor of a finding of greater reprehensibility.

---

[2] The Defendants' present argument that Guidance Endodontics is not financially vulnerable is inconsistent with the testimony they sought to elicit at trial.  <u>See, e.g.,</u> Sept. 21, 2009 Tr. of Trial at 308:22-309:7, filed Nov. 25, 2009 (Doc. 474)(Van Der Geest)(testifying, in response to questioning from the Defendants' counsel, that Guidance Endodontics laid off all of its sales force except for two individuals, and that Guidance Endodontics in 2005/2006, 2007, and 2008 would not have made a profit even without legal fees).

While the economic inequality between Guidance Endodontics and the Defendants supports the jury's finding of some reprehensibility, the imbalance of economic power does not justify a ratio of ten to one. Rarely do two commercial entities have the same power; one almost always has more economic power than the other. The Defendants had factual notice that they had greater economic power than Guidance Endodontics and that Guidance Endodontics was economically vulnerable because of its Manufacturing and Supply Agreement with the Defendants. That vulnerability was the reason the Defendants took the action they did. They were also on notice, because of the Supreme Court's opinion in BMW of North America, Inc. v. Gore, 517 U.S. at 576 ("To be sure, infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty."), that this factor could support significant punitive damages because it suggests a finding of greater reprehensibility.

The Court does not believe, however, that the notice of the factual difference between Guidance Endodontics and the Defendants, under the case law, put the Defendants on notice that they could be subject to such a large punitive damages award. They were on notice of punitive damages, but not an award of ten to one. The award surprised everyone, including the Court (and perhaps three jurors), and was likely the result of the Defendants' decision to agree to less than a unanimous verdict. The Defendants agreed to accept a six to three verdict, see Tr. of Motions Hearing at 54:5-10 (held Sept. 1, 2009), filed March 20, 2010 (Doc. 525); Stipulation, filed Oct. 1, 2009 (Doc. 394), and three jurors disagreed in some respect with the result, see Tr. of Trial Proceedings at 17:14-19:3 (held Oct. 9, 2009), filed Nov. 16, 2009 (Doc. 468). That so many were surprised by the verdict -- even though they knew all the facts -- suggests a finding of lack of

adequate notice.  This factor suggests some punitive damages, but not a ratio of ten to one.

       **b.**     **The Defendants' Conduct Involved More Than One Act of Misconduct.**

The jury's verdict in this case reveals at least two separate instances of misconduct by the Defendants towards Guidance Endodontics.  First, the jury found that the Defendants breached the Manufacturing and Supply Agreement "with respect to the obturators."  See Redacted Jury Verdict at 2.  For this breach, the jury awarded "nominal damages" in the amount of $200,000.00.  See Redacted Jury Verdict at 4.  Second, the jury found that the Defendants breached the Manufacturing and Supply Agreement "as to the V2."  Redacted Jury Verdict at 2.  The jury awarded compensatory damages of $4.08 million for this breach, which included damages up to the time of trial of $500,000.00 as well as damages for the period from the trial through the end of the Manufacturing and Supply Agreement of $3,580,000.00.  See Redacted Jury Verdict at 4.

In addition to these breaches of the parties' Agreement, the jury also heard evidence that the Defendants made multiple misrepresentations to Guidance Endodontics' customers, including false representations that Guidance Endodontics' products were unsafe for consumers.  Accordingly, the Defendants' conduct included, for a period of time, continuing and repetitive misconduct.

Considering the Defendants' repeated actions against Guidance Endodontics, the Court cannot find that punitive damages are based on "a single event arising from a single contractual relationship," FDIC v. Hamilton, 122 F.3d at 862, as the Defendants request, see Defs.' Reply in Supp. of Motion for Remittitur at 8, filed June 17, 2010 (Doc. 597)("Reply").  On the other hand, the case does not involve multiple contracts or multiple violations.  The case involves one contract, one victim, and one economic relationship.  The punitive damages should reflect that the Defendants misbehaved in one contractual relationship, albeit in multiple ways.  While the facts indicate that

the Defendants' misconduct put them on sufficient notice of possible punitive damages, the facts do not, in the Court's view, suggest that the Defendants had fair notice that punitive damages could have been on the order of a ten to one ratio.

The Defendants' actions toward third parties who are not before the Court should not be the basis of a punitive damages award.  See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 421 ("Any proper adjudication of conduct that occurred outside Utah to other persons would require their inclusion.").  The Defendants' conduct toward its competitors other than Guidance Endodontics is, however, what the Supreme Court envisioned when it held in State Farm Mutual Automobile Insurance Co. v. Campbell: "Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff."  538 U.S. at 422.  The evidence at trial of the Defendants' conduct toward competitors other than Guidance Endodontics reflected that the Defendants' business practices, or policy of "playing hardball" to protect their patents and their market share, were consistent.

Moreover, as the Defendants point out, the Supreme Court and other United States Circuit Courts of Appeal other than the Tenth Circuit have found such conduct toward third parties relevant. See Reply at 8 (citing State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 423-24 (rejecting the plaintiffs' evidence of State Farm's actions toward third parties, because that evidence was not "of the sort that injured them"); Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co., 399 F.3d 224, 232 (3rd Cir. 2005)("The 'repeated conduct' cited in Gore involved not merely a pattern of contemptible conduct within one extended transaction (i.e., the sale of one automobile to Dr. Gore), but rather specific instances of similar conduct by defendants in relation to other parties."); Chicago Title Ins. Co. v.

Magnuson, 487 F.3d 985, 1000 (6th Cir. 2007)(holding that, "we interpreted the repeated conduct factor to require that the similar reprehensible conduct be committed against various different parties rather than repeated reprehensible acts within the single transaction with plaintiff," (internal quotation omitted) and, "[w]hen assessing whether the defendant's behavior was sufficiently reprehensible to support an award of punitive damages, the Supreme Court has noted that consideration of the defendant's conduct against other parties across the country is instructive to the analysis").

### c.    The Defendants Acted with Intentional Malice.

The Defendants acknowledge, as they must, that "the jury concluded that the economic harm in this case was the result of malice, trickery, or deceit." Reply at 10. They nonetheless argue that their malicious intent was not so reprehensible as to justify an award of forty million dollars or a punitives to compensatories ratio of nearly ten to one. See Reply at 10. Guidance Endodontics argues that such an award is entirely appropriate, noting that the Defendants' actions were taken to augment profit, a motivation that the Supreme Court specifically mentioned in its most recent punitive damages decision. See Pl.'s Memo. of Law in Opp. to Defs.' Motion for Remittitur ("Response") at 16, filed May 24, 2010 (Doc. 575)(quoting Exxon Shipping Co. v. Baker, 554 U.S. at 494 ("Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as of course does willful or malicious action, taken with a purpose to injure.")).

The Court finds that, while other factors relevant to the reprehensibility guidepost may counsel in favor of a significant reduction in punitive damages, this factor, standing alone, does not. The evidence in this case demonstrates a motive on the part of the Defendants to preserve their

market share and to maintain or augment their profits at considerable risk to Guidance Endodontics. This motive is, even in the context of a case involving purely economic harm, sufficiently reprehensible to support significant punitive damages.

**II.     A PUNITIVE TO COMPENSATORY DAMAGES RATIO OF ONE TO ONE IS THE MAXIMUM PENALTY PERMITTED UNDER THE LAW IN THIS CASE.**

Recognizing that this case does not involve physical harm and that the Defendants' conduct is not indicative of indifference or reckless disregard of human health and safety, the Court finds that case will not support a ratio of punitive to compensatory damages in the range of ten to one.  To the extent that the Supreme Court would permit an award in that range to stand at all, given its recent opinion in the Exxon Shipping Co. v. Baker case, the Court finds that such awards should be reserved for cases involving both physical harm and, at the very least, indifference to the health and safety of others.  In State Farm Mutual Automobile Insurance Co. v. Campbell, the Supreme Court stated that, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  538 U.S. at 425 (emphasis added).

The Court is likewise unpersuaded that the Defendants' actions in this case are sufficiently reprehensible to give fair notice of a punitive to compensatory damage ratio approaching six to one. See, e.g., Cont'l Trend Res., Inc. v. OXY USA Inc., 101 F.3d at 643 (remitting punitive damages award to six to one, finding that the range of four to one to ten to one appropriate in cases "involving commercial litigation with substantial actual and potential damages").  In the Court's view, no ratio greater than three to one is appropriate, given that the parties would have had adequate notice from the UPA that actual damages would be trebled upon a showing of willful misconduct.  See NMSA 1978, § 57-12-10(B).

The jury awarded substantial compensatory damages in this case. Even before the Supreme Court suggested a one to one limit for compensatory to punitive damages, it stated that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425. The Court therefore concludes that the due-process guarantee requires it to remit the punitive damages to no more than the amount of the compensatory damages.

While the Defendants' wealth is not a basis for awarding punitive damages, the Court is persuaded that consideration of the Defendants' wealth is appropriate when evaluating whether a remittitur of punitive damages would serve the purpose of deterring such future misconduct. Here, an award of less than four million dollars might not resonate appropriately with the Defendants, particularly in light of the evidence of their past practices. Moreover, a lesser verdict would fail, in the Court's view, to honor a majority of the jurors' apparently strong feelings that a large punitive damages award was appropriate in this case. The Court will therefore grant the Defendants' Motion in part.

## III.   THE JURY'S NOMINAL AWARD OF $200,000.00 WILL BE REMITTED TO $1.00 CONSISTENT WITH DELAWARE LAW AND TENTH CIRCUIT PRECEDENT.

The Defendants argue that remittitur of the jury's "nominal" award of $200,000.00 is mandatory under Delaware law. Motion at 17-18 (collecting case law). Guidance Endodontics contends that remittitur is not appropriate, because the Defendants failed to object to the Verdict Form in this case, which did not instruct the jury that nominal damages were limited. See Response at 33. Further, Guidance Endodontics argues that Delaware law does not impose a cap on nominal damages but rather merely references a common-law tradition of awarding nominal damages

between six cents and one dollar.  See Response at 33-34.

The Court agrees with the Defendants.  The verdict form in this case contained several references to "nominal damages."  Under the heading, "Guidance's Claim for Nominal Damages," the verdict form asked the jury to: "Please state whether Guidance is entitled to nominal damages for the violation of the Manufacturing and Supply Agreement related to the obturators."  Redacted Jury Verdict at 4, filed October 9, 2009 (Doc. 441).  The jury was then instructed: "In a lump sum, state the amount of nominal damages you are awarding to Guidance."  Redacted Jury Verdict at 5.

Like the verdict in Corpus v. Bennett, the verdict in the present case was internally consistent.  Moreover, the Court in the present case adequately instructed the jury that nominal damages were on the order of one dollar.  Compare Court's Final Jury Instructions (GIVEN) at 29, filed Oct. 8, 2009 (Doc. 430-1) ("Jury Instructions") with Corpus v. Bennett, 430 F.2d at 914 (noting that the trial court had given the following instruction: "If you find that the plaintiff has sustained substantial damages, then you may return a verdict for plaintiff in some nominal sum such as one dollar.").  The present case is therefore distinguishable from Auwood v. Harry Brandt Booking Office, Inc., where the United States Court of Appeals for the Second Circuit noted that the jury instructions on nominal damages failed to specify a dollar amount such as one dollar and therefore "could well have been interpreted as meaning that nominal damages were simply the minimum amount the jury found plaintiffs should be awarded."  850 F.2d at 893.  The Court in the present case further explained -- albeit with regard to potential damages available for Guidance Endodontics' alleged breach of contract as opposed to the claims against the Defendants -- that: "Nominal damages are not given as an equivalent for the wrong, but rather merely in recognition of a technical

48

injury and by way of declaring the rights of Dentsply and Tulsa Dental."  Tr. of Trial Proceedings

at 227:15-18 (held Oct. 7, 2009), filed Nov. 9, 2009 (Doc. 460); Jury Instructions at 68, filed

October 8, 2009 (Doc. 430-1).  Under these circumstances and as the Eighth Circuit held in Corpus

v. Bennett, the Court has "a duty to make the nominal damages award conform to the law."  430

F.3d at 916.

## IV.    RETRIAL, IN THE EVENT THAT GUIDANCE ENDODONTICS DECLINES TO ACCEPT THE COURT'S REMITTED AWARD, WILL INCLUDE BOTH LIABILITY AND DAMAGES.

Should Guidance Endodontics reject the Court's remitted award, the Court will conduct a

full-blown retrial.  The character of the Defendants' conduct, which is the basis of any punitive

damages award, is neither distinct nor separable from the question of the Defendants' liability.  See

Gasoline Prods. Co. v. Champlin Ref. Co., 283 U.S. at 500.  As the Tenth Circuit has previously

held: "A punitive damage claim is not an independent cause of action separate from the balance of

a plaintiff's case."  Mason v. Texaco, Inc., 948 F.2d at 1554.  Moreover, as a practical matter, the

jury empaneled upon retrial would have to hear most of the evidence in the case to determine

damages.  Retrial, if necessary, will therefore be had in full, including both liability and damages.

**IT IS ORDERED** that Dentsply/TDP's Motion for Remittitur, or, In the Alternative, For

a New Trial Under Rule 59, filed April 28, 2010 (Doc. 549) is granted.  Plaintiff Guidance

Endodontics, LLC is ordered to remit $35,919,999.00 of its punitive damages award and

$199,999.00 of its "nominal damages" award, leaving it with a total compensatory damages award

of $4,080,000.00, nominal damages of $1.00, and a total punitive damages award of $4,080,001.00.

If Guidance chooses not to accept this remitted amount, it shall so advise the Court in writing no

49

later than ten days from the entry of this order, and a new trial as to both liability and damages will

be scheduled.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kyle C. Bisceglie
Renee M. Zaystev
Olshan, Grundman, Frome, Rosenzweig
  & Wolosky, LLP
New York, New York

-- and --

John J. Kelly
Donald A. DeCandia
Ryan Flynn
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Albuquerque, New Mexico

    *Attorneys for the Plaintiff and Counter Defendants*

Brian M. Addison
  Vice President, Secretary, and General Counsel
Dentsply International, Inc.
York, Pennsylvania

-- and --

Thomas P. Gulley
Rebecca Avitia
Bannerman & Johnson, PA
Albuquerque, New Mexico

-- and --

R. Ted Cruz
Morgan Lewis & Bockius, LLP
Houston, Texas

-- and --

Howard M. Radzely
W. Brad Nes
Morgan Lewis & Bockius, LLP
Washington, D.C.

*Attorneys for the Defendants and Counter Plaintiffs*